**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

HOMELAND INSURANCE COMPANY OF        :
DELAWARE,                                                      :
                                                                      :        CIVIL ACTION
    Plaintiff,                             :
                                                                      :
    v.                                       :        NO. 2:17-cv-02415-CDJ
                                                                      :
THE DEVEREUX FOUNDATION,              :
                                                                      :
    Defendant.                          :

<u>**ORDER**</u>

   **AND NOW**, this _____ day of _____, 2017, upon consideration of the

Motion To Dismiss Plaintiff's Amended Complaint For Declaratory Judgment Pursuant To

Federal Rule Of Civil Procedure 12(b)(6) (the "<u>Motion</u>") of Defendant The Devereux Foundation

("<u>Devereux</u>"), it is hereby **ORDERED** and **DECREED** that the Motion is **GRANTED**, and,

accordingly, Plaintiff's Amended Complaint for Declaratory Judgment against Devereux is hereby

**DISMISSED** with prejudice in its entirety. The Court finds that Plaintiff Homeland Insurance

Company of Delaware ("<u>Homeland</u>") is obligated to provide indemnity coverage to Devereux for

the underlying Eric Johnson litigation pursuant to Homeland's 2014-2016 professional liability

insurance policy (Policy No. MPP-6333-14).

        **BY THE COURT:**

      _____

                  J.

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| HOMELAND INSURANCE COMPANY OF DELAWARE, | : | |
| | : | |
| | : | CIVIL ACTION |
| Plaintiff, | : | |
| | : | |
| v. | : | NO. 2:17-cv-02415-CDJ |
| | : | |
| THE DEVEREUX FOUNDATION, | : | |
| | : | |
| Defendant. | : | |

**MOTION TO DISMISS PLAINTIFF'S AMENDED COMPLAINT FOR
DECLARATORY JUDGMENT PURSUANT TO FEDERAL RULE 12(b)(6)**

Pursuant to Federal Rule of Civil Procedure 12(b)(6), and for reasons further set out in the

attached Memorandum of Law and accompanying exhibits, which are incorporated herein by

reference, Defendant The Devereux Foundation moves for entry of an order in the attached form

dismissing the Amended Complaint for Declaratory Judgment of Plaintiff Homeland Insurance

Company of Delaware in its entirety.

Respectfully submitted,

**MITTS LAW, LLC**

*/s/ Gerard M. McCabe*
Gerard M. McCabe, Esquire
Geoffrey Paul Huling, Esquire
Jennifer M. Adams, Esquire
Attorney I.D. Nos. 66564/758000/319337
1822 Spruce Street
Philadelphia, PA 19103
(215) 866-0120 (telephone)
(215) 866-0121 (facsimile)
gmccabe@mittslaw.com
ghuling@mittslaw.com
jadams@mittslaw.com

*Attorneys for Defendant
The Devereux Foundation*

Dated:  September 12, 2017

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| HOMELAND INSURANCE COMPANY OF DELAWARE, | : | |
| | : | |
| | : | CIVIL ACTION |
| Plaintiff, | : | |
| | : | |
| v. | : | NO. 2:17-cv-02415-CDJ |
| | : | |
| THE DEVEREUX FOUNDATION, | : | |
| | : | |
| Defendant. | : | |

**MEMORANDUM OF LAW IN SUPPORT OF
MOTION TO DISMISS AMENDED COMPLAINT FOR
DECLARATORY JUDGMENT PURSUANT TO FEDERAL RULE 12(b)(6)**

Defendant The Devereux Foundation ("Devereux"), by and through its undersigned counsel, hereby submits this Memorandum of Law in support of its Motion to Dismiss (the "Motion") Plaintiff's Amended Complaint for Declaratory Judgment (the "Amended Complaint") pursuant to Federal Rule of Civil Procedure 12(b)(6). For the reasons set forth herein, the Court should dismiss the Amended Complaint in its entirety for failure to state a claim upon which relief can be granted.

## I.   PRELIMINARY STATEMENT

Devereux is a non-profit corporation that has provided behavioral health services to vulnerable children and adults since being established in the 1930s. Devereux, among other things, operates residential treatment facilities that provide treatment to minors. Amended Complt. ¶7. For many years, Plaintiff Homeland Insurance Company of Delaware ("Homeland") has issued liability insurance policies to Devereux. In March 2017, a Philadelphia jury entered an $11 million verdict against Devereux in a civil action filed by Eric Johnson (the "*Johnson* Litigation"). Rather than honor its contractual obligations, Homeland filed this declaratory judgment action in an effort

1

to abandon its insured based upon the concocted assertion that Devereux provided late notice of the *Johnson* Litigation to Homeland. Unfortunately for Homeland, the plain language of the policy and the allegations set forth in Homeland's Amended Complaint (the "Amended Complaint") unequivocally demonstrate that Devereux provided Homeland with timely notice of the *Johnson* Litigation. Indeed, the trial in the *Johnson* Litigation did not occur until over two years after Homeland received notice of the lawsuit from Devereux, during which time Homeland actively collaborated with Devereux in defending the *Johnson* Litigation and even encouraged Devereux to take the case to verdict.

It is undisputed that Devereux provided notice of the *Johnson* Litigation to Homeland during the policy term of a "claims made" policy issued by Homeland for the period July 1, 2014, through June 30, 2016 (the "14-16 Policy"). *See id.* ¶47. The plain terms of the 14-16 Policy require that notice of a claim be provided to Homeland no later than June 30, 2016, and Homeland admits that Devereux notified it concerning the *Johnson* Litigation by December 16, 2014. *Id.*[1]   Faced with the prospect of paying a significant multi-million dollar claim as the result of the *Johnson* Litigation verdict against Devereux, Homeland is now belatedly arguing that the service of a Writ of Summons (the "Writ") on Devereux in June 2014 somehow triggered a notice obligation under the **prior** policy (the "13-14 Policy"). According to Homeland, because Devereux failed to provide Homeland with notice of the *Johnson* Litigation before the end of the policy period of that 13-14 Policy (*i.e.*, on or before June 30, 2014), coverage for the *Johnson* Litigation is excluded under **both** the 13-14 Policy and the 14-16 Policy.

---

[1] Actually, notification of the *Johnson* Amended Complaint to Homeland occurred prior to December 16, 2014, but Homeland's allegations in its Amended Complaint are taken as true for purposes of this Motion to Dismiss.

The Amended Complaint, despite including numerous other quotations from the 13-14 Policy, utterly ignores its definition of a "**Claim**." That "**Claim**" definition is critical in underscoring the lack of merit to Homeland's claims. The 13-14 Policy requires two (2) elements to be present before Devereux had a duty to notify Homeland of the *Johnson* Litigation (neither of which exists in this case). **First**, the 13-14 Policy's definition of a "**Claim**" requires the pleading to include a demand for monetary damages.[2] **Second**, the 13-14 Policy's definition of a "**Claim**" requires the claimed damages to have "resulted" from alleged wrongful conduct within the scope of the 13-14 Policy.[3] Importantly, the definition of a "**Claim**" in the 13-14 Policy does **not**: (i) require the consideration of Devereux's subjective knowledge of the historical facts underlying the *Johnson* Litigation or the Shykir Crew criminal trial; or (ii) include a "litigation filing" or "service of suit" notice trigger that might have required notice to Homeland in the event litigation was instituted through the filing of a Writ of Summons.[4]

Homeland's arguments fail because the service of the Writ upon Devereux in June 2014 (less than ten days before the end of the 13-14 Policy) neither constituted a demand for monetary damages under the terms of the 13-14 Policy nor contained any allegation that monetary damages were the result of any wrongful conduct.[5] The Writ, a feature unique to Pennsylvania civil

---

[2] *See* Amended Compl. at Exh. C (II. Definitions) ("'**Claim**' means a written demand . . . for monetary damages . . . .").

[3] The wrongful conduct is defined to include both an "**Occurrence**" and a "**Wrongful Act**," each of which are further defined by the 13-14 Policy, and includes accidents and omissions.

[4] As set forth in greater detail herein, Homeland clearly could have included broader notice language in the 13-14 Policy if Homeland had so desired. Indeed, Homeland changed the definition of "claim" in the 14-16 Policy.

[5] *See* Amended Compl. at Exh. C (II. Definitions) ("'**Claim**' means a written demand . . . for monetary damages resulting from a **Wrongful Act** or an **Occurrence**.").

procedure, only served to toll the statute of limitations on Johnson's potential claims against the eight defendants. It did not make any demand upon Devereux, did not require Devereux to take any action and did not place Devereux into any legal jeopardy. The Writ, once filed, could have sat indefinitely without any ill effect on Devereux. Alternatively, Johnson could have withdrawn the Writ or dismissed it without making (i) a monetary demand on Devereux or (ii) any allegation of wrongful conduct against Devereux.

Homeland filed its Amended Complaint after Devereux had filed its original motion to dismiss. In amending its complaint, Homeland made no substantive changes to its legal claims; instead Homeland merely added several additional factual paragraphs that provided additional information about the underlying facts and the involvement of certain Devereux personnel and employees in the Crew criminal trial and *Johnson* Litigation. *See* Amended Compl. ¶¶7-24, 69. The apparent purpose for the inclusion of this additional information is that Homeland believes that Devereux's subjective knowledge regarding the underlying facts of the Crew criminal trial and *Johnson* Litigation created an obligation, where one did not exist, upon receipt of the Writ, to report the *Johnson* Litigation claim during the policy period of the 13-14 Policy. Homeland's position is not sustainable because, in effect, it seeks to re-write the strict definition of a "**Claim**" to its advantage and to the prejudice of its insured, to permit the consideration of the purported subjective knowledge of the insured. The definition of a "**Claim**," as set forth in detail below, does not account for or permit such consideration of the insured's subjective knowledge, when determining the existence of a "**Claim**." As such, Homeland's inclusion of these additional paragraphs has no bearing upon this Court's analysis of whether the Writ constituted a "**Claim**."

While the Writ "commences an action" under Pennsylvania law, the "commencement of

4

an action" against Devereux does not require Devereux to provide notice of a "**Claim**" to Homeland under the terms of the applicable 13-14 Policy because Homeland opted not to include the "service of summons" as part of the definition of a "**Claim**."[6] The filing of a writ of summons in Pennsylvania makes no legal claim against the named defendant, much less one that could be characterized as one seeking damages for wrongful conduct within the definition of the 13-14 Policy. Thus, while service of the Writ on Devereux in June 2014 suggested that there was the potential for the subsequent filing of a complaint (which would necessarily include both a demand and likely allegation of wrongful conduct), that potentiality did not require Devereux to report the *Johnson* Litigation to Homeland under the 13-14 Policy. Instead, Devereux's timely reporting of the *Johnson* Litigation to Homeland by December 16, 2014 (shortly after Johnson's initial complaint was filed in October 2014) secured Devereux's indemnity coverage under the 14-16 Policy. Therefore, this Court should dismiss the Amended Complaint in its entirety because it fails to state a viable claim upon which relief can be granted.

## II.   FACTUAL ALLEGATIONS IN AMENDED COMPLAINT

On May 25, 2017, Homeland filed its initial complaint, seeking a declaration that it owed no duty to indemnify Devereux with respect to the claims asserted in the *Johnson* Litigation, titled as *Eric Johnson v. Devereux Foundation et al.*, Case No. 140501360 (Phila. C.C.P.). In response, Devereux filed an initial motion to dismiss the complaint in its entirety. On August 18, 2017, Homeland filed an Amended Complaint, seeking the same declaratory judgment claims that it owed no indemnity coverage to Devereux for the *Johnson* Litigation. A true and correct copy of

---

[6] Even if Homeland had included such a provision, the Writ still would have been insufficient to trigger a duty to report a claim under the terms of the policy as the Writ does not set forth an "**Occurrence**" or "**Wrongful Act**," as defined by the 13-14 Policy, and necessary in order to constitute a "**Claim**."

the Amended Complaint, with exhibits, is attached hereto as **Exhibit 1** and incorporated herein by reference. *See also* Amended Compl. ¶55 ("Homeland seeks a declaration that it has no duty to indemnify Devereux under the 2013-14 Policy and the 2014-16 Policy for the verdict because the Johnson Claim is not covered under either policy.").

A.   **The *Johnson* Civil Litigation And Underlying Shykir Crew Criminal Trial**

On May 14, 2014, Eric Johnson ("Johnson") filed the Writ in the Philadelphia Court of Common Pleas. Amended Compl. ¶19. On or about June 20, 2014, Johnson allegedly served the Writ on Devereux. *Id.* ¶20.[7] The Writ served on Devereux merely stated that Johnson had "commenced an action against" Devereux. *See* **Exhibit 2**.[8] The Writ asserted no demand for monetary damages and contained no allegations of any conduct, much less allegations that detailed a "**Wrongful Act**" or an "**Occurrence**." *Id.*

Devereux engaged counsel to represent it in the *Johnson* Litigation who entered an appearance on behalf of Devereux on June 26, 2014. *Id.* ¶22. The Amended Complaint further cites to the civil cover sheet prepared by Johnson's attorneys, which was allegedly available on the docket when Devereux's counsel entered their appearances, that stated that the amount in controversy was "more than $50,000" and the type of case was "tort" and "negligence." A copy of the Civil Cover Sheet is attached as **Exhibit 5**.

---

[7] A copy of the Writ is attached hereto as **Exhibit 2**. Although the Amended Complaint did not attach the Writ, the Writ is referenced extensively throughout the Amended Complaint and accordingly, the Court is permitted to consider the Writ itself in rendering a decision on Devereux's Motion to Dismiss. *See Grp. Against Smog & Pollution, Inc. v. Shenango Inc.*, 810 F.3d 116, 127 (3d Cir. 2016).  In addition, as a matter of public record, the Writ can be considered in the context of a motion pursuant to Rule 12(b)(6). *Mayer v. Belichick*, 605 F.3d 223, 230 (3d Cir. 2010) (citing *Pension Benefit Guar. Corp. v. White Consol. Indus., Inc.*, 998 F.2d 1192, 1996 (3d Cir. 1993).

[8] Crew was also named as a Defendant. *Id.* ¶23.

Thereafter, the Court held a case management conference on August 22, 2014, that Devereux's counsel attended. *Id.* ¶24. Johnson subsequently filed his initial complaint in the *Johnson* Litigation on October 6, 2014, and then filed an amended complaint on December 23, 2014 (the "*Johnson* Amended Complaint"). *Id.* ¶25.

The *Johnson* Amended Complaint alleges that Devereux was negligent in failing to properly hire and/or instruct its employees on procedures for monitoring the whereabouts of Devereux residents; failing to properly maintain and supervise the premises; and failing to supervise its employees. *Id.* ¶27 (citing Exh. B at ¶13). The *Johnson* Amended Complaint also alleges that Devereux was responsible for assault and battery because it stood *in loco parentis* for Shykir Crew ("Crew"), knew of the danger he posed to others, and failed to prevent foreseeable harm. *Id.* ¶28 (citing Exh. B at ¶36).

The underlying allegations in the *Johnson* Litigation regarded Crew who allegedly eloped without permission from Devereux's Glenmoore, Pennsylvania facility on the evening of June 22, 2011 (*id.* ¶8), and who, in the early morning of June 23, 2011, allegedly traveled to West Philadelphia, where he attempted to rob and then shot Johnson, causing severe bodily injuries to Johnson. *Id.* ¶¶9, 26.

According to the Amended Complaint, on July 25, 2011, a detective from the Philadelphia Police Department contacted Devereux's facility in Glenmoore, Pennsylvania, to inquire as to Crew's whereabouts on the night in question. *Id.* ¶10. The Amended Complaint asserts that, upon information and belief, on July 28, 2011, two detectives from the Philadelphia Police Department, along with three Pennsylvania State Troopers, executed a search and seizure warrant on Crew's dorm room at Devereux's Glenmoore, Pennsylvania facility. *Id.* ¶11.

At that time, the Amended Complaint asserts, upon information and belief, that Devereux employee Byron Lee was present during the execution of the warrant and, as a result of this warrant, Devereux turned over records to the police regarding other incidents when Crew had gone AWOL from the facility, including incidents on May 15, 2011, and July 5, 2011. *Id.* ¶12. The Amended Complaint next asserts that, upon information and belief, on September 16, 2011, the Philadelphia District Attorney's office communicated with Devereux about another Devereux client who was allegedly communicating with Crew about going AWOL. *Id.* ¶13. On November 29, 2011, Crew was arrested and charged with the shooting of Johnson. *Id.* ¶14.

The Amended Complaint asserts that, on February 10, 2014, Devereux employee Byron Lee, the same employee allegedly present during the execution of the search warrant, testified as a witness at Crew's criminal trial related to the Johnson shooting (*id.* ¶15), and that, on February 12, 2014, Devereux employee Steven Rose testified as a witness at Crew's criminal trial related to the Johnson shooting. *Id.* ¶16.  The criminal trial against Crew concluded that same day, on February 12, 2014. *Id.* ¶17. On February 18, 2014, the jury found Crew guilty of robbery, aggravated assault, carrying a loaded firearm, possession of a firearm by a minor, and possession of an instrument of crime. *Id.* ¶18.

In the subsequent *Johnson* Litigation, on March 17, 2017, a jury ruled in favor of Johnson and against Devereux in the amount of $11,031,000. *Id.* ¶29. The jury found that Devereux, through its employees, had been grossly negligent, and that such gross negligence was a factual cause of Johnson's injuries. *Id.* ¶30. On July 25, 2017, the trial judge denied Devereux's post-trial motions. *Id.* ¶31. Devereux contends that there are significant reversible errors of law committed during the *Johnson* trial, including the failure to bar Johnson's untimely lawsuit, which was filed

nearly a year after the expiration of the statute of limitations. Devereux will vigorously pursue an appeal to the Pennsylvania Superior Court.

### B.  Relevant Terms Of The Homeland Insurance Policies

As noted above, Homeland issued both the 13-14 Policy and the 14-16 Policy to Devereux.

### 1.  The 13-14 Policy (Count II)

The Insuring Agreement of the 13-14 Policy states, in pertinent part, as follows:

### I.     INSURING AGREEMENTS

**(A)     Claims Made Professional Liability Insurance:**

> The Underwriter will pay up to the applicable Limit of Liability shown in ITEM 4.A. of the Declarations on behalf of the **Insured** any **Loss**, including **Defense Expenses**, that the **Insured** is legally obligated to pay as a result of any covered **Claim** for a **Professional Services Wrongful Act** happening on or after the **Retroactive Date**; provided, that the **Claim** is first made against the **Insured** during the **Policy Period** or applicable **Extended Reporting Period**.

*Id.* ¶35.

In the General Conditions section of the 13-14 Policy, the following provisions concerning the reporting of claims are set forth:

**(D)     Reporting of Claims, Occurrences and Circumstances:**

(1)     If during the **Policy Period** or any **Extended Reporting Period**, any **Claim** for a **Wrongful Act** or an **Occurrence** under the INSURING AGREEMENT (A) or (C) is first made against any **Insured**, as a condition precedent to its right to any coverage under this Policy, the **Insured** shall give the Underwriter written notice of such **Claim** as soon as practicable thereafter, but in no event later than:

(a)     thirty (30) days after the Expiration Date or earlier cancellation date of this Policy; or

(b)     the expiration of any **Extended Reporting Period**.

*Id.* ¶36 (underline emphasis added).

The 13-14 Policy defines a "**Claim**" as a "written demand received by an **Insured** for monetary damages resulting from a **Wrongful Act** or an **Occurrence**." *See* Amended Compl. at Exh. C (II. Definitions). The 13-14 Policy defines "**Wrongful Act**" as, *inter alia*, "any **Professional Services Wrongful Act**." *Id.* A **Professional Services Wrongful Act** is defined as "any actual or alleged act, error or omission, or series of acts, errors or omissions, by an **Insured** in rendering, or failing to render, **Professional Services**." *Id.* The term "**Occurrence**" is defined as "an accident, including continuous or repeated exposure to the same harmful conditions, which results in injury or damage neither expected nor intended by the **Insured**." *Id.*

### 2. The 14-16 Policy (Count I)

Devereux renewed its insurance coverage with Homeland, which issued its 14-16 Policy. Amended Compl. ¶39. The 14-16 Policy's Insuring Agreement states:

**I.   INSURING AGREEMENTS**

**(A)   Claims Made Professional Liability Insurance:**

> The Underwriter will pay up to the applicable Limit of Liability shown in ITEM 4.A. of the Declarations on behalf of the **Insured** any **Loss** that the **Insured** is legally obligated to pay as a result of any covered **Claim** for a **Professional Services Wrongful Act** happening on or after the **Retroactive Date**; provided, that the **Claim** is first made against the **Insured** during the **Policy Period** or applicable Extended Reporting Period and reported to the Underwriter in accordance with GENERAL CONDITION (C) of this Policy.

Amended Compl. ¶41. In the General Conditions section of the 14-16 Policy, the following provisions concerning the reporting of claims are set forth:

    **(C)**      **Reporting of Claims, Occurrences and Circumstances:**

    (1)      If, during the **Policy Period** or any Extended Reporting Period, any **Claim** for a **Wrongful Act** under INSURING AGREEMENT (A) or (C) is first made against an **Insured**, as a condition precedent to its right to any coverage under this Policy, the **Insured** shall give the Underwriter written notice of such **Claim** as soon as practicable thereafter, but in no event later than:

        (a)      thirty (30) days after the Expiration Date or earlier cancellation date of this Policy; or

        (b)      the expiration of the Extended Reporting Period.

Amended Compl. ¶42.

    The 14-16 Policy defines a "**Claim**" as "any written notice received by an **Insured** that any person or entity intends to hold an **Insured** responsible for a **Wrongful Act** or an **Occurrence**." *See* Amended Compl. at Exh. D (II. Definitions). The 14-16 Policy defines "**Wrongful Act**" as, *inter alia*, "any **Professional Services Wrongful Act**." *Id.* A **"Professional Services Wrongful Act"** is defined as, *inter alia*, "any actual or alleged act, error or omission, or series of acts, errors or omissions, by an **Insured** in rendering, or failing to render, **Professional Services**." *Id.* The term "**Occurrence**" is defined as, *inter alia*, "an accident, including continuous or repeated exposure to substantially the same harmful conditions, which results in injury or damage neither expected nor intended by the **Insured**." *Id.*

    **3.**  <u>**Homeland's Failure To Reserve Its Rights**</u>

    According to the Amended Complaint, Devereux advised Homeland of the *Johnson* Litigation by December 16, 2014. Amended Compl. ¶47. On January 14, 2015, Homeland's claims manager sent Devereux a reservation of rights letter (the "<u>ROR Letter</u>"), specifically disclaiming coverage on three different bases (none of which was the failure of Devereux to provide timely

notice) and generally reserving all rights under the 14-16 Policy with respect to coverage for the *Johnson* Litigation. *Id.* ¶50. *See* ROR Letter (attached hereto as **Exhibit 3**). Contrary to the Amended Complaint's ambiguous assertion, Homeland did not purport to reserve all rights under the 13-14 Policy; rather, Homeland only purported to reserve all rights under the 14-16 Policy, which is the only policy referenced in the ROR Letter. *Id.* at 1-4. Homeland has never issued a reservation of rights letter with respect to the 13-14 Policy.

Homeland's payment obligation did not exist until Devereux paid the entirety of each claim deductible. *Id.* ¶51. Thus, Devereux did not request a defense from Homeland and paid for its own defense in the *Johnson* Litigation. *Id.* ¶¶52-53. The jury verdict handed down on March 17, 2017, exceeded the $4M deductible of the 14-16 Policy and implicated Homeland's primary $10M coverage limits pursuant to the terms of the 14-16 Policy. *Id.* ¶40.

## III.   ARGUMENT

### A. Legal Standards

#### 1. Motion To Dismiss

"[A] complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). The adequacy of a complaint is evaluated by: "(1) identifying the elements of the claim, (2) reviewing the complaint to strike conclusory allegations, and then (3) looking at the well-pleaded components of the complaint and evaluating whether all of the elements identified in part one of the inquiry are sufficiently alleged." *Malleus v. George*, 641 F.3d 560, 563 (3d Cir. 2011).

In considering a motion to dismiss, the district court properly considers the factual allegations of the complaint, documents attached to the complaint, and matters of public record. *City of Pittsburgh v. W. Penn Power Co.*, 147 F.3d 256, 259 (3d Cir. 1998). The court also may consider an exhibit attached to a motion to dismiss if it is "an undisputedly authentic document" and "plaintiff's claims are based on the document." *Grp. Against Smog & Pollution, Inc. v. Shenango Inc.*, 810 F.3d 116, 127 (3d Cir. 2016) (quoting *Pension Benefit Guar. Corp. v. White Consolid. Indus., Inc.*, 998 F.2d 1192, 1196 (3d Cir. 1993)); *accord Hughes v. UPS*, 639 Fed. Appx. 99, 103 (3d Cir. 2016).

## 2.   Interpreting Insurance Policies

The goal in construing the language of an insurance contract is to effectuate the intent of the parties as manifested by the language of the policy. *401 Fourth St. Inc. v. Investors Ins. Grp.,* 583 Pa. 445, 879 A.2d 166, 171 (2005); *Lititz Mut. Ins. Co. v. Steely,* 785 A.2d 975, 978 (Pa. 2001); *Bateman v. Motorists Mut. Ins. Co.,* 527 Pa. 241, 590 A.2d 281 (1991) (policy language is primary consideration in interpreting an insurance contract). Interpretation of insurance policy language presents a question of law and is therefore particularly relevant at the motion to dismiss stage. *Minn. Lawyers Mut. Ins. Co. v. Ahrens*, 432 Fed. Appx. 143, 147 (3d Cir. 2011) (citing *Sikirica v. Nationwide Ins. Co.*, 416 F.3d 214 (3d Cir. 2005)).

"If the words of an insurance policy are clear and unambiguous, the court must give them their plain and ordinary meaning . . . Ambiguous terms must be strictly construed against the insurer . . . ." *Id.* (citations omitted). Under Pennsylvania law, "[i]n construing a policy of insurance, [the court is] required to give plain meaning to a clear and unambiguous contract provision unless such provision violates a clearly expressed public policy." *Williams v. GEICO*,

32 A.3d 1195, 1199–1200 (Pa. 2011). *See also 401 Fourth St. Inc.,* 879 A.2d at 171.

**B.     Devereux Was Not Required To Report The *Johnson* Litigation Under The 13-14 Policy Because Service Of The Writ Is Not A "Claim" As Defined By The 13-14 Policy.**

**1.   Devereux Was Only Obligated To Report The *Johnson* Litigation Upon Receipt Of Demand For Monetary Damages And An Allegation of Wrongful Conduct Within The Scope Of Coverage.**

According to the Amended Complaint, Johnson served the Writ on Devereux on June 20, 2014, which service occurred during the policy period of the 13-14 Policy. Homeland contends that the Writ constituted a "**Claim**" under the 13-14 Policy, which allegedly triggered Devereux's reporting obligation of the *Johnson* Litigation to Homeland and precluded coverage under the 14-16 Policy. Homeland's position fails upon the plain reading of the 13-14 Policy terms that Homeland drafted.

Specifically, section IV.D.(1) of the 13-14 Policy requires notice be provided to Homeland **only** for "any **Claim** for a **Wrongful Act** or **Occurrence**." In the 13-14 Policy, a "**Claim**" is defined as a "written demand received by an Insured for monetary damages resulting from a **Wrongful Act** or an **Occurrence**."[9] *See* Amended Compl. at Exh. C (Section II. Definitions). Thus, the 13-14 Policy explicitly requires a "**Claim**" (and therefore the Writ) to include both:

(i)   a written demand for monetary damages; and
(ii)  an allegation that those damages "result" from a "Wrongful Act" or "Occurrence" within the scope of the policy

---

[9] It is notable that Homeland's Amended Complaint conspicuously omits any reference to this key definition of a "**Claim**" despite reference to the term "claim" throughout its Amended Complaint and despite extensive citation to the specific language of other provisions of the 13-14 Policy and 14-16 Policy. The Amended Complaint further fails to even mention the phrases "written demand" and "monetary damages" which are the primary constituent elements of the definition of a "**Claim**." This is only more glaring given that, even though Devereux raised this issue in its original motion to dismiss Homeland's initial complaint, Homeland still deemed the definition of a "**Claim**" under the 13-14 Policy to be insignificant for this Court's consideration of the merits of the Amended Complaint (even though Homeland highlighted the definition of a "**Claim**" under the 14-16 Policy (*see id.* ¶43)).

coverage.

*Id.* As set forth below, the Writ included neither.

### 2. The Writ Is Not A "Claim" Under The 13-14 Policy Because The Writ Made No Demand For Monetary Damages And Did Not Include Any Allegations Of Wrongful Conduct.

Consistent with the general nature of writs of summons, the Writ served on Devereux in the *Johnson* Litigation did not contain either a demand for monetary damages or any specific factual allegations of wrongdoing. Rather, the Writ merely put Devereux on notice that an undefined and undescribed "action ha[d] been commenced" against Devereux. *See* **Exhibit 2**. As a result, the Writ failed to constitute a "**Claim**" as defined by the 13-14 Policy. Accordingly, Devereux's reporting obligation did not accrue until Johnson subsequently filed and served Devereux with the *Johnson* Complaint sometime after October 6, 2014, indisputably during the policy period of the 14-16 Policy.[10]

Writs of Summons are filed to preserve a plaintiff's rights to bring potential causes of action that a plaintiff **may** decide to assert against the named defendant. For these reasons, a writ of summons provides no description of the plaintiff's claims; its purpose is merely to toll the statute of limitations. *In re Hynes*, No. 08-15634BF, 2009 WL 4938181, at *16 (Bankr. E.D. Pa. Dec. 14, 2009) (internal citations omitted) ("A writ of summons simply notifies the defendant that a civil action has been commenced, but does not set forth any claims . . . The writ's purpose is to toll the applicable statute of limitations."); *Frable v. Christmas City Hotel, LLC*, 2006 WL 6840360, at *5 (E.D. Pa. Aug. 24, 2006) ("Accordingly, it appears that under Pennsylvania law, the statute of

---

[10] Although the Amended Complaint does not state **when** Devereux was served with the *Johnson* Complaint, Homeland concedes that Devereux provided Homeland with notice of the *Johnson* Litigation no later than December 2014 (*see* Amended Compl. ¶47), which notice Homeland does not challenge as being untimely under the terms of the 14-16 Policy.

limitations for a claim against a defendant who has been properly served a writ of summons is tolled indefinitely regardless of when a complaint is filed"); *Peters v. Air Prod. & Chem., Inc.*, 2006 WL 860097, at *4 (E.D. Pa. Mar. 31, 2006) ("Under Pennsylvania law, the statute of limitations for a claim against a defendant who has been properly served with a writ of summons is tolled indefinitely regardless of when a complaint is filed ... The remedy for any hardship stemming from the indefinite filing date of the plaintiff's complaint is for a defendant to move for relief by filing a Rule to file a complaint … to force a plaintiff to promptly file a complaint.") (citing *Galbraith v. Gahagen,* 204 A.2d 251, 252 (Pa. 1964)).  Aside from not asserting any claim, a writ of summons also makes no demand for damages.

Unlike the subsequently served *Johnson* Amended Complaint, "a writ of summons is not a pleading that requires a [plaintiff] to set forth a cause of action. . . . Pa. R.C.P. No. 1351 only requires a writ of summons to include the county in which the action is brought, a caption, a short statement that the appellant has commenced an action against the stated party, a dated signature line for the prothonotary or clerk, and the seal of the court." *Lichtman v. Glazer*, 111 A.3d 1225, 1228 (Pa. Commw. 2015) (citing *Pelzer v. Wrestle*, 49 A.3d 926, 932 (Pa. Commw. 2012)); *see also In re Diet Drugs (Phentermine /Fenfluramine/Dexfenfluramine) Prod. Liab. Litig.*, 2012 WL 4757693, at *3 (E.D. Pa. Oct. 5, 2012) ("[T]he writ of summons . . . is not the 'initial pleading' because 'it does not set forth the claim for relief upon which such action is based.'"). A plaintiff who has filed a writ of summons, therefore, is free to file a complaint asserting any cause of action whatsoever. Until the plaintiff does so, the plaintiff has not asserted a claim for damages "resulting from a **Wrongful Act** or an **Occurrence**," as those terms are defined in the 13-14 Policy.

Furthermore, when only a writ of summons has been filed, there is no obligation that the defendant, such as Devereux, take any action or file any response. *See PaineWebber Inc. v. Faragalli*, 61 F.3d 1063, 1065 (3d Cir. 1995) ("Under Pennsylvania law [the defendant] was under no obligation to respond to the Writ, and [the plaintiff] was under no obligation to file an initial pleading unless requested to do so by [the defendant]). A defendant has the option to enter a rule to file a complaint against a plaintiff under Pennsylvania Rule of Civil Procedure 1037, but is not required to do so.[11]

Homeland's counsel may assert that the civil cover sheet submitted to the Court (the "Cover Sheet") when the Writ was filed somehow placed Devereux on notice of "**Claim**" that it was required to report to Homeland. *See* **Exhibit 5**.[12] The Amended Complaint references that the Cover Sheet "stated that the amount in controversy was 'more than $50,000' and the type of case was 'tort' and 'negligence.'" *Id.* ¶23. Such an argument would be unavailing. **First**, there is no allegation in the Amended Complaint or its exhibits that that cover sheet was ever served upon Devereux (only that it was available on the docket). In this regard, the affidavits of service filed as Exh. A to the Amended Complaint detail that the document served on Devereux was only "Plaintiff's Writ of Summons." *Id.* at Exh. A. **Second**, the cover sheet, like the Writ, makes no demand on any of the eight (8) defendants and contains no specific allegations of wrongful conduct

---

[11] Interestingly, Pennsylvania Rule of Civil Procedure 1351 previously required that a writ of summons include a warning of a possible default judgment against the defendant, but this warning was later deleted in 1985. Specifically, "Rule 1351, as it existed, required that a warning of possible default judgment be placed on a writ of summons. However, a default judgment cannot be taken for failure to respond to a writ of summons. Therefore, the warning in Rule 1351 was inaccurate." Pa. R.C.P. No. 1351, cmt. This amendment further confirms that a writ of summons neither makes a demand for relief nor asserts an allegation of wrongdoing, and provides no basis for any liability.

[12] Like the Writ, the Amended Complaint did not include a copy of the Cover Sheet but cited to it. Therefore the document, as attached as **Exhibit 5**, can be considered by this Court in ruling upon this Motion to Dismiss.

by or against any of the eight (8) defendants. **<u>Third</u>**, a civil cover sheet is not an "initial pleading" that is sufficient to compel the defendant to respond. "The initial pleading ... is the complaint, not the summons, praecipe for writ of summons, **<u>or some other document like a Civil Cover Sheet</u>**." *Reifer v. Westport Ins. Corp.*, 751 F.3d 129, 136 n.5 (3d Cir. 2014) (citing *Polanco v. Coneqtec Universal*, 474 F. Supp. 2d 735, 737 (E.D. Pa. 2007) (citing Pa. R.C.P. Nos. 1007, 1017)) (emphasis added). Nor does the Cover Sheet have any independent evidentiary relevance. For these reasons, the Cover Sheet does not change the above analysis that controlling Pennsylvania law confirms that the service of the Writ does not constitute a "**Claim**" as defined by the 13-14 Policy.

### 3.   Other Courts To Have Considered the Issue, Including Pennsylvania's Appellate Courts, Have Consistently Ruled That A Writ Does Not Trigger An Insured's Obligation To Report A Claim.

This plain reading of the definition of a "**Claim**" in the 13-14 Policy is entirely consistent with how other courts have interpreted an insured's reporting obligations where the operative insurance policy included a similar definition of a "claim." *See, e.g., Russoniello v. Twin City Fire Ins. Co.*, No. CIV. A. 09-452 (PGS), 2010 WL 2024084, at *4 (D. N.J. May 20, 2010) (recognizing "a 'claim' is clearly defined as '[a] demand received by an insured for money or services alleging a negligent act, error, omission or personal injury in the rendering of or failure to render professional legal services for others'" under the plain language of the policy, and thus a letter demanding money and alleging malpractice satisfied the definition of a claim).[13]

---

[13] Despite allegations that Devereux was aware of the criminal proceedings in which Crew was convicted, the Amended Complaint contains no allegation that Devereux received any written letter or other communication from Johnson making a demand for monetary damages during the policy period of the 13-14 Policy. As noted above, the words "demand" and "monetary damages" do not even appear in the Amended Complaint. The Amended Complaint

Pennsylvania's appellate courts have also consistently held that the service of a writ of summons is insufficient to trigger a notice of a claim requirement of an insured set forth in a malpractice insurance policy under Pennsylvania's MCARE program that defined a reportable claim in the same way as Homeland's 13-14 Policy.[14] *Yussen v. Medical Care Availability & Reduction of Error Fund*, 46 A.3d 685, 692 (Pa. 2012) (writ of summons insufficient to trigger reportable claim pursuant to Section 715 of the MCARE Act); *Community Hosp. Alternative for Risk Transfer v. Ario*, 59 A.3d 63 (Pa. Commw. 2013) (same); *Cope v. Ins. Comm'r*, 955 A.2d 1043, 1049 (Pa. Commw. 2007) (for purposes of complying with the MCARE Act's 180-day reporting period under Section 715, "bare writ of summons does not contain information about the nature of the claims asserted; the applicable dates; or a description of any alleged wrongful acts.").[15]

---

is thus confined to the sole premise that service of the Writ by itself constituted a "**Claim**," which in turn allegedly obligated Devereux to provide notice to Homeland during the policy period of the 13-14 Policy.

[14] The Pennsylvania legislature enacted the Medical Care Availability and Reduction of Error ("MCARE") Act of March 20, 2002, P.L. 154, *as amended,* 40 P.S. §§ 1303.101–1303.910, which created the MCARE Fund as a statutory insurer providing medical malpractice coverage both (i) in excess of the primary layer of coverage purchased by the health care physician or hospital (*see* 40 P.S. § 1303.712), or, alternatively, in cases where more than four years have passed between the events giving rise to liability on the part of a health care provider and the making of a claim against it, (ii) as the primary "first-dollar indemnity and cost of defense" insurer (known as "Section 715 status") (*see* 40 P.S. § 1303.715).

[15] The *Cope* court offered additional explanation:

[A] bare writ of summons does not constitute valid notice of a Section 715 claim. **Since a bare writ does not include information necessary to determine what type of claim it is, or whether it would qualify for Section 715 coverage, it really cannot be considered "notice of the claim** ... first given to the [provider] ..." 40 P.S. § 1303.715(a).

955 A.2d at 1052 n.20 (emphasis supplied).

Like the interpretation of the 13-14 Policy and its definition of a "**Claim**," Pennsylvania courts have similarly interpreted the plain language of the definition of a "medical professional liability claim" under Section 715 of the MCARE program. *Bender v. Pennsylvania Ins. Dep't,* 893 A.2d 161, 163 (Pa. Commw. 2006) ("[O]ur decision turns on interpreting the phrase, "medical professional liability claim."). The *Bender* court deemed that, in order for there to be a reportable medical professional liability claim pursuant to Section 715, **first**, there had to be a "claim seeking the recovery of damages or loss from a health care provider." In effect, this is the "demand for monetary damages" requirement of the definition of a claim under the 13-14 Policy. *Id.* **Second**, the medical professional liability claim seeking a recovery of damages had to "arise out of any tort or breach of contract … resulting from … services which were or should have been provided." In effect, this is analogous to the "damages resulted from wrongful conduct" requirement of the definition of a "**Claim**" under the 13-14 Policy. *Id.*

Because the definition of a "medical professional liability claim" under Section 715 of the MCARE Act is nearly identical to the definition of a "**Claim**" under the 13-14 Policy, the Pennsylvania Supreme Court's and Commonwealth Courts' holdings that a writ of summons is insufficient to trigger the reporting of a "medical professional liability claim" under the MCARE Act is directly on point.  This court, applying Pennsylvania law, should similarly conclude that service of the Writ was insufficient to trigger Devereux's requirement to report the *Johnson* Litigation to Homeland in June 2014.[16]

---

[16] The Commonwealth Court in *Ario* also flatly rejected any suggestion that the insured held a subjective belief as to the existence of claim and that that subjective belief in some manner created a duty to report the suspected claim. *See also Ario,* 59 A.3d at 67 (discrediting any emphasis on the insured's subjective knowledge and instead finding that "[a]n individual's subjective belief … does not satisfy the objective standard discussed in *Cope* and would require a case by case analysis.").

In that regard, the Pennsylvania Supreme Court has held "that, for purposes of Section 715, **the mere filing of a praecipe for a writ of summons does not suffice to make a claim**, at least in absence of some notice or demand communicated to those from whom damages are sought." *Yussen*, 46 A.3d at 692 (emphasis supplied). *See also Ario*, 59 A.3d 63 (same); *Cope*, 955 A.2d at 1049.

The *Yussen* Court's instruction that there needed to be "**some notice or demand communicated** to those from whom damages are sought" reemphasized the requirement of a "demand" that is simply lacking in any and all writs of summons. *See Yussen*, 46 A.3d at 692 (emphasis supplied). Thus, applying the reasoning in *Yussen, Ario* and *Cope*, the Writ served upon Devereux in June 2014 failed to trigger Devereux's reporting obligations under the terms of the 13-14 Policy because the Writ did not set forth a "written demand… for monetary damages resulting from a **Wrongful Act** or an **Occurrence**." *See* Amended Compl. at Exh. C (II. Definitions). This court should apply Pennsylvania law consistently with regard to the insurance policies issued by Homeland.

### 4. Writs Of Summons Are Similarly Insufficient For Purposes Of Removal Jurisdiction Because They Fail To Specify Any Claim.

Because of their bare bones nature and failure to include any specific demand or allegations of wrongdoing, writs of summons are insufficient for purposes of establishing grounds for removal of state court litigation to federal court. *Sikirica v. Nationwide Ins. Co.*, 416 F.3d 214, 223 (3d Cir. 2005) (writs of summons do not notify a defendant "what the suit is about" and, therefore, are insufficient to trigger notice of grounds for diversity jurisdiction). *See also Gervel v. L & J Talent*, 805 F. Supp. 308, 310 (E.D. Pa. 1992) (holding that writ of summons failed to notify defendant of factual allegations on which plaintiff's claims were based, even if writ, together with state court

docket sheet, indicated that diversity jurisdiction might ultimately exist).

Similar to the federal statute (*see* 28 U.S.C. § 1446(b)(1)), that requires receipt of an "initial pleading setting forth the claim for relief upon which such action or proceeding is based" prior to invoking the 30-day period for the filing of the notice of removal, the 13-14 Policy requires receipt of a written demand for "monetary damages resulting from a **Wrongful Act** or **Occurrence**" prior to invoking the time period by which Devereux must report the claim to Homeland. Accordingly, because the Writ merely notified Devereux that Johnson had "commenced an action against [Devereux]" and did not demand monetary damages or include any factual information from which Devereux could determine whether the Writ arose from a "**Wrongful Act**" or "**Occurrence**," it is consistent with *Sikirica* and its progeny to conclude that Devereux had no duty to report the *Johnson* Litigation as a "**Claim**" during the term of the 13-14 Policy.

### 5. The Plain Definition Of A "Claim" Included In The 13-14 Policy By Homeland Is Narrow And Does Not Encompass the Service of Writs of Summons.

Homeland drafted the 13-14 Policy and its definition of a "**Claim**." In doing so, Homeland opted **not** to define a "**Claim**" so as to include the "mere service of a suit or the initiation or commencement of a litigation." *See* Amended Compl. at Exh. C (II. Definitions). Other insurance policies have included such an expanded definition of a claim and nothing prevented Homeland from doing the same. *See, e.g., Bolden v. Niagara Fire Ins. Co.*, 814 F. Supp. 444, 447 (E.D. Pa.), *aff'd*, 8 F.3d 810 (3d Cir. 1993) ("'Claim' means, whenever used in this policy, a demand received by the insured for money or services **including the service of suit** or institution of arbitration proceedings against the insured") (emphasis added); *Carosella & Ferry, P.C. v. TIG Ins. Co.*, 189 F. Supp. 2d 249, 253–54 (E.D. Pa. 2001) ("Furthermore, a 'Claim' is defined to mean

'a *demand received by the Insured for money* or services, **including the service of suit** or the institution of alternative dispute resolution or arbitration proceeding against the Insured....'") (italicized emphasis in original; underlined and bolded emphasis added); *Kashkashian v. Liberty Ins. Underwriters, Inc.*, No. CIV.A. 14-105, 2014 WL 3389115, at *2 (E.D. Pa. July 11, 2014) ("The policy defines a 'claim' as 'a demand received by you for money or services, **including the service of suit** or institution of arbitration proceedings against you, or a disciplinary proceeding'") (emphasis added).

Homeland's definition of a "**Claim**" in the 13-14 Policy lacked such "service of suit" requirement which arguably may have included the service of a writ of summons. Interestingly, in the 14-16 Policy, Homeland expanded the definition of a "**Claim**" to include the insured's receipt of a written document reflecting an "intent" by "any person or entity" to hold the insured responsible for wrongful conduct.[17] Homeland's revisions to the definition of a "**Claim**" demonstrate Homeland's ability, if it so choose, to have broadened the array of circumstances under which an insured was obligated to provide "claim" notice to Homeland.

### 6. Case Law Anticipated To Be Cited By Homeland Is Distinguishable And Fails To Support Homeland's Assertion That Devereux Breached The Claim Notice Provisions Of The 13-14 Policy And The 14-16 Policy.

Devereux anticipates that Homeland may cite to certain cases that Homeland believes supports its position that the Writ constitutes a "**Claim**" under the 13-14 Policy.[18] For the reasons

---

[17] Specifically, the 14-16 Policy, unlike the 13-14 Policy, defined "**Claim**" as "any written notice received by an **Insured** that any person or entity *intends to hold an Insured responsible* for a **Wrongful Act** or an **Occurrence**." *See* Amended Compl. at Exh. D (II. Definitions (F)) (emphasis added). The 14-16 Policy still required notice of allegations of wrongful conduct such that the Writ would still not qualify.

[18] These cases include, without limitation, the following: *Cohen & Co. v. North River Ins. Co., et al.*, No. CIV.A. 93-1860; 1994 WL 105561 (E.D. Pa. Mar. 29, 1994); *Home Ins. Co. v. Law Office of Jonathan DeYoung, P.C.*, 32 F.

set forth below, Homeland's likely reliance upon this case law would be misguided and thoroughly unavailing for several reasons. **First**, none of these decisions provided a critical analysis of whether a writ of summons was included in the specific language of a "**Claim**" under the operative policies at issue, thereby making these decisions decidedly inapplicable to this litigation which requires strict adherence to the definition of a "**Claim**" under the 13-14 Policy. **Second**, the definition of a claim in two of these decisions (*Cohen* and *DeYoung*) was far more expansive than the definition of "**Claim**" in the 13-14 Policy and thus these decisions have no applicability to the more constricted definition of a "**Claim**" in the 13-14 Policy. **Third**, in two of these decisions (*DeYoung* and *Reifer*), the insured actually conceded (by admitting or failing to object) that the writ of summons in that case was sufficient to have obligated the insured to report the claim.  Thus, the substantive issue was not ruled upon by those courts.  **Finally**, two of these decisions (*Cohen* and *DeYoung*) were decided prior to the Supreme Court's pronouncement in *Yussen* and the related appellate decisions specifically rejecting the argument that a writ of summons does not trigger an insured's claim notice requirement.

> **7. The *Cohen* Decision Failed To Provide A Critical Analysis As To Whether The Writ Of Summons Was Included In The Applicable Definition Of A Claim, Thereby Making *Cohen* Inapplicable To This Litigation.**

In *Cohen & Co. v. North River Ins. Co., et al.*, No. CIV. A. 93-1860; 1994 WL 105561 (E.D. Pa. Mar. 29, 1994), the district court, without any explication of the actual definition of a claim or the notice requirements of plaintiff Cohen & Co., Inc. ("Cohen & Co."), as the insured under the North River insurance policy (the "North River Policy"), deemed, without any analysis,

---

Supp. 2d 219 (E.D. Pa. 1998); and *Reifer v. Westport Ins. Co.*, 2012 CV 1410, 2015 Pa. Dist. & Cnty. Dec. LEXIS 364 (Lackawanna Cnty. C.C.P. Mar. 21, 2015).

that a writ of summons served on the insured in an underlying litigation constituted a claim under a claims made excess insurance policy.

Consistent with the above analysis regarding the purposes of a writ of summons, the *Cohen* court first accepted that a writ of summons "commenced an action" and tolled the statute of limitations, and rightly further concluded that the "writ gave no substantive information regarding the claim." *Id.* at *2. The *Cohen* court next made a **conclusory** determination that a "writ of summons unambiguously conveys to the defendant that a party is making a claim against it." *Id.* The *Cohen* court's finding is not predicated upon and provides no citation to the actual definition of a "claim" of the North River Policy at issue, and thus the *Cohen* decision itself is unavailing on its face as valid precedent for Homeland's position.

In an effort to uncover the actual language of the North River Policy at issue in *Cohen*, undersigned counsel located on Westlaw (at 1994 WL 16166931) the Third Circuit Brief of Cohen & Co. *See* **Exhibit 4** (the "Cohen Brief"). The Cohen Brief recited the operative notice provision of the North River Policy at issue:

> It is a condition precedent to this insurance that the insured shall:
>
> (A) **Upon notice of any claim or of an incident or circumstance likely to give rise to a claim hereunder**, give immediate written notice thereof to Crum & Forster Managers Corporation (Illinois), 200 South Wacker Drive, Chicago, IL 60607;
>
> (B) Give written notice containing particulars sufficient to identify the insured and the claimant and full information with respect to the time, place and circumstances of the act, error or omission complained of;
>
> (C) In the event claim is made **or suit is brought against the insured, immediately forward to the Company every demand, notice, summons or other process** received by him or his representative;....

*Id.* at *9 (emphasis added). This notice provision in *Cohen* includes two additional notice

requirements that do not exist with the 13-14 Policy which would explain the underlying reasoning for the *Cohen* decision. **First**, the North River Policy required Cohen and Co. to have provided notice "of an incident or circumstance **likely to give rise to a claim** hereunder." (emphasis supplied). **Second**, the North River Policy required notice in the event that a "suit is brought **[by a] demand, notice, summons or other process**." (emphasis supplied). This expansive language in the *Cohen* notice provision, while not actually cited in the *Cohen* decision, makes clear that the *Cohen* decision has zero applicability to this litigation given the vast discrepancy of the definition of a "**Claim**" in the 13-14 Policy and the notice provision in the North River Policy. In fact, the *Cohen* decision appears to have been properly decided given the expansive notice requirements under the North River Policy and the specific reference to a "suit … brought [by a] … summons …."

Moreover, a review of the two primary cases relied upon by the *Cohen* court, namely *Bensalem Twp. v. Western World Ins. Co.*, 609 F. Supp. 1343 (E.D. Pa. 1985) and *Hoyt v. St. Paul Fire & Marine Ins. Co.*, 607 F.2d 864, 867 (9th Cir. 1979), further confirm that the *Cohen* decision provides no support for Homeland's position.

In *Bensalem*, the court ruled that the filing of an EEOC claim did not constitute a claim under the applicable Western World insurance policy (the "WW Policy"). The *Bensalem* court properly noted that "[t]he question of when the 'claim' was 'first made' in this case turns on the definition of a 'claim.'" 609 F. Supp. at 1347. Because the WW Policy did not include a definition of a claim, the *Bensalem* court reviewed the notice requirements which the court deemed to be permissive allowing, but not obligating, Bensalem Township, as the insured, to report any "written or oral notice from any party that it is the intention of such party to hold the insureds responsible

for a Wrongful Act, they shall give written notice to [Western World]." *Id.* The *Bensalem* court deemed that this "notice of an intention" was antecedent to and different than a "claim" which itself was required to be reported in writing to Western World by the insured "as soon as practicable." *Id.* at 1348.

With this bifurcated definition of a "notice" and a "claim" in mind, the *Bensalem* court deemed that the filing of an EEOC claim was insufficient to compel Bensalem Township to report such EEOC claim to Western World. The *Bensalem* court ruled that the EEOC claim was at most a "notice" to Bensalem Township that the underlying plaintiff "intended to hold [Bensalem Township] responsible for a wrongful act." *Id.* The *Bensalem* court concluded that "[n]either the letter [from the EEOC] nor the attached charge of discrimination requested money or other relief; neither document stated that a lawsuit was to follow." At most, like the Writ in this case, the *Bensalem* court determined that the EEOC claim "informed [Bensalem Township] that **a demand for relief, based on a legal right, might well follow**. Neither the letter nor the charge, however, purported to be such a demand." *Id.* (emphasis added).[19]

Like the *Cohen* decision, the *Bensalem* court also cited to *Hoyt v. St. Paul Fire & Marine Ins. Co.* 607 F.2d 864, 867 (9th Cir. 1979), finding that the initial letter from a disgruntled client

---

[19] The Pennsylvania Supreme Court in *Yussen* similarly acknowledged the importance that there be a "demand" made on the insured before a "claim" needed to be reported:

> On the other hand, as used in the litigation setting, **the term [claim] often connotes conveyance of a demand to those intended to respond in damages**. Indeed, the conception of the making of a claim has attained a particular meaning (or set of meanings) in the context of claims-made policies in the insurance setting, of which the General Assembly is well aware. *See, e.g.,* 40 P.S. § 1303.702 (defining "Claims made" as "[m]edical professional liability insurance that insures those claims made or reported during a period which is insured and excludes coverage for a claim reported subsequent to the period even if the claim resulted from an occurrence during the period which was insured").

*Yussen*, 46 A.3d at 691 (emphasis supplied).

in *Hoyt* to the insured attorney was merely the request for "information and an explanation" that preceded a subsequent monetary demand and accusation of malpractice.[20] In stark contrast to the definition of a claim in the 13-14 Policy, the notice provision in *Hoyt* required the insured to "immediately forward to [the insurer] every demand, notice, **summons or other process received by him or his representative**." 607 F.2d at 867 (emphasis added). Of course, this expansive requirement in *Hoyt* (that was similar to the definition in *Cohen*) to provide the insurer notice of any "summons or other process" does not exist in the 13-14 Policy, and cannot be read into the definition of a claim in the 13-14 Policy. In distinguishing *Hoyt*, the *Bensalem* court likewise clarified its position, which is consistent with the conclusion that Devereux provided timely notice of the *Johnson* Amended Complaint to Homeland in December 2014:

> The critical factor which distinguished the initial letter in *Hoyt* from a "claim" was **the absence of a demand for some action by the policy holder**. … Because no such demand was made in Mrs. Johnson's [EEOC] charge or in the [EEOC] letter, I do not find that the charge and letter constitute a "claim" within [the WW Policy].

*Id.* at 1349 (citations omitted) (emphasis added).

In this case, the Writ served on Devereux was not a "demand for relief" and was at most a notice to Devereux as to the potentiality that Johnson might seek to hold Devereux responsible for undefined wrongful conduct. Indeed, as the *Bensalem* court ruled, the Writ did not make a "demand" on Devereux "for [any] action," and, as explained above, the service of the Writ did not compel Devereux to do anything and failed to place Devereux into any legal jeopardy.

---

[20] "If Hoyt was put on notice of any kind it was only that a claim might be expected to follow if the estate attorney was not satisfied with the explanation." 607 F.2d at 866. Similarly, the Writ preceded the actual *Johnson* Amended Complaint and could have (i) remained filed indefinitely without any further action or, alternatively, (ii) could have been withdrawn without a demand ever being made or any specific allegations being set forth in a pleading.

    **8.**  **The Definition Of A "Claim" In The 13-14 Policy Does Not Permit The Consideration Of Devereux's Subjective Knowledge Regarding The Underlying Facts Of The Crew Criminal Trial And The *Johnson* Litigation.**

Homeland's Amended Complaint includes additional paragraphs (not included in Homeland's original complaint) regarding Devereux's alleged "subjective knowledge" of the underlying facts regarding the Crew criminal trial and *Johnson* Litigation, and the participation by certain Devereux employees in the investigation of the Johnson shooting. *Id.* ¶¶7-18. By its inclusion of these new paragraphs, Homeland is asserting that this subjective knowledge, when coupled with the Writ, obligated Devereux to report the *Johnson* Litigation to Homeland during the policy period of the 13-14 Policy (which included the extended reporting period through September 1, 2014). *See Id.* ¶69 ("Despite having testified at Crew's criminal trial in February of 2014, being served with a Writ of Summons by Crew's victim in June of 2014, retaining counsel to enter an appearance in June of 2014, and attending a Case Management Conference in August of 2014, Devereux did not report the Johnson Claim to Homeland on or before September 1, 2014.").

Homeland's position is incorrect and the Pennsylvania courts have already denied the relevance of purported subjective knowledge of the insured as it specifically regards the insured's duties upon service of a writ of summons. *See, e.g., Ario*, 59 A.3d at 67 (discrediting any emphasis on the insured's subjective knowledge and instead finding that "[a]n individual's subjective belief … does not satisfy the objective standard discussed in *Cope* and would require a case by case analysis.") (citing *Cope v. Ins. Comm'r*, 955 A.2d 1043, 1050-1051 (Pa. Commw. 2007)).

In both *Ario* and *Cope*, the Commonwealth Court rejected the notion that the insured was required to have relied upon its own internal investigation or otherwise performed a new internal investigation upon receipt of the writ of summons to determine whether the **potential** claims (represented by the respective writ) would in fact come within the purview of Section 715 liability which required the insured knowing information about (i) nature of the claims asserted, (ii) the applicable dates and/or (iii) a description of any alleged wrongful acts. *Ario*, 59 A.3d at 67-68; *Cope*, 955 A.2d at 1051-1052. These courts found that such a subjective "investigative" requirement would result in *ad hoc* impractical determinations where the Section 715 analysis provided for no subjectivity.   As the *Ario* court stated, the insured does not have "verifiable" information until the complaint is actually filed. 59 A.3d at 57. In this same way, the definition of a "**Claim**" in the 13-14 Policy which requires "written demand … for monetary damages … resulting from a **Wrongful Act** or an **Occurrence**" is similarly objective. Unless the Writ in this case satisfied as a "written demand" (it did not), contained a demand for "monetary damages" (it did not), and otherwise described such damages to have resulted from either a "**Wrongful Act**" or an "**Occurrence**" (it did not), then no amount of subjective knowledge of Devereux or pre- or post-Writ investigation by Devereux's employees can convert the Writ into a "**Claim**" as objectively defined by the 13-14 Policy.

Similarly, the *Bensalem* court dismissed the insurer's assertion that the EEOC filing was a "claim" because Bensalem Township had determined itself to treat the EEOC matter as the initiation of a lawsuit. *Bensalem Twp.*, 609 F. Supp. at 1349. The *Bensalem* court found that a "prudent reaction to the filing of a discrimination charge presumably includes some internal investigation to determine whether the charge has merit. **It does not, however, follow that any**

**such investigation renders that which prompted it a 'claim.'**" *Id.* at 1349 n.7 (emphasis added).

So, even though Bensalem Township had reason to believe that a claim was imminent and was

aware of the alleged facts supporting that claim, the actual reaction and subjective knowledge of

the Bensalem Township did not magically convert a "non-claim" into a "claim."

Likewise, in *Wolfson, M.D. v. Medical Care Availability and Reduction of Error Fund*, 39

A.3d 551 (Cmwlth. Ct. 2012), the Commonwealth Court determined that the plaintiff doctor, Saul

D. Wolfson, was **not** on notice of a claim when he had received a records request for certain

medical records. In doing so, the Commonwealth Court reversed the findings of the hearing

examiner that had specifically found that

> [a]lthough the records request did not make a demand for money, **it did inform Dr. Wolfson that his former patient was represented by an attorney bringing a personal injury action**. It also informed him that the former patient was deceased and asked for all of Dr. Wolfson's records pertaining to Mr. Maurer. Along with this letter, Dr. Wolfson submitted a note providing additional specific details about the date he saw Mr. Maurer, the treatment codes, and the number of visits. **Taken all together, this information gave notice of 'specific circumstances which may result in a claim**.'

*Id.* at 557 (emphasis added). Like the Writ in the case at bar, the *Wolfson* court found that there

had not been any "demand for money" in any of the communications regarding the records

request[21] and that the records request letter at issue had provided no notice of the details of the

potential underlying claim. Similarly, the letter was not a demand and provided no detail regarding

the potential underlying claims. *Id.* at 558. So, even though Dr. Wolfson, as found by the Hearing

Examiner, was likely "subjectively" aware of "specific circumstances which may result in a

---

[21] In *Wolfson*, the underlying plaintiff had filed a subsequent writ of summons against Dr. Wolfson which, as the parties had agreed and stipulated, had constituted notice under the applicable policy because the policy, unlike the definition of a "Claim" defined in the 13-14 Policy, defined "a claim" as "a demand received by an Insured [Dr. Wolfson] for money **including the service of Suit, demand for arbitration or the institution of any other similar legal proceeding to which this policy applies**." *Id.* at 556 (emphasis added).

claim," the existence of such "special circumstances" is insufficient to trigger the existence of a "Claim" and corresponding obligation to report such claim. This same reasoning supports a rejection of Homeland's suggestion that Devereux's subjective knowledge triggers any reporting obligations under the 13-14 Policy.

Any suggestion by Homeland that Devereux had subjective knowledge of the underlying facts of the *Johnson* Litigation and Crew criminal trial, and that that subjective knowledge, when coupled with the service of the Writ, triggered Devereux's reporting obligation is inconsistent with and ignores the plain reading of the definition of a "**Claim**" under the 13-14 Policy. In effect, by its reliance on Devereux's purported subjective knowledge of the facts underlying the Crew criminal trial and *Johnson* Litigation, Homeland is attempting to re-write and/or relax the strict terms of the 13-14 Policy and asking that this Court ignore the explicit definition of a "**Claim**." Instead of requiring a "written demand" for "monetary damages," neither of which even appear in the Amended Complaint, Homeland is suggesting that Devereux should have known, based upon the Writ and the other purported facts supporting Devereux's alleged subjective knowledge, that there would be a "**Claim**" and that that potentiality triggered a reporting obligation.

However, there is no authority in the 13-14 Policy for Homeland to apply this *ad-hoc* self-serving revised definition of a "**Claim**." Even assuming that Devereux had this subjective knowledge and believed in the possibility and even the probability that a complaint would be filed and "written demand" for "monetary damages" would be made, it is still insufficient to re-write, to Devereux's prejudice, the stringent dictates of the 13-14 Policy as controlled by the actual definition of a "**Claim**."

Finally, by referencing the occurrence of a case management conference in August 2014, *see* Amended Compl. ¶¶24, 69, Homeland is wrongly suggesting that, because the case management conference occurred during the extended reporting period of the 13-14 Policy, any information learned during this August 2014 case management conference further compelled Devereux to provide notice of the *Johnson* Litigation claim prior to September 1, 2014 (which was the end date for the extending reporting period of the 13-14 Policy). That is untrue and Homeland is incorrect to rely upon the case management conference as having any significance to Devereux's reporting obligations under the 13-14 Policy. Instead, the August 2014 case management conference occurred after the end of the policy period of the 13-14 Policy and thus any information learned as a result of that case management conference would not trigger or otherwise influence Devereux's reporting obligations under the 13-14 Policy (which had already ended). The extended reporting period did not extend the policy term of the 13-14 Policy; rather, the extended reporting period only permitted Devereux as the insured to report claims (that had previously matured or accrued during the policy term of the 13-14 Policy that ended on June 30, 2014) through September 1, 2014. *See* Amended Compl. at Exh. C (§ IV(D)(1)(b)). The extended reporting period was not a new period for new "Claims" to accrue under the already ended 13-14 Policy. Thus, for this reason, the August 2014 case management conference offers no support to Homeland's erroneous position that Devereux was obligated to report the *Johnson* Litigation claim prior to September 1, 2014.

**9. The *DeYoung* And *Reifer* Decisions Similarly Fail To Support Homeland's Position Where The Insureds In Each Case Conceded That The Writ Constituted A Claim, And Further, In The Case Of *DeYoung*, The Definition Of A Claim Included "Service Of A Suit," Which Is Lacking In The Definition Of A Claim In The 13-14 Policy.**

Like the *Cohen* decision, the other decisions likely to be cited by Homeland, *DeYoung* and *Reifer*, provide no basis to support Homeland's assertion that the Writ constituted a "**Claim**" under the 13-14 Policy.

In *DeYoung*, the district court concluded that a writ of summons constituted a claim based upon an apparently unopposed assertion by the insurer **without** any consideration of whether a writ of summons was included in the definition of a claim under the applicable policy. This was because the insured in *DeYoung* provided "no response" to the insurer's allegations that the writ of summons triggered the insured's reporting requirements. *DeYoung*, 32 F. Supp. 2d at 226.[22] Thus, by his failure to respond, the insured conceded that the writ had initiated the "claim" and that this disputed claim had been untimely noticed to the insurer. Such facts are not present here.

Moreover, *DeYoung* is inapposite because the definition of a claim in that case included a "service of suit" provision that does not exist in the definition of a "**Claim**" in the 13-14 Policy. Specifically, the definition of a claim in *DeYoung* was as follows:

> Claim, whenever used in this policy, means a demand received by the Insured for money or services **including the service of suit or institution of arbitration proceedings against the Insured**.

---

[22] "Plaintiff states that Vagnoni's claim was first made by the filing of a writ of summons on July 3, 1995 in the Chester County Court of Common Pleas naming Law Offices, DWN, and Jane Doe, Administratrix of the Estate of Jonathan DeYoung as defendants. Plaintiff alleges that it first received notice of the claim on August 2, 1996 by letter from Vagnoni's counsel. Accepting these facts as true, **as there has been no response filed by Vagnoni**, Vagnoni's claim was first made … almost two months after the expiration of the last claims made policy …." *Id.* (emphasis added).

34

*Id.* (emphasis added).

In fact, the *DeYoung* court, in reviewing another disputed claim for a different insured, properly acknowledged that "[t]he question of whether [an insured's] claim was first made within the policy period depends upon the definition of 'claim.'" *Id.* at 227. The *DeYoung* court cited to the definition of the claim as set forth above (meaning a demand for money including service of a suit or summons). With regard to this second disputed claim, the *DeYoung* court engaged in an analysis of the facts as applied against that definition of a claim and concluded that, as it regarded this additional insured, certain communications did not constitute a "claim" because those disputed communications failed to include a "demand for money or services." *Id.* at 228-29.[23] For this reason, the *DeYoung* decision actually supports Devereux's, and not Homeland's, position that the Writ did not constitute a "**Claim**" because it did not include a "demand for money."

Likewise, in *Reifer*, the Lackawanna County Court of Common Pleas did not perform any analysis of the definition of a claim under the insurance policy but did note that the insured admitted that her claim was reported too late to the insurer. *Reifer,* 2015 Pa. Dist. & Cnty. Dec. LEXIS at *3-4 ("Plaintiff admits that her malpractice claim against Russo was not reported to Defendant Westport during the policy period or within sixty (60) days after the policy period expired as required by the terms of the policy."). As a result of this admission, the *Reifer* court had

---

[23] In support of this ruling that the definition of a claim controls the analysis as to whether the insured's obligation to report a claim was triggered, the *DeYoung* court not only cited to the *Hoyt* and *Bensalem* decisions, but further cited to other decisions that similarly ruled that the definition of the claim under the applicable policy is controlling. *See, e.g., United Capital Ins. Co. v. New York Marine & Gen. Ins. Co.,* No. 91–4862, 1992 WL 38343, at *3 (E.D. Pa. Feb. 19, 1992) (concluding that a letter sent to the plaintiff constituted a claim because the letter "specifies the nature of the injuries, alleges negligence on the part of the insured **and makes a demand for monies in the form of reimbursement**") (emphasis added); and *Insurance Corp. of Am. v. Dillon, Hardamon & Cohen,* 725 F. Supp. 1461, 1469 (N.D. Ind. 1988) ("The word claim requires **a demand for money or property or some specific relief, accompanied by an allegation of negligence**, malpractice, or some kind of wrongdoing.") (emphasis added).

no reason to analyze whether a writ of summons constituted a claim under the terms of the applicable policy, and thus the *Reifer* decision provides no reasoned support for Homeland's position. Like *DeYoung*, the *Reifer* decision obviously has no applicability to the facts in this litigation where Devereux, unlike the absent insured Vagnoni in *DeYoung* and the admitting *Reifer* insured, vehemently disputes that the Writ constituted a claim that triggered Devereux's obligation to report the *Johnson* Litigation in June 2014.

## C. Count I Can Be Dismissed Because Devereux Timely Noticed The *Johnson* Litigation Claim To Homeland During The 14-16 Policy Period.

Devereux first learned of a "**Claim**" against it by Johnson when it was served with the *Johnson* Amended Complaint.[24] The *Johnson* Amended Complaint qualified as a "claim" under the 14-16 Policy, as it was a written demand for monetary damages that set forth specific allegations sufficient to determine that the alleged damages resulted from either an "**Occurrence**" and/or "**Wrongful Act**" as defined by the 14-16 Policy. Thereafter, Devereux promptly reported the *Johnson* Litigation claim to Homeland, in compliance with the 14-16 Policy, by December 16, 2014. *See* Amended Compl. ¶47. The 14-16 Policy provides that when a claim is first made during the policy period, Devereux must give Homeland "written notice of such **Claim** as soon as practicable thereafter, but in no event later than: (a) thirty (30) days after the Expiration Date or earlier cancellation date of this Policy; or (b) the expiration of any Extended Reporting Period." *Id.* ¶42. Thus, the notification that Homeland received on December 16, 2014, was within the

---

[24] The Amended Complaint does not allege a date upon which the *Johnson* Amended Complaint was served on Devereux, only that Devereux allegedly first advised Homeland of the *Johnson* Litigation in mid-December 2014. Amended Compl. ¶47. Regardless, it is undisputed that Devereux provided notice of the *Johnson* litigation during the 14-16 policy period.

policy period of the 14-16 Policy. Homeland does not assert in Count I of the Amended Complaint that the notice it received on December 16, 2014 was "untimely" as to the 14-16 policy period.

Thus, because (1) a "**Claim**" was **first** made against Devereux during the policy period of the 14-16 Policy, (2) Devereux promptly reported the claim to Homeland during the policy period of the 14-16 Policy, and (3) Homeland has not asserted in the Amended Complaint that the notice given on December 16, 2014 was untimely, the Court should dismiss Count I and find that Homeland is obligated to indemnify Devereux for the *Johnson* Litigation to the fullest extent provided by the 14-16 Policy.

## IV.   CONCLUSION

For the foregoing reasons, because the service of the Writ did not qualify as a "**Claim**" under a plain reading of the 13-14 Policy, and because Devereux provided timely notice of the claim during the policy period of the 14-16 Policy, and regardless of whether Devereux held any subjective knowledge of the underlying facts regarding the *Johnson* Litigation, Defendant The Devereux Foundation respectfully requests that the Court enter an order dismissing both Counts I and II of the Amended Complaint of Homeland Insurance Company of Delaware pursuant to Federal Rule of Civil Procedure 12(b)(6).

Respectfully submitted,

**MITTS LAW, LLC**

Dated:  September 12, 2017

*/s/ Gerard M. McCabe*
Gerard M. McCabe, Esquire
Geoffrey Paul Huling, Esquire
Jennifer M. Adams, Esquire
Attorney I.D. Nos. 66564/75800/319337
1822 Spruce Street
Philadelphia, PA 19103
(215) 866-0120 (telephone)

(215) 866-0121 (facsimile)
gmccabe@mittslaw.com
ghuling@mittslaw.com
jadams@mittslaw.com

*Attorneys for Defendant*
*The Devereux Foundation*

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

HOMELAND INSURANCE COMPANY OF    :
DELAWARE,    :
    :    CIVIL ACTION
    Plaintiff,    :
    :
    v.    :    NO. 2:17-cv-02415-CDJ
    :
THE DEVEREUX FOUNDATION,    :
    :
    Defendant.    :

# EXHIBIT INDEX

| EXH. | DATE | DOCUMENT |
|:---:|:---:|---|
| **1** | 8/18/2017 | Homeland's Amended Complaint |
| **2** | 6/17/2014 | Writ of Summons in *Johnson* Litigation |
| **3** | 1/14/2015 | Reservation of Rights Letter from Homeland to Devereux |
| **4** | 4/27/1994 | The Cohen Brief |
| **5** | 5/7/2014 | Civil Coversheet from *Johnson* Litigation |

# **EXHIBIT 1**

Homeland's Amended Complaint

(dated August 18, 2017)

**GORDON & REES**
**SCULLY MANSUKHANI LLP**
Joseph A. Arnold, Esquire
I.D. No. 91103
jarnold@gordonrees.com
Katharine J. Thompson, Esquire
I.D. No. 313741
kthompson@gordonrees.com
2005 Market Street, Suite 2900
Philadelphia, PA 19103
(215) 717-4008
Attorneys for Plaintiff

## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| HOMELAND INSURANCE COMPANY OF DELAWARE | : | |
| | : | |
| Plaintiff, | : | Civil Action No. 17-2415 |
| | : | |
| v. | : | |
| | : | |
| THE DEVEREUX FOUNDATION, | : | |
| | : | |
| Defendants. | : | |

## AMENDED COMPLAINT FOR DECLARATORY JUDGMENT

Plaintiff, Homeland Insurance Company of Delaware ("Homeland"), by and through its attorneys, brings this Complaint for Declaratory Judgment against The Devereux Foundation ("Devereux"), and in support thereof, alleges as follows:

## NATURE OF THE ACTION

1.      This is an action for declaratory relief under 28 U.S.C. §§ 2201 and 2202, in which Homeland seeks a declaration that it has no duty to indemnify under policies of insurance issued to Devereux for an underlying personal injury lawsuit filed by Eric Johnson that resulted in a jury verdict against Devereux on or about March 17, 2017.

## THE PARTIES

2.     Plaintiff Homeland is a corporation organized and existing under the laws of the State of Delaware, and has its principal place of business in Plymouth, Minnesota.

3.     Defendant Devereux is a Pennsylvania non-profit with its principal place of business at 444 Devereux Drive, Villanova, PA 19085

## JURISDICTION AND VENUE

4.     This declaratory judgment action is filed pursuant to 28 U.S.C. §§ 2201, 2202 and Rule 57 of the Federal Rules of Civil Procedure to determine an actual justiciable controversy between Homeland and Devereux regarding the parties' rights under policies of insurance.

5.     This Court has diversity jurisdiction pursuant to 28 U.S.C. § 1332 because the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between citizens of different states.

6.     Venue is proper in this Court under 28 U.S.C. § 1391(a) because a substantial part of the events or omissions giving rise to this lawsuit occurred within this judicial district.

## THE CRIMINAL CASE INVOLVING DEVEREUX CLIENT SHYKIR CREW

7.     Devereux is a behavioral health care organization that, among other things, operates residential treatment facilities that provide treatment to minors.

8.     On the evening of June 22, 2011 and into the early morning of June 23, 2011, Devereux inpatient client Shykir Crew ("Crew") allegedly left Devereux's facility in Glenmoore, Pennsylvania, without permission.

9.     In the early morning of June 23, 2011, Crew allegedly traveled back to his mother's home in Philadelphia and shot Eric Johnson while attempting to rob him.

2

10.     Upon information and belief, on July 25, 2011, a detective from the Philadelphia Policy Department contacted Devereux's facility in Glenmoore, Pennsylvania, to inquire as to Crew's whereabouts on the night in question.

11.     Upon information and belief, on July 28, 2011, two detectives from the Philadelphia Police Department, along with three Pennsylvania State Troopers, executed a Search and Seizure Warrant on Crew's dorm room at Devereux's Glenmoore, Pennsylvania facility.

12.     Upon information and belief, Devereux employee Byron Lee was present during the execution of the warrant and as a result of this warrant, Devereux turned over records to the police regarding other incidents when Crew had gone AWOL from the facility, including incidents on May 15, 2011, and July 5, 2011.

13.     Upon information and belief, on September 16, 2011, the Philadelphia District Attorney's office communicated with Devereux about another Devereux client who allegedly was communicating with Crew about going AWOL.

14.     On November 29, 2011, Crew was arrested and charged with the shooting of Eric Johnson.

15.     On February 10, 2014, Devereux employee Byron Lee, the same employee present during the execution of the search warrant, testified as a witness at Crew's criminal trial related to the Johnson shooting.

16.     On February 12, 2014, Devereux employee Steven Rose testified as a witness at Crew's criminal trial related to the Johnson shooting.

17.     The criminal trial concluded that same day, on February 12, 2014.

3

18. On February 18, 2014, the jury found Crew guilty of robbery, aggravated assault, carrying a loaded firearm, possession of a firearm by a minor, and possession of an instrument of crime.

## JOHNSON'S CIVIL LAWSUIT AGAINST DEVEREUX

19. On May 14, 2014, two months after two Devereux employees testified at Crew's criminal trial involving the Johnson shooting, Johnson filed a Praecipe for Writ of Summons in the Philadelphia Court of Common Pleas, formally commencing a civil action against Devereux ("Johnson Claim"). The Johnson Claim is captioned *Jonson v. Devereux Foundation, et al.*, Case ID 140501360 (Philadelphia County Court of Common Pleas).

20. Devereux received service of the Writ of Summons on June 20, 2014. Copies of the Affidavits of Service are attached hereto as Exhibit A.

21. The Writ of Summons in no uncertain terms states that the "Plaintiff" has "commenced an action against you."

22. Within days, Devereux hired lawyers to represent it in the Johnson Claim and counsel for Devereux entered an appearance on June 26, 2014.

23. The Civil Cover Sheet, which was available on the docket when Devereux's lawyer entered their appearances, stated that the amount in controversy was "more than $50,000" and the type of case was "tort" and "negligence." Crew was also named as a Defendant.

24. A Case Management Conference was conducted on August 22, 2014, attended by Devereux's counsel.

25. Johnson filed a Complaint on October 6, 2014, and ultimately a second Amended Complaint on December 23, 2014. A copy of the Amended Complaint is attached hereto as Exhibit B.

4

26.     According to the Complaint, Devereux inpatient client Crew allegedly eloped from Devereux's Glenmoore (Pa.) facility on June 22, 2011, traveled back to West Philadelphia, and robbed and shot the plaintiff, Eric Johnson, in the early hours of June 23, 2011, causing catastrophic bodily injuries.  *See* Exhibit B at ¶¶ 1, 19-22, 35.

27.     The Complaint alleges that Devereux was negligent in failing to properly hire and/or instruct its employees on procedures for monitoring the whereabouts of Devereux residents; failing to properly maintain and supervise the premises; and failing to supervise its employees.  *See* Exhibit B at ¶ 13.

28.     The Complaint also alleges that Devereux was responsible for assault and battery because it stood *in loco parentis* for Shykir Crew, knew of the danger he posed to others, and failed to prevent foreseeable harm.  *See* Exhibit B at ¶ 36.

29.     On or about March 17, 2017, a jury ruled in favor of Johnson, and against Devereux, in the amount of $11,031,000.

30.     The jury found that Devereux, through its employees, was grossly negligent, and that such gross negligence was a factual cause of Johnson's injuries.

31.     The docket in the Johnson Claim reflects that post-trial motions were denied on July 25, 2017.

32.     Upon information and belief, Devereux will pursue an appeal.

### THE HOMELAND POLICIES

33.     Homeland issued a Health Care Organizations and Providers Professional Liability, General Liability and Employee Benefit Liability Policy to Devereux under Policy No. MPP-5447-13 for the policy period July 1, 2013 to July 1, 2014 ("2013-14 Policy").  A true and correct copy of the 2013-14 Policy is attached hereto as Exhibit C.

5

34.     The 2013-14 Policy provides limits of $4 million for Each Claim, subject to a $2 million Per Claim deductible, applicable to healthcare professional liability claims.

35.     The 2013-14 Policy's Insuring Agreement states, in pertinent part:

**I.      INSURING AGREEMENTS**

**(A)     Claims Made Professional Liability Insurance:**

> The Underwriter will pay up to the applicable Limit of Liability shown in ITEM 4.A. of the Declarations on behalf of the **Insured** any **Loss**, including **Defense Expenses**, that the **Insured** is legally obligated to pay as a result of any covered **Claim** for a **Professional Services Wrongful Act** happening on or after the **Retroactive Date**; provided, that the **Claim** is first made against the **Insured** during the **Policy Period** or applicable **Extended Reporting Period.**

36.     The 2013-14 Policy includes the following language in the General Conditions section:

**(D)     Reporting of Claims, Occurrences and Circumstances**

(1)     If, during the **Policy Period** or any **Extended Reporting Period**, any **Claim** for a **Wrongful Act** or an **Occurrence** under INSURING AGREEMENT (A) or (C) is first made against any Insured, as a condition precedent to its right to any coverage under this Policy, the **Insured** shall give the Underwriter written notice of such **Claim** as soon as practicable thereafter, but in no event later than:

(a)     thirty (30) days after the Expiration Date or earlier cancellation date of this Policy; or

(b)     the expiration of any Extended Reporting Period.

37.     The 2013-14 Policy includes Endorsement No. 4, titled "Grace Period for Notice of Claims Upon Renewal of Policy," which states that if the policy is renewed, Clause (1)(a) of General Condition (D) (in paragraph 21, above), is amended to allow Devereux sixty (60) days after the expiration of the policy period to provide written notice of a claim.

38.     The 2013-14 Policy also includes a provision in the General Conditions section related to payment of the deductible, which states in relevant part:

6

(A)     **Limits of Liability**

(8)     The **Insured** shall be responsible for payment in full of the applicable deductible or self-insured retention stated in ITEM 4 of the Declarations, and the Underwriter's obligation to pay **Loss**, including **Defense Expenses**, under this Policy shall be excess of such deductible or self-insured retention. The applicable deductible or self-insured retention shall apply to each **Claim** or **Related Claims** (subject to the applicable aggregate deductible or self-insured retention amount, if any), and shall be eroded (or exhausted) by the **Insured's** payment of **Loss**, including **Defense Expenses**. The Underwriter shall have no obligation whatsoever, either to the **Insured** or any other person or entity, to pay all or any portion of the applicable deductible or self-insured retention on behalf of the **Insured**. The Underwriter shall, however, at its sole discretion, have the right and option to do so, in which event the **Insured** will repay the Underwriter any amounts so paid.

39.     Homeland renewed the policy under Policy No. MPP-6333-14, for the policy period July 1, 2014 to July 1, 2016 ("2014-16 Policy"). A true and correct copy of the 2014-16 Policy is attached hereto as Exhibit D.

40.     The 2014-16 Policy provides limits of $10 million for Each Claim, subject to a $4 million Per Claim deductible, applicable to healthcare professional liability claims.

41.     The 2014-16 Policy's Insuring Agreement states, in pertinent part:

I.     **INSURING AGREEMENTS**

(A)     **Claims Made Professional Liability Insurance:**

The Underwriter will pay up to the applicable Limit of Liability shown in ITEM 4.A. of the Declarations on behalf of the Insured any Loss that the **Insured** is legally obligated to pay as a result of any covered **Claim** for a **Professional Services Wrongful Act** happening on or after the **Retroactive Date**; provided, that the **Claim** is first made against the **Insured** during the **Policy Period** or applicable Extended Reporting Period, and reported to the Underwriter in accordance with GENERAL CONDITION (C) of this Policy.

42.     General Condition (C) states as follows:

(C)     **Reporting of Claims, Occurrences and Circumstances:**

(1)     If, during the **Policy Period** or any **Extended Reporting Period**, any **Claim** for a **Wrongful Act** under INSURING AGREEMENT (A) or (C) is first made against any **Insured**, as a condition precedent to its right to any coverage under this Policy, the **Insured** shall give the Underwriter written notice of such **Claim** as soon as practicable thereafter, but in no event later than:

     (a)     thirty (30) days after the Expiration Date or earlier cancellation date of this Policy; or

     (b)     the expiration of any Extended Reporting Period.

43.     The 2014-16 Policy defines "claim" to mean "any written notice received by an **Insured** that any person or entity intends to hold an **Insured** responsible for a **Wrongful Act** or an **Occurrence**."

44.     The 2014-16 Policy also includes a provision in the General Conditions section related to payment of the deductible, which states in relevant part:

**(A)     Limits of Liability**

(7)(a)     The **Insured** shall be responsible for payment in full of the applicable deductible or self-insured retention stated in ITEM 4 of the Declarations, and the Underwriter's obligation to pay **Loss** or **Defense Expenses**, under this Policy shall be excess of such deductible or self-insured retention. The applicable deductible or self-insured retention shall apply to each **Claim** or **Related Claims** (subject to the applicable aggregate deductible or self-insured retention amount, if any), and shall be eroded (or exhausted) by the **Insured's** payment of **Loss** or **Defense Expenses**. The Underwriter shall have no obligation whatsoever, either to the **Insured** or any other person or entity, to pay all or any portion of the applicable deductible or self-insured retention on behalf of the **Insured**. The Underwriter shall, however, at its sole discretion, have the right and option to do so, in which event the **Insured** will repay the Underwriter any amounts so paid.

45.     The Limits of Liability provision in the 2014-16 Policy also states:

**(A)     Limits of Liability**

(7)(b)     If a "Deductible" is selected under any Insuring Agreement in ITEM 4 of the Declarations, any amounts paid within such deductible will reduce, and may exhaust, the applicable Limits of Liability for such Insuring Agreement.

8

## DEVEREUX'S INSURANCE CLAIM

46.     Devereux was served with the Writ of Summons in the Johnson Claim on June 20, 2014, during the policy period of the 2013-14 Policy.

47.     Devereux reported the Johnson Claim to Homeland on December 16, 2014, more than 60 days after the 2013-14 Policy expired.

48.     Devereux's December 16, 2014 notice also took place almost 6 months after it was served with the Writ of Summons and retained counsel, and almost 4 months after Devereux attended a Case Management Conference.

49.     Under both the 2013-14 Policy and the 2014-16 Policy, for a claim to be potentially covered, it had to be both first made during the policy period and reporting during that same policy period.

50.     On January 14, 2015, Homeland's claims manager sent Devereux a reservation of rights letter, generally reserving all rights under the policy with respect to coverage for the Johnson Claim.

51.     Homeland's coverage obligation, if any, did not exist until Devereux paid the entirety of the Each Claim deductible.

52.     Therefore, Devereux did not request a defense from Homeland.

53.     Devereux paid for and controlled the defense of the Johnson Claim.

54.     The jury verdict handed down in March of 2017 exceeds the deductible amounts of either policy, thus potentially implicating Homeland's limits.

55.     Accordingly, Homeland seeks a declaration that it has no duty to indemnify Devereux under the 2013-14 Policy and the 2014-16 Policy for the verdict because the Johnson Claim is not covered under either policy.

9

## COUNT I
### (Declaratory Judgment as to the 2014-16 Policy)

56.     Homeland incorporates herein by reference the allegations set forth in Paragraphs 1 through 55 above.

57.     An actual, justiciable controversy exists between Homeland and Devereux concerning their respective rights and obligations under the 2014-16 Policy with respect to the Johnson Claim.

58.     The 2014-16 Policy only provides coverage for a "Claim" for a "Professional Services Wrongful Act" that is "first made against the Insured during the Policy Period or applicable Extended Reporting Period, and reported to the Underwriter in accordance with GENERAL CONDITION (C) of this Policy," which requires notice no later than 30 days after expiration of the policy period.

59.     The 2014-16 Policy defines "claim" to mean "any written notice received by an **Insured** that any person or entity intends to hold an **Insured** responsible for a **Wrongful Act** or an **Occurrence**."

60.     The Claim was first made against Devereux at the latest on June 20, 2014, when it was served with the Writ of Summons.

61.     Therefore, the Claim was not first made during the 2014-16 Policy Period.

62.     Accordingly, the Johnson Claim does not fall within the scope of coverage provided by the 2014-16 Policy.

63.     Homeland therefore has no duty to indemnify Devereux for the jury verdict in the Johnson Claim under the 2014-16 Policy.

10

## COUNT II
### (Declaratory Judgment as to the 2013-14 Policy)

64.     Homeland incorporates herein by reference the allegations set forth in Paragraphs 1 through 63 above.

65.     An actual, justiciable controversy exists between Homeland and Devereux concerning their respective rights and obligations under the 2013-14 Policy with respect to the Johnson Claim.

66.     The 2013-14 Policy only provides coverage for a "Claim" for a "Professional Services Wrongful Act" that is "first made against the Insured during the Policy Period or applicable Extended Reporting Period."

67.     Furthermore, General Condition (D)(1) requires that Devereux, as a "condition precedent" to coverage, provide notice of the Claim to Homeland before the end of the policy period or any extended reporting period, which in this case was extended by the Grace Period endorsement to 60 days after the policy's July 1, 2014 expiration date.

68.     In order to satisfy conditions precedent to coverage, Devereux was obligated to report a Claim by no later than September 1, 2014, or 60 days after the policy's expiration date.

69.     Despite having testified at Crew's criminal trial in February of 2014, being served with a Writ of Summons by Crew's victim in June of 2014, retaining counsel to enter an appearance in June of 2014, and attending a Case Management Conference in August of 2014, Devereux did not report the Johnson Claim to Homeland on or before September 1, 2014.

70.     Accordingly, the Johnson Claim does not fall within the scope of coverage provided by the 2013-14 Policy.

71.     Homeland therefore has no duty to indemnify Devereux for the jury verdict in the Johnson Claim under the 2013-14 Policy.

11

WHEREFORE, Plaintiff Homeland respectfully requests that this Honorable Court enter

judgment in its favor and against Defendants, as follows:

a.  With respect to Count I, a declaration that Homeland has no duty to indemnify
    Devereux for the Johnson Claim;

b.  With respect to Count II, a declaration that Homeland has no duty to indemnify
    Devereux for the Johnson Claim; and

c.  An award to Homeland of its costs of suit and such other relief the Court deems
    just and appropriate.


Respectfully submitted,

GORDON & REES
SCULLY MANSUKHANI LLP

By:  _____

Joseph A. Arnold
I.D. No. 91103
jarnold@gordonrees.com
Katharine J. Thompson
I.D. No. 313741
kthomspon@gordonrees.com
2005 Market Street, Suite 2900
Philadelphia, PA 19103
(215) 717-4008

Dated: August 17, 2017

*Attorneys for Plaintiff Homeland Insurance
Company of Delaware*

12

EXHIBIT A

## Affidavit / Return of Service

| | |
|---|---|
| **Plaintiff:** ERIC JOHNSON | **Court Term & No.:** 140501360 |
| | E-File# 1407026426 |
| **Defendant:** DAVID WOODWARD | **Document Served:** Plaintiff's Writ of Summons |
| **Serve at:** DEVEREUX CHILDREN'S BEHAIORAL HEALTH S | **Company Reference/Control No.:** 119456 |

Served and Made Known to DAVID WOODWARD on 06/20/2014 at 01:30 PM, in the manner described below:

Agent or person in charge of Party's office or usual place of business. NAME: PATRICIA HILLIS-CLARK

| Description | Age: | Height: | Weight: | Race: | Sex: |
|---|---|---|---|---|---|
| | | | | | |
| | Other: | | | | |

| **Company Profile:** | **Name of Server:** |
|---|---|
| SHERIFF OFFICE<br>100 SOUTH BROAD STREET<br>5TH FLOOR<br>PHILADELPHIA PA 19110<br>PHONE: (215)686-3581 | Being duly sworn according to law, deposes and says that he/she is process server herein names; and that the facts herein set forth above are true and correct to the best of their knowledge, information and belief. |
| | **Deputy Sheriff:** CHESTER COUNTY SHERIFF |

**FILED AND ATTESTED PRO-PROTHY 15 JUL 2014 09:45 AM**

\\zdrafsrv 12/8/11

# Affidavit / Return of Service

| | | |
|---|---|---|
| **Plaintiff:** | ERIC JOHNSON | **Court Term & No.:** 140501360<br><br><br>E-File# 1407026354 |
| **Defendant:** | BYRON LEE<br>STEVEN ROSE | **Document Served:**<br>Plaintiff's Writ of Summons |
| **Serve at:** | DEVEREUX BRANDYWINE FACILITY DEVEREUX | **Company Reference/Control No.:**<br>119456 |

Served and Made Known to BYRON LEE AND STEVEN ROSE on 06/20/2014 at 11:25 AM, in the manner described below:

Agent or person in charge of Party's office or usual place of business. NAME: MEG RAPPOLDT

| | Age: | Height: | Weight: | Race: | Sex: |
|---|---|---|---|---|---|
| **Description** | | | | | |
| | **Other:** | | | | |

| **Company Profile:** | **Name of Server:** |
|---|---|
| SHERIFF OFFICE<br>100 SOUTH BROAD STREET<br>5TH FLOOR<br>PHILADELPHIA PA 19110<br>PHONE: (215)686-3581 | Being duly sworn according to law, deposes and says that he/she is process server herein names; and that the facts herein set forth above are true and correct to the best of their knowledge, information and belief. |
| | **Deputy Sheriff:** CHESTER COUNTY SHERIFF |

\\zdrafsrv 12/8/11

# EXHIBIT B

**MCMONAGLE, PERRI, MCHUGH & MISCHAK, P.C.**
By:    **WILLIAM M. DAVIS, ESQUIRE**          **Attorney for Plaintiff**
Identification No. 93102
1845 Walnut St., 19th Floor
Philadelphia, PA 19103
(215) 981-0999  Fax 981-0977
wdavis@mpmpc.com

---

| | | |
|---|---|---|
| **ERIC JOHNSON** | : | **COURT OF COMMON PLEAS** |
| **Plaintiff** | : | **PHILADELPHIA COUNTY** |
| vs. | : | **CIVIL SECTION** |
| | : | |
| | : | |
| **DEVEREUX FOUNDATION,** | : | **MAY TERM, 2014** |
| | : | **NO. 01360** |
| **SHYKIR CREW** | : | |
| **Defendants** | : | |

---

## AMENDED COMPLAINT – CIVIL ACTION

### NOTICE

You have been sued in court. If you wish to defend against the claims set forth in the following pages, you must take action within twenty (20) days after this complaint and notice are served, by entering a written appearance personally or by attorney and filing in writing with the court your defenses or objections to the claims set forth against you. You are warned that if you fail to do so the case may proceed without you and a judgment may be entered against you by the court without further notice for any money claimed in the complaint or for any other claim or relief requested by the plaintiff. You may lose money or property or other rights important to you.

   YOU SHOULD TAKE THIS PAPER TO YOUR LAWYER AT ONCE. IF YOU DO NOT HAVE A LAWYER, GO TO OR TELEPHONE THE OFFICE SET FORTH BELOW. THIS OFFICE CAN PROVIDE YOU WITH INFORMATION ABOUT HIRING A LAWYER.

   IF YOU CANNOT AFFORD TO HIRE A LAWYER, THIS OFFICE MAY BE ABLE TO PROVIDE YOU WITH INFORMATION ABOUT AGENCIES THAT MAY OFFER LEGAL SERVICES TO ELIGIBLE PERSONS AT A REDUCED FEE OR NO FEE.

<div align="center">

PHILADELPHIA BAR ASSOCIATION
Lawyer Referral and Information Service
One Reading Center
Philadelphia, PA 19107
Telephone: 215-238-6333

</div>

Johnson Vs Devereux Foundation Etal-CMAMD



1

## INTRODUCTORY STATEMENT

1. This is a civil action seeking money damages against Devereux Foundation and its agents, servants, workmen, representatives and employees for willful actions, reckless actions or negligent actions in the supervision of juveniles who had been placed in the charge of Devereux Foundation, which led to one such juvenile, Shykir Crew, leaving the Devereux Foundation Placement Facility where he had been ordered placed by a Judge of the First Judicial District of Pennsylvania, and once he had left the premises, on June 22 and 23, 2011, he traveled to Philadelphia and robbed and shot the Plaintiff, Eric Johnson. Plaintiff further alleges that Devereux Foundation failed to instruct, supervise and control its agents, servants, workmen, representatives and employees and that, in turn, the lack of supervision of juveniles, which led to Shykir Crew's leaving Devereux Foundation, was part of a pattern, which was a result of official policy or the custom, practice and normal behavior of the Devereux Foundation and its supervisors, agents, servants, workmen, representatives and employees. Further, the policy makers, supervisors, representatives and employees of Devereux Foundation were deliberately indifferent to the supervision of the juveniles in their charge, while knowing at all times that the juveniles posed a threat to the community if they were to leave Devereux Foundation. The deliberate, reckless and negligent lack of supervision of Shykir Crew, which allowed him to leave Devereux Foundation and return to Philadelphia, where he robbed and shot Eric Johnson, was the direct and proximate cause of the catastrophic injuries suffered by Eric Johnson.

## PARTIES

2. Plaintiff, Eric Johnson, is an adult individual currently residing at 7149 Greenway Ave., Apt. A, Philadelphia, PA 19142.

2

3. At all times referred to herein, Defendant Devereux Foundation was a business, company, entity, partnership, franchise, fictitious name, proprietorship or corporation, duly incorporated and existing under the laws of the Commonwealth of Pennsylvania. In this cause of action, Devereux Foundation acted through its supervisors, agents, servants, workmen and employees, with its principal place of business being 444 Devereux Drive, Villanova, PA 19085.

4. At all times referred to herein, Defendant Devereux Foundation maintained facilities and a place of business at 655 Sugartown Rd., Malvern, PA 19355 and Defendant David Woodward was employed by Devereux Foundation and has an acceptable and proper place for service of process at said address.

5. At all times referred to herein, Defendant Devereux Foundation maintained facilities and a place of business at Devereux Rd., Glenmore, PA 19343 and Defendant Byron Lee was employed by Devereux Foundation and has an acceptable and proper place for service of process at said address.

6. At all times referred to herein, Defendant Devereux Foundation maintained facilities and a place of business at Devereux Rd., Glenmore, PA 19343 and Defendant Byron Lee was employed by Devereux Foundation and has an acceptable and proper place for service of process at said address.

7. At all times referred to herein, Defendant Devereux Foundation maintained facilities and a place of business at 151 Wannamaker Dr., Wallace Township, Chester County, PA.

8. Defendant, Shykir Crew resides at SCI Camp Hill, 2500 Lisburn Rd., Lower Allen, PA 17001.

9. At all times referred to herein, Defendants David Woodward, Byron Lee and Steven Rose worked as agents, servants, workmen, representatives and employees of Devereux Foundation and were acting under the direction and control of Devereux Foundation, and were acting pursuant to the policy, custom, practice and usage of Devereux Foundation, and were at all times acting within the course and scope of their employment and/or agency for a common purpose with Devereux Foundation.

10. In September 2010, Shykir Crew was placed, pursuant to a First Judicial District of Pennsylvania Court of Common Pleas court order, in a facility and eventually came to reside at the Devereux Foundation, Children's Behavioral Health Services, Devereux School, located at 151 Wannamaker Drive, Wallace Township, Chester County, PA. His placement was the result of his manifest and severe behavior issues, his two arrests, one for burglary and one for drug possession, the inability of his parent to provide proper care, as well as other reasons.

11. At all times relevant hereto, Defendant Devereux Foundation owed a duty to the community members and communities from which their juvenile residents had come, to provide a safe and secure facility while the juvenile residents remained in their care, custody or control, knowing that the residents posed a threat and danger and were likely to cause harm to others if they were released or escaped prior to their release from commitment by an appropriate Court.

## COUNT ONE

## NEGLIGENCE

12. Plaintiff, Eric Johnson, incorporates by reference thereto, paragraphs one through eleven, inclusive, as though the same were set forth herein at length.

4

13. The recklessness, gross negligence, negligence and/or carelessness of the defendants consisted of the following:

      (a)    failing to properly and adequately hire and/or instruct the agents, servants, workmen, employees and/or representatives, of defendants herein, as to safe and proper procedures for monitoring the security and whereabouts of residents and/or inmates, such as Shykir Crew, who was a resident and/or inmate upon the premises;

      (f)    failing to provide and maintain proper supervision of the premises, especially providing proper security, monitoring and/or assistance to residents and/or inmates on the defendants' premises;

      (h)    failing to supervise its agents, employees, workmen and/or representatives to ensure the security and whereabouts of its residents and/or inmates;

      (l)    Negligence per se ; and

      (m)    negligence under the theory of res ipsa loquitor, there being no non-negligent cause or explanation for the occurrence described above; and

14. The circumstances under which Plaintiff was injured were such that said injuries to Plaintiff could not have occurred except by defendants' recklessness, gross negligence, negligence and/or carelessness.

15. The aforesaid incident resulted solely from the recklessness, gross negligence, negligence and carelessness of defendants herein and in no manner whatsoever due to any act or failure to act on the part of said Plaintiff.

5

16. At all times referred to herein, Defendants David Woodward, Byron Lee and Steven Rose worked as agents, servants, workmen, representatives and employees of Devereux Foundation and were acting under the direction and control of Devereux Foundation, and were acting pursuant to the policy, custom, practice and usage of Devereux Foundation, and were at all times acting within the course and scope of their employment and/or agency for a common purpose with Devereux Foundation.

17. Due to the Defendant Devereux Foundation's lack proper policies and training, a lack of supervision by the agents, servants, workmen, representatives and employees of Devereux Foundation, and the negligence of Defendant Devereux Foundation and its agents, servants, workmen, representatives and employees, Shykir Crew was allowed to leave the facility on at least one occasion, if not multiple occasions, prior to June 22, 2011. These prior incidents were known to the Defendant Devereux Foundation and were documented and recorded.

18. Although Defendant Devereux Foundation knew about Shykir Crew's prior incidents of leaving the facility without permission, and although Defendant Devereux Foundation knew of the danger that this action posed to the community, specifically the community in West Philadelphia, where Shykir Crew was known to live with his mother, Defendant Devereux Foundation took no measures to ensure the safety and security of its facility to ensure that Shykir Crew would not be able to leave the facility again.

19. On June 22, 2011, due to the Defendant Devereux Foundation's lack of and improper policies and training, a lack of supervision by the agents, servants, workmen, representatives and employees of Devereux Foundation, and the recklessness and/or negligence of Defendant Devereux Foundation and its agents, servants, workmen,

6

representatives and employees, Shykir Crew was allowed to leave the facility.

20. As a direct and proximate result of the reckless, grossly negligent and negligent acts of Defendant Devereux Foundation described above, on the night of June 22, 2011 and into the early morning of June 23, 2011, Shykir Crew was allowed to travel to his mother's home in West Philadelphia.

21. As a direct and proximate result of the reckless, grossly negligent and negligent acts of Defendant Devereux Foundation described above, on June 23, 2011, at approximately 2:00 am, while in the area of the 5300 block of Poplar St., Shykir Crew was able to , and did in fact, approach, rob and shoot Plaintiff, Eric Johnson.

22. As a direct and proximate result of the intentional, reckless or negligent acts of Defendant Devereux Foundation described above, Plaintiff, Eric Johnson, suffered serious and permanent injuries to his body, including but not limited to injuries to his back, multiple internal organs and his spine.

23. At the time of Shykir Crew's escape from the Devereux Facility, the area in which Shykir Crew was being held or housed or was occupying was being monitored and overseen by agents, servants, workmen, representatives or employees of Devereux Foundation, however, Shykir Crew was able to simply walk away from the facility, as he had done before.

24. As a direct, proximate and reasonable result of this incident, Plaintiff has been obligated to receive and undergo reasonable and necessary medical treatment and rehabilitative services for the extensive injuries he suffered and to incur various expenses for said treatment and services.

25. As a direct, proximate and reasonable result of this incident, Plaintiff will

incur various reasonable and necessary future medical expenses from the injuries he sustained and Defendants are liable for all of the same.

26. As a further direct, proximate and reasonable result of this incident, Plaintiff has suffered severe and actual loss of his gross income.

27. As a further direct, proximate and reasonable result of this incident, Plaintiff has suffered severe impairment of his earning capacity and power.

28. As a direct, proximate and reasonable result of this incident, Plaintiff will hereafter incur other financial expenses and losses.

29. As a further direct, proximate and reasonable result of this incident, Plaintiff severe physical pain, aches, mental anguish, humiliation, inconveniences and loss of life's pleasures, and he will continue to suffer same for an indefinite time into the future.

30. As a direct, proximate and reasonable result of this accident, Plaintiff has been unable to attend to his daily chores, duties and occupations and will be unable to do so for an indefinite period of time into the future.

31. At no time prior to March of 2014 did Plaintiff have any knowledge, nor was there any reasonable way that Plaintiff could have known, that Shykir Crew had ever been placed at or entrusted into the care of the Devereux Foundation. No reasonable inquiry by Plaintiff would have led him to learn of Shykir Crew's placement or escape from the Devereux Foundation facility or Devereux Foundation's negligence in allowing Mr. Crew to leave the facility.

32. Plaintiff reported the facts of his being robbed and shot to Philadelphia Police and at all times cooperated with their investigation. Plaintiff also cooperated with the Philadelphia District Attorney's Office and the prosecution of Shykir Crew. However,

Plaintiff was never told and had no reason to believe that Shykir Crew had ever been placed at the Devereux Foundation facility, and no reasonable inquiry by Plaintiff would have uncovered this information and the cause of his injury.

33. Plaintiff knew Shykir Crew from the neighborhood they lived in and was familiar with Crew's mother. In making reasonable inquiries of people in the neighborhood, the Philadelphia Police and the Philadelphia District Attorney's Office, Plaintiff never had reason to believe, and all reasonable inquiries could not have revealed, that his injuries were caused by anything more than the actions of Shykir Crew, who Plaintiff knew to be indigent.

WHEREFORE, Plaintiff, Eric Johnson, demands compensatory damages from defendants, jointly and/or severally, in a sum in excess of $50,000.00 plus interest, costs and other relief the Court may deem appropriate.

## COUNT TWO

## ASSAULT AND BATTERY

34. Plaintiff, Eric Johnson, incorporates by reference thereto, paragraphs one through thirty, inclusive, as though the same were set forth herein at length.

35. On June 22, 2011, Shykir Crew escaped from a Devereux Foundation facility and on June 23, 2011, Shykir Crew shot Plaintiff causing catastrophic injuries.

36. Devereux Foundation stood *in loco parentis* for Shykir Crew, knew of the danger he posed to others, due to his history of escapes and criminal behavior, and knew that if he escaped he was most likely to return to his mother's neighborhood, which is exactly what he did. Defendant Devereux Foundation is therefore responsible and liable for the actions of Shykir Crew, which they had reason to foresee and a duty to prevent.

9

37. At no time prior to March of 2014 did Plaintiff have any knowledge, nor was there any reasonable way that Plaintiff could have known, that Shykir Crew had ever been placed at or entrusted into the care of the Devereux Foundation. No reasonable inquiry by Plaintiff would have led him to learn of Shykir Crew's placement or escape from the Devereux Foundation facility or Devereux Foundation's negligence in allowing Mr. Crew to leave the facility.

38. Plaintiff reported the facts of his being robbed and shot to Philadelphia Police and at all times cooperated with their investigation. Plaintiff also cooperated with the Philadelphia District Attorney's Office and the prosecution of Shykir Crew. However, Plaintiff was never told and had no reason to believe that Shykir Crew had ever been placed at the Devereux Foundation facility, and no reasonable inquiry by Plaintiff would have uncovered this information and the cause of his injury.

39. Plaintiff knew Shykir Crew from the neighborhood they lived in and was familiar with Crew's mother. In making reasonable inquiries of people in the neighborhood, the Philadelphia Police and the Philadelphia District Attorney's Office, Plaintiff never had reason to believe, and all reasonable inquiries could not have revealed, that his injuries were caused by anything more than the actions of Shykir Crew, who Plaintiff knew to be indigent.

WHEREFORE, Plaintiff, Eric Johnson, demands compensatory damages from defendants, jointly and/or severally, in a sum in excess of $50,000.00 plus interest, costs and other relief the Court may deem appropriate.

**MCMONAGLE, PERRI, MCHUGH
& MISCHAK, P.C.
1845 Walnut St., 19th Floor
Philadelphia, PA 19103**

William M. Davis, Esq.
Attorney for Plaintiff, Eric Johnson

11

## VERIFICATION

WILLIAM M. DAVIS, ESQUIRE, verifies that the statements made in the foregoing AMENDED COMPLAINT are true and correct to the best of his knowledge, information and belief and understands that false statements herein are made subject to the penalties of 18 Pa. C. S. 4904, relating to unsworn falsification to authorities.

William M. Davis, Esq.
Attorney for Plaintiff, Eric Johnson

## VERIFICATION

ERIC JOHNSON, verifies that the statements made in the foregoing AMENDED

COMPLAINT are true and correct to the best of his knowledge, information and belief

and understands that false statements herein are made subject to the penalties of 18 Pa. C.

S. 4904, relating to unsworn falsification to authorities.

Eric Johnson, Plaintiff

## CERTIFICATE OF SERVICE

WILLIAM M. DAVIS, ESQUIRE, hereby certifies that a true and correct copy of

the within document has been served by first class United States mail upon:

**Yost & Tretta, LLP**
**Counsel for The Devereux Foundation**
**2 Penn Center, Suite 610**
**1500 JFK Blvd.**
**Philadelphia, PA 19102**

**Shykir Crew**
**SCI Greene**
**169 Progress Dr.**
**Waynesburg, PA 15370**

**WILLIAM M. DAVIS, ESQUIRE**
**Attorney for defendant**

Dated: _12/19/14_

14



**AutoScan Batch Card – 1 (Next Document)**

# EXHIBIT C

# OneBeacon
### PROFESSIONAL INSURANCE™

onebeaconpro.com

| RE: Hospital Professional Liability - Primary<br>Devereux Foundation | Policy |
|---|---|
| Account No: 121          Policy No: MPP-5447-13 | |

199 Scott Swamp Road | 860.321.2888 t
Farmington, CT 06032 | 860.321.2889 f



199 Scott Swamp Road     877.701.0171 t
Farmington, CT 06032     866.625.3590 f     **onebeaconpro.com**

Thanks for choosing OneBeacon Professional Insurance as your liability insurance carrier.  You now have access to a broad range of risk management resources, all designed to assist you in your efforts to advance patient safety and mitigate risk.  And, in the event you do have a claim, you have an experienced team to work with you throughout the life of the claim.

**Risk Management Information and Support at Your Fingertips**

Resources Include

- Educational programs
- Electronic newsletters and headline alerts
- Access to publications/texts
- Consultative and research services
- Sample tools
- Policy and procedure development assistance
- Risk assessments

In addition to our in-house expertise, we have a relationship with The Rozovsky Group/Virtual Group, an industry leader offering a broad range of risk management services.  As an OBPI insured, you can register to start accessing this material immediately.

- Go to [http://www.onebeaconpro.com/500](http://www.onebeaconpro.com/500)  (this will bring you to OBPI's Services Page).
- Under Risk Management Programs, click on Hospitals, Physicians and Complex Risks or Medical Facilities.
- A screen will pop up, noting that you will be leaving the OBPI website. Click on "good to go" in the upper right corner of the screen.
- You will now be on The Rozovsky Group website.
- Please click on Register in the Subscriber Login section on the left hand side of the page.
- Fill in the requested information. **Please do not request to purchase *Dialogues in Healthcare*. As an OBPI insured, you will receive a complimentary subscription to this publication.**
- Click Submit.
- Within 24 hours, you will receive an email approving your registration, and you can now access the resources available to you.
- If you have difficulty registering, please contact Joshua Rozovsky at 860.242.1302 or [josh@therozovskygroup.com](mailto:josh@therozovskygroup.com).

Please know we value your privacy and will never sell or otherwise distribute your personal information to any third party.

**Superior Claims Support**

We realize that - despite best efforts - claims sometimes do occur.  An experienced Claims Examiner is assigned for each reported claim, and will serve as a dedicated resource and point of contact.  For your convenience, claims can be submitted one of three ways:

Secure E-mail:    obpiclaims@onebeaconpro.com (You will receive an immediate email acknowledgment)
Fax:                   877.256.5067
U.S. Mail:

                     Chief Claims Officer
                     OneBeacon Professional Insurance
                     199 Scott Swamp Road
                     Farmington, CT 06032

We hope that you find these resources helpful as we strive to provide you with an entirely better insurance and risk management experience.  We welcome your feedback or questions, which can be sent to us at tellobpi@onebeaconpro.com.

If you are not the person who should be receiving this information, please forward it to the appropriate person and copy tgillis@onebeaconpro.com so we can update our files.

Thank you again for selecting OneBeacon Professional Insurance. We look forward to working with you.

Patricia Hughes, MSN, CPHRM
Vice President
Risk Management
860.321.2601
phughes@onebeaconpro.com

Tom Ruane
Vice President, Claims Leader
Medical and Professional Claims
860.321.2902
truane@onebeaconpro.com

**OneBeacon Professional Insurance Medical Professional and General Liability Claim Reporting Guidelines**

Following are examples of the types of events that should be reported in accordance with the general conditions regarding Reporting of Claims, Occurrences and Circumstances under your One Beacon policy:

- Medication errors resulting in injury and/or requiring further treatment (including patient not receiving medication; receiving incorrect dosage of medication; or receiving wrong medication)
- Falls resulting in injury
- Family/Patient complaints of inadequate care resulting in injury
- Events reported to the state Dept of Health, other regulatory body or police
- Visitor injuries
- Unexpected death
- Serious injury (including, but not limited to, paraplegia; quadriplegia; or severe neurological impairment)
- Elopement
- Allegations of physical or sexual abuse
- Sentinel events
- Oral or written demands for damages
- Lawsuits
- Communication from an attorney regarding any of the events noted above
- Request from an attorney for medical records
- Any other event the Insured reasonably believes could result in a Claim under the policy

*The above list of events is not meant to be exhaustive or exclusive. Nothing contained in or omitted from this document should be deemed a waiver of any terms or conditions of any applicable policy. These guidelines are provided for general informational purposes only and should not be considered or relied upon as coverage, legal or risk-management advice. Readers should consult the specific terms of their policy and their own legal counsel for advice.*

*Please report all claims and reportable events to:*

Chief Claims Officer
OneBeacon Professional Insurance
199 Scott Swamp Road
Farmington, CT 06032
877.256.5067 (fax)
obpiclaims@onebeaconpro.com

# Homeland Insurance Company of Delaware

One Beacon Lane
Canton, MA 02021

**Policy Number:** MPP-5447-13

## DECLARATIONS

## HEALTH CARE ORGANIZATIONS AND PROVIDERS
### PROFESSIONAL LIABILITY, GENERAL LIABILITY AND EMPLOYEE BENEFIT LIABILITY POLICY

**THE COVERAGE AFFORDED BY THIS POLICY DIFFERS IN SOME RESPECTS FROM THAT AFFORDED BY OTHER POLICIES. *PLEASE READ THIS POLICY CAREFULLY.***

| ITEM 1.    **FIRST NAMED INSURED**<br>Name and Principal Address:<br>Devereux Foundation<br>444 Devereux Dr<br>Villanova, PA 19085-1932<br><br>**OTHER NAMED INSUREDS**: | ITEM 2.    **POLICY PERIOD:**<br>(a)  Inception Date: July 1, 2013<br>(b)  Expiration Date: July 1, 2014<br><br>Both dates at 12:01 a.m. at the<br>Principal Address in ITEM 1. |
|---|---|

**ITEM 3.        COVERAGE/TYPE/RETROACTIVE DATE(S)**

| | Coverage | Type | Retroactive Date |
|---|---|---|---|
| A. | Healthcare Professional Liability | Claims Made | July 1, 1990 |
| B. | General Liability | Occurrence | N/A |
| C. | Employee Benefit Liability | Claims Made | July 1, 1990 |
| D. | Evacuation Expense | Claims Made | N/A |
| E. | Legal/Media Expense | Claims Made | N/A |

**ITEM 4.        LIMIT(S) OF LIABILITY** (inclusive of **Defense Expenses**);
**DEDUCTIBLE/SELF-INSURED RETENTION**

A.  Healthcare Professional Liability
    Each Claim……………………………………………………$4,000,000
    Aggregate for all Claims……………………………………$12,000,000
    Deductible ☒    Self-Insured Retention ☐
        Per Claim………………………………………………$2,000,000
        Aggregate………………………………………………$8,000,000

B.  General Liability
    Each Occurrence………………………….……………………$4,000,000
    Aggregate for all Claims……....…………………………............$12,000,000
    Deductible ☐    Self-Insured Retention ☒
        Per Occurrence………………………………………...Included in PL Deductible
        Aggregate………………………………………….. Included in PL Deductible

C.   Employee Benefit Liability
       Each Claim………………………………………………… $4,000,000
       Aggregate for all Claims………………………………………$12,000,000
       Deductible ☒    Self-Insured Retention ☐
               Per Claim……………………………………………$1,000
               Aggregate……………………………………………N/A
D.   Evacuation Expense
       Each Claim…………………………………………………N/A
       Aggregate for all Claims…...………………………………...N/A
       Deductible ☐    Self-Insured Retention ☐
               Per Claim……………………………………………N/A
               Aggregate……………………………………………N/A
E.   Legal/Media Expense
       Each Claim………………………………………………… N/A
       Aggregate for all Claims…...………………………………… N/A
       Deductible ☐    Self-Insured Retention ☐
               Per Claim…………………………………………… N/A
               Aggregate……………………………………………N/A

ITEM 5.     **PREMIUM:** ███████

__ *Gross Premium:*  The Underwriter will pay a percentage of the Premium shown above as brokerage commission.  The Underwriter does not pay contingent or deferred commissions. Consult your broker for information concerning commission.

 X  *Net Premium:* The Premium shown above is net, and the Underwriter will pay no brokerage commission of any kind thereon.

 X  This Policy provides coverage for acts of terrorism as defined in the Terrorism Risk Insurance Act of 2002 (the "Act").  The premium attributable to this coverage is $Included.

__ This Policy specifically excludes coverage for acts of terrorism as defined in the Act.

ITEM 6.     **ALL NOTICES REQUIRED TO BE GIVEN TO THE UNDERWRITER UNDER GENERAL CONDITION (D) OF THE POLICY MUST BE ADDRESSED TO:**

       Chief Claims Officer
       OneBeacon Professional Insurance
       199 Scott Swamp Road
       Farmington, CT 06032

| ITEM 7. | **POLICY FORM AND ENDORSEMENTS ATTACHED AT ISSUANCE:** |
|---|---|
| | G16249 02 06 |
| | HPL-P-DEVX1  Amend Definition of Insured to Include Additional Individuals |
| | HPL-P-DEVX10 Limited Waiver of Subrogation - Insuring Agreement (A) |
| | HPL-P-DEVX2  Pollution Exclusion |
| | HPL-P-DEVX6 Grace Period for Notice of Claims Upon Renewal of Policy |
| | HPL-P-0024 Min Earned Premium |
| | HPL-P-0025 Service of Suit |
| | HPL-P-DEVX9 Co-Insurance Endorsement |
| | HPL-P-DEVX7 Amend Definition of Named Insured to Include Additional Entities with Separate Retroactive Dates |
| | HPL-P-DEVX8 Amend Definition of Named Insured to Include Additional Entities |
| | HPL-P-DEVX3 Amend Definition of Insured to Include Independent Contractors |
| | HPL-P-DEVX4 Insured vs. Insured Carveback Endorsement |
| | HPL-P-0016 Medical Payments |
| | HPL-P-DEVX5 Severability Endorsement |
| | HPL-P-0017 Fire Damage |
| | HPL-P-0059 Waiver of Subrogation - GL Only |
| | HPL-P-0037 ERP Options |
| | HPL-P-DEVX11 Amend Definition of Occurrence Endorsement |
| | HPL-P-DEVX12 Spousal Extension for Insuring Agreement (B) Endorsement |
| | HPL-P-DEVX13  Amend Notice of Cancellation Endorsement |
| | HPE-100013-12--8 - Personal Information Protection |
| | FTCA-004201-11 - Additional Insured Endorsement - Primary & Non-Contributory  (GL) |
| | HPL-P-DEVX15 Amend Section III Exclusion (b)(18) f |
| | Manuscript – Quota Share Endorsement |

These Declarations, the completed signed Application, and the Policy (together with any and all endorsements thereto) shall constitute the entire agreement between the Underwriter and the Insured(s).

**Homeland Insurance Company of Delaware**
By:

_____      August 29, 2013
Its Authorized Representative                                          Date:

G16442 (2-06 ed.)

*PORTIONS OF THIS POLICY APPLY ONLY TO CLAIMS FIRST MADE AGAINST THE INSURED AND REPORTED TO THE UNDERWRITER DURING THE POLICY PERIOD.  PLEASE READ THIS POLICY CAREFULLY.*

## Homeland Insurance Company of Delaware

### HEALTH CARE ORGANIZATIONS AND PROVIDERS PROFESSIONAL LIABILITY, GENERAL LIABILITY AND EMPLOYEE BENEFIT LIABILITY POLICY

In consideration of the payment of the premium, and in reliance on all statements made and information furnished to **Homeland Insurance Company of Delaware** (hereinafter referred to as the "Underwriter"), and subject to all of the terms and conditions of this Policy (including all endorsements hereto), the Underwriter and the Insured agree as follows:

## I.  INSURING AGREEMENTS

**(A)  Claims Made Professional Liability Insurance:**

The Underwriter will pay up to the applicable Limit of Liability shown in ITEM 4.A. of the Declarations on behalf of the **Insured** any **Loss**, including **Defense Expenses**, that the **Insured** is legally obligated to pay as a result of any covered **Claim** for a **Professional Services Wrongful Act** happening on or after the **Retroactive Date**; provided, that the **Claim** is first made against the **Insured** during the **Policy Period** or applicable **Extended Reporting Period**.

**(B)  Occurrence-Based General Liability Insurance:**

The Underwriter will pay up to the applicable Limit of Liability shown in ITEM 4.B. of the Declarations on behalf of the **Insured** any **Loss**, including **Defense Expenses**, which the **Insured** is legally obligated to pay as a result of a covered **Claim** alleging **Bodily Injury**, **Property Damage**, **Advertising Injury** or **Personal Injury** that is caused by an **Occurrence** that takes place during the **Policy Period**.

**(C)  Claims Made Employee Benefit Liability Insurance:**

The Underwriter will pay up to the Limit of Liability shown in ITEM 4.C. of the Declarations on behalf of the **Insured** any **Loss**, including **Defense Expenses**, that the **Insured** is legally obligated to pay as a result of any covered **Claim** for an **Employee Benefit Wrongful Act** happening on or after the **Retroactive Date**; provided, that the **Claim** is first made against the **Insured** during the **Policy Period** or applicable **Extended Reporting Period**.

**(D)  Evacuation Expense Reimbursement Insurance:**

Upon satisfactory proof of payment by the **Named Insured**, the Underwriter will reimburse the **Named Insured** up to the amount set forth in ITEM 4(D) of the Declarations for

**Evacuation Expense** actually paid by the **Named Insured** during the **Policy Period** in connection with an **Evacuation** occurring after the **Retroactive Date**.

**(E)**   **Legal/Media Expense Reimbursement Insurance:**

Upon satisfactory proof of payment by the **Named Insured**, the Underwriter will reimburse the **Named Insured** up to the amount set forth in ITEM 4(E) of the Declarations for **Legal/Media Expense** actually paid by the **Named Insured** during the **Policy Period** in connection with a **Legal Event** occurring after the **Retroactive Date,** provided, that the Underwriter will have no liability whatsoever for fines, penalties, assessments of costs or other financial awards associated with any such **Legal Event**.

## II.   DEFINITIONS

(A)   "**Administration**" as used in connection with **Employee Benefit Programs** shall mean the following acts if authorized by the **Named Insured**:

(1)   giving counsel to **Employees** with respect to **Employee Benefit Programs**;

(2)   interpreting the **Employee Benefit Programs**;

(3)   handling records and processing of **Claims** in connection with the **Employee Benefit Programs**; and

(4)   effecting enrollment, termination or cancellation of **Employees** under **Employee Benefit Programs**.

(B)   "**Advertising Injury**" means injury arising out of one or more of the following offenses:

(1)   oral or written publication of material that slanders or libels a person or an organization or disparages a person's or an organization's goods, products or services;

(2)   oral or written publication of material that violates a person's right of privacy; or

(3)   misappropriation of advertising ideas or style of doing business.

(C)   "**Bodily Injury**" means bodily injury, sickness or disease sustained by a person, including death resulting from any of these at any time; mental anguish; and mental injury.

(D)   "**Claim**" means a written demand received by an **Insured** for monetary damages resulting from a **Wrongful Act** or an **Occurrence**.

(E)   "**Covered Contract**" means any lease of premises; sidetrack agreement; elevator maintenance agreement; easement of license agreement; obligation to indemnify a municipality if the obligation is required by ordinance and is not connected to **Insured Work** for the municipality; contract or agreement under which the **Named Insured**

assumes the tort liability of a municipality for **Bodily Injury** or **Property Damage** covered under this Policy that is sustained by others and results from **Insured Work** for the municipality; or any contract or agreement specifically listed in SCHEDULE A attached to and made part of this Policy, under which the **Named Insured** assumes the tort liability of another to pay damages for **Bodily Injury** or **Property Damage** covered by this Policy that is sustained by others.

(F)    "**Defense Expenses**" means the reasonable fees of attorneys, experts and consultants costs and expenses incurred in the investigation, adjustment, defense and or appeal of a **Claim** with the approval or at the direction of the Underwriter; provided that **Defense Expenses** shall not include:

    (1)    remuneration, salaries, overhead, fees, loss of earning reimbursement or benefit expenses of any **Insured**;

    (2)    any amounts incurred in defense of a **Claim** for which any other insurer has a duty to defend, regardless whether such other insurer undertakes such duty; or

    (3)    any benefits under an **Employee Benefit Program**.

(G)    "**Employee**" means any person who has an assigned work schedule for and is on the regular payroll of the **Named Insured**, with federal and state taxes withheld.  Independent contractors are not **Employees**.  An **Employee's** status as an **Insured** shall be determined as of the date of the **Occurrence** or **Wrongful Act** upon which a **Claim** involving the **Employee** is based.

(H)    "**Employee Benefit Programs**" means any group life insurance, group accident and health insurance, profit sharing plans, pension plans, **Employee** stock subscription plans, workers' compensation, unemployment insurance, social security and disability benefits insurance or any other similar plan under the **Administration** of the **Named Insured**.

(I)    "**Employee Benefit Wrongful Act**" means any actual or alleged act, error or omission, or series of acts, errors or omissions, by any **Insured** in the **Administration** of an **Employee Benefit Program**.

(J)    "**Employment Practices**" means any of the following: breach of any employment contract; failure or refusal to hire or employ; dismissal, discharge, reduction in force, downsizing or termination of employment, whether actual or constructive; demotion, reassignment, failure or refusal to promote, or deprivation of career opportunity; discipline of **Employees**; evaluation of **Employees**; discrimination or harassment of any kind or on any basis including, but not limited to, discrimination, limitation, segregation or classification based on race, sex, marital status, ancestry, physical or mental handicaps, age, sexual preference, pregnancy or religion or other status that is protected under any applicable federal, state or local statute or ordinance affecting any present or former **Employee** or applicant for employment; humiliation or defamation of any present or former **Employee** or applicant for employment; retaliatory treatment against an **Employee** arising out of the **Employee's** attempted or actual exercise of the **Employee's** rights under the law; employment-related misrepresentations; or failure to implement appropriate workplace or employment policies

or procedures.

(K)     "**Evacuation**" means the removal from one or more of the **Named Insured's** facilities to any other location of fifteen (15) or more patients or residents in such facility(ies) as a result of any natural or man-made occurrence that, in the reasonable judgment of the **Named Insured's** management, causes or could potentially cause such facility(ies) to be unsafe for such patients or residents.

(L)     "**Evacuation Expense"** means reasonable costs incurred in connection with an **Evacuation**, including costs associated with transporting and lodging patients or residents who have been evacuated.   **Evacuation Expense** does not include any remuneration, salaries, overhead or benefit expenses of the **Named Insured**.

(M)     "**Extended Reporting Period**" means the period of time after the **Policy Period** for reporting any **Claim** for a **Wrongful Act** or an **Occurrence** that happened after the **Retroactive Date** and before the termination of the **Policy Period**.

(N)     "**First Named Insured**" means the entity designated as such in ITEM 1 of the Declarations.

(O)     "**Hostile Fire**" means a fire which becomes uncontrollable or breaks out from where it was intended to be contained; provided, that **Hostile Fire** does not include any fire that originates at any site operating as a waste disposal facility or waste storage facility.

(P)     "**Impaired Property**" means tangible property, other than **Insured Property** or **Insured Work**, that cannot be used or is not useful because:

(1)     it incorporates **Insured Product** or **Insured Work** that is known or thought to be defective, deficient, inadequate or dangerous; or

(2)     the **Named Insured** has failed to fulfill the terms of any contract or agreement.

(Q)     "**Insured**" means any of the following:

(1)     the **Named Insured**;

(2)     any **Employee** or **Volunteer**; but only when such **Employee** or **Volunteer** is acting within the capacity and scope of his or her duties as such;

(3)     any **Insured Medical Practitioner**;

(4)     any member of the **Named Insured's** medical staff who is not an **Employee** or an **Insured Medical Practitioner**, while acting within the capacity and scope of his or her duties under the medical staff bylaws, rules and regulations, including such authority and responsibility as may be delegated to such medical staff member by the **Named Insured**, provided that such member shall not be an **Insured** under this Policy for **Claims** arising from direct patient care;

G16249 (2/06 ed.)                4

(5)     the **Named Insured's** medical directors, department heads, or chiefs of staff but only while acting within the scope and capacity of their duties to the **Named Insured**;

(6)     any member of a duly authorized board or any committee of the **Named Insured**; any person communicating information to the **Named Insured** or its medical or professional staff for the purpose of aiding in the evaluation of **Professional Services** or the qualifications, professional competence, fitness, or character of an applicant for membership or privileges on such medical or professional staff or for purposes of initiating corrective action; or any person charged with the duty of acting as a hearing officer or an agent of a judicial review committee or executing directives of any such board or committee but, in each case, only when such person is acting within the capacity and scope of his or her duties to such board or committee;

(7)     solely with respect to and limited to coverage afforded under INSURING AGREEMENT (A), the lawful spouses of individual **Insureds** and, in the event of the death, incapacity, or bankruptcy of an individual **Insured** the estates, heirs, legal representatives or assigns of such individual **Insured**;

(8)     any **Insured Medical Practitioner** or **Employee** providing **Proctoring Services** but only with respect to his or her legal liability for providing, or failing to provide, such **Proctoring Services**. The fact that a patient also may be obligated to pay for **Medical Services** rendered to the patient shall not reduce the coverage for the **Insured** to the extent of his or her **Proctoring Services**;

(9)     any person enrolled as a student in a formal training program offered by the **Named Insured** or a subsidiary or an affiliate in connection with the **Named Insured's** on-site operation as a health care organization or provider but only for such person's legal liability arising from the performance of, or failure to perform, duties relating to the on-site training program in which he or she is enrolled;

(10)    any driver or operator of **Mobile Equipment** but only when operating **Mobile Equipment** at the direction and with the permission of the **Named Insured;**

(R)     "**Insured Medical Practitioner**" means any clinical professional including, without limitation, any physician, surgeon, intern, extern, resident, certified registered nurse anesthetist, osteopathic physician and surgeon, podiatrist and dentist who, on the date of the **Occurrence** or **Wrongful Act** giving rise to any **Claim** covered by this Policy, was:

(1)     independently professionally licensed by the State in which the **Insured Medical Practitioner** is providing services for or on behalf of the **Named Insured**; and

(2)     an **Employee**.

(S)     "**Insured Product**" means:

(1)     any goods or products, other than real property, manufactured, sold, handled, distributed or disposed of by

(a)     the **Named Insured**;

(b)     others trading under the name of the **Named Insured**; or

(c)     a person or an organization whose business or assets the **Named Insured** has acquired; and

(2)     containers (other than vehicles), materials, parts or equipment furnished in connection with such goods or products. **Insured Product** includes:

(a)     warranties or representations made at any time with respect to the fitness, quality, durability, performance or use of the **Insured Product**; and

(b)     the providing of or failure to provide warnings or instructions. **Insured Product** does not include vending machines or other property rented to or located for the use of others but not sold.

**Insured Product** includes leased equipment used in or useful to the **Named Insured** in providing its services, but only if the lease for such leased equipment had an original term of six (6) months or more.  **Insured Product** does not include vending machines or other property rented to, or located for the use of, others but not sold.

(T)     "**Insured Work**" means:

(1)     work or operations performed by the **Named Insured** or on the **Named Insured's** behalf; and

(2)     materials, parts or equipment furnished in connection with such work or operations. **Insured Work** includes:

(a)     warranties or representations made at any time with respect to the fitness, quality, durability, performance or use of the **Insured Work;** and

(b)     the providing of or failure to provide warnings or instructions.

(U)     "**Legal/Media Expense**" means reasonable fees and costs of attorneys, experts and consultants, including third-party media consultants, incurred in the investigation and defense of an actual or alleged **Legal Event**.  **Legal/Media Expense** includes costs incurred in the management of public relations with respect to such **Legal Event**, but does not include any remuneration, salaries, overhead, fees, loss of earning reimbursement or benefit expenses of the **Named Insured**.

(V)     "**Legal Event**" means any criminal investigation; criminal complaint; indictment; administrative, regulatory, disciplinary or licensure proceeding; or other agency proceeding (other than proceedings in the normal course of **Named Insured's** business), in any such case relating to the alleged violation or infringement of one or more state or federal statutes or regulations regarding:

(a)   patient privacy, including the handling of protected health information;

(b)   hiring practices and reference checking with respect to potential employees; or

(c)   any other similar law or regulation applicable to operations of the **Named Insured** and intended to protect the rights or safety of patients or residents.

(W)   "**Loss**" means **Defense Expenses**, **Legal/Media Expenses**, **Evacuation Expenses** and any damages (including punitive or exemplary damages where insurable by law), settlements, judgments or other amounts in excess of the applicable Retention, if any, stated in ITEM 4 of the Declarations and not exceeding the applicable Limit of Liability stated in ITEM 4 of the Declarations which an **Insured** is legally obligated to pay as a result of a **Claim**. **Loss** shall not include:

(1)   the multiple portion of any multiplied damage award;

(2)   fines, penalties, sanctions, fees, government payments or taxes;

(3)   amounts owed to any provider of **Medical Services** under any contract;

(4)   restitution, return or disgorgement of fees, profits, charges for products or services rendered, capitation payments, premium or any other funds allegedly wrongfully held or obtained;

(5)   benefits under an **Employee Benefit Plan**;

(6)   non-monetary relief or redress in any form other than monetary compensation or monetary damages, including without limitation the cost of complying with any injunctive, declaratory or administrative relief; or

(7)   matters which are uninsurable under applicable law.

(X)   **"Managed Care Services"** means services or activities performed in the **Administration** or management of health care plans; advertising, marketing or selling health care plans or health care products; handling, investigating or adjusting **Claims** for benefits or coverages under health care plans; or establishing health care provider networks.

(Y)   "**Medical Services**" means health care, medical care, or treatment provided to any individual, including without limitation any of the following: medical, surgical, dental, psychiatric, mental health, chiropractic, osteopathic, nursing, or other professional health care; the furnishing or dispensing of medications, drugs, blood, blood products, or medical, surgical, dental, or psychiatric supplies, equipment, or appliances in connection with such care; the furnishing of food or beverages in connection with such care; the providing of counseling or other social services in connection with such care; and the handling of, or the performance of post-mortem examinations on, human bodies.

(Z)   "**Mobile Equipment**" means any of the following types of land vehicles, including any

attached machinery or equipment:

(1)      bulldozers, farm machinery, forklifts and other vehicles designed for use principally off public roads;

(2)      vehicles maintained for use solely on or next to premises owned or rented by an **Insured**;

(3)      vehicles that travel on crawler treads;

(4)      vehicles, whether self-propelled or not, maintained primarily to provide mobility to permanently mounted:

        (a)      power cranes, shovels, loaders, diggers or drills, or

        (b)      road construction or resurfacing equipment such as graders, scrapers or rollers;

(5)      vehicles not described in clauses (1)-(4) above that are not self-propelled and are maintained primarily to provide mobility to permanently attached equipment of the following types:

        (a)      air compressors, pumps and generators, including spraying, welding, building cleaning, geophysical exploration, lighting and well servicing equipment; or

        (b)      cherry pickers and similar devices used to raise or lower workers; and

(6)      vehicles not described in clauses (1)-(4) above maintained primarily for purposes other than the transportation of persons or cargos. **Mobile Equipment** does not include self-propelled vehicles with the following types of permanently attached equipment:

        (a)      equipment designed primarily for:

                (i)      snow removal;

                (ii)      road maintenance but not construction or resurfacing; or

                (iii)      street cleaning;

        (b)      cherry pickers and similar devices mounted on automobile or truck chassis and used to raise or lower workers; and

        (c)      air compressors, pumps and generators, including spraying, welding, building cleaning, geophysical exploration, lighting and well servicing equipment.

(AA)    "**Mold**" means mold, mildew, spores, mycotoxins, fungi, organic pathogens or other micro organisms of any type, nature or description whatsoever.

(BB)   "**Named Insured**" means the **First Named Insured** and each other entity designated as a **Named Insured** in ITEM 1 of the Declarations.

(CC)   "**Occurrence**" means an accident, including continuous or repeated exposure to the same harmful conditions, which results in injury or damage neither expected nor intended by the **Insured**.

(DD)   "**Peer Review**" means the process of evaluating, by members of a formal, duly constituted professional review board or committee of the **Named Insured**, any individual or entity for purposes of selecting, employing, contracting with or credentialing current or prospective providers of **Medical Services.**

(EE)   "**Personal Injury**" means injury, other than **Bodily Injury**, arising out of one or more of the following offenses:

   (1)   false arrest, detention or imprisonment;

   (2)   malicious prosecution;

   (3)   the wrongful eviction from, wrongful entry into, or invasion of the right of private occupancy of a room, dwelling or premises that a person occupies by or on behalf of its owner, landlord or lessor;

   (4)   oral or written publication of material that slanders or libels a person or an organization or disparages a person's or an organization's goods, products or services; or

   (5)   oral or written publication of material that violates a person's right of privacy.

(FF)   "**Policy Period**" means the period from the Inception Date of this Policy stated in ITEM 2(a) of the Declarations to the Expiration Date of this Policy stated in ITEM 2(b) of the Declarations or to any earlier cancellation date of this Policy.

(GG)   "**Pollutant**" means smoke, vapors, soot, fumes, acids, alkalis, toxic chemicals, liquids or gases, medical waste, waste materials (including materials which are intended to be or have been recycled, reconditioned or reclaimed) or other irritants, pollutants or contaminants. **Pollutant** does not include smoke, fumes, vapor or soot emanating from equipment used to heat or cool a building owned or operated by the **Named Insured**.

(HH)   "**Proctoring Services**" means such supervision, evaluation or instruction provided by a member of the **Named Insured's** medical staff to other members of, or applicants to, the **Named Insured's** medical staff or to residents, paramedics, trainees or **Employees** of the **Named Insured**, pursuant to medical staff bylaws, rules and regulations or by authority of a governmental authority or directive, which is required by the **Named Insured** as an obligation of medical staff membership and for which the medical staff member either volunteers or is paid by the **Named Insured**.

(II)     "**Professional Services** means:

    (1)     **Medical Services**;

    (2)     the activities of an **Insured** as a member of a board or committee of the **Named Insured**, or as a member of any committee of the medical or professional staff of the **Named Insured**, when engaged in **Peer Review** or **Utilization Review**;

    (3)     the activities of an **Insured** as a member of a formal accreditation, standards review or similar professional board or committee, including executing the directives of such board or committee; or

    (4)     reviewing the quality of **Medical Services** or providing quality assurance on behalf of the **Named Insured**.

(JJ)     "**Professional Services Wrongful Act** means any actual or alleged act, error or omission, or series of acts, errors or omissions, by an **Insured** in rendering, or failing to render, **Professional Services**.

(KK)     "**Property Damage**" means:

    (1)     physical injury to tangible property, including all resulting loss of use of that property; provided, that such loss of use shall be deemed to have occurred at the time of the physical injury that caused it; or

    (2)     loss of use of tangible property that is not physically injured; provided, that such loss of use shall be deemed to occur at the time of the **Occurrence** that caused it.

(LL)     "**Related Claims**" means:

        (i)     **Claims** for **Wrongful Acts**, and

        (ii)     **Claims** for **Bodily Injury**, **Property Damage**, **Advertising Injury** or **Personal Injury** caused by an **Occurrence**,

based on, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving the same or related facts, circumstances, situations, transactions, or events or the same or related series of facts, circumstances, situations, transactions, or events, whether related logically, causally, or in any other way, in any combination, whether or not involving more than one policy, practice, procedure or product, including any course of treatment, and whether or not deemed a continuous tort.

(MM)     "**Retroactive Date**" means the date(s) set forth in ITEM 3 of the Declarations.

(NN)     "**Utilization Review**" means the process of evaluating the appropriateness or necessity of **Medical Services** provided or to be provided by an **Insured**. **Utilization Review** shall include prospective review of proposed **Medical Services**, concurrent review of ongoing

**Medical Services**, and retrospective review of already rendered **Medical Services**; **Utilization Review** does not include services or activities performed in the **Administration** or management of health care plans.

(OO)   "**Volunteer**" means a person who provides his or her services or labor to the **Named Insured**, and whose activities are supervised and directed by the **Named Insured**, but who does not have a contract to provide and is not compensated for such services and labor. No **Insured Medical Practitioner**, **Employee** or staff physician shall be considered a **Volunteer**.

(PP)   "**Wrongful Act**" means any **Professional Services Wrongful Act** or **Employee Benefit Wrongful Act**.


## III.   EXCLUSIONS

**(A)    Exclusions Applicable to INSURING AGREEMENT (A):**

In addition to the EXCLUSIONS listed under (D) below, no coverage will be available under INSURING AGREEMENT (A), and the Underwriter will not pay any **Loss,** including **Defense Expenses,** for any **Claim** based upon, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving any actual or alleged:

(1)   discrimination of any kind on any basis, including, but not limited to, discrimination, limitation, segregation or classification based on race, sex, marital status, ancestry, physical or mental handicaps, age, sexual preference, pregnancy, religion or other status that is protected under any applicable federal, state or local statute or ordinance affecting any present or former **Employee** or applicant for employment;

(2)   **Property Damage;**

(3)   **Advertising Injury** or **Personal Injury**, except to the extent that such injury relates to the rendering of, or failure to render, **Professional Services**;

(4)   **Employee Benefit Wrongful Acts;**

(5)   rendering of, or failure to render, **Medical Services** by any **Insured** while the **Insured's** license to practice is or was not active; or

(6)   violation of the Employee Retirement Income Security Act of 1974 (ERISA), the Fair Labor Standards Act (except the Equal Pay Act), the National Labor Relations Act, the Worker Adjustment and Retraining Notification Act, the Consolidated Omnibus Budget Reconciliation Act, the Occupational Safety and Health Act, all as may be amended, or any similar federal, state or local statutory or common law, or any rules or regulations promulgated thereunder; except this EXCLUSION (A)(6) will not apply to any **Claim** arising out of the rendering of, or failure to render, **Medical Services**, which is otherwise covered under INSURING AGREEMENT (A) of this Policy and for which reimbursement for such services was received from

health care plans covered by such statutes, rules or regulations.

**(B)**     **Exclusions Applicable to INSURING AGREEMENT (B):**

In addition to the EXCLUSIONS listed under (D) below, no coverage will be available under INSURING AGREEMENT (B), and the Underwriter will not pay any **Loss,** including **Defense Expenses,** for any **Claim** based upon, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving any actual or alleged:

(1)     **Professional Services Wrongful Act**;

(2)     discrimination of any kind on any basis, including, but not limited to, discrimination, limitation, segregation or classification based on race, sex, marital status, ancestry, physical or mental handicaps, age, sexual preference, pregnancy, religion or other status that is protected under any applicable federal, state or local statute or ordinance affecting any present or former **Employee** or applicant for employment, except to the extent that such discrimination relates to the rendering of, or failure to render, **Professional Services**;

(3)     **Bodily Injury**, **Property Damage**, **Personal Injury** or **Advertising Injury** expected or intended from the standpoint of any **Insured**; except for **Bodily Injury** resulting from use of reasonable force to protect persons or property;

(4)     **Personal Injury** or **Advertising Injury** arising out of oral or written publication of material:

(a)     if done by or at the direction of an **Insured** with knowledge of its falsity; or

(b)     whose first publication took place before the Inception Date set forth in ITEM 2 of the Declarations;

(5)     **Advertising Injury** arising out of any false, incorrect or misleading description of the price of goods, products or services;

(6)     **Employee Benefit Wrongful Acts**;

(7)     **Bodily Injury** or **Property Damage** for which an **Insured** is or may be held liable by reason of:

(a)     causing or contributing to the intoxication of any person;

(b)     the furnishing of alcoholic beverages to a person under the legal drinking age or under the influence of alcohol; or

(c)     any statute, ordinance or regulation relating to the sale, gift, distribution or use of alcoholic beverages;

except this EXCLUSION (B)(7) will not apply if the **Insured** is not in the business of manufacturing, selling or distributing alcoholic beverages.

(8)  **Bodily Injury** or **Property Damage** arising out of the ownership, maintenance, use, operation or entrustment to others of any aircraft, auto, watercraft, motor vehicle or semi-trailer or the loading or unloading thereof; except to the extent such injury arises from the loading or unloading of patients or relates to the maintenance or use of non-owned aircraft, watercraft or motor vehicles but only as excess cover over any other insurance, whether collectible or not;

(9)  **Bodily Injury** or **Property Damage** arising out of:

(a)  the transportation of **Mobile Equipment** by, in or on an auto owned or operated by, or rented or loaned to, any **Insured**; or

(b)  the use of **Mobile Equipment** in, or while in practice or preparation for, any prearranged racing, speed, demolition or stunt activity;

(10) **Bodily Injury** or **Property Damage** arising from any consequence, direct or indirect, of war, invasion, hostilities (whether war be declared or not), civil war, rebellion, revolution, insurrection, military or usurped power, strike, riot or civil insurrection;

(11) **Property Damage** to:

(a)  property the **Insured** owns, rents or occupies;

(b)  premises sold, given away or abandoned by the **Named Insured**, if the **Property Damage** arises out of any part of those premises;

(c)  property loaned to the **Insured**;

(d)  personal property in the care, custody or control of the **Insured**;

(e)  that particular part of real property on which the **Insured**, or any contractor or subcontractor working directly or indirectly on the **Insured's** behalf, is performing operations, if the **Property Damage** arises out of those operations;

(f)  that particular part of any property that must be restored, repaired or replaced because the **Insured's Work** was incorrectly, poorly or improperly performed on it; or

(g)  property which is being transported by the **Insured** by automobile, **Mobile Equipment** or team, including the loading and unloading thereof;

EXCLUSION (B)(11)(b) above does not apply if the premises are **Insured Work**

and were never occupied, rented or held for rental by the **Named Insured**;

EXCLUSIONS (B)(11)(c), (d), (e), and (f) above do not apply to liability assumed under a sidetrack agreement; and

EXCLUSION (B)(11)(f) above does not apply to **Property Damage** included in the products and completed operations hazard;

(12)    **Property Damage** to the **Insured Product** arising out of it or any part of it;

(13)    **Property Damage** to **Insured Work** arising out of it or any part of it and included in the products and completed operations hazard; except if the damaged work or the work out of which the damage arises was performed on behalf of the **Named Insured** by a subcontractor;

(14)    **Property Damage** to **Impaired Property** or property that has not been physically injured, arising out of:

    (a)    defect, deficiency, inadequacy or dangerous condition in **Insured Product** or **Insured Work**; or

    (b)    a delay or failure by an **Insured** or anyone acting on the **Named Insured's** behalf to perform a contract or an agreement in accordance with its terms; except this EXCLUSION (B)(14)(b) does not apply to the loss of use of other property arising out of sudden and accidental physical injury to **Insured Work** after it has been put to its intended use;

(15)    damages claimed for any loss, cost or expense incurred by the **Named Insured** or others for the loss of use, withdrawal, recall, inspection, repair, replacement, adjustment, removal or disposal of:

    (a)    **Insured Product**;

    (b)    **Insured Work**; or

    (c)    **Impaired Property**, if such product, work or property is withdrawn or recalled from the market or from use by any person or organization because of a known or suspected defect, deficiency, inadequacy or dangerous condition in it;

(16)    injury or damage arising in whole or in part, either directly or indirectly, out of asbestos, regardless whether the asbestos is:

    (a)    airborne as a fiber or particle;

    (b)    contained in a product;

    (c)    carried or transmitted on clothing or by any other means; or

(d) contained in or a part of:

  (i) any building;

  (ii) any building material;

  (iii) any insulation product; or

  (iv) any component part of any building, building material or insulation product;

(17) (a) exposure to, or the manifestation, release, dispersal, seepage, migration, discharge, appearance, presence, reproduction or growth of, **Mold**;

  (b) cost, expense or charge to test, monitor, clean up, remediate, mitigate, remove, contain, treat, detoxify, neutralize, rehabilitate, or in any other way respond to or assess the effect(s) of **Mold**;

  (c) any cost, expense, charge, fine or penalty incurred, sustained or imposed by order, direction, request or agreement of any court, governmental agency, regulatory body or civil, public or military authority in connection with or in any way relating to **Mold**;

except this EXCLUSION (B)(17) will not apply to any **Claim** based on, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving the **Insured's** use of **Mold** in connection with the rendering of **Medical Services**, including medical research activities; or

(18) (a) any actual or alleged exposure to, or generation, storage, manifestation, transportation, discharge, emission, release, dispersal, seepage, migration, escape, appearance, presence, reproduction, growth of, treatment, removal or disposal of, any **Pollutant**, except where such exposure, generation, storage, manifestation, transportation, discharge, emission, release, dispersal, seepage, migration, escape, appearance, presence, reproduction, growth, treatment, removal or disposal was caused by an unintentional fire or any heat, smoke or fumes issuing from such unintentional fire;

  (b) any fee, cost, expense or charge to test, monitor, clean up, remediate, mitigate, remove, contain, treat, detoxify, neutralize or rehabilitate any **Pollutant**;

  (c) any fee, cost, expense, charge, fine or penalty incurred, sustained or imposed by order, direction, request or agreement of any court, governmental agency, regulatory body or civil, public or military authority in connection with or in any way relating to any Pollutant;

except this EXCLUSION (B)(18) will not apply to any **Claim** for **Bodily Injury** or **Property Damage** caused by heat, smoke or fumes from a **Hostile Fire**; or

(19)   violation of the Employee Retirement Income Security Act of 1974 (ERISA), the Fair Labor Standards Act (except the Equal Pay Act), the National Labor Relations Act, the Worker Adjustment and Retraining Notification Act, the Consolidated Omnibus Budget Reconciliation Act, the Occupational Safety and Health Act, all as may be amended, or any similar federal, state or local statutory or common law, or any rules or regulations promulgated thereunder; except this EXCLUSION (B)(19) will not apply to a **Claim** arising out of the rendering of, or failure to render, **Medical Services**, which is otherwise covered under INSURING AGREEMENT (A) of this Policy and for which reimbursement for such services was received from health care plans covered by such statutes, rules or regulations; or

(20)   any actual or alleged nuclear reaction, nuclear radiation, radioactive contamination, or radioactive substance.

**(C)**   **Exclusions Applicable to INSURING AGREEMENT (C):**

In addition to the Exclusions listed in EXCLUSION (D) below, no coverage will be available under INSURING AGREEMENT (C), and the Underwriter will not pay any **Loss,** including **Defense Expenses,** for any **Claim** based upon, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving any actual or alleged:

(1)   **Bodily Injury** or **Property Damage**;

(2)   failure of performance by any insurer;

(3)   failure of securities or other investments to perform as represented or advice given to an **Employee** to participate or not to participate in stock subscription or other benefit programs; provided, that for purposes of this EXCLUSION (C)(3), "security" means a security of any nature whatsoever including, without limitation, stocks, shares, bonds, debentures, options, derivatives, partnership interests, limited liability company interests, any other form of debt or equity instrument and any other forms of ownership interest;

(4)   the insufficiency of funds to meet any obligations of **Employee Benefit Programs**;

(5)   discrimination of any kind on any basis, including, but not limited to, discrimination, limitation, segregation or classification based on race, sex, marital status, ancestry, physical or mental handicaps, age, sexual preference, pregnancy, religion or other status that is protected under any applicable federal, state or local statute or ordinance affecting any present or former **Employee** or applicant for employment, except to the extent that such discrimination relates to the rendering of, or failure to render, **Professional Services**; or

(6)   **Professional Services Wrongful Acts**; or

(7)     violation of the Employee Retirement Income Security Act of 1974 (ERISA), the Fair Labor Standards Act (except the Equal Pay Act), the National Labor Relations Act, the Worker Adjustment and Retraining Notification Act, the Consolidated Omnibus Budget Reconciliation Act, the Occupational Safety and Health Act, all as may be amended, or any similar federal, state or local statutory or common law, or any rules or regulations promulgated thereunder.

**(D)     Exclusions Applicable to All INSURING AGREEMENTS:**

Except as otherwise expressly provided in this Policy, this Policy does not apply to, and the Underwriter will not pay **Loss,** including **Defense Expenses,** for any **Claim** based upon, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving any actual or alleged:

(1)     **Wrongful Act** or **Occurrence** that happened before the **Retroactive Date** if applicable, or after the **Retroactive Date** if, on the Inception Date of this Policy, the **Insured** knew, had been told, should have known or had notified a prior professional liability insurer or administrator of any other risk transfer instrument that such **Wrongful Act** or **Occurrence** would or could result in a **Claim**;

(2)     violation of any federal, state or local antitrust, restraint of trade, unfair competition, or price-fixing law, or any rules or regulations promulgated thereunder, or any involvement in any agreement or conspiracy to restrain trade, except for any **Claim** otherwise covered under INSURING AGREEMENT (A) arising out of the rendering of, or failure to render, **Professional Services**;

(3)     dishonest, fraudulent, criminal or intentionally malicious act, error or omission by an **Insured**; any willful violation of law, statute, rule or regulation by an **Insured**; or the gaining of any profit, remuneration or advantage by any **Insured** to which such **Insured** was not legally entitled, including, but not limited to, health care fraud; provided, however, that no such act of one **Insured** will be imputed to any other **Insured** who was not aware of and did not participate in such act;

(4)     obligation for which the **Named Insured** or any other insurer may be liable under workers' compensation, unemployment compensation, disability benefits or any similar law;

(5)     obligation which an **Insured** has assumed under a written or oral contract or agreement; except this EXCLUSION (D)(5) will not apply to:

(a)     liability an **Insured** would have had in the absence of such contract or agreement; or

(b)     liability assumed by the **Named Insured** under a **Covered Contract**;

(6)     **Claim** made by or for the benefit of, or in the name or right of, one current or former **Insured** against another current or former **Insured**; except this EXCLUSION (D)(6) shall not apply to **Peer Review** activities otherwise covered by

this Policy;

(7) **Employment Practices**;

(8) liability of any subsidiary or affiliate as described in GENERAL CONDITION (I) or its **Insured Persons** acting in their capacity as such for any **Claim**, **Occurrence**, fact, circumstance, situation, transaction, event or **Wrongful Act** or series of **Claims**, **Occurrences**, facts, circumstances, situations, transactions, events or **Wrongful Acts** happening before the date such entity became a subsidiary;

(9) unauthorized or illegal use or release of confidential, private or proprietary information;

(10) liability of any individual acting as an independent contractor for an **Insured**; except this EXCLUSION (D)(10) shall not exclude coverage for **Loss**, including **Defense Expenses**, from **Claims** based upon the actual or alleged vicarious liability of an **Insured**.

(11) infringement of any right of patent, service mark, trademark, copyright, title or slogan; or

(12) liability of any **Insured** for **Managed Care Services**, except this EXCLUSION (D)(12) will not apply to liability of any **Insured** for **Professional Services**.

## IV.  GENERAL CONDITIONS

### (A)  Limits of Liability

(1) Insuring Agreement A – Professional Liability

  a. The "Each Claim" amount stated in ITEM 4(A) of the Declarations will be the Underwriter's maximum Limit of Liability for all **Loss**, including **Defense Expenses**, resulting from each **Claim** or **Related Claims** for which this Policy provides coverage under INSURING AGREEMENT A.

  b. The "Aggregate for all Claims" amount stated in ITEM 4(A) of the Declarations will be the Underwriter's maximum Limit of Liability for all **Loss**, including **Defense Expenses**, resulting from all **Claims** or **Related Claims** for which this Policy provides coverage under INSURING AGREEMENT A.

(2) Insuring Agreement B – General Liability

  a. The "Each Claim" amount for General Liability, Products-Completed Operations, Personal Advertising Injury, Fire Damage and Medical Expense stated in ITEM 4(B) of the Declarations will be the Underwriter's maximum Limit of Liability for all **Loss**, including **Defense Expenses**, resulting from each **Claim** or **Related Claims** for which this Policy provides coverage under

G16249 (2/06 ed.)                    18

    b.  The "Aggregate for all Claims" amount stated in ITEM 4(B) of the Declarations:

        i.  With respect to General Liability, Products-Completed Operations, Personal Advertising Injury and Fire Damage will be the Underwriter's maximum Limit of Liability for all **Loss**, including **Defense Expenses**, resulting from all **Claims** or **Related Claims** under all such coverages for which this Policy provides coverage under INSURING AGREEMENT B; and

        ii.  With respect to Medical Expense, will be the Underwriter's maximum Limit of Liability for all **Loss**, including **Defense Expenses**, resulting from all **Claims** or **Related Claims** under such Medical Expense coverage for which this Policy provides coverage under INSURING AGREEMENT B.

(3)    Insuring Agreement C – Employee Benefit Liability

    a.  The "Each Claim" amount stated in ITEM 4(C) of the Declarations will be the Underwriter's maximum Limit of Liability for all **Loss**, including **Defense Expenses**, resulting from each **Claim** or **Related Claims** for which this Policy provides coverage under INSURING AGREEMENT C.

    b.  The "Aggregate for all Claims" amount stated in ITEM 4(C) of the Declarations will be the Underwriter's maximum Limit of Liability for all **Loss**, including **Defense Expenses**, resulting from all **Claims** or **Related Claims** for which this Policy provides coverage under INSURING AGREEMENT C.

(4)    Insuring Agreement D – Evacuation Expense

    a.  The "Each Claim" amount stated in ITEM 4(D) of the Declarations will be the Underwriter's maximum Limit of Liability for all **Loss** resulting from each **Claim** or **Related Claims** for which this Policy provides coverage under INSURING AGREEMENT D.

    b.  The "Aggregate for all Claims" amount stated in ITEM 4(D) of the Declarations will be the Underwriter's maximum Limit of Liability for all **Loss** resulting from all **Claims** or **Related Claims** for which this Policy provides coverage under INSURING AGREEMENT D.

(5)    Insuring Agreement E – Legal/Media Expense

    a.  The "Each Claim" amount stated in ITEM 4(E) of the Declarations will be the Underwriter's maximum Limit of Liability for all **Loss** resulting from each **Claim** or **Related Claims** for which this Policy provides coverage under INSURING AGREEMENT E.

b.  The "Aggregate for all Claims" amount stated in ITEM 4(E) of the Declarations will be the Underwriter's maximum Limit of Liability for all **Loss** resulting from all **Claims** or **Related Claims** for which this Policy provides coverage under INSURING AGREEMENT E.

(6)  Each Limit of Liability described in paragraphs (1) through (5) above shall apply regardless of the time of payment by the Underwriter, the number of persons or entities included within the definition of **Insured,** or the number of claimants, and regardless of whether such **Claim** or **Related Claims** is/are first made during the **Policy Period** or during any **Extended Reporting Period.**

(7)  **Defense Expenses** are part of and not in addition to the Limit of Liability, and payment of **Defense Expenses** by the Underwriter will reduce, and may exhaust, the Limit of Liability.

(8)  The **Insured** shall be responsible for payment in full of the applicable deductible or self-insured retention stated in ITEM 4 of the Declarations, and the Underwriter's obligation to pay **Loss**, including **Defense Expenses**, under this Policy shall be excess of such deductible or self-insured retention.  The applicable deductible or self-insured retention shall apply to each **Claim** or **Related Claims** (subject to the applicable aggregate deductible or self-insured retention amount, if any), and shall be eroded (or exhausted) by the **Insured's** payment of **Loss**, including **Defense Expenses**.  The Underwriter shall have no obligation whatsoever, either to the **Insured** or any other person or entity, to pay all or any portion of the applicable deductible or self-insured retention on behalf of the **Insured**. The Underwriter shall, however, at its sole discretion, have the right and option to do so, in which event the **Insured** will repay the Underwriter any amounts so paid.

(9)  All **Insureds** under this Policy share the Limit of Liability. In no event will the number of **Insureds** involved in a **Claim** or **Related Claims** increase the Limit of Liability.

(10)  If any **Claim** made against the **Insureds** gives rise to coverage both under this Policy and under any other policy or policies issued by the Underwriter or any affiliate of the Underwriter, the Underwriter's and, if applicable, such affiliate's maximum aggregate limit of liability under all such policies for all **Loss**, including **Defense Expenses**, in respect of such **Claim** will not exceed the largest single available limit of liability under any such policy, including this Policy. In no event will more than one policy issued by the Underwriter respond to a **Claim**.

**(B)**   **Related Claims Deemed Single Claim:**

All **Related Claims**, whenever made, shall be deemed to be a single **Claim**, regardless of:

(1)  the number of **Related Claims**;

(2)  the number or identity of claimants;

(3)     the number or identity of **Insureds** involved or against whom **Related Claims** have been or could be made;

(4)     whether the **Related Claims** are asserted in a class action or otherwise; and

(5)     the number and timing of the **Related Claims**, even if the **Related Claims** comprising such single **Claim** were made in more than one **Policy Period**.

All **Related Claims** will be treated as a single **Claim** made when the earliest of such **Related Claims** was first made, or when the earliest of such **Related Claims** is treated as having been made in accordance with GENERAL CONDITION (D)(2) below, whichever is earlier.

**(C)**     **Defense and Supplementary Payments:**

The Underwriter has the right and duty to defend any **Claim** that is covered by INSURING AGREEMENTS (A), (B), and (C) of this Policy, even if any of the allegations of such **Claim** are groundless, false or fraudulent.  As part of, and not in addition to, the Limit of Liability for INSURING AGREEMENTS (A), (B), and (C), the Underwriter will pay **Defense Expenses** and will:

(1)     pay the premium on any bond to release attachments for an amount not in excess of the Limit of Liability for INSURING AGREEMENTS (A), (B), and (C) of this Policy and the premium on any appeal bond required in any defended suit, provided, that the Underwriter will not be obligated to apply for or furnish any such bond;

(2)     pay all costs taxed against the **Insured** in any such suit;

(3)     provide a legal defense and pay **Defense Expenses** for any arbitration, mediation or other alternative dispute proceeding if:

    (a)     the dispute at issue is a **Claim** covered by this Policy, and

    (b)     the **Insured** provides notice of the proceeding as required by GENERAL CONDITION (D) of this Policy; and

(4)     pay reasonable expenses, plus loss of earnings due to time off from work, incurred by an **Insured** as a result of being a defendant or co-defendant in a **Claim** or at the Underwriter's request, but not to exceed:

    (a)     $500 per day per **Insured**; and

    (b)     $12,500 per **Claim**.

**(D)** **Reporting of Claims, Occurrences and Circumstances:**

(1) If, during the **Policy Period** or any **Extended Reporting Period,** any **Claim** for a **Wrongful Act** or an **Occurrence** under INSURING AGREEMENT (A) or (C) is first made against any **Insured**, as a condition precedent to its right to any coverage under this Policy, the **Insured** shall give the Underwriter written notice of such **Claim** as soon as practicable thereafter, but in no event later than:

    (a) thirty (30) days after the Expiration Date or earlier cancellation date of this Policy; or

    (b) the expiration of any **Extended Reporting Period**.

Timely and sufficient notice by one **Insured** of a **Claim** shall be deemed timely and sufficient notice for all **Insureds** involved in the **Claim**. Such notice shall give full particulars of the **Claim**, including, but not limited to, a description of the **Claim**, **Wrongful Act** or **Occurrence**; the identity of the patient, all potential claimants and the health care provider(s) and any **Insureds** involved; a description of the injury or damages that may result from such **Wrongful Act** or **Occurrence**; information on the time, place and nature of the **Wrongful Act** or **Occurrence**; the manner in which the **Insured** first became aware of such **Wrongful Act** or **Occurrence**; and the reasons the **Insured** believes the **Wrongful Act** or **Occurrence** is likely to result in a **Claim.**

(2) If during the **Policy Period** the Insured first becomes aware of any **Wrongful Act** or **Occurrence** that may subsequently give rise to a **Claim** under INSURING AGREEMENT (A) or (C) and:

    (a) gives the Underwriter written notice of such **Wrongful Act** or **Occurrence** with full particulars as soon as practicable thereafter but in any event before the Expiration Date or earlier cancellation date of this Policy; and

    (b) requests coverage under INSURING AGREEMENT (A) or (C) of this Policy for any **Claim** subsequently arising from such **Wrongful Act** or **Occurrence**;

then any **Claim** not otherwise excluded by this Policy subsequently made against the **Insured** arising out of such **Wrongful Act** or **Occurrence** shall be treated as if it had been first made during the **Policy Period**. Full particulars of the **Claim** shall include, but not be limited to, a description of the **Claim**, **Wrongful Act** or **Occurrence**; the identity of the patient; all potential claimants and the health care provider(s) and any **Insureds** involved; information on the time, place and nature of the **Wrongful Act** or **Occurrence**; the manner in which the **Insured** first became aware of such **Wrongful Act** or **Occurrence**; and the reasons the **Insured** believes the **Wrongful Act** or **Occurrence** is likely to result in a **Claim**.

**(E)     Defense and Settlement:**

(1)     No **Insured** shall, except at its own cost, incur any expense, make any payment, admit liability for, assume any obligation, or settle any **Claim** without the Underwriter's written consent. With respect to any **Claim,** the Underwriter will have the right to investigate, direct the defense, and conduct settlement negotiations it deems appropriate. The Underwriter may make any settlement of any **Claim** which it deems appropriate.  If the **Insured** refuses to consent to a settlement acceptable to the claimant in accordance with the Underwriter's recommendation, then, subject to the Underwriter's applicable Limit of Liability, the Underwriter's liability for such **Claim** will not exceed:

(a)     the amount for which such **Claim** could have been settled by the Underwriter plus **Defense Expenses** up to the date on which the **Insured** refused to settle such **Claim**, plus

(b)     fifty percent (50%) of any **Loss**, including **Defense Expenses**, in excess of the amount in clause (a) above incurred in connection with such **Claim**. (The remaining fifty percent (50%) of **Loss**, including **Defense Expenses**, in excess of the amount in clause (a) above will be carried by the **Insured** at its own risk and will be uninsured.

(2)     The Underwriter will have no obligation to pay **Loss**, including **Defense Expenses**, or continue to direct the defense of any **Insured**, after the applicable Limit of Liability has been exhausted by the payment of **Loss**, including **Defense Expenses**. If the Limit of Liability is exhausted by the payment of **Loss**, including **Defense Expenses**, the premium for this Policy will be fully earned.

(3)     If both **Loss** covered by this Policy and **Loss** not covered by this Policy are incurred, either because a **Claim** made against the **Insureds** includes both covered and uncovered matters, or because a **Claim** is made against both **Insureds** and others not included within the definition of "**Insured**" set forth in DEFINITION (Q) above, the **Insured Entity**, the **Insured Persons** and the Underwriter agree to use their best efforts to determine a fair and proper allocation of all such amounts. The Underwriter's obligation to pay **Loss** under this Policy shall relate only to those sums allocated to the **Insureds**.  In making such determination, the parties shall take into account the relative legal and financial exposures of, and relative benefits obtained in connection with the defense and/or settlement of the **Claim** by the **Insured Persons**, the **Insured Entity** and others.  In the event that the Underwriter and the **Insureds** do not reach an agreement with respect to an allocation, then the Underwriter shall be obligated to make an interim payment of the amount of **Loss**, including **Defense Expenses**, which the parties agree is not in dispute until a final amount is agreed upon or determined pursuant to the provisions of this Policy and applicable law.

**(F)     Territory:**

This policy applies to **Wrongful Act**s or **Occurrence**s taking place anywhere in the world.

**Claim** or suit must be made against an **Insured**, however, in the United States of America, including its territories or possessions, Puerto Rico, or Canada.

**(G)**  **Mergers, Acquisitions or Newly Created Entities:**

If, during the **Policy Period,** the **Named Insured** acquires or creates another entity or subsidiary or becomes a member of a joint venture or partner in a partnership, or if the **Named Insured** merges or consolidates with another entity such that the **Named Insured** is the surviving entity (any of which events is referred to as a "Transaction" in this GENERAL CONDITION (G)), the Underwriter will have the option of providing coverage in respect of such entity or subsidiary, and no coverage will be afforded under this Policy for any **Claim** in any way involving the entity or subsidiary that is acquired, created, merged or consolidated with, unless:

(1)    the **Named Insured** gives the Underwriter notice of such Transaction as soon as possible but in no event later than sixty (60) days after the effective date of the Transaction;

(2)    the **Named Insured** gives the Underwriter such information regarding the Transaction as the Underwriter requests; and

(3)    the **Named Insured** accepts any terms, conditions, exclusions, and limitations and pays any additional premium as the Underwriter, at its sole discretion, imposes.

If the Underwriter, at its sole discretion, elects to provide coverage in respect of such entity or subsidiary, this Policy shall not apply to, and the Underwriter will not pay any **Loss** or **Defense Expenses** for, any **Claim** based upon, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving, any **Occurrence** or **Wrongful Act** happening before:

(a)    the effective date of the Transaction; or

(b)    the effective date of coverage under this Policy for such entity or subsidiary as set forth in an endorsement to be issued to extend coverage to such entity or subsidiary, whichever is later.

For purposes of this GENERAL CONDITION (G), "subsidiary" means any entity for which the **Named Insured** owns or possesses fifty percent (50%) of the issued and outstanding capital stock, or has or controls the right to elect or appoint more than fifty percent (50%) of the directors or trustees.

**(H)**  **Sales or Dissolution of Insured Entities; Cessation of Business:**

If, during the **Policy Period**:

(1)    the **Named Insured** is dissolved, sold, acquired by, merged into, or consolidated with another entity such that the **Named Insured** is not the surviving entity; or

(2)     any person, entity, or affiliated group of persons or entities obtains:

    (a)     ownership or possession of fifty percent (50%) of the issued and outstanding capital stock of the **Named Insured,** or;

    (b)     the right to elect or appoint more than fifty percent (50%) of the **Named Insured's** directors or trustees; or

    (c)     if the **Named Insured** ceases to do business for any reason;

(any of which events is referred to as a "Transaction" in this GENERAL CONDITION (H) coverage under this Policy shall continue in full force and effect until the Expiration Date or any earlier cancellation date, but this Policy shall apply only to **Occurrences** or **Wrongful Acts** happening before the effective date of such Transaction. This Policy will not apply to, and the Underwriter will not pay any **Loss** or **Defense Expenses** for, any **Claim** based upon, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving, any **Wrongful Act** or **Occurrence** happening on or after the effective date of such Transaction.

**(I)     Extended Reporting Period for INSURING AGREEMENTS (A) and (C):**

(1)     If this Policy is terminated by any party for any reason other than misrepresentation, fraud or nonpayment of premium, the **First Named Insured** shall have the right to purchase an **Extended Reporting Period**, but only with respect to the coverage afforded under INSURING AGREEMENTS (A) and (C) of this Policy.  In order to purchase the **Extended Reporting Period**, the **First Named Insured**, within thirty (30) days of the termination or the date of such conversion of coverage, must (i) provide written notice by certified mail to the Underwriter requesting the **Extended Reporting Period**, and (ii) pay any additional premium required by the Underwriter promptly when due, together with any earned but unpaid premium which may be due under the terminated policy.  The additional premium shall be deemed fully earned upon inception of the **Extended Reporting Period.**

(2)     The **Extended Reporting Period** will apply only with respect to any **Wrongful Act** or **Occurrence** committed before the effective date of such termination or the date of any conversion of coverage under GENERAL CONDITION (H)(2), whichever is earlier.  The **Extended Reporting Period** will not apply to:

    (a)     any **Claim** for **Professional Services** rendered before the **Retroactive Date** or after the termination date of this Policy;

    (b)     any **Claim** or proceedings pending as of the termination date of this Policy;

    (c)     any paid **Claim**;

    (d)     any **Wrongful Act** or **Occurrence** that is covered under any subsequent insurance purchased by the **Insureds** or that would be covered but for exhaustion of the limit of liability applicable to such **Wrongful Act** or

**Occurrence** under such insurance;

(e)     any **Administration** of the **Insured's Employee Benefit Program** rendered before the **Retroactive Date** or after termination of this Policy; or

(f)     any **Wrongful Act** or **Occurrence** that happened before the **Retroactive Date** of this Policy.

(3)     If an **Extended Reporting Period** is purchased in accordance with clause (1) above, any **Claim** made during such **Extended Reporting Period** shall be deemed to have been made during the **Policy Period.** The Underwriter's **Limit of Liability** in respect of **Claims** made during the **Extended Reporting Period** shall be part of, and not in addition to, the Underwriter's **Limit of Liability** for all **Claims** made during the **Policy Period.** The **Extended Reporting Period** will not be deemed to extend the **Policy Period** or change the scope of coverage provided by this Policy.

**(J)     Cancellation; Non-Renewal:**

(1)     The Underwriter may cancel this Policy by mailing written notice to the **First Named Insured** at the last known address shown on the Declarations stating when, not less than sixty (60) days thereafter (or such longer period of time as required by applicable law), such cancellation shall be effective; except that, in the event of cancellation for non-payment of premium, the Underwriter may make the cancellation effective upon notice of only ten (10) days (or such longer period of time as required by applicable law).

(2)     Except as set forth in GENERAL CONDITION (N), the **First Named Insured** may cancel this Policy by mailing the Underwriter written notice stating when, not later than the Expiration Date set forth in ITEM 2(b) of the Declarations, such cancellation will be effective. In such event, the earned premium will be computed in accordance with the customary short rate table and procedure. Premium adjustment may be made either at the time cancellation is effective or as soon as practicable after cancellation becomes effective, but payment or tender of unearned premium is not a condition of cancellation.

(3)     The Underwriter will not be required to renew this Policy upon its expiration.

**(K)     Assistance and Cooperation:**

In the event of a **Claim**, the **Insured** shall provide the Underwriter with all information, assistance and cooperation that the Underwriter reasonably requests. At the Underwriter's request, the **Insured** shall assist in investigating, defending and settling **Claims**; enforcing any right of contribution or indemnity against another who may be liable to any **Insured**; and the conduct of actions, suits, appeals or other proceedings, including, but not limited to, attending trials, hearings and depositions; securing and giving evidence; and obtaining the attendance of witnesses.

**(L)**     **Subrogation:**

In the event of any payment hereunder, the Underwriter shall be subrogated to the extent of any payment to all of the rights of recovery of the **Insured**. The **Insured** shall execute all papers and do everything necessary to secure such rights, including the execution of any documents necessary to enable the Underwriter effectively to bring suit in its name. The **Insured** shall do nothing that may prejudice the Underwriter's position or potential or actual rights of recovery. The obligations of the **Insured** under this GENERAL CONDITION (L) shall survive the expiration or termination of the Policy.

**(M)**     **Other Insurance and Risk Transfer Arrangements:**

Any **Loss**, including **Defense Expenses,** resulting from any **Claim** insured under any other insurance policy or risk transfer instrument, including, but not limited to, self-insured retentions, deductibles, fronting arrangements, professional liability policies covering any of the **Named Insured's** medical staff, **Employee**s, **Volunteers** or **Insured Medical Practitioners**, or other alternative arrangements which apply to the **Loss** or **Defense Expenses** shall be paid first by those instruments, policies or other arrangements. It is the intent of this Policy to apply only to **Loss**, including **Defense Expenses,** that are more than the total limit of all deductibles, limits of liability, self-insured amounts or other insurance or risk transfer arrangements, whether primary, contributory, excess, contingent, fronting or otherwise and whether or not collectible. These provisions do not apply to other insurance policies or risk transfer arrangements written as specific umbrella or excess insurance over the applicable Limit of Liability of this Policy. This Policy shall not be subject to the terms of any other policy of insurance or plan or program of self-insurance; and in no event will the Underwriter pay more than the applicable Limit of Liability set forth in ITEM 3 of the Declarations.

**(N)**     **Exhaustion:**

If the Underwriter's Limit of Liability is exhausted by the payment of **Loss**, including **Defense Expenses**, the premium will be fully earned, all obligations of the Underwriter under this Policy will be completely fulfilled and exhausted, and the Underwriter will have no further obligations of any kind or nature whatsoever under this Policy.

**(O)**     **Authorization and Notices:**

The **First Named Insured** will act on behalf of all **Insureds** with respect to the giving or receiving of any notices under this Policy; the payment of premiums to, and receiving of return premiums from, the Underwriter; the receiving and acceptance of any endorsements issued to form a part of this Policy; and the exercising or declining to exercise any Discovery Period.

**(P)**     **Conformance:**

Any terms of this Policy that are in conflict with the laws or regulations of the state in which this Policy is issued are amended to conform with such laws or regulations.

**(Q)**   **Representation; Incorporation of Application; Entire Agreement:**

The **Insureds** represent that the particulars and statements contained in the Application attached to this Policy are true, accurate and complete and agree that:

(1)   this Policy is issued and continued in force by the Underwriter in reliance upon the truth of such representation;

(2)   those particulars and statements are the basis of this Policy; and

(3)   the Application and those particulars and statements are incorporated in and form a part of this Policy.

No knowledge or information possessed by any **Insured** shall be imputed to any other **Insured**, except for material facts or information known to the person or persons who signed the Application. In the event of any material untruth, misrepresentation or omission in connection with any of the particulars or statements in the Application, this Policy shall be void with respect to any **Insured** who knew of such untruth, misrepresentation or omission or to whom such knowledge is imputed.

**(R)**   **No Action against Underwriter:**

(1)   No action shall be taken against the Underwriter by any **Insured** unless, as conditions precedent thereto, the **Insured** has fully complied with all of the terms of this Policy and the amount of the **Insured's** obligation to pay has been finally determined either by judgment against the **Insured** after adjudicatory proceedings or by written agreement of the **Insured**, the claimant and the Underwriter.

(2)   No individual or entity shall have any right under this Policy to join the Underwriter as a party to any **Claim** to determine the liability of any **Insured**; nor shall the Underwriter be impleaded by an **Insured** or his, her, or its legal representative in any such **Claim**.

**(S)**   **Notice:**

(1)   Notice to any **Insured** shall be sent to the **First Named Insured** at the address designated in ITEM 1 of the Declarations.

(2)   Notice to the Underwriter shall be sent to the address designated in ITEM 6 of the Declarations.

**(T)**   **Changes:**

Notice to or knowledge possessed by any agent or other person acting on behalf of the Underwriter shall not effect a waiver or change in any part of this Policy or prevent or estop the Underwriter from asserting any right(s) under this Policy. This Policy can only be altered, waived, or changed by written endorsement issued to form a part of this Policy.

**(U)** **Insolvency of Insured:**

The Underwriter will not be relieved of any of its obligations under this Policy by the bankruptcy or insolvency of any **Insured** or his/her/its estate.

**(V)** **Inspections and Surveys:**

The Underwriter or its duly authorized agent has the right but is not obliged to:

(1)     make inspections and surveys of the **Named Insured's** premises and operations at any time;

(2)     provide the **Insured** with reports on the conditions found;

(3)     recommend changes;

(4)     conduct loss control and prevention activity.

Any inspections, surveys, reports, or recommendations relate only to insurability and the premium to be charged.

The Underwriter does not:

(1)     make safety inspections;

(2)     undertake to perform the duty of any entity to provide for the health or safety of workers or the public; nor

(3)     warrant that conditions:

(a)     are safe or healthy; or

(b)     comply with laws, regulations or codes.

**(W)** **Examination of Books and Records:**

The Underwriter may examine and audit the books and records of the **Insured** as they relate to this Policy.

**(X)** **Assignment:**

No assignment of interest under this Policy shall bind the Underwriter without its written consent issued as an endorsement to form a part of this Policy.

**(Y)** **Entire Agreement:**

The **Insureds** agree that this Policy, including the **Application** and any endorsements, constitutes the entire agreement between them and the Underwriter or any of its agents relating to this insurance.

**(Z)**   **Headings:**

The descriptions in the headings and sub-headings of this Policy are solely for convenience, and form no part of the terms and conditions of coverage.

**In witness whereof the Underwriter has caused this Policy to be executed by its authorized officers.**

ENDORSEMENT NO.  1

HEALTH CARE ORGANIZATIONS AND PROVIDERS
PROFESSIONAL LIABILITY, GENERAL LIABILITY AND
EMPLOYEE BENEFIT LIABILITY POLICY

AMEND DEFINITION OF "INSURED" TO INCLUDE ADDITIONAL INDIVIDUALS

This Endorsement, which is effective at 12:01 a.m. on July 1, 2013, forms part of:

Policy No.   MPP-5447-13
Issued to    Devereux Foundation
Issued by    Homeland Insurance Company of Delaware

In consideration of the premium charged, the term "**Insured**," as defined in Section II Definitions of this Policy, is amended to include the following person(s) (each an "Additional Insured"), but only with respect to the specific activities and/or liabilities set forth opposite the name of each such individual:

| Additional Insured | Insured Activity/Liability |
|---|---|
| Foster Parents | Activities performed by or on behalf of the **Named Insured** |
| Funding Sources | Activities performed by or on behalf of the **Named Insured** and/or their placement of clients with the **Named Insured** |
| Governmental Agencies | Activities performed on behalf of the **Named Insured** and/or their placement of clients with the **Named Insured** |
| Landlords | Liability arising out of the negligence and/or legal liability of the **Named Insured** |
| Lessors or Managers of Premises | Liability arising out of the negligence and/or legal liability of the **Named Insured** |
| Lessors of Leased Equipment | Liability arising out of the negligence and/or legal liability of the **Named Insured** |

All other terms, conditions and limitations of the Policy shall remain unchanged.

ENDORSEMENT NO.  2

HEALTH CARE ORGANIZATIONS AND PROVIDERS
PROFESSIONAL LIABILITY, GENERAL LIABILITY AND
EMPLOYEE BENEFIT LIABILITY POLICY

LIMITED WAIVER OF SUBROGATION – INSURING AGREEMENT (A)

This Endorsement, which is effective at 12:01 a.m. on July 1, 2013, forms part of:

      Policy No.    MPP-5447-13
      Issued to      Devereux Foundation
      Issued by     Homeland Insurance Company of Delaware


In consideration of the premium charged, solely with respect to any payment made under
INSURING AGREEMENT (A) of this Policy, the Underwriter waives its right to subrogation
under Section IV General Conditions (L) of this Policy with respect to The City of Denver, The
County of Denver and the Denver Department of Human Services.  Section IV General
Conditions (L) of this Policy shall be deemed amended to the extent necessary to affect the
purpose and intent of this endorsement.


All other terms, conditions and limitations of the Policy shall remain unchanged.

ENDORSEMENT NO. 3

HEALTH CARE ORGANIZATIONS AND PROVIDERS
PROFESSIONAL LIABILITY, GENERAL LIABILITY AND
EMPLOYEE BENEFIT LIABILITY POLICY

POLLUTION EXCLUSION

This Endorsement, which is effective at 12:01 a.m. on July 1, 2013, forms part of:

Policy No.    MPP-5447-13
Issued to      Devereux Foundation
Issued by     Homeland Insurance Company of Delaware

In consideration of the premium charged:

1.    Section III Exclusions (B)(18) of this Policy will not apply to any **Claim** for **Bodily Injury** or **Property Damage** arising out of a Short-term Pollution Event (as defined below), provided the Short-term Pollution Event would not have taken place but for a Named Peril (as defined below) having occurred, and the **Insured** notified the Underwriter of such Short-term Pollution Event as soon as practicable but no more than fourteen (14) days after its ending.

2.    For the purposes of this endorsement, the following terms shall have the meanings set forth below:

(a)    "Named Peril" means:

(i)    lightning, windstorm or earthquake;

(ii)    explosion, implosion, collapse, puncture, bursting, rupture, collision, or overturn of a tank, a vessel, machinery, equipment, or other similar apparatus or device (other than an "auto"), including any attached piping, pumps or valves, if the explosion, implosion, collapse, puncture, bursting, rupture, collision, or overturn is not caused by deterioration, corrosion, erosion, decay, rotting or wear and tear; or

(iii)    vandalism or malicious mischief by someone other than an **Insured**.

(b)    "Short-term Pollution Event" means a discharge, dispersal, release or escape of **Pollutants** which:

(i)    begins during the **Policy Period**;

(ii)    begins at an identified time and place;

(iii)   ends, in its entirety, at an identified time within forty-eight (48) hours of the beginning of the discharge, dispersal, release or escape of the **Pollutants**; and

(iv)   does not originate from an Underground Storage Tank (as defined below).

To be a Short-term Pollution Event, the discharge, dispersal, release or escape of **Pollutants** need not be continuous. However, if the discharge, dispersal, release or escape is not continuous, then all discharges, dispersals, releases or escapes of the same **Pollutants** from essentially the same source, considered together, must satisfy subparagraphs (i) through (iv) of this definition to be considered a Short-term Pollution Event.

(c)   "Underground Storage Tank" means any storage tank, including any attached pumps, valves or piping, buried below the surface of the ground or water, or which, at any time, had been buried under the surface of the ground or water and then subsequently exposed by any means. For the purposes of this definition, buried means that at least 10% of it is below the surface of the ground or water.

All other terms, conditions and limitations of this Policy shall remain unchanged.

ENDORSEMENT NO.  4

HEALTH CARE ORGANIZATIONS AND PROVIDERS
PROFESSIONAL LIABILITY, GENERAL LIABILITY AND
EMPLOYEE BENEFIT LIABILITY POLICY

GRACE PERIOD FOR NOTICE OF CLAIMS UPON RENEWAL OF POLICY

This Endorsement, which is effective at 12:01 a.m. on July 1, 2013, forms part of:

Policy No.   MPP-5447-13
Issued to    Devereux Foundation
Issued by    Homeland Insurance Company of Delaware

In consideration of the premium charged, in the event that this Policy is renewed by the Underwriter:

1.   Clause (1)(a) of General Condition (D) of this Policy is amended to read as follows:

(a)    sixty (60) days after the Expiration Date or earlier cancellation date of this Policy; or

2.   Clause (2)(a) of General Condition (D) of this Policy is amended to read as follows:

(a)    the **Insured** gives the Underwriter written notice of such **Wrongful Act** or **Occurrence** with full particulars as soon as practicable thereafter but in no event later than sixty (60) days after the Expiration Date or earlier cancellation date of this Policy; and

It is understood and agreed that the amendments set forth above shall apply *only* in the event this Policy is renewed by the Underwriter.  In the event that this Policy is not renewed by the Underwriter, General Condition (D) of this Policy shall remain unchanged.

All other terms, conditions and limitations of the Policy shall remain unchanged.

ENDORSEMENT NO.   5

HEALTH CARE ORGANIZATIONS AND PROVIDERS
PROFESSIONAL LIABILITY, GENERAL LIABILITY AND
EMPLOYEE BENEFIT LIABILITY POLICY
MINIMUM EARNED PREMIUM ENDORSEMENT

This Endorsement, which is effective at 12:01 a.m. on July 1, 2013, forms part of:

|              |                                          |
|--------------|------------------------------------------|
| Policy No.   | MPP-5447-13                              |
| Issued to    | Devereux Foundation                      |
| Issued by    | Homeland Insurance Company of Delaware   |

In consideration of the premium charged:

It is understood and agreed that, for all purposes under the Policy, premium in the amount of $55,000 will be deemed fully earned as of the Inception Date set forth in Item 2(a) of the Declarations.

All other terms, conditions and limitations of this Policy shall remain unchanged.

HPL-P-0024

ENDORSEMENT NO.  6

HEALTH CARE ORGANIZATIONS AND PROVIDERS
PROFESSIONAL LIABILITY, GENERAL LIABILITY AND
EMPLOYEE BENEFIT LIABILITY POLICY
SERVICE OF SUIT ENDORSEMENT

This Endorsement, which is effective at 12:01 a.m. on July 1, 2013, forms part of:

      Policy No.    MPP-5447-13
      Issued to     Devereux Foundation
      Issued by     Homeland Insurance Company of Delaware


In consideration of the premium charged, the Underwriter hereby designates the Director of the Pennsylvania Department of Insurance, and his/her successor(s) in office, as its true and lawful attorney upon whom may be served any lawful process in any action, suit or proceeding instituted by or on behalf of the Insured arising under or out of this Policy.


All other terms, conditions and limitations of this Policy shall remain unchanged.

HPL-P-0025

ENDORSEMENT NO. 7

HEALTH CARE ORGANIZATIONS AND PROVIDERS
PROFESSIONAL LIABILITY, GENERAL LIABILITY AND
EMPLOYEE BENEFIT LIABILITY POLICY

CO-INSURANCE ENDORSEMENT

This Endorsement, which is effective at 12:01 a.m. on July 1, 2013, forms part of:

      Policy No.     MPP-5447-13
      Issued to      Devereux Foundation
      Issued by     Homeland Insurance Company of Delaware

In consideration of the premium charged, it is understood and agreed that, after application of the Deductible described in Section IV General Condition (B) of this Policy, all remaining Limit(s) of Liability shall be subject to co-insurance by the **Insured** in the amount of 75%, such that any **Loss**, including **Defense Expenses**, in excess of the applicable Deductible amount shall be shared equally between the **Insured** and the Underwriter.  It is further understood and agreed that any amounts paid by the **Insured** hereunder shall erode the Limit(s) of Liability set forth in ITEM 3 of the Declarations.


All other terms, conditions and limitations of this Policy shall remain unchanged.

ENDORSEMENT NO. 8

HEALTH CARE ORGANIZATIONS AND PROVIDERS
PROFESSIONAL LIABILITY, GENERAL LIABILITY AND
EMPLOYEE BENEFIT LIABILITY POLICY

AMEND DEFINITION OF "NAMED INSURED" TO INCLUDE ADDITIONAL
ENTITIES WITH SEPARATE RETROACTIVE DATES

This Endorsement, which is effective at 12:01 a.m. on July 1, 2013, forms part of:

| | |
|---|---|
| Policy No. | MPP-5447-13 |
| Issued to | Devereux Foundation |
| Issued by | Homeland Insurance Company of Delaware |

In consideration of the premium charged:

1.      The term "**Named Insured**," as defined in Section II Definitions of this Policy, is amended to include the following entities, but solely with respect to INSURING AGREEMENTS (A) and (C ) and only for **Wrongful Acts** committed or allegedly committed on or after the Retroactive Date set forth opposite the name of each such entity:

| Additional Insured | Retroactive Date |
|---|---|
| Devereux Cleo Wallace | December 13, 1985 |
| La Hacienda | July 1, 1987 |
| Devereux Kids, Inc. | May 19, 1999 |
| Sonoma County | |

2.      Item 6 of the Declarations will be deemed amended to the extent necessary to effect the purpose and intent of this endorsement.

3.      Notwithstanding paragraph 1. above, it is expressly understood and agreed that, for the purposes of Section IV General Conditions (G), (H), (I), (J), (O) and (S) of this Policy, the term "**Named Insured**" shall mean only The Devereux Foundation.

All other terms, conditions and limitations of the Policy shall remain unchanged.

ENDORSEMENT NO.  9

HEALTH CARE ORGANIZATIONS AND PROVIDERS
PROFESSIONAL LIABILITY, GENERAL LIABILITY AND
EMPLOYEE BENEFIT LIABILITY POLICY

AMEND DEFINITION OF "NAMED INSURED" TO INCLUDE
ADDITIONAL ENTITIES

This Endorsement, which is effective at 12:01 a.m. on July 1, 2013, forms part of:

Policy No.    MPP-5447-13
Issued to     Devereux Foundation
Issued by     Homeland Insurance Company of Delaware

In consideration of the premium charged:

1.      The term "**Named Insured**," as defined in Section II Definitions of this Policy, is
        amended to include the entities listed on the schedule attached hereto, but solely with
        respect to INSURING AGREEMENTS (A) and (C) and only for **Wrongful Acts**
        committed or allegedly committed on or after the retroactive date set forth in Item 6 of
        the Declarations (as the same may be amended by endorsement to this Policy).

2.      Notwithstanding paragraph 1. above, it is expressly understood and agreed that, for the
        purposes of Section IV General Conditions (G), (H), (I), (J), (O) and (S) of this Policy,
        the term "**Named Insured**" shall mean only The Devereux Foundation.

All other terms, conditions and limitations of the Policy shall remain unchanged.

ENDORSEMENT NO.  10

HEALTH CARE ORGANIZATIONS AND PROVIDERS
PROFESSIONAL LIABILITY, GENERAL LIABILITY AND
EMPLOYEE BENEFIT LIABILITY POLICY

AMEND DEFITION OF "INSURED" TO INCLUDE
INDEPENDENT CONTRACTORS

This Endorsement, which is effective at 12:01 a.m. on July 1, 2013, forms part of:

| | |
|---|---|
| Policy No. | MPP-5447-13 |
| Issued to | Devereux Foundation |
| Issued by | Homeland Insurance Company of Delaware |

In consideration of the premium charged:

1.  The term "**Insured**," as defined in Section II Definitions of this Policy, is amended to include any independent contractor providing **Professional Services** on behalf of the **Named Insured** and under contract with the **Named Insured**, but only when, and to the extent that, such independent contractor is acting on behalf of, and within the scope and capacity of his or her contracted services for, the **Named Insured**.

2.  It is expressly understood and agreed that the coverage afforded under paragraph 1. above shall be specifically excess over, and shall not contribute with, any other valid insurance or self-insurance, regardless of whether such other insurance or self-insurance is stated to be primary, contributing, excess, contingent or otherwise.

3.  The term "independent contractor," as used in this endorsement, shall not include any medical doctor except when such medical doctor is acting as a Medical Director, department head or Chief of Staff for the **Named Insured**, and then only to the extent such individual is acting within the scope and capacity of his or her position as such Medical Director, department head or Chief of Staff for the **Named Insured**.

All other terms, conditions and limitations of the Policy shall remain unchanged.

ENDORSEMENT NO. 11

HEALTH CARE ORGANIZATIONS AND PROVIDERS
PROFESSIONAL LIABILITY, GENERAL LIABILITY AND
EMPLOYEE BENEFIT LIABILITY POLICY

INSURED VS. INSURED CARVEBACK ENDORSEMENT

This Endorsement, which is effective at 12:01 a.m. on July 1, 2013, forms part of:

|  |  |
|---|---|
| Policy No. | MPP-5447-13 |
| Issued to | Devereux Foundation |
| Issued by | Homeland Insurance Company of Delaware |

In consideration of the premium charged:

1.      Solely with respect to the coverage afforded under Insuring Agreement (A) of the Policy,
        Section III Exclusions (D)(6) of this Policy will not apply to **Claims** made against any
        **Insured Medical Practitioner** or **Insured** who is a registered nurse or licensed practical
        nurse arising out of his/her rendering of first aid, flu shots or other inoculations to another
        **Insured**.

2.      Solely with respect to the coverage afforded under Insuring Agreement (B) of the Policy,
        Section III Exclusions (D)(6) of this Policy will not apply to **Claims** made against any
        Specific Insured (as defined below) for **Bodily Injury** and/or **Personal Injury** to another
        **Insured**.

3.      Solely for the purposes of this endorsement, the term "Specific Insured" means the
        following:

        Any Officer
        Any Executive Director
        Any National Human Resources Director
        Any National Director
        Any Assistant Director
        Any Assistant Center Director

All other terms, conditions and limitations of the Policy shall remain unchanged.

ENDORSEMENT NO. 12

HEALTH CARE ORGANIZATIONS AND PROVIDERS
PROFESSIONAL LIABILITY, GENERAL LIABILITY AND
EMPLOYEE BENEFIT LIABILITY POLICY

MEDICAL EXPENSES FOR BODILY INJURY ENDORSEMENT

This Endorsement, which is effective at 12:01 a.m. on July 1, 2013, forms part of:

Policy No.     MPP-5447-13
Issued to      Devereux Foundation
Issued by      Homeland Insurance Company of Delaware


In consideration of the premium charged:

(1)     Solely with respect to the coverage afforded under Insuring Agreement (B) of the
Policy and subject to the terms and conditions set forth in this endorsement, it is
understood and agreed that the Underwriter will pay on behalf of the Insured
Medical Expenses (as defined below) for the Bodily Injury caused by an accident:

(a)     on premises owned or rented by the Named Insured;

(b)     on ways adjacent to premises owned or rented by the Named Insured; or

(c)     because of the operations of the Named Insured;

provided that:

(i)     such accident takes place in the coverage territory and during
the Policy Period;

(ii)    Medical Expenses are incurred and reported to the
Underwriter within one year of the date of the accident; and

(iii)   the injured person submits to examination, as often as
required by the Underwriter, by physicians of the
Underwriter's choice and at the expense of the Underwriter.

(1)     Solely with respect to the coverage afforded by this endorsement:

(a) "Medical Expenses" means reasonable payments for

(iv)    first aid administered at the time of an accident;

          (ii)   necessary medical, surgical, x-ray and dental services, including prosthetic devices; and

          (iii)  necessary ambulance, hospital, professional medical and nursing, and funeral services.

(3)    In addition to, and not in limitation of, Section III Exclusions of the Policy, no coverage will be available under this Policy for Bodily Injury sustained by:

      (a)    any Insured;

      (b)   any person hired to do work for or on behalf of any Insured or tenant of any Insured;

      (c)   any person injured on that part of premises owned or rented by the Named Insured that the person normally occupies;

      (d)   any person, whether or not an Employee of any Insured, if benefits for such Bodily Injury are payable or must be provided under workers' compensation or disability benefits or a similar law; or

      (e)   any person injured while engaging in athletic activities.

(4)    The Underwriter's maximum limit of liability for Medical Expenses for Bodily Injury caused by accidents, as set forth in paragraph (1) of this endorsement, is $5,000 for each person per accident. Such amount shall be part of, and not in addition to, the Underwriter's maximum aggregate Limit of Liability set forth in Item 3 of the Declarations.  Notwithstanding the above, in no event shall the Underwriter's maximum obligation to pay Medical Expenses on behalf of the Insured exceed $25,000, which amount shall be part of, and not in addition to, the Underwriter's maximum aggregate Limit of Liability set forth in Item 3 of the Declarations.

(5)    Notwithstanding anything to the contrary contained in the Policy, no Deductible shall apply to the coverage afforded under this endorsement for Medical Expenses for Bodily Injury caused by an accident.

(6)    Solely with respect to the coverage afforded under this endorsement, the definition of "Loss," as set forth in Section II Definitions of the Policy, is amended to include Medical Expenses for Bodily Injury caused by an accident.

All other terms, conditions and limitations of the Policy shall remain unchanged.

HPL-P-0016 Devereux

ENDORSEMENT NO.  13

HEALTH CARE ORGANIZATIONS AND PROVIDERS
PROFESSIONAL LIABILITY, GENERAL LIABILITY AND
EMPLOYEE BENEFIT LIABILITY POLICY

SEVERABILITY ENDORSEMENT

This Endorsement, which is effective at 12:01 a.m. on July 1, 2013, forms part of:

Policy No.    MPP-5447-13
Issued to     Devereux Foundation
Issued by     Homeland Insurance Company of Delaware

In consideration of the premium charged, it is understood and expressly agreed that Section III Exclusions (D)(3) of this Policy is amended to read in its entirety as follows:

(3)     dishonest, fraudulent, criminal or intentionally malicious act, error or omission by an **Insured**; any willful violation of law, statute, rule or regulation by an **Insured**; or the gaining of any profit, remuneration or advantage by any **Insured** to which such **Insured** was not legally entitled, including, but not limited to, health care fraud; *provided, however*, that this exclusion applies separately to each **Insured**, and any such act, error or omission of any one **Insured** will not reduce or avoid coverage afforded to any other **Insured** hereunder, except with respect to the limits of liability.  No fraudulent, criminal or intentionally malicious act, error or omission of one **Insured** will be imputed to any other **Insured** who was not aware of and did not participate in such act;

All other terms, conditions and limitations of this Policy shall remain unchanged.

HPL-P-DEVX5 (08/08 ed.)              1

ENDORSEMENT NO.  14

HEALTH CARE ORGANIZATIONS AND PROVIDERS
PROFESSIONAL LIABILITY, GENERAL LIABILITY AND
EMPLOYEE BENEFIT LIABILITY POLICY

FIRE DAMAGE COVERAGE ENDORSEMENT

This Endorsement, which is effective at 12:01 a.m. on July 1, 2013, forms part of:

Policy No.    MPP-5447-13
Issued to      Devereux Foundation
Issued by      Homeland Insurance Company of Delaware

In consideration of the premium charged, notwithstanding anything to the contrary contained in the Policy, the Underwriter's maximum aggregate Limit of Liability under the Policy for all Loss resulting from any and all fires caused by, or resulting from, an Insured's negligence and occurring on premises

(1)    rented to the Insured, or

(2)    temporarily occupied by the Insured with the permission of the owner of the such premises shall be $100,000.

All other terms, conditions and limitations of the Policy shall remain unchanged.

HPL-P-0017

ENDORSEMENT NO.  15
HEALTH CARE ORGANIZATIONS AND PROVIDERS
PROFESSIONAL LIABILITY, GENERAL LIABILITY AND
EMPLOYEE BENEFIT LIABILITY POLICY

WAIVER OF SUBROGATION – INSURING AGREEMENT (B)

This Endorsement, which is effective at 12:01 a.m. on July 1, 2013, forms part of:

Policy No.     MPP-5447-13
Issued to       Devereux Foundation
Issued by       Homeland Insurance Company of Delaware

In consideration of the premium charged, Section IV GENERAL CONDITION (L) is amended to read in its entirety as follows:

"(L)     In the event of any payment under INSURING AGREEMENT (A) or (C) of this Policy, the Underwriter shall be subrogated to the extent of any such payment to all of the rights of recovery of the **Insured**. The **Insured** shall execute all papers and do everything necessary to secure such rights, including the execution of any documents necessary to enable the Underwriter effectively to bring suit in its name. The **Insured** shall do nothing after a loss that may prejudice the Underwriter's position or potential or actual rights of recovery. The obligations of the **Insured** under this GENERAL CONDITION (L) shall survive the expiration or termination of the Policy."

All other terms, conditions and limitations of the Policy shall remain unchanged.

HPL-P-0059

ENDORSEMENT NO.  16

EXTENDED REPORTING PERIOD OPTION(S) ENDORSEMENT

This Endorsement, which is effective at 12:01 a.m. on July 1, 2013, forms part of:

Policy No.    MPP-5447-13
Issued to      Devereux Foundation
Issued by      Homeland Insurance Company of Delaware

In consideration of the premium charged, paragraph (1) of Section IV, GENERAL CONDITION I, Extended Reporting Period for INSURING AGREEMENTS (A) and (C), is amended to read in its entirety as follows:

(1)    If this Policy is terminated by any party for any reason other than misrepresentation, fraud or nonpayment of premium, the Named Insured shall have the right to purchase an Extended Reporting Period of:

(a)  Twelve (12) months for an additional premium equal to seventy five percent (75%) of the full annual premium for this Policy; or

(b)  Twenty four (24) months for an additional premium equal to one hundred twenty five percent (125%) of the full annual premium for this Policy; or

(c)  Thirty six (36) months for an additional premium equal to one hundred seventy five percent (175%) of the full annual premium for this Policy,

but only with respect to the coverage afforded under INSURING AGREEMENTS (A) and (C) of this Policy.  In order to purchase the Extended Reporting Period, the Named Insured, within thirty (30) days of the termination or the date of such conversion of coverage, must (i) provide written notice by certified mail to the Underwriter requesting the applicable Extended Reporting Period described above, and (ii) pay the full amount of additional premium required hereunder, together with any earned but unpaid premium which may be due under the terminated policy.  The additional premium shall be deemed fully earned upon inception of the Extended Reporting Period.

All other terms, conditions and limitations of the Policy shall remain unchanged.

HPL-P-0037

ENDORSEMENT NO.  17

HEALTH CARE ORGANIZATIONS AND PROVIDERS
PROFESSIONAL LIABILITY, GENERAL LIABILITY AND
EMPLOYEE BENEFIT LIABILITY POLICY

AMEND DEFINITION OF OCCURRENCE ENDORSEMENT

This Endorsement, which is effective at 12:01 a.m. on July 1, 2013, forms part of:

|  |  |
|---|---|
| Policy No. | MPP-5447-13 |
| Issued to | Devereux Foundation |
| Issued by | Homeland Insurance Company of Delaware |

In consideration of the premium charged, the term "**Occurrence**," as defined in Section II Definitions of this Policy, is amended to read in its entirety as follows:

"**Occurrence**" means:

(1)     with respect to **Bodily Injury** or **Property Damage**, an accident, including continuous or repeated exposure to substantially the same harmful conditions, which results in injury or damage neither expected nor intended by the **Insured**; and

(2)     with respect to **Advertising Injury** or **Personal Injury**, a covered offense as set forth in Definitions (B) or Definitions (Z) of this Policy.

All other terms, conditions and limitations of this Policy shall remain unchanged.

ENDORSEMENT NO. 18

HEALTH CARE ORGANIZATIONS AND PROVIDERS
PROFESSIONAL LIABILITY, GENERAL LIABILITY AND
EMPLOYEE BENEFIT LIABILITY POLICY

SPOUSAL EXTENSION FOR INSURING AGREEMENT (B) ENDORSEMENT

This Endorsement, which is effective at 12:01 a.m. on July 1, 2013, forms part of:

Policy No.     MPP-5447-13
Issued to      Devereux Foundation
Issued by      Homeland Insurance Company of Delaware


In consideration of the premium charged, subparagraph (8) of the term "**Insured**," as defined in Section II Definitions of this Policy, is amended to read in its entirety as follows:

(8)(a)   solely with respect to and limited to coverage afforded under INSURING AGREEMENTS (A) and (B), the lawful spouses of individual **Insureds**;

(b)   solely with respect to and limited to coverage afforded under INSURING AGREEMENT (A), in the event of the death, incapacity, or bankruptcy of an individual **Insured**, the estates, heirs, legal representatives or assigns of such individual **Insured**;


All other terms, conditions and limitations of this Policy shall remain unchanged.

ENDORSEMENT NO.  19


HEALTH CARE ORGANIZATIONS AND PROVIDERS
PROFESSIONAL LIABILITY, GENERAL LIABILITY AND
EMPLOYEE BENEFIT LIABILITY POLICY


AMEND NOTICE OF CANCELLATION ENDORSEMENT

This Endorsement, which is effective at 12:01 a.m. on July 1, 2013, forms part of:

        Policy No.    MPP-5447-13
        Issued to     Devereux Foundation
        Issued by     Homeland Insurance Company of Delaware


In consideration of the premium charged, Section IV General Conditions (J)(1) of this Policy is amended by deleting the phrase "sixty (60) days" therein and replacing it with the phrase "ninety (90) days."


All other terms, conditions and limitations of this Policy shall remain unchanged.

ENDORSEMENT NO. 20
PERSONAL INFORMATION PROTECTION EVENT REIMBURSEMENT
COVERAGE ENDORSEMENT

This Endorsement, which is effective at 12:01 a.m. on July 1, 2013, forms part of:

| | |
|---|---|
| Policy No. | MPP-5447-13 |
| Issued to | Devereux Foundation |
| Issued by | Homeland Insurance Company of Delaware |

In consideration of the premium charged:

(1)     In addition to the coverage afforded under INSURING AGREEMENTS (A), (B), (C), (D) and (E) of this Policy, the Underwriter will reimburse the **Named Insured**, up to the Limit of Liability set forth in paragraph (2) below and upon satisfactory proof of payment by the **Named Insured**, for **Personal Information Protection Event Expenses** (as defined below) actually paid by the **Named Insured** in connection with a **Personal Information Protection Event** (as defined below) that occurs during the **Policy Period**.

(2)     The maximum aggregate Limit of Liability of the Underwriter for all **Personal Information Protection Event Expenses** resulting from all covered **Personal Information Protection Events** reimbursed under paragraph (1) above shall be $100,000.  Payment of such maximum aggregate Limit of Liability shall terminate the Underwriter's obligation to reimburse any further **Personal Information Protection Event Expenses** under this endorsement.

(3)     The term "**Loss**," as defined in Section II DEFINTIONS of this Policy, is amended to include **Personal Information Protection Event Expenses**.

(4)     Section II DEFINITIONS of this Policy is amended to include the following terms:

      (a)     "**Personal Information Protection Event**" means any failure by an **Insured** to maintain the confidentiality of information regarding **Medical Services** or information obtained in connection with **Medical Services,** or any unauthorized release or use of such information by an **Insured**.

      (b)     "**Personal Information Protection Event Expenses**" means:

            (i)     reasonable fees and costs of attorneys, experts and consultants, including third-party media consultants, incurred in the management or investigation of an actual or alleged **Personal Information Protection Event**;

(ii)     reasonable fees and costs incurred in connection with notification of a **Personal Information Protection Event** to those individuals whose information has been accessed, released or used;

(iii)    reasonable fees and costs of providing credit monitoring services to those individuals whose information has been accessed, released or used in connection with a **Personal Information Protection Event**; and

(iv)    reasonable costs incurred in the management of public relations with respect to a **Personal Information Protection Event**;

provided, that **Personal Information Protection Event Expenses** shall not include any remuneration, salaries, overhead, fees, loss of earning reimbursement or benefit expenses of an **Insured.**

(5)    If, during the **Policy Period**, a **Personal Information Protection Event** occurs, as a condition precedent to its right to any coverage under this endorsement, the **Named Insured** shall give the Underwriter written notice of such **Personal Information Protection Event** as soon as practicable thereafter, but in no event later than thirty (30) days after the Expiration Date or earlier cancellation date of this Policy.  The **Named Insured** shall also provide the Underwriter with all information and documentation as the Underwriter may reasonably require.

All other terms, conditions and limitations of this Policy shall remain unchanged.

ENDORSEMENT NO. 21

ADDITIONAL INSURED ENDORSEMENT - PRIMARY AND NON-CONTRIBUTORY (GL)

This Endorsement, which is effective at 12:01 a.m. on July 1, 2013, forms part of:

| | |
|---|---|
| Policy No. | MPP-5447-13 |
| Issued to | Devereux Foundation |
| Issued by | Homeland Insurance Company of Delaware |

In consideration of the premium charged:

(1)     Solely for the purposes of the coverage afforded under INSURING AGREEMENT (B) of this Policy, and subject to the terms and conditions set forth in this endorsement, the term "**Insured**," as defined in Section II DEFINITIONS of this Policy, is amended to include the person or entity scheduled below with whom/which the **Named Insured** has a written agreement to provide such person or entity additional insured status under this Policy (each an "Additional Insured"), but solely with respect to any liability imposed or sought to be imposed on such Additional Insured as a result of the acts, errors or omissions of an **Insured**.

Additional Insured

- Blanket Basis where required by contract
- The County of Orange

(2)     Subject to the terms and conditions set forth in this endorsement, the coverage provided to an Additional Insured shall be primary and non-contributory with respect to any liability imposed or sought to be imposed on such Additional Insured as a result of the acts, errors or omissions of an **Insured**.

(3)     No coverage will be available under this Policy for **Loss** or **Defense Expenses** for any **Claim** against an Additional Insured based upon, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving any actual or alleged act, error or omission of an Additional Insured.

(4)     An Additional Insured's status as an Additional Insured under this Policy shall immediately terminate when the **Named Insured's** agreement to provide such status or obligation to indemnify such Additional Insured terminates.

(5)     The amount, extent and scope of coverage available under this Policy to an Additional Insured will be no greater than the amount, extent and scope of the indemnification available to such Additional Insured as agreed to by the **Named Insured** in the written agreement between the **Named Insured** and such Additional Insured.

(6)     It is understood and agreed that the Additional Insured(s) share in the applicable Limits of Liability set forth in ITEM 4.B. of the Declarations.

All other terms, conditions and limitations of this Policy shall remain unchanged.

ENDORSEMENT NO.  22
AMEND SECTION III EXCLUSION (B)(18) FOR PESTICIDE/HERBICIDE
APPLICATION ENDORSEMENT

This Endorsement, which is effective at 12:01 a.m. on July 1, 2013, forms part of:

Policy No.   MPP-5447-13
Issued to      Devereux Foundation
Issued by     Homeland Insurance Company of Delaware

In consideration of the premium charged:

(1)     Section III Exclusions (B)(18) of this Policy will not apply to the application of
herbicides or pesticides by an **Insured** on property owned by the **Named
Insured**; provided, that such application of herbicides or pesticides meets all
standards of any statute, ordinance, regulation or license requirement of any
federal, state or local government which apply to such application.

(2)     It is understood and agreed that the Underwriter's maximum limit of liability for
all **Loss**, including **Defense Expenses**, resulting from all covered **Claims** based
upon, arising out of, directly or indirectly resulting from, in consequence of, or in
any way involving any actual or alleged application of herbicides or pesticides by
an **Insured** on property owned by the **Named Insured** shall be $1,000,000, which
amount shall be part of, and not in addition to, the Underwriter's Limits of
Liability set forth in ITEM 4 of the Declarations.

All other terms, conditions and limitations of the Policy shall remain unchanged.

ENDORSEMENT NO.  23
ADDITIONAL INSURED ENDORSEMENT

This Endorsement, which is effective at 12:01 a.m. on July 1, 2013, forms part of:

Policy No.    MPP-5447-13
Issued to      Devereux Foundation
Issued by      Homeland Insurance Company of Delaware

In consideration of the premium charged:

(1)    The term "**Insured**," as defined in Section II DEFINITIONS of this Policy, is amended to include the person(s) or entity(ies) listed below (each an "Additional Insured"), but solely with respect to any liability imposed or sought to be imposed on such Additional Insured as a result of the acts, errors or omission of an original **Insured**.

Additional Insured(s)
Sachem Central School District
51 School Street
Lake Ronkonkoma, NY 11779-2299

(2)    No coverage will be available under this Policy for **Loss** or **Defense Expenses** for any **Claim** against an Additional Insured based solely upon the actual or alleged acts, errors or omissions of an Additional Insured.

(3)    With respect to any **Claim** against an Additional Insured based upon both the acts, errors or omissions of the original **Insured** and the acts, errors or omissions of an Additional Insured, the Underwriter will pay **Defense Expenses** incurred by such Additional Insured in connection with such **Claim** and **Loss** such Additional Insured is legally obligated to pay as a result of the acts, errors or omissions of the original **Insured**, subject in all events to all other terms, conditions and exclusions of this Policy.  No coverage will be available under this Policy for any **Loss** such Additional Insured is obligated to pay as a result of its own acts, errors or omissions.

(4)    Section IV GENERAL CONDITIONS (I)(1) of this Policy is amended by adding the following thereto:

The Underwriter will provide the Additional Insured(s) with at least ten (10) days' written notice of cancellation of this Policy if such cancellation is for non-payment of premium, or sixty (60) days' written notice of cancellation if such cancellation is for any other reason.

All other terms, conditions and limitations of this Policy shall remain unchanged.

ENDORSEMENT NO.  24
ADDITIONAL INSURED ENDORSEMENT

This Endorsement, which is effective at 12:01 a.m. on July 1, 2013, forms part of:

Policy No.    MPP-5447-13
Issued to      Devereux Foundation
Issued by      Homeland Insurance Company of Delaware

In consideration of the premium charged:

(1)    The term "**Insured**," as defined in Section II DEFINITIONS of this Policy, is amended to include the person(s) or entity(ies) listed below (each an "Additional Insured"), but solely with respect to any liability imposed or sought to be imposed on such Additional Insured as a result of the acts, errors or omission of an original **Insured**.

Additional Insured(s)
 York County Community Policy and Management Team
 301 Goodwin Neck Road
 Yorktown, VA  23692

(2)    No coverage will be available under this Policy for **Loss** or **Defense Expenses** for any **Claim** against an Additional Insured based solely upon the actual or alleged acts, errors or omissions of an Additional Insured.

(3)    With respect to any **Claim** against an Additional Insured based upon both the acts, errors or omissions of the original **Insured** and the acts, errors or omissions of an Additional Insured, the Underwriter will pay **Defense Expenses** incurred by such Additional Insured in connection with such **Claim** and **Loss** such Additional Insured is legally obligated to pay as a result of the acts, errors or omissions of the original **Insured**, subject in all events to all other terms, conditions and exclusions of this Policy.  No coverage will be available under this Policy for any **Loss** such Additional Insured is obligated to pay as a result of its own acts, errors or omissions.

(4)    Section IV GENERAL CONDITIONS (I)(1) of this Policy is amended by adding the following thereto:

The Underwriter will provide the Additional Insured(s) with at least ten (10) days' written notice of cancellation of this Policy if such cancellation is for non-payment of premium, or sixty (60) days' written notice of cancellation if such cancellation is for any other reason.

All other terms, conditions and limitations of this Policy shall remain unchanged.

ENDORSEMENT NO.  25
ADDITIONAL INSURED ENDORSEMENT

This Endorsement, which is effective at 12:01 a.m. on November 6, 2013, forms part of:

Policy No.   MPP-5447-13
Issued to     Devereux Foundation
Issued by     Homeland Insurance Company of Delaware

In consideration of the premium charged:

(1)     The term "**Insured**," as defined in Section II DEFINITIONS of this Policy, is amended to include the person(s) or entity(ies) listed below (each an "Additional Insured"), but solely with respect to any liability imposed or sought to be imposed on such Additional Insured as a result of the acts, errors or omission of an original **Insured**.

Additional Insured(s)
  The Government of the Virgin Islands
  Department of Human Services
  Knud Hansen Complex, Bldg. A
  St. Thomas, VI  08002

(2)     No coverage will be available under this Policy for **Loss** or **Defense Expenses** for any **Claim** against an Additional Insured based solely upon the actual or alleged acts, errors or omissions of an Additional Insured.

(3)     With respect to any **Claim** against an Additional Insured based upon both the acts, errors or omissions of the original **Insured** and the acts, errors or omissions of an Additional Insured, the Underwriter will pay **Defense Expenses** incurred by such Additional Insured in connection with such **Claim** and **Loss** such Additional Insured is legally obligated to pay as a result of the acts, errors or omissions of the original **Insured**, subject in all events to all other terms, conditions and exclusions of this Policy.  No coverage will be available under this Policy for any **Loss** such Additional Insured is obligated to pay as a result of its own acts, errors or omissions.

(4)     Section IV GENERAL CONDITIONS (I)(1) of this Policy is amended by adding the following thereto:

The Underwriter will provide the Additional Insured(s) with at least ten (10) days' written notice of cancellation of this Policy if such cancellation is for non-payment of premium, or sixty (60) days' written notice of cancellation if such cancellation is for any other reason.

All other terms, conditions and limitations of this Policy shall remain unchanged.

ENDORSEMENT NO.  26
MANAGED CARE SERVICES COVERAGE ENDORSEMENT

This Endorsement, which is effective at 12:01 a.m. on November 1, 2013, forms part of:

Policy No.    MPP-5447-13
Issued to      Devereux Foundation
Issued by      Homeland Insurance Company of Delaware

In consideration of the premium charged, solely with respect to **Claims** based upon, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving the rendering of, or failure to render, **Professional Services** in connection with or pursuant to the following contact:

Devereux Community Based Care of Okeechobee and the Treasure Coast – Contract # ZJK85

(1)     ITEM 4.A. of the Declarations is amended to read in its entirety as follows:

A.  Healthcare Professional Liability
Each Claim……………………………………$1,000,000
Aggregate for all Claims……………………....$3,000,000
Deductible     Self-Insured Retention
Per Claim……………………………..$50,000
Aggregate ……………………………. N/A

(2)     For purposes of this endorsement, the term "**Claim Services**" means the following services, but only if performed by an **Insured**: the submission, handling, investigation, payment or adjustment of claims for benefits or coverages under health care or workers' compensation plans.

Section II DEFINITIONS of this Policy shall be deemed amended to include such term

(3)     The term "**Managed Care Services**," as defined in Section II DEFINITIONS of this Policy, is amended to read in its entirety as follows:

"**Managed Care Services**" means any of the following services or activities: **Peer Review**; **Utilization Review**; advertising, marketing, selling, or enrollment for health care or workers' compensation plans; **Claim Services**; establishing health care provider networks; design and/or implementation of financial incentive plans; wellness or health promotion education; development or implementation of clinical guidelines, practice parameters or protocols; triage for payment of **Medical Services**; and services or activities performed in the administration or management of health care or workers' compensation plans.

(4)     The term "**Professional Services**," as defined in Section II DEFINITIONS of this Policy, is amended to read in its entirety as follows:

> "**Professional Services**" means:

> (1)    **Medical Services**;

> (2)    **Managed Care Services**;

> (3)    the activities of an **Insured** as a member of a formal accreditation, standards review or similar professional board or committee, including executing the directives of such board or committee; or

> (4)    reviewing the quality of **Medical Services** or providing quality assurance on behalf of the **Named Insured**.

(5)     The term "**Utilization Review**," as defined in Section II DEFINITIONS of this Policy, is amended to read in its entirety as follows:

> "**Utilization Review**" means the process of evaluating the appropriateness or necessity of **Medical Services** provided or to be provided by an **Insured**. **Utilization Review** shall include prospective review of proposed **Medical Services**, concurrent review of ongoing **Medical Services** and retrospective review of already rendered **Medical Services**.

(6)     Section III EXCLUSIONS (D)(12) of this Policy is deleted in its entirety.

(7)     Solely with respect to any **Claim** based upon, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving any **Managed Care Services**, no coverage will be available under this Policy for any such **Claim** made by or on behalf of any federal, state or local governmental, regulatory or administrative agency, whether such **Claim** is brought in the name of such agency or by or on behalf of such agency in the name of any other individual or entity.

(8)     Solely with respect to **Claims** for which coverage is provided under this endorsement, it is understood and agreed that the provisions set forth in Endorsement No. 7 to this Policy, "CO-INSURANCE ENDORSEMENT," shall not apply.

All other terms, conditions and limitations of this Policy shall remain unchanged.

ENDORSEMENT NO.  27
ADDITIONAL INSURED ENDORSEMENT

This Endorsement, which is effective at 12:01 a.m. on April 9, 2014, forms part of:

<div style="margin-left:2em">

Policy No.    MPP-5447-13
Issued to     Devereux Foundation
Issued by    Homeland Insurance Company of Delaware

</div>

In consideration of the premium charged, the term "**Insured**," as defined in Section II DEFINITIONS of this Policy, shall include the person(s) listed below (each an "Additional Insured"), but only with respect to liability of any such Additional Insured that is based on or arises out of acts, errors or omissions committed or allegedly committed by such Additional Insured in the scope of his/her duties for the **Named Insured**, and only with respect to **Claims** under INSURING AGREEMENT B of this Policy; provided that such **Claim** is also made and continuously maintained against an **Insured**, other than an Additional Insured.

Additional Insured(s)

Shasta County, its elected officials, officers, employees, agents, and volunteers
1810 Market Street
Redding, CA 96001

All other terms, conditions and limitations of this Policy shall remain unchanged.

HPE-10008-07/08                  1

ENDORSEMENT NO. 28
ADDITIONAL INSURED ENDORSEMENT

This Endorsement, which is effective at 12:01 a.m. on April 28, 2014, forms part of:

        Policy No.    MPP-5447-13
        Issued to     Devereux Foundation
        Issued by    Homeland Insurance Company of Delaware

In consideration of the premium charged:

(1)     The term "**Insured**," as defined in Section II DEFINITIONS of this Policy, is amended to include the person(s) or entity(ies) listed below (each an "Additional Insured"), but solely with respect to any liability imposed or sought to be imposed on such Additional Insured as a result of the acts, errors or omission of an original **Insured**.

        Additional Insured(s)
         The Government of the Virgin Islands
         Department of Health
         1303 Hospital Ground, Suite 10
         St. Thomas, U.S.V.I.  00802-6722

(2)     No coverage will be available under this Policy for **Loss** or **Defense Expenses** for any **Claim** against an Additional Insured based solely upon the actual or alleged acts, errors or omissions of an Additional Insured.

(3)     With respect to any **Claim** against an Additional Insured based upon both the acts, errors or omissions of the original **Insured** and the acts, errors or omissions of an Additional Insured, the Underwriter will pay **Defense Expenses** incurred by such Additional Insured in connection with such **Claim** and **Loss** such Additional Insured is legally obligated to pay as a result of the acts, errors or omissions of the original **Insured**, subject in all events to all other terms, conditions and exclusions of this Policy.  No coverage will be available under this Policy for any **Loss** such Additional Insured is obligated to pay as a result of its own acts, errors or omissions.

(4)     Section IV GENERAL CONDITIONS (I)(1) of this Policy is amended by adding the following thereto:

             The Underwriter will provide the Additional Insured(s) with at least ten (10) days' written notice of cancellation of this Policy if such cancellation is for non-payment of premium, or sixty (60) days' written notice of cancellation if such cancellation is for any other reason.

All other terms, conditions and limitations of this Policy shall remain unchanged.

# EXHIBIT D

# OneBeacon
### PROFESSIONAL INSURANCE™

onebeaconpro.com

| RE: Hospital Professional Liability - Primary<br>Devereux Foundation | Policy |
|---|---|
| Account No: 121    Policy No: MPP-6333-14 | |



| | 199 Scott Swamp Road | 877.701.0171 t | onebeaconpro.com |
| | Farmington, CT 06032 | 866.625.3590 f | |

Thank you for choosing OneBeacon Professional Insurance as your liability insurance carrier.  You now have access to a broad range of risk management resources, all designed to assist you in your efforts to advance patient safety and mitigate risk.  And, in the event you do have a claim, you have an experienced team to work with you throughout the life of the claim.

**Risk Management Information and Support at Your Fingertips**

Resources Include

- Access to an OBPI client only risk management resources portal
- Educational programs
- Electronic newsletters and headline alerts
- Access to publications/reference texts
- Consultative and research services
- Electronic risk assessment tools

In addition to our in-house expertise, we have a relationship with The Rozovsky Group and The Virtual Group, industry leaders in offering a broad range of risk management services.  As an OBPI insured, you can register to start accessing this material now.

- To register, go to obpi.therozovskygroup.com. If you have registered previously, please take an opportunity to update your information by re-registering so that we can send you our webinar invitations and enewsletter updates.
- If you have difficulty registering, please contact Joshua Rozovsky at 860.242.1302 or josh@therozovskygroup.com.

Please know we value your privacy and will never sell or otherwise distribute your personal information to any third party.

**Superior Claims Support**

We realize that - despite best efforts - claims sometimes do occur.  An experienced Claims Examiner is assigned for each reported claim, and will serve as a dedicated resource and point of contact.  For your convenience, claims can be submitted one of three ways:

Secure E-mail: obpiclaims@onebeaconpro.com (You will receive an immediate email acknowledgment)
Fax: 877.256.5067
U.S. Mail:
        Chief Claims Officer
        OneBeacon Professional Insurance
        199 Scott Swamp Road
        Farmington, CT 06032

We hope that you find these resources helpful as we strive to provide you with an entirely better insurance and risk management experience.  We welcome your feedback or questions, which can be sent to us at tellobpi@onebeaconpro.com.

If you are not the person who should be receiving this information, please forward it to the appropriate person and copy cmahaney@onebeaconpro.com so we can update our files.

Thank you again for selecting OneBeacon Professional Insurance. We look forward to working with you.

Patricia Hughes, MSN, CPHRM
Vice President
Risk Management
860 321 2601
phughes@onebeaconpro.com

Tom Ruane
Vice President, Claims Leader
Medical and Professional Claims
860.321.2902
truane@onebeaconpro.com

## <u>OneBeacon Professional Insurance Medical Professional and General Liability Claim Reporting Guidelines</u>

Following are examples of the types of events that should be reported in accordance with the general conditions regarding Reporting of Claims, Occurrences and Circumstances under your One Beacon policy:

- Medication errors resulting in injury and/or requiring further treatment (including patient not receiving medication; receiving incorrect dosage of medication; or receiving wrong medication)
- Falls resulting in injury
- Family/Patient complaints of inadequate care resulting in injury
- Events reported to the state Dept of Health, other regulatory body or police
- Visitor injuries
- Unexpected death
- Serious injury (including, but not limited to, paraplegia; quadriplegia; or severe neurological impairment)
- Elopement
- Allegations of physical or sexual abuse
- Sentinel events
- Oral or written demands for damages
- Lawsuits
- Communication from an attorney regarding any of the events noted above
- Request from an attorney for medical records
- Any other event the Insured reasonably believes could result in a Claim under the policy

*The above list of events is not meant to be exhaustive or exclusive. Nothing contained in or omitted from this document should be deemed a waiver of any terms or conditions of any applicable policy. These guidelines are provided for general informational purposes only and should not be considered or relied upon as coverage, legal or risk-management advice. Readers should consult the specific terms of their policy and their own legal counsel for advice.*

*Please report all claims and reportable events to:*

Chief Claims Officer
OneBeacon Professional Insurance
199 Scott Swamp Road
Farmington, CT 06032
877.256.5067 (fax)
obpiclaims@onebeaconpro.com

**Homeland Insurance Company of Delaware**
One Beacon Lane
Canton, MA 02021
*(hereinafter referred to as the "Underwriter")*



**Policy Number:** MPP-6333-14

## DECLARATIONS

**HEALTH CARE ORGANIZATIONS AND PROVIDERS PROFESSIONAL LIABILITY, GENERAL LIABILITY AND EMPLOYEE BENEFIT LIABILITY POLICY**

**PORTIONS OF THIS POLICY PROVIDE CLAIMS MADE AND REPORTED COVERAGE, WHICH APPLIES ONLY TO CLAIMS FIRST MADE AGAINST THE INSURED DURING THE POLICY PERIOD OR AN APPLICABLE EXTENDED REPORTING PERIOD AND REPORTED IN ACCORDANCE WITH THIS POLICY'S REPORTING PROVISIONS.  PLEASE READ THIS POLICY CAREFULLY.**

| ITEM 1. **FIRST NAMED INSURED**<br><br>Name and Principal Address:<br><br>Devereux Foundation<br>444 Devereux Drive<br>Villanova, PA 19085 | ITEM 2. **POLICY PERIOD:**<br><br>(a) Inception Date: July 1, 2014<br>(b) Expiration Date: July 1, 2016<br><br>Both dates at 12:01 a.m. at the<br>Principal Address in ITEM 1. |
|---|---|

**ITEM 3.   COVERAGE/TYPE/RETROACTIVE DATE(S)**

| Coverage | Type | Retroactive Date |
|---|---|---|
| A.  Healthcare Professional Liability | Claims Made | July 1, 1990 |
| B.  General Liability | Occurrence | |
| C.  Employee Benefit Liability | Claims Made | July 1, 1990 |
| D.  Evacuation Expense | Expense Reimbursement | N/A |
| E.  Legal/Media Expense | Expense Reimbursement | Per Insuring Agreement (A) |

**ITEM 4.   LIMIT(S) OF LIABILITY; DEDUCTIBLE/SELF-INSURED RETENTION**

A.   Healthcare Professional Liability
    Each Claim..........................................................................$10,000,000
    Aggregate for all Claims.....................................................$18,000,000

    Deductible X     Self-Insured Retention _
        Per Claim...............................................................$4,000,000
        Aggregate...............................................................$8,000,000

B.   General Liability
    Each Claim..........................................................................$10,000,000
    Aggregate for all Claims.....................................................$18,000,000

    Deductible X     Self-Insured Retention _
        Per Claim...............................................................Included in
        Aggregate...............................................................PL Deductible

C.   Employee Benefit Liability
      Each Claim...................................................$10,000,000
      Aggregate for all Claims...............................$18,000,000

      Deductible <u>X</u>    Self-Insured Retention _
           Per Claim...............................................$1,000
           Aggregate..............................................N/A

D.   Evacuation Expense
      Each Evacuation............................................$100,000
      Aggregate for all Evacuations.........................$100,000

E.   Legal/Media Expense
      Each Legal Defense Proceeding.......................$25,000
      Aggregate for all Legal Defense Proceedings..................$100,000

---

**ITEM 5.**    **PREMIUM**

A.   Policy Premium: 

B.   Minimum Earned Premium:  25% of Policy Premium shown above.

  <u>X</u> This Policy provides coverage for acts of terrorism as defined in the Terrorism Risk Insurance Act of 2002 (the "Act").  The premium attributable to this coverage is <u>Included</u>.

  ___ This Policy specifically excludes coverage for acts of terrorism as defined in the Act.

---

**ITEM 6.**    **EXTENDED REPORTING PERIOD OPTION(S):**

12 months at 100% of Full Annual Premium

**"Full Annual Premium" means the amount set forth in ITEM 5 above including any premium adjustments made during the Policy Period.**

---

**ITEM 7.**    **ALL NOTICES REQUIRED TO BE GIVEN TO THE UNDERWRITER UNDER GENERAL CONDITION (C) OF THE POLICY MUST BE ADDRESSED TO:**

Chief Claims Officer
OneBeacon Professional Insurance
199 Scott Swamp Road
Farmington, CT 06032

**ALL OTHER NOTICES REQUIRED TO BE GIVEN TO THE UNDERWRITER UNDER THIS POLICY MUST BE ADDRESSED TO:**

OneBeacon Professional Insurance
199 Scott Swamp Road
Farmington, CT 06032

| ITEM 8. | **POLICY FORM AND ENDORSEMENTS ATTACHED AT ISSUANCE:** |
|---|---|
| | HPF 10001 02 13   Health Care Organization and Providers Professional Liability, General Liability and Employee Benefit Liability Policy |
| HPE-00001-07-08 | Defense Within the Limits Endorsement |
| HPE-00006-07-08 | Medical Expenses for Bodily Injury Endorsement |
| HPE-00012-07-08 | Minimum Earned Premium Endorsement |
| HPE-00013-07-08 | Service of Suit Endorsement |
| HPE-00032-08-09 | Blanket Waiver of Subrogation Endorsement - Insuring Agreement (B) Only |
| HPE-00042-02-13 | Amend Cancellation to Ninety (90) Days Endorsement |
| HPE-10023-02-10 | Amend Professional Services Endorsement |
| HPE-10013-02-13 | Personal Information Protection Event Reimbursement Coverage Endorsement |
| HPE-10001-07-08 | Schedule A - Named Insured Endorsement |
| HPE-10018-08-09 | Additional Insured Endorsement |
| HPE-10008-07-08 | Additional Insured Endorsement |
| HPE-00007-02-13 | Damage to Rented Premises Coverage Endorsement |
| HPE-30029-03-13 | Additional Insured Endorsement – Where Required by Contract GL Only |
| HPE-DEVX3-10-14 | Delete Duty to Defend Endorsement |
| HPL-P-DEVX1 | Amend Definition of Insured to include Additional Individuals |
| HPL-P-DEVX10 | Limited Waiver of Subrogation – Insuring Agreement (A) |
| HPL-P-DEVX2 | Pollution Exclusion |
| HPL-P-DEVX4 | Insured v Insured Carve Back Endorsement |
| FTCA-004201-11 | Additional Insured Endorsement Primary & Non-Contributory (GL) |
| HPL-P-DEVX15 | Amend Section III Exclusion (B)(18) for Pesticide/Herbicide Application Endorsement |
| HPL-P-DEVX12 | Spousal Extension for Insuring Agreement B Endorsement |
| HPL-P-DEVX3 | Amend Definition of Insured to Include Independent Contractors |
| HPL-P-DEVX16 | Managed Care Services Coverage Endorsement |
| HPE-DEVX2-10-14 | Amend Definition of Employee Endorsement |
| HPE-DEV1-10-14 | Amend Item 4.B.of the Declarations for Specific Insured Endorsement |
| HPE-10003-07-08 | Schedule of Insured Physicians with Separate Limits Endorsement |
| HPE-10026-02-13 | Two Year Policy Period Endorsement |
| Manuscript | Separate limits for Employed Physicians |
| Manuscript | Amend Non-Renewal Notice to 90 days |

These Declarations, the completed signed Application, and the Policy (together with any and all endorsements thereto) shall constitute the entire agreement between the Underwriter and the Insured(s).

**Homeland Insurance Company of Delaware**
By:

_T. M. Lill_

_____      November 3, 2014
Its Authorized Representative                                    Date:

**HEALTH CARE ORGANIZATIONS AND
PROVIDERS PROFESSIONAL LIABILITY,
GENERAL LIABILITY AND
EMPLOYEE BENEFIT LIABILITY POLICY**



**PORTIONS OF THIS POLICY PROVIDE CLAIMS MADE AND REPORTED COVERAGE, WHICH
APPLIES ONLY TO CLAIMS FIRST MADE AGAINST THE INSURED DURING THE POLICY
PERIOD OR AN APPLICABLE EXTENDED REPORTING PERIOD AND REPORTED IN
ACCORDANCE WITH THIS POLICY'S REPORTING PROVISIONS.  PLEASE READ THIS POLICY
CAREFULLY.**

In consideration of the payment of the premium, and in reliance on all statements made and information
furnished to the Underwriter, and subject to all of the terms and conditions of this Policy (including all
endorsements hereto), the Underwriter and the **Insured** agree as follows:

**I.     INSURING AGREEMENTS**

**(A)     Claims Made Professional Liability Insurance:**

The Underwriter will pay up to the applicable Limit of Liability shown in ITEM 4.A. of the
Declarations on behalf of the **Insured** any **Loss** that the **Insured** is legally obligated to pay as a
result of any covered **Claim** for a **Professional Services Wrongful Act** happening on or after
the **Retroactive Date**; provided, that the **Claim** is first made against the **Insured** during the
**Policy Period** or applicable Extended Reporting Period and reported to the Underwriter in
accordance with GENERAL CONDITION (C) of this Policy.

**(B)     Occurrence-Based General Liability Insurance:**

The Underwriter will pay up to the applicable Limit of Liability shown in ITEM 4.B. of the
Declarations on behalf of the **Insured** any **Loss** which the **Insured** is legally obligated to pay as
a result of a covered **Claim** alleging **Bodily Injury**, **Property Damage**, **Advertising Injury** or
**Personal Injury** that is caused by an **Occurrence** that takes place during the **Policy Period**;
provided, that the **Claim** is reported to the Underwriter in accordance with GENERAL CONDITION
(C) of this Policy.

**(C)     Claims Made Employee Benefit Liability Insurance:**

The Underwriter will pay up to the Limit of Liability shown in ITEM 4.C. of the Declarations on
behalf of the **Insured** any **Loss** that the **Insured** is legally obligated to pay as a result of any
covered **Claim** for an **Employee Benefit Wrongful Act** happening on or after the **Retroactive
Date**; provided, that the **Claim** is first made against the **Insured** during the **Policy Period** or
applicable Extended Reporting Period and reported to the Underwriter in accordance with
GENERAL CONDITION (C) of this Policy.

**(D)     Evacuation Expense Reimbursement Insurance:**

Upon satisfactory proof of payment by the **Named Insured**, the Underwriter will reimburse the
**Named Insured** up to the amount set forth in ITEM 4.D. of the Declarations for **Evacuation
Expenses** actually paid by the **Named Insured** in connection with an **Evacuation** that occurs
during the **Policy Period**; provided, that such **Evacuation Expenses** are incurred by the
**Named Insured** no later than sixty (60) days after the Expiration Date or earlier cancellation
date of this Policy and reported to the Underwriter in accordance with GENERAL CONDITION (C)

of this Policy.

**(E)     Legal/Media Expense Reimbursement Insurance:**

Upon satisfactory proof of payment by the **Named Insured**, the Underwriter will reimburse the **Named Insured** up to the amount set forth in ITEM 4.E. of the Declarations for **Legal/Media Expenses** actually paid by the **Insured** in connection with a **Legal Defense Proceeding** first brought against the **Insured** during the **Policy Period**; provided, that:

(1)     such **Legal Defense Proceeding** arises out of **Professional Services** rendered by the **Insured** on or after the **Retroactive Date** applicable to the **Insured** against whom/which such **Legal Defense Proceeding** is brought; and

(2)     such **Legal Defense Proceeding** is reported to the Underwriter in accordance with GENERAL CONDITION (C) of this Policy.

**(F)     Defense and Supplementary Payments:**

The Underwriter has the right and duty to defend any **Claim** that is covered by INSURING AGREEMENTS (A), (B), and (C) of this Policy, even if any of the allegations of such **Claim** are groundless, false or fraudulent.  In addition to the Limits of Liability for INSURING AGREEMENTS (A), (B), and (C), the Underwriter will pay **Defense Expenses** and will:

(1)     pay the premium on any bond to release attachments for an amount not in excess of the Limits of Liability for INSURING AGREEMENTS (A), (B), and (C) of this Policy and the premium on any appeal bond required in any defended suit, provided, that the Underwriter will not be obligated to apply for or furnish any such bond;

(2)     pay all costs imposed against the **Insured** in any such suit;

(3)     provide a legal defense and pay **Defense Expenses** for any arbitration, mediation or other alternative dispute proceeding if:

(a)     the dispute at issue is a **Claim** covered by this Policy, and

(b)     the **Insured** provides notice of the proceeding as required by GENERAL CONDITION (C) of this Policy; and

(4)     pay reasonable expenses, plus loss of earnings due to time off from work, incurred by an **Insured** as a result of being a defendant or co-defendant in a **Claim** or at the Underwriter's request, but not to exceed:

(a)     $500 per day per **Insured**; and

(b)     $12,500 per **Claim**.

**II.     DEFINITIONS**

(A)     "**Administration**" means:

(1)     giving advice or counsel to **Employees** or their beneficiaries concerning their rights or interest with respect to **Employee Benefit Programs**;

(2)     determining the eligibility of **Employees** to participate in **Employee Benefit**

**Programs**;

(3)     interpreting the provisions of **Employee Benefit Programs**;

(4)     handling and keeping records and processing of claims in connection with **Employee Benefit Programs**; and

(5)     effecting enrollment, termination or cancellation of **Employees** under **Employee Benefit Programs**.

(B)     "**Advertisement**" means a notice that is broadcast or published to the general public or specific market segments about the **Insured's** goods, products or services, for the purpose of attracting customers or supporters. For purposes of this Definition:

(1)     notice that is broadcast or published includes material placed on the Internet or similar means of electronic communication; and

(2)     with regard to websites, only that part of a website that is about the **Insured's** goods, products or services, for the purpose of attracting customers or supporters, will be considered an **Advertisement**.

(C)     "**Advertising Injury**" means injury arising out of one or more of the following offenses:

(1)     the **Insured's** use of another's advertising idea in an **Advertisement**;

(2)     the **Insured's** use of another's copyright, trade dress or slogan in an **Advertisement**; or

(3)     the **Insured's** infringement upon another's copyright, trade dress or slogan in an **Advertisement**.

(D)     "**Auto**" means:

(1)     a land motor vehicle, trailer or semitrailer designed for travel on public roads, including any attached machinery or equipment; or

(2)     any other land vehicle that is subject to a compulsory or financial responsibility law or other motor vehicle insurance law in the state where it is licensed or principally garaged.

**Auto** does not include **Mobile Equipment**.

(E)     "**Bodily Injury**" means bodily injury, sickness or disease sustained by a person, including death resulting from any of these at any time; mental anguish; and mental injury.

(F)     "**Claim**" means any written notice received by an **Insured** that any person or entity intends to hold an **Insured** responsible for a **Wrongful Act** or an **Occurrence**.

(G)     "**Covered Contract**" means any contract or agreement specifically added as a **Covered Contract**  by written endorsement  to this Policy, under which the **Named Insured** assumes the tort liability of another to pay damages for **Bodily Injury** or **Property Damage** covered by this Policy that is sustained by others.

(H)     "**Defense Expenses**" means the reasonable fees of attorneys, experts and consultants and costs and expenses incurred in the investigation, adjustment, defense or appeal of a **Claim** with the

approval or at the direction of the Underwriter; provided, that **Defense Expenses** shall not include:

(1)     remuneration, salaries, overhead, fees, loss of earning reimbursement or benefit expenses of an **Insured**;

(2)     any amounts incurred in defense of a **Claim** for which any other insurer has a duty to defend, regardless of whether such other insurer undertakes such duty; or

(3)     any benefits under an **Employee Benefit Program**.

(I)     "**Employee**" means any person who has an assigned work schedule for and is on the regular payroll of the **Named Insured**, with federal and state taxes withheld.  Independent contractors are not **Employees**.  An **Employee's** status as an **Insured** shall be determined as of the date of the **Occurrence** or **Wrongful Act** upon which a **Claim** involving the **Employee** is based.

(J)     "**Employee Benefit Programs**" means any group life insurance, group accident and health insurance, profit sharing plans, pension plans, **Employee** stock subscription plans, workers' compensation, unemployment insurance, social security and disability benefits insurance or any other similar plan under the **Administration** of the **Named Insured** for the benefit of its **Employees**.

(K)     "**Employee Benefit Wrongful Act**" means any actual or alleged act, error or omission, or series of acts, errors or omissions, by an **Insured** in the **Administration** of an **Employee Benefit Program**.

(L)     "**Employment Practices**" means any of the following: breach of any employment contract; failure or refusal to hire or employ; dismissal, discharge, reduction in force, downsizing or termination of employment, whether actual or constructive; demotion, reassignment, failure or refusal to promote, or deprivation of career opportunity; discipline of **Employees**; evaluation of **Employees**; discrimination or harassment of any kind or on any basis including, but not limited to, discrimination, limitation, segregation or classification based on race, sex, marital status, ancestry, physical or mental handicaps, age, sexual preference, pregnancy or religion or other status that is protected under any applicable federal, state or local statute or ordinance affecting any present or former **Employee** or applicant for employment; humiliation or defamation of any present or former **Employee** or applicant for employment; retaliatory treatment against an **Employee** arising out of the **Employee's** attempted or actual exercise of the **Employee's** rights under the law; employment-related misrepresentations; or failure to implement appropriate workplace or employment policies or procedures.

(M)     "**Evacuation**" means the removal from one or more of the **Named Insured's** facilities to any other location of fifteen (15) or more patients or residents in such facility(ies) as a result of any natural or man-made occurrence that, in the reasonable judgment of the **Named Insured's** management, causes or could potentially cause such facility(ies) to be unsafe for such patients or residents.

(N)     "**Evacuation Expenses**" means reasonable costs incurred by the **Named Insured** in connection with an **Evacuation**, including costs associated with transporting, lodging and providing meals to patients or residents who have been evacuated.  **Evacuation Expenses** shall not include any remuneration, salaries, overhead or benefit expenses of the **Named Insured**.

(O)     "**First Named Insured**" means the entity designated as such in ITEM 1 of the Declarations.

(P)     "**Good Samaritan Acts**" means emergency medical treatment provided by an **Insured**, without

remuneration, at the scene of an accident, medical crisis or disaster.

(Q)   "**Hostile Fire**" means a fire which becomes uncontrollable or breaks out from where it was intended to be contained; provided, that **Hostile Fire** does not include any fire that originates at any site operating as a waste disposal facility or waste storage facility.

(R)   "**Impaired Property**" means tangible property, other than **Insured Product** or **Insured Work**, that cannot be used or is not useful because:

   (1)   it incorporates **Insured Product** or **Insured Work** that is known or thought to be defective, deficient, inadequate or dangerous; or

   (2)   the **Named Insured** has failed to fulfill the terms of any contract or agreement.

(S)   "**Insured**" means any of the following:

   (1)   the **Named Insured**;

   (2)   any **Employee** or **Volunteer**, but only when such **Employee** or **Volunteer** is acting within the capacity and scope of his or her duties as such;

   (3)   any **Locum Tenens**, but only when such **Locum Tenens** is acting within the capacity and scope of his or her duties as such.  Coverage for any **Locum Tenens** shall only extend for up to sixty (60) days during the **Policy Period** per **Insured** for whom such **Locum Tenens** is serving as a substitute;

   (4)   the **Named Insured's** medical directors, department heads, or chiefs of staff, but only while acting within the scope and capacity of their duties as such for the **Named Insured**;

   (5)   any member of a duly authorized board or committee of the **Named Insured**; any person communicating information to the **Named Insured** or its medical or professional staff for the purpose of aiding in the evaluation of **Professional Services** or the qualifications, professional competence, fitness, or character of an applicant for membership or privileges on such medical or professional staff or for purposes of initiating corrective action; or any person charged with the duty of acting as a hearing officer or an agent of a judicial review committee or executing directives of any such board or committee but, in each case, only when such person is acting within the capacity and scope of his or her duties to such board or committee;

   (6)   solely with respect to and limited to coverage afforded under INSURING AGREEMENT (A), the lawful spouses of individual **Insureds** and, in the event of the death, incapacity, or bankruptcy of an individual **Insured**, the estates, heirs, legal representatives or assigns of such individual **Insured**;

   (7)   any **Employee** providing **Proctoring Services** but only with respect to his or her legal liability for providing, or failing to provide, such **Proctoring Services**. The fact that a patient also may be obligated to pay for **Medical Services** rendered to the patient shall not reduce the coverage for the **Insured** to the extent of his or her **Proctoring Services**;

   (8)   any person enrolled as a student in a formal training program offered by the **Named Insured** or a subsidiary or an affiliate in connection with the **Named Insured's** on-site operation as a health care organization or provider, but only when such person is acting

within the capacity and scope of his or her duties as such;

(9)    any person hired or retained by the **Named Insured** to provide language interpretation services in connection with the provision of **Medical Services;**

(10)   any member or partner of a joint venture or partnership specifically listed as a **Named Insured** in Schedule A to this Policy, but only with respect to such member or partner's liability arising out of such joint venture or partnership; and

(11)   any driver or operator of **Mobile Equipment**, but only when operating **Mobile Equipment** at the direction and with the permission of the **Named Insured.**

(T)    "**Insured Product**" means:

(1)    any goods or products, other than real property, manufactured, sold, handled, distributed or disposed of by:

(a)    the **Named Insured**;

(b)    others trading under the name of the **Named Insured**; or

(c)    a person or an organization whose business or assets the **Named Insured** has acquired; and

(2)    containers (other than vehicles), materials, parts or equipment furnished in connection with such goods or products. **Insured Product** includes:

(a)    warranties or representations made at any time with respect to the fitness, quality, durability, performance or use of the **Insured Product**; and

(b)    the providing of or failure to provide warnings or instructions.

**Insured Product** does not include vending machines or other property rented to, or located for the use of, others but not sold.

(U)    "**Insured Work**" means:

(1)    work or operations performed by the **Named Insured** or on the **Named Insured's** behalf; and

(2)    materials, parts or equipment furnished in connection with such work or operations. **Insured Work** includes:

(a)    warranties or representations made at any time with respect to the fitness, quality, durability, performance or use of the **Insured Work**; and

(b)    the providing of or failure to provide warnings or instructions.

(V)    "**Legal Defense Proceeding**" means: (1) a hearing or disciplinary action against an **Insured** before a state or other licensing board or governmental regulatory body; (2) a civil or criminal proceeding in which the **Insured** is not a defendant but has been ordered to offer deposition testimony regarding treatment rendered to a **Patient**; or (3) a civil or criminal proceeding in which the **Insured** is not a party but has received a subpoena for record production regarding treatment rendered to a **Patient**.

(W)     "**Legal/Media Expenses**" means reasonable fees and costs of attorneys, experts and consultants incurred by the **Insured** in the investigation and defense of a **Legal Defense Proceeding**. **Legal/Media Expenses** also include reasonable costs incurred by the **Insured** in the management of public relations with respect to a **Legal Defense Proceeding**, including reasonable fees and costs of third-party media consultants. **Legal/Media Expenses** shall not include any remuneration, salaries, overhead, fees, loss of earning reimbursement or benefit expenses of an **Insured**.

(X)     "**Locum Tenens**" means any physician, surgeon, midwife, nurse anesthetist, nurse practitioner, physician assistant or surgical assistant who is temporarily serving as  a substitute physician, surgeon, midwife , nurse anesthetist, nurse practitioner, physician assistant or surgical assistant, as applicable, for an **Insured** while such **Insured** is temporarily absent from professional practice.

(Y)     "**Loss**" means:

    (1)     for the purposes of INSURING AGREEMENTS (A), (B) and (C), any damages, settlements, judgments or other amounts (including punitive or exemplary damages if insurable under the applicable law most favorable to the insurability thereof) in excess of the applicable deductible or self-insured retention, if any, stated in ITEM 4 of the Declarations which an **Insured** is legally obligated to pay as a result of a **Claim**;

    (2)     for the purposes of INSURING AGREEMENT (D), **Evacuation Expenses**;

    (3)     for the purposes of INSURING AGREEMENT (E), **Legal/Media Expenses**.

**Loss** shall not include:

    (a)     **Defense Expenses**;

    (b)     the multiple portion of any multiplied damage award;

    (c)     fines, penalties, sanctions, fees, government payments or taxes;

    (d)     amounts owed to any provider of **Medical Services** under any contract;

    (e)     restitution, return or disgorgement of fees, profits, charges for products or services rendered, capitation payments, premium or any other funds allegedly wrongfully held or obtained;

    (f)     benefits under an **Employee Benefit Program**;

    (g)     relief or redress in any form other than monetary compensation or monetary damages, including without limitation the cost of complying with any injunctive, declaratory or administrative relief;

    (h)     the payment, satisfaction or writing off of any medical bills or charges by an **Insured**; or

    (i)     matters which are uninsurable under applicable law.

(Z)     "**Managed Care Services**" means services or activities performed in the administration or management of health care plans; advertising, marketing or selling health care plans or health care products; handling, investigating or adjusting claims for benefits or coverages under health

care plans; or establishing health care provider networks.

(AA) "**Medical Services**" means health care, medical care, or treatment provided to any individual, including without limitation any of the following: medical, surgical, dental, psychiatric, mental health, chiropractic, osteopathic, nursing, or other professional health care; the furnishing or dispensing of medications, drugs, blood, blood products, or medical, surgical, dental, or psychiatric supplies, equipment, or appliances in connection with such care; the furnishing of food or beverages in connection with such care; the providing of counseling or other social services in connection with such care; and the handling of, or the performance of post-mortem examinations on, human bodies.

(BB) "**Mobile Equipment**" means any of the following types of land vehicles, including any attached machinery or equipment:

(1)     bulldozers, farm machinery, forklifts and other vehicles designed for use principally off public roads;

(2)     vehicles maintained for use solely on or next to premises owned or rented by an **Insured**;

(3)     vehicles that travel on crawler treads;

(4)     vehicles, whether self-propelled or not, maintained primarily to provide mobility to permanently mounted:

(a)     power cranes, shovels, loaders, diggers or drills, or

(b)     road construction or resurfacing equipment such as graders, scrapers or rollers;

(5)     vehicles not described in clauses (1)-(4) above that are not self-propelled and are maintained primarily to provide mobility to permanently attached equipment of the following types:

(a)     air compressors, pumps and generators, including spraying, welding, building cleaning, geophysical exploration, lighting and well servicing equipment; or

(b)     cherry pickers and similar devices used to raise or lower workers; and

(6)     vehicles not described in clauses (1)-(4) above maintained primarily for purposes other than the transportation of persons or cargos.

**Mobile Equipment** does not include:

(i)     self-propelled vehicles with the following types of permanently attached equipment:

(aa)     equipment designed primarily for:

(AA)     snow removal;

(BB)     road maintenance but not construction or resurfacing; or

(CC)     street cleaning;

(bb)     cherry pickers and similar devices mounted on automobile or truck chassis and

used to raise or lower workers; and

    (cc)    air compressors, pumps and generators, including spraying, welding, building cleaning, geophysical exploration, lighting and well servicing equipment; or

    (ii)    any land vehicles that are subject to a compulsory or financial responsibility law or other motor vehicle insurance law in the state where it is licensed or principally garaged.

(CC)    "**Mold**" means mold, mildew, spores, mycotoxins, fungi, organic pathogens or other micro organisms of any type, nature or description whatsoever.

(DD)    "**Named Insured**" means the **First Named Insured** and each other entity listed as a **Named Insured** in Schedule A to this Policy.

(EE)    "**Occurrence**" means:

    (1)    with respect to **Bodily Injury** or **Property Damage**, an accident, including continuous or repeated exposure to substantially the same harmful conditions, which results in injury or damage neither expected nor intended by the **Insured**; and

    (2)    with respect to **Advertising Injury** or **Personal Injury**, a covered offense as set forth in DEFINITIONS (C) or DEFINITIONS (HH) of this Policy.

(FF)    "**Patient**" means any person or human body admitted or registered to receive **Medical Services** from an **Insured**, whether on an inpatient, outpatient or emergency basis.

(GG)    "**Peer Review**" means the process of evaluating, by members of a formal, duly constituted professional review board or committee of the **Named Insured**, any individual or entity for purposes of selecting, employing, contracting with or credentialing current or prospective providers of **Medical Services.**

(HH)    "**Personal Injury**" means injury, other than **Bodily Injury**, arising out of one or more of the following offenses:

    (1)    false arrest, detention or imprisonment;

    (2)    malicious prosecution;

    (3)    the wrongful eviction from, wrongful entry into, or invasion of the right of private occupancy of a room, dwelling or premises that a person occupies by or on behalf of its owner, landlord or lessor;

    (4)    oral or written publication of material that slanders or libels a person or an organization or disparages a person's or an organization's goods, products or services; or

    (5)    oral or written publication of material that violates a person's right of privacy.

(II)    "**Personally Identifiable Health Information**" means a natural person's name used in combination with his/her confidential health care or other medical information, including "protected health information" as defined in the Health Insurance Portability and Accountability Act of 1996, as amended, and any rules or regulations promulgated thereunder. **Personally Identifiable Health Information** does not include information that is lawfully available to the general public, including but not limited to information from any federal, state or local governmental or regulatory agency or entity.

(JJ)    "**Policy Period**" means the period from the Inception Date of this Policy stated in ITEM 2(a) of the Declarations to the Expiration Date of this Policy stated in ITEM 2(b) of the Declarations or to any earlier cancellation date of this Policy.

(KK)    "**Pollutant**" means smoke, vapors, soot, fumes, acids, alkalis, toxic chemicals, liquids or gases, medical waste, waste materials (including materials which are intended to be or have been recycled, reconditioned or reclaimed) or other irritants, pollutants or contaminants.  **Pollutant** does not include smoke, fumes, vapor or soot emanating from equipment used to heat or cool a building owned or operated by the **Named Insured**.

(LL)    "**Proctoring Services**" means the supervision, evaluation or instruction provided by a member of the **Named Insured's** medical staff to other members of, or applicants to, the **Named Insured's** medical staff or to any person enrolled as a student in a formal training program offered by the **Named Insured** or a subsidiary or affiliate thereof; provided, that such supervision, evaluation or instruction is provided in accordance with applicable medical staff bylaws, rules and regulations or a governmental authority or directive.

(MM)    "**Products and Completed Operations Hazard**" means **Bodily Injury** and **Property Damage** occurring away from premises owned or rented by the **Insured** and arising out of **Insured Product** or **Insured Work**, except:

(1)    products that are still in the **Insured's** physical possession; and

(2)    work that has not yet been completed or abandoned; provided that work will be deemed completed at the earliest of the following times:

(a)    when that part of the work done at a job site has been put to its intended use by any person or organization other than another contractor or subcontractor working on the same project;

(b)    when all of the work called for in the **Insured's** contract has been completed; or

(c)    when all of the work to be done at the job site has been completed if the **Insured's** contract calls for work at more than one job site.

Work that may need service, maintenance, correction, repair or replacement, but which is otherwise complete, will be treated as completed work.

**Products and Completed Operations Hazard** does not include **Bodily Injury** or **Property Damage** arising out of:

(i)    the transportation of property, unless the injury or damage arises out of a condition in or on a vehicle not owned or operated by the **Insured**, and that condition was created by the loading or unloading of that vehicle by an **Insured**; or

(ii)    the existence of tools, uninstalled equipment, or abandoned or unused materials.

(NN)    "**Professional Services**" means:

(1)    **Medical Services**;

(2)    **Good Samaritan Acts**;

(3)   **Proctoring Services**;

(4)   the activities of an **Insured** as a member of a board or committee of the **Named Insured**, or as a member of any committee of the medical or professional staff of the **Named Insured**, when engaged in **Peer Review** or **Utilization Review**;

(5)   the activities of an **Insured** as a member of a formal accreditation, standards review or similar professional board or committee, including executing the directives of such board or committee; or

(6)   reviewing the quality of **Medical Services** or providing quality assurance on behalf of the **Named Insured**.

(OO)   "**Professional Services Wrongful Act**" means:

(1)   any actual or alleged act, error or omission, or series of acts, errors or omissions, by an **Insured** in rendering, or failing to render, **Professional Services**;

(2)   any actual or alleged act, error or omission, or series of acts, errors or omissions, by any person other than an **Insured** in rendering, or failing to render, **Medical Services**, but only for an **Insured's** vicarious liability with regard to such **Medical Services**.  In no event shall this Policy provide coverage for the direct liability of any person other than an **Insured** for the rendering of, or failure to render, **Medical Services**; or

(3)   any inadvertent:

(a)   publication of **Personally Identifiable Health Information**; or

(b)   utterance of confidential health care or other medical information,

of a **Patient** by an **Insured** while providing **Medical Services** to such **Patient**.

(PP)   "**Property Damage**" means:

(1)   physical injury to tangible property, including all resulting loss of use of that property; provided, that such loss of use shall be deemed to have occurred at the time of the physical injury that caused it; or

(2)   loss of use of tangible property that is not physically injured; provided, that such loss of use shall be deemed to occur at the time of the **Occurrence** that caused it.  **Property Damage** shall not include loss of use of tangible property that results from any actual or alleged theft.

(QQ)   "**Related Claims**" means all **Claims** based upon, arising out of, directly or indirectly resulting from, in consequence of, in any way involving, or in any way having a common nexus of the same or related facts, circumstances, situations, transactions, or events, or the same or related series of facts, circumstances, situations, transactions or events.

(RR)   "**Retroactive Date**" means the applicable date(s) set forth in ITEM 3 of the Declarations.

(SS)   "**Utilization Review**" means the process of evaluating the appropriateness or necessity of **Medical Services** provided or to be provided by an **Insured**. **Utilization Review** shall include prospective review of proposed **Medical Services**, concurrent review of ongoing **Medical Services**, and retrospective review of already rendered **Medical Services**. **Utilization Review**

does not include services or activities performed in the administration or management of health care plans.

(TT) "**Volunteer**" means a person who provides his or her services or labor to the **Named Insured**, and whose activities are supervised and directed by the **Named Insured**, but who is not compensated for such services and labor. No **Employee** or staff physician shall be considered a **Volunteer**.

(UU) "**Wrongful Act**" means any **Professional Services Wrongful Act** or **Employee Benefit Wrongful Act**.

## III.   EXCLUSIONS

**(A)   Exclusions Applicable to INSURING AGREEMENT (A):**

In addition to the EXCLUSIONS listed under (D) below, no coverage will be available under INSURING AGREEMENT (A), and the Underwriter will not pay any **Loss** or **Defense Expenses,** for any **Claim** based upon, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving any actual or alleged:

(1)   **Professional Services Wrongful Act** that happened before the **Retroactive Date**;

(2)   **Bodily Injury** or **Property Damage**, except to the extent such **Claim** arises out of a **Professional Services Wrongful Act;**

(3)   **Advertising Injury** or **Personal Injury**, except to the extent that such injury relates to the rendering of, or failure to render, **Professional Services**;

(4)   **Employee Benefit Wrongful Act;**

(5)   rendering of, or failure to render, **Medical Services** by any **Insured** or any person for whom an **Insured** is vicariously liable while the **Insured's** or such person's license to practice is or was not active; or

(6)   rendering of, or failure to render, **Medical Services** by any person other than an **Insured**; except this EXCLUSION (A)(6) will not apply to an **Insured's** vicarious liability with regard to such **Medical Services**.

**(B)   Exclusions Applicable to INSURING AGREEMENT (B):**

In addition to the EXCLUSIONS listed under (D) below, no coverage will be available under INSURING AGREEMENT (B), and the Underwriter will not pay any **Loss** or **Defense Expenses,** for any **Claim** based upon, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving any actual or alleged:

(1)   **Occurrence** that happened before the Inception Date set forth in ITEM 2 of the Declarations;

(2)   **Professional Services Wrongful Act**;

(3)   injury to a **Patient**; except this EXCLUSION (B)(3) shall not apply to any **Claim** based upon, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving: fire or lightning; windstorm or hail; explosion; riot, including riot attending a

strike or civil commotion; smoke; vandalism or malicious mischief; sprinkler leakage; elevator malfunction; earthquake or flood; or structural collapse of a building;

(4) **Bodily Injury**, **Property Damage**, **Personal Injury** or **Advertising Injury** expected or intended from the standpoint of any **Insured**; except for **Bodily Injury** resulting from use of reasonable force to protect persons or property;

(5) **Personal Injury** or **Advertising Injury** arising out of oral or written publication of material:

    (a) if done by or at the direction of an **Insured** with knowledge of its falsity; or

    (b) whose first publication took place before the Inception Date set forth in ITEM 2 of the Declarations;

(6) **Advertising Injury** arising out of any false, incorrect or misleading description of the price of goods, products or services;

(7) **Employee Benefit Wrongful Act**;

(8) **Bodily Injury** or **Property Damage** for which an **Insured** is or may be held liable by reason of:

    (a) causing or contributing to the intoxication of any person;

    (b) the furnishing of alcoholic beverages to a person under the legal drinking age or under the influence of alcohol; or

    (c) any statute, ordinance or regulation relating to the sale, gift, distribution or use of alcoholic beverages;

except this EXCLUSION (B)(8) will not apply if the **Insured** is not in the business of manufacturing, selling or distributing alcoholic beverages;

(9) **Bodily Injury** or **Property Damage** arising out of:

    (a) the transportation of **Mobile Equipment** by, in or on an **Auto** owned or operated by, or rented or loaned to, any **Insured**; or

    (b) the use of **Mobile Equipment** in, or while in practice or preparation for, any prearranged racing, speed, demolition or stunt activity;

(10) **Bodily Injury** or **Property Damage** arising from any consequence, direct or indirect, of war, invasion, hostilities (whether war be declared or not), civil war, rebellion, revolution, insurrection, military or usurped power, strike, riot or civil insurrection;

(11) **Property Damage** to:

    (a) property the **Insured** owns, rents or occupies;

    (b) premises sold, given away or abandoned by the **Named Insured**, if the **Property Damage** arises out of any part of those premises;

    (c) property loaned to the **Insured**;

(d)    personal property in the care, custody or control of the **Insured**;

(e)    that particular part of real property on which the **Insured**, or any contractor or subcontractor working directly or indirectly on the **Insured's** behalf, is performing operations, if the **Property Damage** arises out of those operations;

(f)    that particular part of any property that must be restored, repaired or replaced because the **Insured's Work** was incorrectly, poorly or improperly performed on it; or

(g)    property which is being transported by the **Insured** by automobile, **Mobile Equipment** or team, including the loading and unloading thereof;

EXCLUSION (B)(11)(b) above does not apply if the premises are **Insured Work** and were never occupied, rented or held for rental by the **Named Insured**;

EXCLUSIONS (B)(11)(c), (d), (e), and (f) above do not apply to liability assumed under a sidetrack agreement; and

EXCLUSION (B)(11)(f) above does not apply to **Property Damage** included in the **Products and Completed Operations Hazard**;

(12)    **Property Damage** to the **Insured Product** arising out of it or any part of it;

(13)    **Property Damage** to **Insured Work** arising out of it or any part of it and included in the **Products and Completed Operations Hazard**; except if the damaged work or the work out of which the damage arises was performed on behalf of the **Named Insured** by a subcontractor;

(14)    **Property Damage** to **Impaired Property** or property that has not been physically injured, arising out of:

(a)    defect, deficiency, inadequacy or dangerous condition in **Insured Product** or **Insured Work**; or

(b)    a delay or failure by an **Insured** or anyone acting on the **Named Insured's** behalf to perform a contract or an agreement in accordance with its terms; except this EXCLUSION (B)(14)(b) does not apply to the loss of use of other property arising out of sudden and accidental physical injury to **Insured Product** or **Insured Work** after it has been put to its intended use;

(15)    damages claimed for any loss, cost or expense incurred by the **Named Insured** or others for the loss of use, withdrawal, recall, inspection, repair, replacement, adjustment, removal or disposal of:

(a)    **Insured Product**;

(b)    **Insured Work**; or

(c)    **Impaired Property**, if such product, work or property is withdrawn or recalled from the market or from use by any person or organization because of a known or suspected defect, deficiency, inadequacy or dangerous condition in it;

(16)     injury or damage arising in whole or in part, either directly or indirectly, out of asbestos, regardless whether the asbestos is:

    (a)     airborne as a fiber or particle;

    (b)     contained in a product;

    (c)     carried or transmitted on clothing or by any other means; or

    (d)     contained in or a part of:

        (i)     any building;

        (ii)     any building material;

        (iii)     any insulation product; or

        (iv)     any component part of any building, building material or insulation product;

(17)     (a)     exposure to, or the manifestation, release, dispersal, seepage, migration, discharge, appearance, presence, reproduction or growth of, **Mold**;

    (b)     fee, cost, expense or charge to test, monitor, clean up, remediate, mitigate, remove, contain, treat, detoxify, neutralize, rehabilitate, or in any other way respond to or assess the effect(s) of **Mold**; or

    (c)     fee, cost, expense, charge, fine or penalty incurred, sustained or imposed by order, direction, request or agreement of any court, governmental agency, regulatory body or civil, public or military authority in connection with or in any way relating to **Mold**;

(18)     (a)     exposure to, or generation, storage, manifestation, transportation, discharge, emission, release, dispersal, seepage, migration, escape, appearance, presence, reproduction, growth of, treatment, removal or disposal of, any **Pollutant**, including any threat thereof, except where such exposure, generation, storage, manifestation, transportation, discharge, emission, release, dispersal, seepage, migration, escape, appearance, presence, reproduction, growth, treatment, removal or disposal was caused by an unintentional fire or any heat, smoke or fumes issuing from such unintentional fire;

    (b)     fee, cost, expense or charge to test, monitor, clean up, remediate, mitigate, remove, contain, treat, detoxify, neutralize or rehabilitate any **Pollutant**; or

    (c)     fee, cost, expense, charge, fine or penalty incurred, sustained or imposed by order, direction, request or agreement of any court, governmental agency, regulatory body or civil, public or military authority in connection with or in any way relating to any **Pollutant**;

except this EXCLUSION (B)(18) will not apply to any **Claim** for **Bodily Injury** or **Property Damage** caused by heat, smoke or fumes from a **Hostile Fire**;

(19)     nuclear reaction, nuclear radiation, radioactive contamination, or radioactive substance; or

(20)    violation of the Telephone Consumer Protection Act, the CAN-SPAM Act of 2003, the Fair Credit Reporting Act, the Fair and Accurate Credit Transaction Act, all as may be amended, or any other federal, state or local statutory or common law that addresses, prohibits, or limits the printing, dissemination, disposal, collecting, recording, sending, transmitting, communicating or distribution of material or information, or any rules or regulations promulgated thereunder.

**(C)**    **Exclusions Applicable to INSURING AGREEMENT (C):**

In addition to the Exclusions listed in EXCLUSION (D) below, no coverage will be available under INSURING AGREEMENT (C), and the Underwriter will not pay any **Loss** or **Defense Expenses,** for any **Claim** based upon, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving any actual or alleged:

(1)    **Employee Benefit Wrongful Act** that happened before the **Retroactive Date**;

(2)    **Advertising Injury**, **Bodily Injury**, **Personal Injury** or **Property Damage**;

(3)    failure of performance by any insurer;

(4)    failure of securities or other investments to perform as represented or advice given to an **Employee** to participate or not to participate in stock subscription or other benefit programs; provided, that for purposes of this EXCLUSION (C)(4), "security" means a security of any nature whatsoever including, without limitation, stocks, shares, bonds, debentures, options, derivatives, partnership interests, limited liability company interests, any other form of debt or equity instrument and any other forms of ownership interest;

(5)    insufficiency of funds to meet any obligations of **Employee Benefit Programs**; or

(6)    **Professional Services Wrongful Act**.

**(D)**    **Exclusions Applicable to All INSURING AGREEMENTS:**

Except as otherwise expressly provided in this Policy, this Policy does not apply to, and the Underwriter will not pay **Loss** or **Defense Expenses,** for any **Claim** based upon, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving any actual or alleged:

(1)    act, error, omission or **Wrongful Act** if any **Insured**, on or before the Inception Date set forth in ITEM 2 of the Declarations, knew or reasonably could have foreseen that such act, error, omission or **Wrongful Act** might result in a **Claim**.

If, however, this Policy is a renewal of one or more policies previously issued by the Underwriter to the **First Named Insured**, and the coverage provided by the Underwriter to the **First Named Insured** was in effect, without interruption, for the entire time between the inception date of the first such other policy and the Inception Date of this Policy, the reference in this EXCLUSION (D)(1) to the Inception Date will be deemed to refer instead to the inception date of the first policy under which the Underwriter began to provide the **First Named Insured** with the continuous and uninterrupted coverage of which this Policy is a renewal;

(2)    act, error, omission, **Wrongful Act**, event, suit or demand which was the subject of any notice given under:

(a)     any medical professional liability or similar policy of insurance or plan or program of self-insurance, with respect to any **Claim** otherwise covered under INSURING AGREEMENT (A);

(b)     any general liability or similar policy of insurance or plan or program of self-insurance, with respect to any **Claim** otherwise covered under INSURING AGREEMENT (B); or

(c)     any employee benefit liability or similar policy of insurance or plan or program of self-insurance, with respect to any **Claim** otherwise covered under INSURING AGREEMENT (C);

in effect prior to the Inception Date set forth in ITEM 2 of the Declarations;

(3)     violation of any federal, state or local antitrust, restraint of trade, unfair competition, or price-fixing law, or any rules or regulations promulgated thereunder, or any involvement in any agreement or conspiracy to restrain trade, except for any **Claim** otherwise covered under INSURING AGREEMENT (A) arising out of the rendering of, or failure to render, **Medical Services**;

(4)     dishonest, fraudulent, criminal or intentionally malicious act, error or omission by an **Insured**; any willful violation of law, statute, rule or regulation by an **Insured**; or the gaining of any profit, remuneration or advantage by an **Insured** to which such **Insured** was not legally entitled, including, but not limited to, health care fraud; provided, however, that no such act of one **Insured** will be imputed to any other **Insured** who was not aware of and did not participate in such act;

(5)     **Bodily Injury** or **Property Damage** arising out of the ownership, maintenance, use, operation or entrustment to others of any aircraft, **Auto** or watercraft or the loading or unloading thereof; except this EXCLUSION (D)(5) will not apply to any **Claim** for a **Professional Services Wrongful Act** in connection with the loading or unloading of any **Patient** from any aircraft or **Auto**;

(6)     obligation of an **Insured** pursuant to any  workers' compensation, unemployment compensation, disability benefits or similar law;

(7)     obligation which an **Insured** has assumed under a written or oral contract or agreement; except this EXCLUSION (D)(7) will not apply to:

(a)     liability an **Insured** would have had in the absence of such contract or agreement; or

(b)     liability assumed by the **Named Insured** under a **Covered Contract**;

(8)     **Claim** made by or for the benefit of, or in the name or right of, one current or former **Insured** against another current or former **Insured**; except this EXCLUSION (D)(8) will not apply to any **Claim** for:

(a)     **Peer Review** activities otherwise covered under INSURING AGREEMENT (A) of this Policy;

(b)     the rendering of, or failure to render, **Medical Services** otherwise covered under INSURING AGREEMENT (A) of this Policy; or

(c)    any **Employee Benefit Wrongful Act** otherwise covered under INSURING AGREEMENT (C) of this Policy;

(9)    discrimination of any kind on any basis, including, but not limited to, discrimination, limitation, segregation or classification based on race, sex, marital status, ancestry, physical or mental handicaps, age, sexual preference, pregnancy, religion or other status that is protected under any applicable federal, state or local statute or ordinance, except to the extent that such discrimination relates to the rendering of, or failure to render, **Professional Services**;

(10)    **Employment Practices**;

(11)    liability of any "Acquired Entity" described in GENERAL CONDITION (F) or its individual **Insureds** acting in their capacity as such for any **Claim**, **Occurrence**, fact, circumstance, situation, transaction, event or **Wrongful Act** or series of **Claims**, **Occurrences**, facts, circumstances, situations, transactions, events or **Wrongful Acts** happening before the date such entity became an "Acquired Entity;"

(12)    (a)    unauthorized, unlawful, or unintentional taking, obtaining, accessing, using, disclosing, distributing, disseminating, transmitting, gathering, collecting, acquiring, corrupting, damaging, destroying, deleting, or impairing of any information or data of any kind, including but not limited to any health care or other medical information or **Personally Identifiable Health Information**; provided, that this Exclusion (D)(12)(a) shall not apply to any **Claim** for a **Professional Services Wrongful Act** as defined in DEFINTION (OO)(3);

        (b)    failure or inability of any computer, computer component (including but not limited to any hardware, network, terminal device, data storage device, input and output device, or back up facility), application, program, software, code, or script of any kind (a "System") to perform or function as planned or intended, including but not limited to any failure or inability of any System to prevent any hack, virus, contaminant, worm, trojan horse, logic bomb, or unauthorized or unintended accessing or use involving any System; or

        (c)    creation, development, design, manufacture, programming, leasing, licensing, distribution, assembly, installation, alteration, modification, or sale of any computer, computer component (including but not limited to any hardware, network, terminal device, data storage device, input and output device, or back up facility), application, program, software, code, script, or data of any kind;

(13)    liability of any individual or entity acting as an independent contractor for an **Insured**; except this EXCLUSION (D)(13) will not apply to any **Claim** otherwise covered under INSURING AGREEMENT (A) for the **Insured's** vicarious liability with regard to such independent contractor;

(14)    infringement of any right of patent, service mark, trademark, copyright, title or slogan; except this EXCLUSION (D)(14) will not apply to liability of an **Insured** for infringement of copyright, trade dress or slogan in an **Advertisement**;

(15)    liability of any **Insured** for **Managed Care Services**; except this EXCLUSION (D)(15) will not apply to liability of an **Insured** for **Professional Services**;

(16)    **Claim** made by or on behalf of any federal, state or local governmental or regulatory

agency or entity, including but not limited to any **Claim** alleging health care fraud and abuse or violation of the Health Insurance Portability and Accountability Act of 1996 or the Health Information Technology for Economic and Clinical Health Act, all as may be amended, or any rules or regulations promulgated thereunder; or

(17)    violation of the Employee Retirement Income Security Act of 1974 (ERISA), the Fair Labor Standards Act (except the Equal Pay Act), the National Labor Relations Act, the Worker Adjustment and Retraining Notification Act, the Consolidated Omnibus Budget Reconciliation Act, the Occupational Safety and Health Act, all as may be amended, or any similar federal, state or local statutory or common law, or any rules or regulations promulgated thereunder; except this EXCLUSION (D)(17) will not apply to any **Claim** arising out of the rendering of, or failure to render, **Medical Services**, which is otherwise covered under INSURING AGREEMENT (A) of this Policy and for which reimbursement for such services was received from health care plans covered by such statutes, rules or regulations.

## IV.   GENERAL CONDITIONS

### (A)   Limits of Liability

(1)    Insuring Agreement (A) – Professional Liability

    (a)    The "Each Claim" amount stated in ITEM 4.A. of the Declarations will be the Underwriter's maximum Limit of Liability for all **Loss** resulting from each **Claim** or **Related Claims** for which this Policy provides coverage under INSURING AGREEMENT (A).

    (b)    The "Aggregate for all Claims" amount stated in ITEM 4.A. of the Declarations will be the Underwriter's maximum Limit of Liability for all **Loss** resulting from all **Claims** or **Related Claims** for which this Policy provides coverage under INSURING AGREEMENT (A).

(2)    Insuring Agreement (B) – General Liability

    (a)    The "Each Claim" amount stated in ITEM 4.B. of the Declarations will be the Underwriter's maximum Limit of Liability for all **Loss** resulting from each **Claim** or **Related Claims** for which this Policy provides coverage under INSURING AGREEMENT (B).

    (b)    The "Aggregate for all Claims" amount stated in ITEM 4.B. of the Declarations will be the Underwriter's maximum Limit of Liability for all **Loss** resulting from all **Claims** or **Related Claims**  for which this Policy provides coverage under INSURING AGREEMENT (B).

    (c)    The Underwriter's Limits of Liability for **Claims** alleging **Bodily Injury** or **Property Damage** included in the **Products and Completed Operations Hazard** shall be equal to, part of, and not in addition to, the "Each Claim" and "Aggregate for all Claims" amounts stated in ITEM 4.B. of the Declarations.

(3)    Insuring Agreement (C) – Employee Benefit Liability

    (a)    The "Each Claim" amount stated in ITEM 4.C. of the Declarations will be the Underwriter's maximum Limit of Liability for all **Loss** resulting from each **Claim**

or **Related Claims** for which this Policy provides coverage under INSURING AGREEMENT (C).

(b)    The "Aggregate for all Claims" amount stated in ITEM 4.C. of the Declarations will be the Underwriter's maximum Limit of Liability for all **Loss** resulting from all **Claims** or **Related Claims** for which this Policy provides coverage under INSURING AGREEMENT (C).

(4)    Insuring Agreement (D) – Evacuation Expense

(a)    The "Each Evacuation" amount stated in ITEM 4.D. of the Declarations will be the Underwriter's maximum Limit of Liability for all **Loss** resulting from each **Evacuation** for which this Policy provides coverage under INSURING AGREEMENT (D).

(b)    The "Aggregate for all Evacuations" amount stated in ITEM 4.D. of the Declarations will be the Underwriter's maximum Limit of Liability for all **Loss** resulting from all **Evacuations** for which this Policy provides coverage under INSURING AGREEMENT (D).

(5)    Insuring Agreement (E) – Legal/Media Expense

(a)    The "Each Legal Defense Proceeding" amount stated in ITEM 4.E. of the Declarations will be the Underwriter's maximum Limit of Liability for all **Loss** resulting from each **Legal Defense Proceeding** for which this Policy provides coverage under INSURING AGREEMENT (E).

(b)    The "Aggregate for all Legal Defense Proceedings" amount stated in ITEM 4.E. of the Declarations will be the Underwriter's maximum Limit of Liability for all **Loss** resulting from all **Legal Defense Proceedings** for which this Policy provides coverage under INSURING AGREEMENT (E).

(6)    Each Limit of Liability described in paragraphs (1) through (5) above shall apply regardless of the time of payment by the Underwriter, the number of persons or entities included within the definition of **Insured,** or the number of claimants, and regardless of whether such **Claim** or **Related Claims** is/are first made during the **Policy Period** or during any Extended Reporting Period.

(7)    (a)    The **Insured** shall be responsible for payment in full of the applicable deductible or self-insured retention stated in ITEM 4 of the Declarations, and the Underwriter's obligation to pay **Loss** or **Defense Expenses** under this Policy shall be excess of such deductible or self-insured retention.  The applicable deductible or self-insured retention shall apply to each **Claim** or **Related Claims** (subject to the applicable aggregate deductible or self-insured retention amount, if any), and shall be eroded (or exhausted) by the **Insured's** payment of **Loss** or **Defense Expenses**.  The Underwriter shall have no obligation whatsoever, either to the **Insured** or any other person or entity, to pay all or any portion of the applicable deductible or self-insured retention on behalf of the **Insured**. The Underwriter shall, however, at its sole discretion, have the right and option to do so, in which event the **Insured** will repay the Underwriter any amounts so paid.

(b)    If  a "Deductible" is selected under any Insuring Agreement in ITEM 4 of the Declarations,  any amounts paid within such deductible will reduce, and may exhaust, the applicable Limits of Liability for such Insuring Agreement.

If a "Self-Insured Retention" is selected under any Insuring Agreement in ITEM 4 of the Declarations, any amounts paid within such self-insured retention will not reduce the applicable Limits of Liability for such Insuring Agreement.

(8)     All **Insureds** under this Policy share the Limits of Liability. In no event will the number of **Insureds** involved in a **Claim** or **Related Claims** increase the applicable Limit of Liability.

(9)     In the event a **Claim** under this Policy involves more than one (1) Insuring Agreement hereunder, it is understood and agreed that only one (1) deductible or self-insured retention and one (1) Limit of Liability will apply to such **Claim**, which shall be the highest applicable "Each Claim" Limit of Liability stated in ITEM 4 of the Declarations and the deductible or self-insured retention corresponding to such Limit of Liability.

(10)    If any **Claim** made against the **Insureds** gives rise to coverage both under this Policy and under any other policy or policies issued by the Underwriter or any affiliate of the Underwriter, the Underwriter's and, if applicable, such affiliate's maximum aggregate limit of liability under all such policies for all **Loss** in respect of such **Claim** will not exceed the largest single available limit of liability under any such policy, including this Policy. In no event will more than one policy issued by the Underwriter respond to a **Claim**.

**(B)     Related Claims Deemed Single Claim:**

All **Related Claims**, whenever made, shall be deemed to be a single **Claim**, regardless of:

(1)     the number of **Related Claims**;

(2)     the number or identity of claimants;

(3)     the number or identity of **Insureds** involved or against whom **Related Claims** have been or could be made;

(4)     whether the **Related Claims** are asserted in a class action or otherwise; and

(5)     the number and timing of the **Related Claims**, even if the **Related Claims** comprising such single **Claim** were made in more than one **Policy Period**.

All **Related Claims** will be treated as a single **Claim** made when the earliest of such **Related Claims** was first made, or when the earliest of such **Related Claims** is treated as having been made in accordance with GENERAL CONDITION (C)(2) below, whichever is earlier.

**(C)     Reporting of Claims, Occurrences and Circumstances:**

(1)     If, during the **Policy Period** or any Extended Reporting Period, any **Claim** for a **Wrongful Act** under INSURING AGREEMENT (A) or (C) is first made against an **Insured**, as a condition precedent to its right to any coverage under this Policy, the **Insured** shall give the Underwriter written notice of such **Claim** as soon as practicable thereafter, but in no event later than:

(a)     thirty (30) days after the Expiration Date or earlier cancellation date of this Policy; or

(b)     the expiration of any Extended Reporting Period.

Timely and sufficient notice by one **Insured** of a **Claim** shall be deemed timely and sufficient notice for all **Insureds** involved in the **Claim**. Such notice shall give full particulars of the **Claim**, including, but not limited to: a description of the **Claim** and **Wrongful Act**; the identity of the patient, all potential claimants and the health care provider(s) and any **Insureds** involved; a description of the injury or damages that resulted from such **Wrongful Act**; information on the time, place and nature of the **Wrongful Act**; and the manner in which the **Insured** first became aware of such **Wrongful Act** .

(2)   If during the **Policy Period** an **Insured** first becomes aware of any **Wrongful Act** that may subsequently give rise to a **Claim** under INSURING AGREEMENT (A) or (C) and:

(a)   gives the Underwriter written notice of such **Wrongful Act** with full particulars as soon as practicable thereafter but in any event before the Expiration Date or earlier cancellation date of this Policy; and

(b)   requests coverage under INSURING AGREEMENT (A) or (C) of this Policy for any **Claim** subsequently arising from such **Wrongful Act**;

then any **Claim** not otherwise excluded by this Policy subsequently made against the **Insured** arising out of such **Wrongful Act** shall be treated as if it had been first made during the **Policy Period**. Full particulars shall include, but are not limited to: a description of the **Wrongful Act**; the identity of the patient, all potential claimants and the health care provider(s) and any **Insureds** involved; information on the time, place and nature of the **Wrongful Act**; the manner in which the **Insured** first became aware of such **Wrongful Act**; and the reasons the **Insured** believes the **Wrongful Act** is likely to result in a **Claim**.

(3)   If any **Claim** alleging **Bodily Injury**, **Property Damage**, **Advertising Injury** or **Personal Injury** that is caused by an **Occurrence** under INSURING AGREEMENT (B) is first made against an **Insured**, as a condition precedent to its right to any coverage under this Policy, the **Insured** shall give the Underwriter written notice of such **Claim** as soon as practicable thereafter.  Timely and sufficient notice by one **Insured** of a **Claim** shall be deemed timely and sufficient notice for all **Insureds** involved in the **Claim**. Such notice shall give full particulars of the **Claim**, including, but not limited to: a description of the **Claim** and **Occurrence**; the identity of all potential claimants and any **Insureds** involved; a description of the injury or damages that resulted from such **Occurrence**; information on the time, place and nature of the **Occurrence**; and the manner in which the **Insured** first became aware of such **Occurrence.**

If an **Insured** becomes aware of an **Occurrence** that may subsequently give rise to a **Claim** under INSURING AGREEMENT (B), the **Insured** shall give the Underwriter written notice of such **Occurrence** as soon as practicable thereafter. Such notice shall include a description of the **Occurrence**; the identity of all potential claimants and any **Insureds** involved; a description of the injury or damages that resulted from such **Occurrence**; information on the time, place and nature of the **Occurrence**; the manner in which the **Insured** first became aware of such **Occurrence**; and the reasons the **Insured** believes such **Occurrence** is likely to result in a **Claim.**

(4)   As a condition precedent to its right to any reimbursement under INSURING AGREEMENT (D) of this Policy, the **Named Insured** shall provide the Underwriter written proof of payment of **Evacuation Expenses** as soon as practicable, but in no event later than sixty (60) days after the Expiration Date or earlier cancellation date of this Policy.

(5)     As a condition precedent to its right to any reimbursement under INSURING AGREEMENT (E) of this Policy:

        (a)     the **Insured** shall provide the Underwriter written notice of any **Legal Defense Proceeding** as soon as practicable, but in no event later than thirty (30) days after the **Insured** first receives notice of such **Legal Defense Proceeding**; and

        (b)     the **Named Insured** shall provide the Underwriter written proof of payment of **Legal/Media Expenses** in connection with such **Legal Defense Proceeding** within sixty (60) days of the **Insured's** payment of such **Legal/Media Expenses**.

**(D)    Defense and Settlement:**

(1)     No **Insured** shall, except at its own cost, incur any expense, make any payment, admit liability for, assume any obligation, or settle any **Claim** without the Underwriter's written consent. With respect to any **Claim,** the Underwriter will have the right to investigate, direct the defense, and conduct settlement negotiations it deems appropriate. The Underwriter may make any settlement of any **Claim** which it deems appropriate.

(2)     The Underwriter will have no obligation to pay **Loss** or **Defense Expenses**, or continue to direct the defense of any **Insured**, after the applicable Limit of Liability has been exhausted by the payment of **Loss**.

(3)     If both **Loss** covered by this Policy and **Loss** not covered by this Policy are incurred, either because a **Claim** made against the **Insureds** includes both covered and uncovered matters, or because a **Claim** is made against both **Insureds** and others not included within the definition of "**Insured**" set forth in DEFINITION (S) above, the **Insureds** and the Underwriter agree to use their best efforts to determine a fair and proper allocation of all such amounts.  The Underwriter's obligation to pay **Loss** under this Policy shall relate only to those sums allocated to the **Insureds**.  In making such determination, the parties shall take into account the relative legal and financial exposures of, and relative benefits obtained in connection with the defense and/or settlement of the **Claim** by the **Insureds** and others.  In the event that the Underwriter and the **Insureds** do not reach an agreement with respect to an allocation, then the Underwriter shall be obligated to make an interim payment of the amount of **Loss** which the parties agree is not in dispute until a final amount is agreed upon or determined pursuant to the provisions of this Policy and applicable law.

**(E)    Territory:**

This Policy applies to **Wrongful Acts** or **Occurrences** taking place anywhere in the world. **Claim** or suit must be made against an **Insured**, however, in the United States of America, including its territories or possessions, Puerto Rico, or Canada.

**(F)    Mergers, Acquisitions or Newly Created Entities:**

If, during the **Policy Period,** the **Named Insured** acquires or creates another entity or subsidiary or becomes a member of a joint venture or partner in a partnership, or if the **Named Insured** merges or consolidates with another entity such that the **Named Insured** is the surviving entity (any such acquired, created, merged or consolidated entity an "Acquired Entity"), then for a period of sixty (60) days after the effective date of the transaction, such Acquired Entity shall be included within the term "**Named Insured**" with respect to **Wrongful Acts** or

**Occurrences** happening after the effective date of the transaction. Upon the expiration of the sixty (60) day period, there will be no coverage under this Policy for any **Claim** in any way involving the Acquired Entity or its **Insureds** unless within such sixty (60) day period:

(1)    the **Named Insured** gives the Underwriter such information regarding the transaction as the Underwriter requests; and

(2)    the Underwriter has specifically agreed by written endorsement to this Policy to provide coverage with respect to such Acquired Entity and its **Insureds**, and the **Named Insured** accepts any terms, conditions, exclusions or limitations, including payment of additional premium, as the Underwriter, in its sole discretion, imposes in connection with the transaction.

For purposes of this GENERAL CONDITION (F), "subsidiary" means any entity for which the **Named Insured** owns or possesses fifty percent (50%) of the issued and outstanding capital stock, or has or controls the right to elect or appoint more than fifty percent (50%) of the directors or trustees.

**(G)**    **Sales or Dissolution of Insured Entities; Cessation of Business:**

(1)    If, during the **Policy Period**:

    (a)    the **First Named Insured** is dissolved, sold, acquired by, merged into, or consolidated with another entity such that the **First Named Insured** is not the surviving entity; or

    (b)    any person, entity, or affiliated group of persons or entities obtains:

        (i)    ownership or possession of fifty percent (50%) or more of the issued and outstanding capital stock of the **First Named Insured**; or

        (ii)    the right to elect or appoint more than fifty percent (50%) of the **First Named Insured's** directors or trustees; or

    (c)    the **First Named Insured** ceases to do business for any reason;

    (any of which events is referred to as a "Transaction" in this GENERAL CONDITION (G)) coverage under this Policy shall continue in full force and effect until the Expiration Date or any earlier cancellation date, but this Policy shall apply only to **Occurrences** or **Wrongful Acts** happening before the effective date of such Transaction. This Policy will not apply to, and the Underwriter will not pay any **Loss** or **Defense Expenses** for, any **Claim** based upon, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving, any **Occurrence** or **Wrongful Act** happening on or after the effective date of such Transaction. It is further understood and agreed that if such a Transaction occurs during the **Policy Period**, then no coverage will be available for any **Evacuation** that occurs on or after the effective date of such Transaction or any **Legal Defense Proceeding** that is first brought against an **Insured** on or after the effective date of such Transaction.

(2)    If, during the **Policy Period**, any **Named Insured**, other than the **First Named Insured**, is involved in an event described in paragraph (1) above, then solely with respect to such **Named Insured** and its **Insureds**, coverage under this Policy for **Occurrences** or **Wrongful Acts** happening before the effective date of such event shall continue in full force and effect until the Expiration Date or any earlier cancellation date

and this Policy will not apply to, and the Underwriter will not pay any **Loss** or **Defense Expenses** for, any **Claim** based upon, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving, any **Occurrence** or **Wrongful Act** happening on or after the effective date of such event. It is further understood and agreed that if any **Named Insured**, other than the **First Named Insured**, is involved in an event described in paragraph (1) above during the **Policy Period**, then solely with respect to such **Named Insured** and its **Insureds**, no coverage will be available for any **Evacuation** that occurs on or after the effective date of such event or any **Legal Defense Proceeding** that is first brought against an **Insured** on or after the effective date of such event.

**(H)    Extended Reporting Period for INSURING AGREEMENTS (A) and (C):**

If this Policy is canceled for any reason other than fraud, misrepresentation or non-payment of premium or is not renewed by the Underwriter or the **First Named Insured**, an additional period of time during which **Claims** made under INSURING AGREEMENTS (A) and (C) of this Policy may be reported (an "Extended Reporting Period") shall be made available as described in this GENERAL CONDITION (H), but any such Extended Reporting Period shall apply only to **Claims** for **Wrongful Acts** committed or allegedly committed before the effective date of such cancellation or non-renewal (the "Termination Date") or the date of any conversion of coverage under GENERAL CONDITION (G), whichever is earlier. No Extended Reporting Period shall in any way increase the Underwriter's Limits of Liability as stated in ITEM 4 of the Declarations, and the Underwriter's Limit of Liability for **Claims** made during any Extended Reporting Period shall be part of, and not in addition to, the Limits of Liability stated in ITEM 4 of the Declarations. The Extended Reporting Period will apply as follows:

(1)    An Extended Reporting Period of sixty (60) days, beginning as of the Termination Date, will apply automatically and requires no additional premium; provided, that such Extended Reporting Period will remain in effect only as long as no other policy of insurance is in effect that would apply to any **Claim** made during such Extended Reporting Period.

(2)    The **First Named Insured** may purchase an additional Extended Reporting Period for the period of time stated in ITEM 6 of the Declarations by notifying the Underwriter in writing of its intention to do so no later than thirty (30) days after the Termination Date. The additional premium for this additional Extended Reporting Period shall be equal to the applicable amount stated in ITEM 6 of the Declarations and must be paid no later than thirty (30) days after the Termination Date. Such additional premium shall be deemed fully earned upon inception of such Extended Reporting Period.

If no election to purchase an additional Extended Reporting Period is made as described in GENERAL CONDITION (H)(2) above, or if the additional premium for any such Extended Reporting Period is not paid within thirty (30) days after the Termination Date, there will be no right to purchase an additional Extended Reporting Period at any later time.

**(I)    Cancellation; Non-Renewal:**

(1)    The Underwriter may cancel this Policy by mailing written notice to the **First Named Insured** at the last known address shown on the Declarations stating when, not less than sixty (60) days thereafter (or such longer period of time as required by applicable law), such cancellation shall be effective; except that, in the event of cancellation for non-payment of premium, the Underwriter may make the cancellation effective upon notice of only ten (10) days (or such longer period of time as required by applicable law). Notwithstanding the foregoing, if the Underwriter receives no premium whatsoever by

the premium due date and no premium whatsoever is received by the last day of such ten (10) day notice period (or such longer period of time as required by applicable law), the Underwriter may cancel this Policy as of the Inception Date set forth in ITEM 2(a) of the Declarations.

(2)     Except as set forth in GENERAL CONDITION (M), the **First Named Insured** may cancel this Policy by mailing the Underwriter written notice stating when, not later than the Expiration Date set forth in ITEM 2(b) of the Declarations, such cancellation will be effective. In such event, and subject at all times to GENERAL CONDITION (N), the earned premium will be computed in accordance with the customary short rate table and procedure.  Premium adjustment may be made either at the time cancellation is effective or as soon as practicable after cancellation becomes effective, but payment or tender of unearned premium is not a condition of cancellation.

(3)     The Underwriter will not be required to renew this Policy upon its expiration.

**(J)     Assistance and Cooperation:**

In the event of a **Claim**, the **Insured** shall provide the Underwriter with all information, assistance and cooperation that the Underwriter reasonably requests. At the Underwriter's request, the **Insured** shall assist in: investigating, defending and settling **Claims**; enforcing any right of contribution or indemnity against another who may be liable to any **Insured**; the conduct of actions, suits, appeals or other proceedings, including, but not limited to, attending trials, hearings and depositions; securing and giving evidence; and obtaining the attendance of witnesses.

**(K)     Subrogation:**

In the event of any payment hereunder, the Underwriter shall be subrogated to the extent of any payment to all of the rights of recovery of the **Insured**. The **Insured** shall execute all papers and do everything necessary to secure such rights, including the execution of any documents necessary to enable the Underwriter effectively to bring suit in its name. The **Insured** shall do nothing that may prejudice the Underwriter's position or potential or actual rights of recovery. The obligations of the **Insured** under this GENERAL CONDITION (K) shall survive the expiration or termination of the Policy.

**(L)     Other Insurance and Risk Transfer Arrangements:**

Any **Loss** or **Defense Expenses** resulting from any **Claim** insured under any other insurance or self-insurance policy or program or risk transfer instrument, including, but not limited to, self-insured retentions, deductibles, fronting arrangements, professional liability policies covering any **Insured**, or other alternative arrangements which apply to the **Loss** or **Defense Expenses** shall be paid first by those instruments, policies or other arrangements. It is the intent of this Policy to apply only to **Loss** or **Defense Expenses** that are more than the total limit of all deductibles, limits of liability, self-insured amounts or other insurance or risk transfer arrangements, whether primary, contributory, excess, contingent, fronting or otherwise and whether or not collectible. These provisions do not apply to other insurance policies or risk transfer arrangements written as specific umbrella or excess insurance over the applicable Limits of Liability of this Policy. This Policy shall not be subject to the terms of any other policy of insurance or plan or program of self-insurance; and in no event will the Underwriter pay more than the applicable Limits of Liability set forth in ITEM 4 of the Declarations.

**(M)    Exhaustion:**

If the Underwriter's applicable Aggregate Limit of Liability for any Insuring Agreement, as set forth in ITEM 4 of the Declarations, is exhausted by the payment of **Loss**, all obligations of the Underwriter under such Insuring Agreement will be completely fulfilled and exhausted, including any obligation to pay **Defense Expenses** or to continue to direct the defense of any **Insured**, and the Underwriter will have no further obligations of any kind or nature whatsoever under such Insuring Agreement.

If all of the Underwriter's applicable Limits of Liability are exhausted by the payment of **Loss**, the premium will be fully earned, all obligations of the Underwriter under this Policy will be completely fulfilled and exhausted, including any obligation to pay **Defense Expenses** or to continue to direct the defense of any **Insured**, and the Underwriter will have no further obligations of any kind or nature whatsoever under this Policy.

**(N)    Minimum Earned Premium:**

The percentage set forth in ITEM 5.B. of the Declarations is the percentage of the Policy Premium set forth in ITEM 5.A. of the Declarations that shall be deemed fully earned as of the Inception Date set forth in ITEM 2(a) of the Declarations.

**(O)    Risk Management:**

The Underwriter directly or indirectly may make available risk management services in connection with this Policy for the purpose of managing and reducing the risks covered under this Policy.  Such risk management services may cease or change in the Underwriter's sole discretion at any time.

**(P)    Authorization and Notices:**

The **First Named Insured** will act on behalf of all **Insureds** with respect to: the giving or receiving of any notices under this Policy; the payment of premiums to, and receiving of return premiums from, the Underwriter; the receiving and acceptance of any endorsements issued to form a part of this Policy; and the exercising or declining to exercise any Extended Reporting Period.

**(Q)    Conformance:**

Any terms of this Policy that are in conflict with the laws or regulations of the state in which this Policy is issued are amended to conform with such laws or regulations.

**(R)    Representation; Incorporation of Application:**

The **Insureds** represent that the particulars and statements contained in the Application attached to this Policy are true, accurate and complete and agree that:

(1)    this Policy is issued and continued in force by the Underwriter in reliance upon the truth of such representation;

(2)    those particulars and statements are the basis of this Policy; and

(3)    the Application and those particulars and statements are incorporated in and form a part of this Policy.

No knowledge or information possessed by any **Insured** shall be imputed to any other **Insured**, except for material facts or information known to the person or persons who signed the Application. In the event of any material untruth, misrepresentation or omission in connection with any of the particulars or statements in the Application, this Policy shall be void with respect to any **Insured** who knew of such untruth, misrepresentation or omission or to whom such knowledge is imputed.

**(S)** **No Action against Underwriter:**

(1) No action shall be taken against the Underwriter by any **Insured** unless, as conditions precedent thereto, the **Insured** has fully complied with all of the terms of this Policy and the amount of the **Insured's** obligation to pay has been finally determined either by judgment against the **Insured** after adjudicatory proceedings or by written agreement of the **Insured**, the claimant and the Underwriter.

(2) No individual or entity shall have any right under this Policy to join the Underwriter as a party to any **Claim** to determine the liability of any **Insured**; nor shall the Underwriter be impleaded by an **Insured** or his, her, or its legal representative in any such **Claim**.

**(T)** **Notice:**

(1) Notice to any **Insured** shall be sent to the **First Named Insured** at the address designated in ITEM 1 of the Declarations.

(2) Notice to the Underwriter shall be sent to the address designated in ITEM 7 of the Declarations.

**(U)** **Changes:**

Notice to or knowledge possessed by any agent or other person acting on behalf of the Underwriter shall not effect a waiver or change in any part of this Policy or prevent or estop the Underwriter from asserting any right(s) under this Policy. This Policy can only be altered, waived, or changed by written endorsement issued to form a part of this Policy.

**(V)** **Insolvency of Insured:**

The Underwriter will not be relieved of any of its obligations under this Policy by the bankruptcy or insolvency of any **Insured** or his/her/its estate.

**(W)** **Inspections and Surveys:**

The Underwriter or its duly authorized agent has the right but is not obliged to:

(1) make inspections and surveys of the **Named Insured's** premises and operations at any time;

(2) provide the **Insured** with reports on the conditions found;

(3) recommend changes;

(4) conduct loss control and prevention activity.

Any inspections, surveys, reports, or recommendations relate only to insurability and the premium to be charged.

The Underwriter does not:

(a)    make safety inspections;

(b)    undertake to perform the duty of any entity to provide for the health or safety of workers or the public; or

(c)    warrant that conditions:

  (i)    are safe or healthy; or

  (ii)   comply with laws, regulations or codes.

**(X)    Examination of Books and Records:**

The Underwriter may examine and audit the books and records of the **Insured** as they relate to this Policy.

**(Y)    Service of Suit:**

Pursuant to any statute of any state, territory or district of the United States which makes provision therefor, the Underwriter hereby designates the Superintendent, Commissioner or Director of Insurance or other officer specified for that purpose by statute, as its true and lawful attorney upon whom may be served any lawful process in any action, suit or proceeding instituted by or on behalf of the **Insured**, or any beneficiary hereunder, arising out of this contract of insurance.

**(Z)    Assignment:**

No assignment of interest under this Policy shall bind the Underwriter without its written consent issued as a written endorsement to form a part of this Policy.

**(AA)   Entire Agreement:**

The **Insureds** agree that this Policy, including the Application and any endorsements, constitutes the entire agreement between them and the Underwriter or any of its agents relating to this insurance.

**(BB)   Headings:**

The descriptions in the headings and sub-headings of this Policy are solely for convenience, and form no part of the terms and conditions of coverage.


**In witness whereof the Underwriter has caused this Policy to be executed by its authorized officers.**

ENDORSEMENT NO. 1
DEFENSE WITHIN THE LIMITS ENDORSEMENT

This Endorsement, which is effective at 12:01 a.m. on July 1, 2014, forms part of:

|           |                                          |
|-----------|------------------------------------------|
| Policy No.| MPP-6333-14                              |
| Issued to | Devereux Foundation                      |
| Issued by | Homeland Insurance Company of Delaware    |

In consideration of the premium charged:

(1)     Each reference to the term "**Loss**" in Section I INSURING AGREEMENTS (A), (B) and (C) of this Policy is replaced with the phrase "**Loss** and **Defense Expenses**".

(2)     Section I INSURING AGREEMENT (F) of this Policy is amended to read in its entirety as follows:

> **(F)     Defense and Supplementary Payments:**
>
> The Underwriter has the right and duty to defend any **Claim** that is covered by INSURING AGREEMENTS (A), (B), and (C) of this Policy, even if any of the allegations of such **Claim** are groundless, false or fraudulent.  As part of, and not in addition to, the Limits of Liability for INSURING AGREEMENTS (A), (B), and (C), the Underwriter will pay **Defense Expenses** and will:
>
> > (1)     pay the premium on any bond to release attachments for an amount not in excess of the Limits of Liability for INSURING AGREEMENTS (A), (B), and (C) of this Policy and the premium on any appeal bond required in any defended suit, provided, that the Underwriter will not be obligated to apply for or furnish any such bond;
> >
> > (2)     pay all costs imposed against the **Insured** in any such suit;
> >
> > (3)     provide a legal defense and pay **Defense Expenses** for any arbitration, mediation or other alternative dispute proceeding if:
> >
> > > (a)     the dispute at issue is a **Claim** covered by this Policy, and
> > >
> > > (b)     the **Insured** provides notice of the proceeding as required by GENERAL CONDITION (C) of this Policy; and
> >
> > (4)     pay reasonable expenses, plus loss of earnings due to time

off from work, incurred by an **Insured** as a result of being a defendant or co-defendant in a **Claim** or at the Underwriter's request, but not to exceed:

    (a)    $500 per day per **Insured**; and

    (b)    $12,500 per **Claim**.

(3)    Each reference to the term "**Loss**" in Section IV GENERAL CONDITIONS (A)(1), (A)(2), (A)(3) and (A)(10) of this Policy is replaced with the phrase "**Loss** and all **Defense Expenses**".

(4)    Section IV GENERAL CONDITIONS (A) of this Policy is amended to include the following as paragraph (11) thereof:

    (11)    **Defense Expenses** are part of and not in addition to the applicable Limits of Liability, and payment of **Defense Expenses** by the Underwriter will reduce, and may exhaust, such applicable Limits of Liability.

(5)    Section IV GENERAL CONDITIONS (D)(2) of this Policy is amended to read in its entirety as follows:

    (2)    The Underwriter will have no obligation to pay **Loss** or **Defense Expenses**, or continue to direct the defense of any **Insured**, after the applicable Limit of Liability has been exhausted by the payment of **Loss** and/or **Defense Expenses**.

(6)    Section IV GENERAL CONDITIONS (M) of this Policy is amended to read in its entirety as follows:

If the Underwriter's applicable Aggregate Limit of Liability for any Insuring Agreement, as set forth in ITEM 4 of the Declarations, is exhausted by the payment of **Loss** and/or **Defense Expenses**, all obligations of the Underwriter under such Insuring Agreement will be completely fulfilled and exhausted, including any obligation to continue to direct the defense of any **Insured**, and the Underwriter will have no further obligations of any kind or nature whatsoever under such Insuring Agreement.

If all of the Underwriter's applicable Limits of Liability are exhausted by the payment of **Loss** and/or **Defense Expenses**, the premium will be fully earned, all obligations of the Underwriter under this Policy will be completely fulfilled and exhausted, including any obligation to continue to direct the defense of any **Insured**, and the Underwriter will have no further obligations of any kind or nature whatsoever under this Policy.

All other terms, conditions and limitations of this Policy shall remain unchanged.

ENDORSEMENT NO. 2
MEDICAL EXPENSES FOR BODILY INJURY ENDORSEMENT

This Endorsement, which is effective at 12:01 a.m. on July 1, 2014, forms part of:

    Policy No.    MPP-6333-14
    Issued to     Devereux Foundation
    Issued by     Homeland Insurance Company of Delaware

In consideration of the premium charged:

(1)    Solely with respect to the coverage afforded under INSURING AGREEMENT
       (B) of this Policy and subject to the terms and conditions set forth in this
       endorsement, it is understood and agreed that the Underwriter will pay on behalf
       of the **Insured Medical Expenses** (as defined below) for **Bodily Injury** caused
       by an accident:

       (a)    on premises owned or rented by the **Named Insured**;

       (b)    on ways adjacent to premises owned or rented by the **Named Insured**; or

       (c)    because of the operations of the **Named Insured**;

       provided that:

       (i)    such accident takes place in the coverage territory and during the **Policy
              Period**;

       (ii)   **Medical Expenses** are incurred and reported to the Underwriter within
              one year of the date of the accident; and

       (iii)  the injured person submits to examination, as often as required by the
              Underwriter, by physicians of the Underwriter's choice and at the expense
              of the Underwriter.

(2)    Solely with respect to the coverage afforded by this endorsement, "**Medical
       Expenses**" means reasonable payments for:

       (a)    first aid administered at the time of an accident;

       (b)    necessary medical, surgical, x-ray and dental services, including prosthetic
              devices; and

       (c)    necessary ambulance, hospital, professional medical and nursing, and
              funeral services.

(3)     In addition to, and not in limitation of, Section III EXCLUSIONS of this Policy, no coverage will be available under this Policy for **Medical Expenses** for **Bodily Injury** sustained by:

    (a)     any **Insured**;

    (b)     any person hired to do work for or on behalf of any **Insured** or tenant of any **Insured**;

    (c)     any person injured on that part of premises owned or rented by the **Named Insured** that the person normally occupies;

    (d)     any person, whether or not an **Employee** of any **Insured**, if benefits for such **Bodily Injury** are payable or must be provided under workers' compensation or disability benefits or a similar law; or

    (e)     any person injured while engaging in athletic activities.

(4)     The Underwriter's maximum limit of liability for **Medical Expenses** for **Bodily Injury** caused by accidents, as set forth in paragraph (1) of this endorsement, is $10,000 for each person per accident.  Notwithstanding the foregoing, in no event shall the Underwriter's maximum obligation to pay **Medical Expenses** on behalf of the **Insured** exceed $50,000.  Such amounts shall be part of, and not in addition to, the Underwriter's maximum aggregate Limit of Liability for INSURING AGREEMENT (B) of this Policy, as set forth in ITEM 4.B. of the Declarations.

(5)     Notwithstanding anything to the contrary contained in this Policy, no deductible or self-insured retention shall apply to the coverage afforded under this endorsement for **Medical Expenses** for **Bodily Injury** caused by an accident.

(6)     Solely with respect to the coverage afforded under this endorsement, the term "**Loss**," as defined in Section II DEFINITIONS of this Policy, is amended to include **Medical Expenses** for **Bodily Injury** caused by an accident.


All other terms, conditions and limitations of this Policy shall remain unchanged.

ENDORSEMENT NO.  3
MINIMUM EARNED PREMIUM ENDORSEMENT

This Endorsement, which is effective at 12:01 a.m. on July 1, 2014, forms part of:

Policy No.    MPP-6333-14
Issued to     Devereux Foundation
Issued by     Homeland Insurance Company of Delaware


In consideration of the premium charged, it is understood and agreed that, for all purposes under this Policy, premium in an amount equal to 25% of the full annual premium for this Policy, as set forth in ITEM 5 of the Declarations, will be deemed fully earned as of the Inception Date set forth in ITEM 2(a) of the Declarations.


All other terms, conditions and limitations of this Policy shall remain unchanged.

ENDORSEMENT NO.  4
SERVICE OF SUIT ENDORSEMENT

This Endorsement, which is effective at 12:01 a.m. on July 1, 2014, forms part of:

Policy No.      MPP-6333-14
Issued to        Devereux Foundation
Issued by       Homeland Insurance Company of Delaware

Pursuant to any statute of any state, territory or district of the United States which makes provision therefore, the Underwriter hereby designates the Superintendent, Commissioner or Director of Insurance or other officer specified for that purpose in such statute, or his successors in office, as its true and lawful attorney upon whom may be served any lawful process in any action, suit or proceeding instituted by or on behalf of the **Insured**, or any beneficiary hereunder, arising out of this contract of insurance.

All other terms, conditions and limitations of this Policy shall remain unchanged.

ENDORSEMENT NO.  5
BLANKET WAIVER OF SUBROGATION ENDORSEMENT – INSURING
AGREEMENT (B) ONLY

This Endorsement, which is effective at 12:01 a.m. on July 1, 2014, forms part of:

　　　　Policy No.　　MPP-6333-14
　　　　Issued to　　　Devereux Foundation
　　　　Issued by　　　Homeland Insurance Company of Delaware

In consideration of the premium charged, solely with respect to any payment made under INSURING AGREEMENT (B) of this Policy, the Underwriter agrees to waive its right to subrogation under Section IV GENERAL CONDITIONS (K) of this Policy.  Section IV GENERAL CONDITIONS (K) of this Policy shall be deemed amended to the extent necessary to affect the purpose and intent of this endorsement.

All other terms, conditions and limitations of this Policy shall remain unchanged.

ENDORSEMENT NO.  6
AMEND CANCELLATION TO NINETY (90) DAYS ENDORSEMENT

This Endorsement, which is effective at 12:01 a.m. on July 1, 2014, forms part of:

Policy No.   MPP-6333-14
Issued to    Devereux Foundation
Issued by    Homeland Insurance Company of Delaware

In consideration of the premium charged, paragraph (1) of Section IV GENERAL CONDITIONS (I) of this Policy is amended to read in its entirety as follows:

(1)     The Underwriter may cancel this Policy by mailing written notice to the **First Named Insured** at the last known address shown on the Declarations stating when, not less than ninety (90) days thereafter (or such longer period of time as required by applicable law), such cancellation shall be effective; except that, in the event of cancellation for non-payment of premium, the Underwriter may make the cancellation effective upon notice of only ten (10) days (or such longer period of time as required by applicable law).  Notwithstanding the foregoing, if the Underwriter receives no premium whatsoever by the premium due date and no premium whatsoever is received by the last day of such ten (10) day notice period (or such longer period of time as required by applicable law), the Underwriter may cancel this Policy as of the Inception Date set forth in ITEM 2(a) of the Declarations.

All other terms, conditions and limitations of the Policy shall remain unchanged.

ENDORSEMENT NO. 7
AMEND PROFESSIONAL SERVICES ENDORSEMENT

This Endorsement, which is effective at 12:01 a.m. on July 1, 2014, forms part of:

Policy No.   MPP-6333-14
Issued to    Devereux Foundation
Issued by    Homeland Insurance Company of Delaware

In consideration of the premium charged, the term "**Professional Services**," as defined in Section II DEFINITIONS of this Policy, is amended to include the following service(s):

Foster Care and Adoption Services, Mental Health related Educational Services, Teaching, Fundraising, Administration of Client Funds, Research and Publishing.

All other terms, conditions and limitations of this Policy shall remain unchanged.

ENDORSEMENT NO. 8
PERSONAL INFORMATION PROTECTION EVENT REIMBURSEMENT
COVERAGE ENDORSEMENT

This Endorsement, which is effective at 12:01 a.m. on July 1, 2014, forms part of:

Policy No.   MPP-6333-14
Issued to     Devereux Foundation
Issued by    Homeland Insurance Company of Delaware

In consideration of the premium charged:

(1)     In addition to the coverage afforded under INSURING AGREEMENTS (A), (B), (C), (D) and (E) of this Policy, the Underwriter will reimburse the **Named Insured**, up to the Limit of Liability set forth in paragraph (2) below and upon satisfactory proof of payment by the **Named Insured**, for **Personal Information Protection Event Expenses** (as defined below) actually paid by the **Named Insured** in connection with a **Personal Information Protection Event** (as defined below) that occurs during the **Policy Period**.

(2)     The maximum aggregate Limit of Liability of the Underwriter for all **Personal Information Protection Event Expenses** resulting from all covered **Personal Information Protection Events** reimbursed under paragraph (1) above shall be $<PIP Limit>.  Payment of such maximum aggregate Limit of Liability shall terminate the Underwriter's obligation to reimburse any further **Personal Information Protection Event Expenses** under this endorsement.

(3)     Solely with respect to the coverage afforded under this endorsement, the term "**Loss**," as defined in Section II DEFINTIONS of this Policy, is amended to include **Personal Information Protection Event Expenses**.

(4)     Section II DEFINITIONS of this Policy is amended to include the following terms:

(a)     "**Personal Information Protection Event**" means any failure by an **Insured** to maintain the confidentiality of information regarding **Medical Services** or information obtained in connection with **Medical Services,** or any unauthorized release or use of such information by an **Insured**.

(b)     "**Personal Information Protection Event Expenses**" means:

(i)     reasonable fees and costs of attorneys, experts and consultants, including third-party media consultants, incurred in the management or investigation of an actual or alleged **Personal Information Protection Event**;

(ii)     reasonable fees and costs incurred in connection with notification of a **Personal Information Protection Event** to those individuals whose information has been accessed, released or used;

(iii)    reasonable fees and costs of providing credit monitoring services to those individuals whose information has been accessed, released or used in connection with a **Personal Information Protection Event**; and

(iv)     reasonable costs incurred in the management of public relations with respect to a **Personal Information Protection Event**;

provided, that **Personal Information Protection Event Expenses** shall not include any remuneration, salaries, overhead, fees, loss of earning reimbursement or benefit expenses of an **Insured.**

(5)     If, during the **Policy Period**, a **Personal Information Protection Event** occurs, as a condition precedent to its right to any coverage under this endorsement, the **Named Insured** shall give the Underwriter written notice of such **Personal Information Protection Event** as soon as practicable thereafter, but in no event later than thirty (30) days after the Expiration Date or earlier cancellation date of this Policy.  The **Named Insured** shall also provide the Underwriter with all information and documentation as the Underwriter may reasonably require.

All other terms, conditions and limitations of this Policy shall remain unchanged.

ENDORSEMENT NO. 9
SCHEDULE A - NAMED INSURED ENDORSEMENT

This Endorsement, which is effective at 12:01 a.m. on July 1, 2014, forms part of:

> Policy No.    MPP-6333-14
> Issued to     Devereux Foundation
> Issued by     Homeland Insurance Company of Delaware

In consideration of the premium charged, the term "**Named Insured**," as defined in Section II DEFINITIONS of this Policy, shall include the entity(ies) scheduled below. With respect to such entity(ies), the applicable **Retroactive Date** shall be the Retroactive Date set forth opposite the name of each such entity, and ITEM 3 of the Declarations shall be deemed amended accordingly.

| Named Insured | Retroactive Date |
| --- | --- |
| Devereux Foundation | 07.01.1990 |
| Devereux Cleo Wallace | 12.13.1985 |
| La Hacienda | 07.01.1987 |
| Devereux Kids, Inc. Sonoma County | 05.19.1999 |
| Devereux Community Based  Care of Okeechobee and the Treasure Coast | 11.01.2013 |

All other terms, conditions and limitations of this Policy shall remain unchanged.

ENDORSEMENT NO.  10
ADDITIONAL INSURED ENDORSEMENT

This Endorsement, which is effective at 12:01 a.m. on July 1, 2014, forms part of:

      Policy No.   MPP-6333-14
      Issued to    Devereux Foundation
      Issued by    Homeland Insurance Company of Delaware

In consideration of the premium charged:

(1)    The term "**Insured**," as defined in Section II DEFINITIONS of this Policy, is amended to include the person(s) or entity(ies) listed below (each an "Additional Insured"), but solely with respect to any liability imposed or sought to be imposed on such Additional Insured as a result of the acts, errors or omission of an original **Insured**.

        Additional Insured(s)

      Sachem Central School District
      The Government of The Virgin Islands, Dept. of Health
      The Government of The Virgin Islands, Dept. of Human Services
      York County Community Policy and Management Team

(2)    No coverage will be available under this Policy for **Loss** or **Defense Expenses** for any **Claim** against an Additional Insured based solely upon the actual or alleged acts, errors or omissions of an Additional Insured.

(3)    With respect to any **Claim** against an Additional Insured based upon both the acts, errors or omissions of the original **Insured** and the acts, errors or omissions of an Additional Insured, the Underwriter will pay **Defense Expenses** incurred by such Additional Insured in connection with such **Claim** and **Loss** such Additional Insured is legally obligated to pay as a result of the acts, errors or omissions of the original **Insured**, subject in all events to all other terms, conditions and exclusions of this Policy.  No coverage will be available under this Policy for any **Loss** such Additional Insured is obligated to pay as a result of its own acts, errors or omissions.

(4)    Section IV GENERAL CONDITIONS (I)(1) of this Policy is amended by adding the following thereto:

        The Underwriter will provide the Additional Insured(s) with at least ten (10) days' written notice of cancellation of this Policy if such cancellation is for non-payment of premium, or sixty (60) days' written notice of cancellation if such cancellation is for any other reason.

All other terms, conditions and limitations of this Policy shall remain unchanged.

ENDORSEMENT NO.  11
ADDITIONAL INSURED ENDORSEMENT

This Endorsement, which is effective at 12:01 a.m. on July 1, 2014, forms part of:

Policy No.    MPP-6333-14
Issued to     Devereux Foundation
Issued by     Homeland Insurance Company of Delaware


In consideration of the premium charged, the term "**Insured**," as defined in Section II DEFINITIONS of this Policy, shall include the person(s) listed below (each an "Additional Insured"), but only with respect to liability of any such Additional Insured that is based on or arises out of acts, errors or omissions committed or allegedly committed by such Additional Insured in the scope of his/her duties for the **Named Insured**, and only with respect to **Claims** under INSURING AGREEMENT A, B and C of this Policy; provided that such **Claim** is also made and continuously maintained against an **Insured**, other than an Additional Insured.

Additional Insured(s)

  Shasta County, its elected officials, officers, employees, agents, and volunteers


All other terms, conditions and limitations of this Policy shall remain unchanged.

ENDORSEMENT NO. 12
DAMAGE TO RENTED PREMISES COVERAGE ENDORSEMENT

This Endorsement, which is effective at 12:01 a.m. on July 1, 2014, forms part of:

Policy No.   MPP-6333-14
Issued to    Devereux Foundation
Issued by    Homeland Insurance Company of Delaware

In consideration of the premium charged:

(1)     Section III EXCLUSIONS (B)(11)(a) of this Policy shall not apply to any **Claim** for **Property Damage** resulting from any fire caused by the **Insured's** negligence and occurring on premises rented by the **Insured** or temporarily occupied by the **Insured** with the permission of the owner of such premises, up to the "Damage to Rented Premises Limit" set forth in paragraph (3) of this endorsement.

(2)     Section III EXCLUSIONS (B)(11)(a), (c) and (d) of this Policy shall not apply to any **Claim** for **Property Damage** (other than damage caused by fire) to premises, including the contents of such premises, rented to the **Insured** for a period of seven (7) or fewer consecutive days, up to the "Damage to Rented Premises Limit" set forth in paragraph (3) of this endorsement.

(3)     The Underwriter's maximum aggregate Limit of Liability for all (a) **Claims** for **Property Damage** resulting from any and all fires caused by the **Insured's** negligence and occurring on premises rented to the **Insured** or temporarily occupied by the **Insured** with the permission of the owner of such premises and (b) **Claims** for **Property Damage** (other than damage caused by fire) to premises, including the contents of such premises, rented to the **Insured** for a period of seven (7) or fewer consecutive days shall be $1,000,000 ("Damage to Rented Premises Limit"), which amount is part of, and not in addition to, the Underwriter's "Aggregate for all Claims" Limit of Liability for INSURING AGREEMENT (B), as set forth in ITEM 4.B. of the Declarations.


All other terms, conditions and limitations of this Policy shall remain unchanged.

ENDORSEMENT NO.  13
ADDITIONAL INSURED ENDORSEMENT - WHERE REQUIRED BY CONTRACT
GL ONLY

This Endorsement, which is effective at 12:01 a.m. on July 1, 2014, forms part of:

Policy No.    MPP-6333-14
Issued to      Devereux Foundation
Issued by     Homeland Insurance Company of Delaware

In consideration of the premium charged:

(1)     Solely for the purposes of the coverage afforded under INSURING AGREEMENT (B) of this Policy and subject to the terms and conditions set forth in this endorsement, the term "**Insured**," as defined in Section II DEFINITIONS of this Policy, shall include any person or entity with whom/which the **Named Insured** has a written agreement, effective during the **Policy Period**, to provide such person or entity insured status under this Policy (each an "Additional Insured"), but solely with respect to any liability imposed or sought to be imposed on such Additional Insured as a result of the acts, errors or omissions of an original **Insured**.

(2)     No coverage will be available under this Policy for that portion of **Loss** or **Defense Expenses** for any **Claim** against an Additional Insured resulting from the actual or alleged acts, errors or omissions of an Additional Insured.

(3)     An Additional Insured's status as an **Insured** under this Policy shall immediately terminate when the **Named Insured's** agreement to provide such status terminates.

(4)     If a written agreement between the **Named Insured** and an Additional Insured providing indemnity or contribution in favor of such Additional Insured exists, the amount, extent and scope of coverage available under this Policy to such Additional Insured will be no greater than the amount, extent and scope of indemnification available to such Additional Insured as agreed to by the **Named Insured** in such agreement.

(5)     It is understood and agreed that the Additional Insured(s) share in the applicable Limits of Liability set forth in ITEM 4.B. of the Declarations.


All other terms, conditions and limitations of this Policy shall remain unchanged.

ENDORSEMENT NO. 14
DELETE DUTY TO DEFEND ENDORSEMENT

This Endorsement, which is effective at 12:01 a.m. on July 1, 2014, forms part of:

Policy No.    MPP-6333-14
Issued to     Devereux Foundation
Issued by     Homeland Insurance Company of Delaware

In consideration of the premium charged:

(1)    Section I INSURING AGREEMENTS (F) of this Policy is amended to read in its entirety as follows:

**(F)    Defense and Supplementary Payments:**

In addition to the Limits of Liability for INSURING AGREEMENTS (A), (B), and (C), the Underwriter will pay **Defense Expenses** and will:

(1)    pay the premium on any bond to release attachments for an amount not in excess of the Limits of Liability for INSURING AGREEMENTS (A), (B), and (C) of this Policy and the premium on any appeal bond required in any defended suit, provided, that the Underwriter will not be obligated to apply for or furnish any such bond;

(2)    pay all costs imposed against the **Insured** in any such suit;

(3)    provide a legal defense and pay **Defense Expenses** for any arbitration, mediation or other alternative dispute proceeding if:

(a)    the dispute at issue is a **Claim** covered by this Policy, and

(b)    the **Insured** provides notice of the proceeding as required by GENERAL CONDITION (C) of this Policy; and

(4)    pay reasonable expenses, plus loss of earnings due to time off from work, incurred by an **Insured** as a result of being a defendant or co-defendant in a **Claim** or at the Underwriter's request, but not to exceed:

(a)    $500 per day per **Insured**; and

(b)    $12,500 per **Claim**.

(2)      Section IV GENERAL CONDITIONS (D) of this Policy is amended to read in its entirety as follows:

    **(D)**   **Defense and Settlement:**

        (1)      The Underwriter will have no duty under this Policy to defend any **Claim**.  The **Insureds** shall defend and contest any **Claim** made against them.  In conducting any such defense, the **Insureds** will be permitted to select qualified counsel approved by the Underwriter to represent them in the defense and appeal of **Claims**; provided, that the foregoing permission, and the Underwriter's obligation to pay **Defense Expenses** to such counsel, is expressly conditioned on the following:

            (a)      The Underwriter shall be reasonably satisfied that such counsel is able and competent to handle any **Claim** for which such counsel is engaged to provide legal services;

            (b)      Such counsel shall adhere in all respects to the Underwriter's Litigation Management Guidelines in effect when such **Claim** is assigned to counsel;

            (c)      The Underwriter shall pay such counsel at an hourly rate commensurate with the average hourly rate the Underwriter pays approved counsel in the same jurisdiction;

            (d)      Such counsel maintains an office in the judicial jurisdiction in which such **Claim** is pending; and

            (e)      All **Claims** shall be handled in a reasonable manner and such counsel shall provide the Underwriter with all information reasonably requested by the Underwriter in connection with any **Claim**.

        An **Insured** is not permitted to represent himself or herself to defend a **Claim** under this Policy and it shall not be unreasonable for the Underwriter to withhold its consent to the representation of any **Insured** by another **Insured** or, if more than one **Insured** is involved in a **Claim**, to withhold its consent to separate counsel for one or more of such **Insureds** unless there is a material actual or potential conflict of interest among such **Insureds**.

        No **Insured** shall incur any expenses, admit liability for, assume any obligation, or settle any **Claim** without the

Underwriter's written consent.  The Underwriter may, at its sole discretion, elect to associate in the investigation and defense of any **Claim**.  The Underwriter may make any settlement of any **Claim** which it deems appropriate.

(2)     The Underwriter will have no obligation to pay **Loss** or **Defense Expenses** after the applicable Limit of Liability has been exhausted by the payment of **Loss**.

(3)     The Underwriter will pay on a current basis **Defense Expenses** for which this Policy provides coverage.  The Underwriter will pay **Loss** only upon the final disposition of a **Claim**.  As a condition of any payment of **Defense Expenses** under this GENERAL CONDITION (D)(3), the Underwriter may require a written undertaking on terms and conditions satisfactory to the Underwriter guaranteeing the repayment of any **Defense Expenses** paid to or on behalf of any **Insured** if it is finally determined that **Loss** incurred by such **Insured** would not be covered under this Policy.

(4)     If both **Loss** covered by this Policy and **Loss** not covered by this Policy are incurred, either because a **Claim** made against the **Insureds** includes both covered and uncovered matters, or because a **Claim** is made against both **Insureds** and others not included within the definition of "**Insured**," set forth in DEFINITION (S) above, the **Insureds** and the Underwriter agree to use their best efforts to determine a fair and proper allocation of all such amounts.  The Underwriter's obligation to pay **Loss** under this Policy shall relate only to those sums allocated to the **Insureds**.  In making such determination, the parties shall take into account the relative legal and financial exposures of, and relative benefits obtained in connection with the defense and/or settlement of the **Claim** by the **Insureds** and others. In the event that the Underwriter and the **Insureds** do not reach an agreement with respect to an allocation, then the Underwriter shall be obligated to make an interim payment of the amount of **Loss** which the parties agree is not in dispute until a final amount is agreed upon or determined pursuant to the provisions of this Policy and applicable law.

(3)      Section IV GENERAL CONDITIONS (M) of this Policy is amended to read in its entirety as follows:

      **(M)**    **Exhaustion:**

If the Underwriter's applicable Aggregate Limit of Liability for any Insuring Agreement, as set forth in ITEM 4 of the Declarations, is exhausted by the payment of **Loss**, all obligations of the Underwriter under such Insuring Agreement will be completely fulfilled and exhausted, including any obligation to pay **Defense Expenses**, and the Underwriter will have no further obligations of any kind or nature whatsoever under such Insuring Agreement.

If all of the Underwriter's applicable Limits of Liability are exhausted by the payment of **Loss**, the premium will be fully earned, all obligations of the Underwriter under this Policy will be completely fulfilled and exhausted, including any obligation to pay **Defense Expenses**, and the Underwriter will have no further obligations of any kind or nature whatsoever under this Policy.

All other terms, conditions and limitations of this Policy shall remain unchanged.

ENDORSEMENT NO.  15

HEALTH CARE ORGANIZATIONS AND PROVIDERS
PROFESSIONAL LIABILITY, GENERAL LIABILITY AND
EMPLOYEE BENEFIT LIABILITY POLICY

AMEND DEFINITION OF "INSURED" TO INCLUDE ADDITIONAL INDIVIDUALS

This Endorsement, which is effective at 12:01 a.m. on July 1, 2014, forms part of:

Policy No.    MPP-6333-14
Issued to     Devereux Foundation
Issued by    Homeland Insurance Company of Delaware

In consideration of the premium charged, the term "**Insured**," as defined in Section II
Definitions of this Policy, is amended to include the following person(s) (each an "Additional
Insured"), but only with respect to the specific activities and/or liabilities set forth opposite the
name of each such individual:

| Additional Insured | Insured Activity/Liability |
|---|---|
| Foster Parents | Activities performed by or on behalf of the **Named Insured** |
| Funding Sources | Activities performed by or on behalf of the **Named Insured** and/or their placement of clients with the **Named Insured** |
| Governmental Agencies | Activities performed on behalf of the **Named Insured** and/or their placement of clients with the **Named Insured** |
| Landlords | Liability arising out of the negligence and/or legal liability of the **Named Insured** |
| Lessors or Managers of Premises | Liability arising out of the negligence and/or legal liability of the **Named Insured** |
| Lessors of Leased Equipment | Liability arising out of the negligence and/or legal liability of the **Named Insured** |

All other terms, conditions and limitations of the Policy shall remain unchanged.

ENDORSEMENT NO. 16

HEALTH CARE ORGANIZATIONS AND PROVIDERS
PROFESSIONAL LIABILITY, GENERAL LIABILITY AND
EMPLOYEE BENEFIT LIABILITY POLICY

LIMITED WAIVER OF SUBROGATION – INSURING AGREEMENT (A)

This Endorsement, which is effective at 12:01 a.m. on July 1, 2014, forms part of:

|  |  |
|---|---|
| Policy No. | MPP-6333-14 |
| Issued to | Devereux Foundation |
| Issued by | Homeland Insurance Company of Delaware |

In consideration of the premium charged, solely with respect to any payment made under
INSURING AGREEMENT (A) of this Policy, the Underwriter waives its right to subrogation
under Section IV General Conditions (L) of this Policy with respect to The City of Denver, The
County of Denver and the Denver Department of Human Services.  Section IV General
Conditions (L) of this Policy shall be deemed amended to the extent necessary to affect the
purpose and intent of this endorsement.


All other terms, conditions and limitations of the Policy shall remain unchanged.

ENDORSEMENT NO.  17

HEALTH CARE ORGANIZATIONS AND PROVIDERS
PROFESSIONAL LIABILITY, GENERAL LIABILITY AND
EMPLOYEE BENEFIT LIABILITY POLICY

POLLUTION EXCLUSION

This Endorsement, which is effective at 12:01 a.m. on July 1, 2014, forms part of:

| | |
|---|---|
| Policy No. | MPP-6333-14 |
| Issued to | Devereux Foundation |
| Issued by | Homeland Insurance Company of Delaware |

In consideration of the premium charged:

1.  Section III Exclusions (B)(18) of this Policy will not apply to any **Claim** for **Bodily Injury** or **Property Damage** arising out of a Short-term Pollution Event (as defined below), provided the Short-term Pollution Event would not have taken place but for a Named Peril (as defined below) having occurred, and the **Insured** notified the Underwriter of such Short-term Pollution Event as soon as practicable but no more than fourteen (14) days after its ending.

2.  For the purposes of this endorsement, the following terms shall have the meanings set forth below:

    (a)  "Named Peril" means:

        (i)  lightning, windstorm or earthquake;

        (ii)  explosion, implosion, collapse, puncture, bursting, rupture, collision, or overturn of a tank, a vessel, machinery, equipment, or other similar apparatus or device (other than an "auto"), including any attached piping, pumps or valves, if the explosion, implosion, collapse, puncture, bursting, rupture, collision, or overturn is not caused by deterioration, corrosion, erosion, decay, rotting or wear and tear; or

        (iii)  vandalism or malicious mischief by someone other than an **Insured**.

    (b)  "Short-term Pollution Event" means a discharge, dispersal, release or escape of **Pollutants** which:

        (i)  begins during the **Policy Period**;

        (ii)  begins at an identified time and place;

(iii)    ends, in its entirety, at an identified time within forty-eight (48) hours of the beginning of the discharge, dispersal, release or escape of the **Pollutants**; and

(iv)    does not originate from an Underground Storage Tank (as defined below).

To be a Short-term Pollution Event, the discharge, dispersal, release or escape of **Pollutants** need not be continuous. However, if the discharge, dispersal, release or escape is not continuous, then all discharges, dispersals, releases or escapes of the same **Pollutants** from essentially the same source, considered together, must satisfy subparagraphs (i) through (iv) of this definition to be considered a Short-term Pollution Event.

(c)    "Underground Storage Tank" means any storage tank, including any attached pumps, valves or piping, buried below the surface of the ground or water, or which, at any time, had been buried under the surface of the ground or water and then subsequently exposed by any means. For the purposes of this definition, buried means that at least 10% of it is below the surface of the ground or water.

All other terms, conditions and limitations of this Policy shall remain unchanged.

ENDORSEMENT NO.  18

HEALTH CARE ORGANIZATIONS AND PROVIDERS
PROFESSIONAL LIABILITY, GENERAL LIABILITY AND
EMPLOYEE BENEFIT LIABILITY POLICY

INSURED VS. INSURED CARVEBACK ENDORSEMENT

This Endorsement, which is effective at 12:01 a.m. on July 1, 2014, forms part of:

Policy No.   MPP-6333-14
Issued to     Devereux Foundation
Issued by     Homeland Insurance Company of Delaware

In consideration of the premium charged:

1.      Solely with respect to the coverage afforded under Insuring Agreement (A) of the
        Policy, Section III Exclusions (D)(6) of this Policy will not apply to **Claims** made
        against any **Insured Medical Practitioner** or **Insured** who is a registered nurse
        or licensed practical nurse arising out of his/her rendering of first aid, flu shots or
        other inoculations to another **Insured**.

2.      Solely with respect to the coverage afforded under Insuring Agreement (B) of the
        Policy, Section III Exclusions (D)(6) of this Policy will not apply to **Claims** made
        against any Specific Insured (as defined below) for **Bodily Injury** and/or
        **Personal Injury** to another **Insured**.

3.      Solely for the purposes of this endorsement, the term "Specific Insured" means
        the following:

        Any Officer
        Any Executive Director
        Any National Human Resources Director
        Any National Director
        Any Assistant Director
        Any Assistant Center Director

All other terms, conditions and limitations of the Policy shall remain unchanged.

ENDORSEMENT NO.  19

ADDITIONAL INSURED ENDORSEMENT - PRIMARY AND NON-CONTRIBUTORY (GL)

This Endorsement, which is effective at 12:01 a.m. on July 1, 2014, forms part of:

| | |
|---|---|
| Policy No. | MPP-6333-14 |
| Issued to | Devereux Foundation |
| Issued by | Homeland Insurance Company of Delaware |

In consideration of the premium charged:

(1)  Solely for the purposes of the coverage afforded under INSURING AGREEMENT (B) of this Policy, and subject to the terms and conditions set forth in this endorsement, the term "**Insured**," as defined in Section II DEFINITIONS of this Policy, is amended to include the person or entity scheduled below with whom/which the **Named Insured** has a written agreement to provide such person or entity additional insured status under this Policy (each an "Additional Insured"), but solely with respect to any liability imposed or sought to be imposed on such Additional Insured as a result of the acts, errors or omissions of an **Insured**.

Additional Insured

· Blanket Basis Where Required by Contract
· Orange County

(2)  Subject to the terms and conditions set forth in this endorsement, the coverage provided to an Additional Insured shall be primary and non-contributory with respect to any liability imposed or sought to be imposed on such Additional Insured as a result of the acts, errors or omissions of an **Insured**.

(3)  No coverage will be available under this Policy for **Loss** or **Defense Expenses** for any **Claim** against an Additional Insured based upon, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving any actual or alleged act, error or omission of an Additional Insured.

(4)  An Additional Insured's status as an Additional Insured under this Policy shall immediately terminate when the **Named Insured's** agreement to provide such status or obligation to indemnify such Additional Insured terminates.

(5)  The amount, extent and scope of coverage available under this Policy to an Additional Insured will be no greater than the amount, extent and scope of the indemnification available to such Additional Insured as agreed to by the **Named Insured** in the written agreement between the **Named Insured** and such Additional Insured.

(6)  It is understood and agreed that the Additional Insured(s) share in the applicable Limits of Liability set forth in ITEM 4.B. of the Declarations.

All other terms, conditions and limitations of this Policy shall remain unchanged.

ENDORSEMENT NO. 20
AMEND SECTION III EXCLUSION (B)(18) FOR PESTICIDE/HERBICIDE
APPLICATION ENDORSEMENT

This Endorsement, which is effective at 12:01 a.m. on July 1, 2014, forms part of:

Policy No.   MPP-6333-14
Issued to     Devereux Foundation
Issued by    Homeland Insurance Company of Delaware

In consideration of the premium charged:

(1)     Section III Exclusions (B)(18) of this Policy will not apply to the application of herbicides or pesticides by an **Insured** on property owned by the **Named Insured**; provided, that such application of herbicides or pesticides meets all standards of any statute, ordinance, regulation or license requirement of any federal, state or local government which apply to such application.

(2)     It is understood and agreed that the Underwriter's maximum limit of liability for all **Loss**, including **Defense Expenses**, resulting from all covered **Claims** based upon, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving any actual or alleged application of herbicides or pesticides by an **Insured** on property owned by the **Named Insured** shall be $1,000,000, which amount shall be part of, and not in addition to, the Underwriter's Limits of Liability set forth in ITEM 4 of the Declarations.

All other terms, conditions and limitations of the Policy shall remain unchanged.

ENDORSEMENT NO. 21

HEALTH CARE ORGANIZATIONS AND PROVIDERS
PROFESSIONAL LIABILITY, GENERAL LIABILITY AND
EMPLOYEE BENEFIT LIABILITY POLICY

SPOUSAL EXTENSION FOR INSURING AGREEMENT (B) ENDORSEMENT

This Endorsement, which is effective at 12:01 a.m. on July 1, 2014, forms part of:

> Policy No.   MPP-6333-14
> Issued to      Devereux Foundation
> Issued by     Homeland Insurance Company of Delaware

In consideration of the premium charged, subparagraph (8) of the term "**Insured**," as defined in Section II Definitions of this Policy, is amended to read in its entirety as follows:

> (8)(a)   solely with respect to and limited to coverage afforded under INSURING AGREEMENTS (A) and (B), the lawful spouses of individual **Insureds**;
>
> (b)   solely with respect to and limited to coverage afforded under INSURING AGREEMENT (A), in the event of the death, incapacity, or bankruptcy of an individual **Insured**, the estates, heirs, legal representatives or assigns of such individual **Insured**;

All other terms, conditions and limitations of this Policy shall remain unchanged.

ENDORSEMENT NO.  22

HEALTH CARE ORGANIZATIONS AND PROVIDERS
PROFESSIONAL LIABILITY, GENERAL LIABILITY AND
EMPLOYEE BENEFIT LIABILITY POLICY

AMEND DEFITION OF INSURED TO INCLUDE
INDEPENDENT CONTRACTORS

This Endorsement, which is effective at 12:01 a.m. on July 1, 2014, forms part of:

     Policy No.    MPP-6333-14
     Issued to     Devereux Foundation
     Issued by    Homeland Insurance Company of Delaware

In consideration of the premium charged:

1.     The term "**Insured**," as defined in Section II Definitions of this Policy, is amended to include any independent contractor providing **Professional Services** on behalf of the **Named Insured** and under contract with the **Named Insured**, but only when, and to the extent that, such independent contractor is acting on behalf of, and within the scope and capacity of his or her contracted services for, the **Named Insured**.

2.     It is expressly understood and agreed that the coverage afforded under paragraph 1. above shall be specifically excess over, and shall not contribute with, any other valid insurance or self-insurance, regardless of whether such other insurance or self-insurance is stated to be primary, contributing, excess, contingent or otherwise.

3.     The term "independent contractor," as used in this endorsement, shall not include any medical doctor except when such medical doctor is acting as a Medical Director, department head or Chief of Staff for the **Named Insured**, and then only to the extent such individual is acting within the scope and capacity of his or her position as such Medical Director, department head or Chief of Staff for the **Named Insured**.

All other terms, conditions and limitations of the Policy shall remain unchanged.

ENDORSEMENT NO.  23
MANAGED CARE SERVICES COVERAGE ENDORSEMENT

This Endorsement, which is effective at 12:01 a.m. on July 1, 2014, forms part of:

Policy No.    MPP-6333-14
Issued to     Devereux Foundation
Issued by     Homeland Insurance Company of Delaware

In consideration of the premium charged, solely with respect to **Claims** based upon, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving the rendering of, or failure to render, **Professional Services** in connection with or pursuant to the following contact:

| Devereux Based Community Care Contract |
| --- |

(1)    ITEM 4.A. of the Declarations is amended to read in its entirety as follows:

A.  Healthcare Professional Liability
Each Claim…………………………………………...$6,000,000
Aggregate for all Claims…………………………..$8,000,000
Deductible     Self-Insured Retention
Per Claim…………………………………$10,000
Aggregate …………………………………N/A

(2)    For purposes of this endorsement, the term "**Claim Services**" means the following services, but only if performed by an **Insured**: the submission, handling, investigation, payment or adjustment of claims for benefits or coverages under health care or workers' compensation plans.

Section II DEFINITIONS of this Policy shall be deemed amended to include such term

(3)    The term "**Managed Care Services**," as defined in Section II DEFINITIONS of this Policy, is amended to read in its entirety as follows:

"**Managed Care Services**" means any of the following services or activities: **Peer Review**; **Utilization Review**; advertising, marketing, selling, or enrollment for health care or workers' compensation plans; **Claim Services**; establishing health care provider networks; design and/or implementation of financial incentive plans; wellness or health promotion education; development or implementation of clinical guidelines, practice parameters or protocols; triage for payment of **Medical Services**; and services or activities performed in the administration or management of health care or workers' compensation plans.

(4)    The term "**Professional Services**," as defined in Section II DEFINITIONS of this

Policy, is amended to read in its entirety as follows:

"**Professional Services**" means:

(1)     **Medical Services**;

(2)     **Managed Care Services**;

(3)     the activities of an **Insured** as a member of a formal accreditation, standards review or similar professional board or committee, including executing the directives of such board or committee; or

(4)     reviewing the quality of **Medical Services** or providing quality assurance on behalf of the **Named Insured**.

(5)     The term "**Utilization Review**," as defined in Section II DEFINITIONS of this Policy, is amended to read in its entirety as follows:

"**Utilization Review**" means the process of evaluating the appropriateness or necessity of **Medical Services** provided or to be provided by an **Insured**. **Utilization Review** shall include prospective review of proposed **Medical Services**, concurrent review of ongoing **Medical Services** and retrospective review of already rendered **Medical Services**.

(6)     Section III EXCLUSIONS (D)(12) of this Policy is deleted in its entirety.

(7)     Solely with respect to any **Claim** based upon, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving any **Managed Care Services**, no coverage will be available under this Policy for any such **Claim** made by or on behalf of any federal, state or local governmental, regulatory or administrative agency, whether such **Claim** is brought in the name of such agency or by or on behalf of such agency in the name of any other individual or entity.

(8)     Solely with respect to **Claims** for which coverage is provided under this endorsement, it is understood and agreed that the provisions set forth in Endorsement No. 7 to this Policy, "CO-INSURANCE ENDORSEMENT," shall not apply.

All other terms, conditions and limitations of this Policy shall remain unchanged.

ENDORSEMENT NO.  24
AMEND DEFINITION OF EMPLOYEE ENDORSEMENT

This Endorsement, which is effective at 12:01 a.m. on July 1, 2014, forms part of:

> Policy No.    MPP-6333-14
> Issued to     Devereux Foundation
> Issued by     Homeland Insurance Company of Delaware

In consideration of the premium charged, the term "**Employee**," as defined in Section II DEFINITIONS of this Policy, is amended to include:

(1)     any part-time, seasonal and temporary employee; and

(2)     any individual who is leased to the **Named Insured** through a temporary staffing agency;

but only for acts, errors or omissions committed: (a) within the capacity and scope of such person's duties as such; and (b) under the direct supervision of, at the direction of, and for the benefit of the **Named Insured**.

All other terms, conditions and limitations of this Policy shall remain unchanged.

ENDORSEMENT NO.  25
AMEND ITEM 4.B. OF THE DECLARATIONS FOR SPECIFIC INSURED
ENDORSEMENT

This Endorsement, which is effective at 12:01 a.m. on July 1, 2014, forms part of:

Policy No.    MPP-6333-14
Issued to      Devereux Foundation
Issued by      Homeland Insurance Company of Delaware

In consideration of the premium charged, solely with respect to the entity identified in the SCHEDULE below, an **Insured** herein, the Per Claim and Aggregate Deductible/Self-Insured Retention amounts set forth in ITEM 4.B. of the Declarations are amended to read in their entirety as follows:

Deductible        Self-Insured Retention
          Per Claim………………………………………..$10,000
          Aggregate ………………………………………N/A

SCHEDULE

| Devereux Based Community Care |
| --- |

All other terms, conditions and limitations of this Policy shall remain unchanged.

ENDORSEMENT NO.  26
SCHEDULE OF INSURED PHYSICIANS WITH SEPARATE LIMITS
ENDORSEMENT

This Endorsement, which is effective at 12:01 a.m. on July 1, 2014, forms part of:

Policy No.   MPP-6333-14
Issued to     Devereux Foundation
Issued by    Homeland Insurance Company of Delaware

In consideration of the premium charged:

(1)    Solely with respect to the **Insured** physicians scheduled below:

(a)    The amount identified as the Each Claim Limit opposite such **Insured** physician's name below will be the Underwriter's maximum Limit of Liability for all **Loss** and all **Defense Expenses** resulting from each **Claim** or **Related Claims** made against such **Insured** physician for which this Policy provides coverage under INSURING AGREEMENT (A), regardless of the time of payment by the Underwriter, or the number of claimants, and regardless of whether such **Claim** or **Related Claims** is/are first made during the **Policy Period** or during any Extended Reporting Period.

(b)    The amount identified as the Aggregate Limit opposite such **Insured** physician's name below will be the Underwriter's maximum Limit of Liability for all **Loss** and all **Defense Expenses** resulting from all **Claims** or **Related Claims** made against such **Insured** physician for which this Policy provides coverage under INSURING AGREEMENT (A), regardless of the time of payment by the Underwriter, or the number of claimants, and regardless of whether such **Claims** or **Related Claims** are first made during the **Policy Period** or during any Extended Reporting Period.

(2)    No coverage will be available under this Policy for **Loss** or **Defense Expenses** for any **Claim** based upon, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving any actual or alleged **Professional Services Wrongful Act** committed or allegedly committed by any **Insured** physician scheduled below prior to the Retroactive Date set forth opposite such **Insured** physician's name.

(3)     No coverage will be available under this Policy for **Loss** or **Defense Expenses** for any **Claim** based upon, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving any actual or alleged **Professional Services Wrongful Act** committed or allegedly committed by any **Insured** physician scheduled below after the Termination Date, if any, set forth opposite such **Insured** physician's name.  To the extent that an **Insured** physician scheduled below does not have a Termination Date, this paragraph shall not apply.

SCHEDULE

| Name | Each Claim Limit | Aggregate Limit | Retroactive Date | Termination Date | Specialty |
|---|---|---|---|---|---|
| Edelstein, Joel | $500,000 | $1,500,000 | 08.01.1998 | | Psychiatry |
| Posner, Imran | $500,000 | $1,500,000 | 08.01.2010 | | Psychiatry |
| Reeder, Tilden | $500,000 | $1,500,000 | 01.01.2003 | | Psychiatry |
| Shresta, Ranjeeb | $500,000 | $1,500,000 | 07.16.2012 | | Psychiatry |
| Zavodnick, Jacquelyn | $500,000 | $1,500,000 | 02.10.2001 | | Psychiatry |

All other terms, conditions and limitations of this Policy shall remain unchanged.

ENDORSEMENT NO. 27
TWO YEAR POLICY PERIOD ENDORSEMENT

This Endorsement, which is effective at 12:01 a.m. on July 1, 2014, forms part of:

      Policy No.    MPP-6333-14
      Issued to     Devereux Foundation
      Issued by    Homeland Insurance Company of Delaware

In consideration of the premium charged:

(1)     Section II DEFINITIONS of this Policy is amended to include the following terms:

     (a)     "**Anniversary Date**" means that date and time exactly one (1) year after the date and time set forth in ITEM 2(a) of the Declarations.

     (b)     "**Policy Year**" means:

          (i)     the period from the date and time set forth in ITEM 2(a) of the Declarations to the **Anniversary Date** (the "First Policy Year"); and

          (ii)    the period from the **Anniversary Date** to the Expiration Date set forth in ITEM 2(b) of the Declarations or earlier cancellation date of this Policy (the "Second Policy Year").

(2)     It is understood and agreed that the applicable "Aggregate for all Claims" amounts for Insuring Agreements (A), (B) and (C) set forth in ITEM 4 of the Declarations will apply separately to each **Policy Year**.  Accordingly:

    (a)(i)    the applicable "Aggregate for all Claims" amounts for Insuring Agreements (A) and (C) set forth in ITEM 4 of the Declarations will be the Underwriter's maximum Limit of Liability for all **Loss** resulting from all **Claims** or **Related Claims** first made during the First Policy Year under each such Insuring Agreement;

     (ii)    the applicable "Aggregate for all Claims" amounts for Insuring Agreements (A) and (C) set forth in ITEM 4 of the Declarations will be the Underwriter's maximum Limit of Liability for all **Loss** resulting from all **Claims** or **Related Claims** first made during the Second Policy Year under each such Insuring Agreement;

    (b)(i)    the "Aggregate for all Claims" amount for Insuring Agreement (B) set forth in ITEM 4 of the Declarations will be the Underwriter's maximum Limit of Liability for all **Loss** resulting from all **Claims** or **Related**

HPE-10026-02-13

**Claims** alleging **Bodily Injury**, **Property Damage**, **Advertising Injury** or **Personal Injury** caused by **Occurrences** that take place during the First Policy Year; and

(ii) the "Aggregate for all Claims" amount for Insuring Agreement (B) set forth in ITEM 4 of the Declarations will be the Underwriter's maximum Limit of Liability for all **Loss** resulting from all **Claims** or **Related Claims** alleging **Bodily Injury**, **Property Damage**, **Advertising Injury** or **Personal Injury** caused by **Occurrences** that take place during the Second Policy Year.

Section IV GENERAL CONDITIONS (A) of this Policy shall be deemed amended to the extent necessary to effect the purpose and intent of this paragraph.

(3) It is understood and agreed that the "Aggregate for all Evacuations" and "Aggregate for all Legal Defense Proceedings" amounts for Insuring Agreements (D) and (E) set forth in ITEM 4 of the Declarations will apply separately to each **Policy Year**. Accordingly:

(a)(i) the "Aggregate for all Evacuations" amount for Insuring Agreement (D) set forth in ITEM 4 of the Declarations will be the Underwriter's maximum Limit of Liability for all **Loss** resulting from all **Evacuations** occurring during the First Policy Year;

(ii) the "Aggregate for all Evacuations" amount for Insuring Agreement (D) set forth in ITEM 4 of the Declarations will be the Underwriter's maximum Limit of Liability for all **Loss** resulting from all **Evacuations** occurring during the Second Policy Year;

(b)(i) the "Aggregate for all Legal Defense Proceedings" amount for Insuring Agreement (E) set forth in ITEM 4 of the Declarations will be the Underwriter's maximum Limit of Liability for all **Loss** resulting from all **Legal Defense Proceedings** first brought against the **Insured** during the First Policy Year; and

(ii) the "Aggregate for all Legal Defense Proceedings" amount for Insuring Agreement (D) set forth in ITEM 4 of the Declarations will be the Underwriter's maximum Limit of Liability for all **Loss** resulting from all **Legal Defense Proceedings** first brought against the **Insured** during the Second Policy Year.

Section IV GENERAL CONDITIONS (A) of this Policy shall be deemed amended to the extent necessary to effect the purpose and intent of this paragraph.

(4) It is understood and agreed that any applicable "Aggregate" deductible or self-insured retention amounts set forth in ITEM 4 of the Declarations shall reinstate

on and as of the **Anniversary Date** and apply separately to each **Policy Year**. Section IV GENERAL CONDITIONS (A)(7) of this Policy shall be deemed amended to the extent necessary to effect the purpose and intent of this paragraph.

(5)    It is understood and agreed that the Underwriter's Limit of Liability for **Claims** made during any Extended Reporting Period shall be part of, and not in addition to, the Underwriter's Limit of Liability for all **Claims** made during the Second Policy Year.  Section IV GENERAL CONDITIONS (H) of this Policy shall be deemed amended to the extent necessary to effect the purpose and intent of this paragraph.

All other terms, conditions and limitations of this Policy shall remain unchanged.

ENDORSEMENT NO.  28
DELETE ENDORSEMENT

This Endorsement, which is effective at 12:01 a.m. on July 1, 2014, forms part of:

    Policy No.    MPP-6333-14
    Issued to     Devereux Foundation
    Issued by     Homeland Insurance Company of Delaware

In consideration of the premium charged, Endorsement No. 26 to this Policy is deleted in its entirety and shall be of no force or effect from and after the effective date of this Endorsement.

All other terms, conditions and limitations of this Policy shall remain unchanged.

ENDORSEMENT NO. 29
SEPARATE LIMITS OF LIABILITY FOR PENNSYLVANIA PHYSICIANS
ENDORSEMENT

This Endorsement, which is effective at 12:01 a.m. on July 1, 2014, forms part of:

Policy No.      MPP-6333-14
Issued to       Devereux Foundation
Issued by       Homeland Insurance Company of Delaware

In consideration of the premium charged:

(1)     Solely with respect to each **Insured** physician scheduled below:

    (a)     the maximum amount payable by the **Insured** and/or the Underwriter under INSURING AGREEMENT (A) of this Policy for all **Loss** resulting from each covered **Claim** made against each such **Insured** physician shall be $500,000; and

    (b)     the maximum amount payable by the **Insured** and/or the Underwriter under INSURING AGREEMENT (A) of this Policy for all **Loss** resulting from all covered **Claims** made against each such **Insured** physician shall be $1,500,000.

(2)     The Limits of Liability stated in paragraph (1) above shall apply separately to each **Policy Year** (as such term is defined in Endorsement No. 27 to this Policy).

(3)     The Underwriter will have no obligation to pay **Loss** or **Defense Expenses** resulting from any **Claim** under INSURING AGREEMENT (A) of this Policy made against an **Insured** physician scheduled below, or continue to direct the defense of an **Insured** physician scheduled below, after the applicable Limit of Liability stated in paragraph (1) above has been exhausted by the payment of **Loss**.

(4)     It is understood and agreed that the applicable Deductible stated in ITEM 4.A. of the Declarations shall apply to **Claims** made against the **Insured** physicians scheduled below.

(5)     In the event that the full amount of the applicable aggregate Deductible stated in ITEM 4 of the Declarations has been paid by the Underwriter and/or the **Insured,** a maintenance deductible in the amount of $500,000 shall apply to each **Claim** under INSURING AGREEMENT (A) of this Policy made after the date such aggregate Deductible has been paid in full against any **Insured** physician scheduled below.

(6)     The maintenance deductible stated in paragraph (5) above shall be eroded (or exhausted) by the payment of **Loss**.  The **Insured** shall be responsible for payment in full of such deductible; provided, that the Underwriter has agreed to pay such deductible on behalf of the **Insured** and the **Insured** understands and agrees that he/she/it shall repay the

Underwriter any amounts so paid as soon as practicable upon demand of the Underwriter. Any amounts paid within such maintenance deductible will reduce, and may exhaust, the applicable Limits of Liability stated in paragraph (1) above.

(7)     Unless and until the "Aggregate for all Claims" Limit of Liability stated in ITEM 4.A. of the Declarations for any **Policy Year** is exhausted by the payment of **Loss** and/or **Defense Expenses**, any payment of **Loss** resulting from a **Claim** under INSURING AGREEMENT (A) of this Policy made against an **Insured** physician scheduled below will reduce, and may exhaust, such "Aggregate for all Claims" Limit of Liability.  In the event that the "Aggregate for all Claims" Limit of Liability stated in ITEM 4.A. of the Declarations for any **Policy Year** is exhausted by the payment of **Loss** and/or **Defense Expenses**, then any available applicable Limits of Liability stated in paragraph (1) above shall be paid in addition to such "Aggregate for all Claims" Limit of Liability.

(8)     No coverage will be available under this Policy for **Loss** or **Defenses Expenses** for any **Claim** based upon, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving any actual or alleged **Professional Services Wrongful Act** committed or allegedly committed by any **Insured** physician scheduled below prior to the Retroactive Date set forth opposite such **Insured** physician's name.

(9)     No coverage will be available under this Policy for **Loss** or **Defense Expenses** for any **Claim** based upon, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving any actual or alleged **Professional Services Wrongful Act** committed or allegedly committed by any **Insured** physician scheduled below after the Termination Date, if any, set forth opposite such **Insured** physician's name.  To the extent that an **Insured** physician scheduled below does not have a Termination Date, this paragraph shall not apply.

(10)    This Policy shall be deemed amended to extent necessary to effect the purpose and intent of this endorsement.


Schedule

| Name | Retroactive Date | Termination Date | Specialty |
|------|------------------|------------------|-----------|
| Edelstein, Joel | 08.01.1998 | | Psychiatry |
| Handler, Robert | 01.01.2005 | | Psychiatry |
| Posner, Imran | 08.01.2010 | | Psychiatry |
| Reeder, Tilden | 01.01.2003 | | Psychiatry |
| Shresta, Ranjeeb | 07.16.2012 | | Psychiatry |
| Zavodnick, Jacquelyn | 02.10.2001 | | Psychiatry |


All other terms, conditions and limitations of this Policy shall remain unchanged.

ENDORSEMENT NO.  30
DELETE ENDORSEMENT

This Endorsement, which is effective at 12:01 a.m. on December 9, 2014, forms part of:

    Policy No.    MPP-6333-14
    Issued to     Devereux Foundation
    Issued by    Homeland Insurance Company of Delaware

In consideration of the premium charged, Endorsement No. 29 to this Policy is deleted in its entirety and shall be of no force or effect from and after the effective date of this Endorsement.

All other terms, conditions and limitations of this Policy shall remain unchanged.

ENDORSEMENT NO. 31
SEPARATE LIMITS OF LIABILITY FOR PENNSYLVANIA PHYSICIANS
ENDORSEMENT

This Endorsement, which is effective at 12:01 a.m. on December 9, 2014, forms part of:

|          |                                          |
|----------|------------------------------------------|
| Policy No. | MPP-6333-14                            |
| Issued to | Devereux Foundation                     |
| Issued by | Homeland Insurance Company of Delaware   |

In consideration of the premium charged:

(1)     Solely with respect to each **Insured** physician scheduled below:

     (a)     the maximum amount payable by the **Insured** and/or the Underwriter under INSURING AGREEMENT (A) of this Policy for all **Loss** resulting from each covered **Claim** made against each such **Insured** physician shall be $500,000; and

     (b)     the maximum amount payable by the **Insured** and/or the Underwriter under INSURING AGREEMENT (A) of this Policy for all **Loss** resulting from all covered **Claims** made against each such **Insured** physician shall be $1,500,000.

(2)     The Limits of Liability stated in paragraph (1) above shall apply separately to each **Policy Year** (as such term is defined in Endorsement No. 27 to this Policy).

(3)     The Underwriter will have no obligation to pay **Loss** or **Defense Expenses** resulting from any **Claim** under INSURING AGREEMENT (A) of this Policy made against an **Insured** physician scheduled below, or continue to direct the defense of an **Insured** physician scheduled below, after the applicable Limit of Liability stated in paragraph (1) above has been exhausted by the payment of **Loss**.

(4)     It is understood and agreed that the applicable Deductible stated in ITEM 4.A. of the Declarations shall apply to **Claims** made against the **Insured** physicians scheduled below.

(5)     In the event that the full amount of the applicable aggregate Deductible stated in ITEM 4 of the Declarations has been paid by the Underwriter and/or the **Insured,** a maintenance deductible in the amount of $500,000 shall apply to each **Claim** under INSURING AGREEMENT (A) of this Policy made after the date such aggregate Deductible has been paid in full against any **Insured** physician scheduled below.

(6)     The maintenance deductible stated in paragraph (5) above shall be eroded (or exhausted) by the payment of **Loss**.  The **Insured** shall be responsible for payment in full of such deductible; provided, that the Underwriter has agreed to pay such deductible on behalf of the **Insured** and the **Insured** understands and agrees that he/she/it shall repay the

Underwriter any amounts so paid as soon as practicable upon demand of the Underwriter. Any amounts paid within such maintenance deductible will reduce, and may exhaust, the applicable Limits of Liability stated in paragraph (1) above.

(7)     Unless and until the "Aggregate for all Claims" Limit of Liability stated in ITEM 4.A. of the Declarations for any **Policy Year** is exhausted by the payment of **Loss** and/or **Defense Expenses**, any payment of **Loss** resulting from a **Claim** under INSURING AGREEMENT (A) of this Policy made against an **Insured** physician scheduled below will reduce, and may exhaust, such "Aggregate for all Claims" Limit of Liability.  In the event that the "Aggregate for all Claims" Limit of Liability stated in ITEM 4.A. of the Declarations for any **Policy Year** is exhausted by the payment of **Loss** and/or **Defense Expenses**, then any available applicable Limits of Liability stated in paragraph (1) above shall be paid in addition to such "Aggregate for all Claims" Limit of Liability.

(8)     No coverage will be available under this Policy for **Loss** or **Defenses Expenses** for any **Claim** based upon, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving any actual or alleged **Professional Services Wrongful Act** committed or allegedly committed by any **Insured** physician scheduled below prior to the Retroactive Date set forth opposite such **Insured** physician's name.

(9)     No coverage will be available under this Policy for **Loss** or **Defense Expenses** for any **Claim** based upon, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving any actual or alleged **Professional Services Wrongful Act** committed or allegedly committed by any **Insured** physician scheduled below after the Termination Date, if any, set forth opposite such **Insured** physician's name.  To the extent that an **Insured** physician scheduled below does not have a Termination Date, this paragraph shall not apply.

(10)    This Policy shall be deemed amended to extent necessary to effect the purpose and intent of this endorsement.

Schedule

| Name | Retroactive Date | Termination Date | Specialty |
|------|------------------|------------------|-----------|
| Edelstein, Joel | 08.01.1998 | | Psychiatry |
| Handler, Robert | 01.01.2005 | | Psychiatry |
| Musunuri, Sailaja | 05.14.2007 | | Psychiatry |
| Posner, Imran | 08.01.2010 | | Psychiatry |
| Reeder, Tilden | 01.01.2003 | | Psychiatry |
| Shresta, Ranjeeb | 07.16.2012 | | Psychiatry |
| Zavodnick, Jacquelyn | 02.10.2001 | | Psychiatry |

All other terms, conditions and limitations of this Policy shall remain unchanged.

ENDORSEMENT NO.  32
DELETE ENDORSEMENT

This Endorsement, which is effective at 12:01 a.m. on January 2, 2015, forms part of:

>     Policy No.    MPP-6333-14
>     Issued to     Devereux Foundation
>     Issued by     Homeland Insurance Company of Delaware

In consideration of the premium charged, Endorsement No. 31 to this Policy is deleted in its entirety and shall be of no force or effect from and after the effective date of this Endorsement.

All other terms, conditions and limitations of this Policy shall remain unchanged.

ENDORSEMENT NO. 33
SEPARATE LIMITS OF LIABILITY FOR PENNSYLVANIA PHYSICIANS
ENDORSEMENT

This Endorsement, which is effective at 12:01 a.m. on January 2, 2015, forms part of:

      Policy No.    MPP-6333-14
      Issued to     Devereux Foundation
      Issued by    Homeland Insurance Company of Delaware

In consideration of the premium charged:

(1)      Solely with respect to each **Insured** physician scheduled below:

      (a)    the maximum amount payable by the **Insured** and/or the Underwriter under
              INSURING AGREEMENT (A) of this Policy for all **Loss** resulting from each
              covered **Claim** made against each such **Insured** physician shall be $500,000; and

      (b)    the maximum amount payable by the **Insured** and/or the Underwriter under
              INSURING AGREEMENT (A) of this Policy for all **Loss** resulting from all
              covered **Claims** made against each such **Insured** physician shall be $1,500,000.

(2)      The Limits of Liability stated in paragraph (1) above shall apply separately to each **Policy Year** (as such term is defined in Endorsement No. 27 to this Policy).

(3)      The Underwriter will have no obligation to pay **Loss** or **Defense Expenses** resulting from any **Claim** under INSURING AGREEMENT (A) of this Policy made against an **Insured** physician scheduled below, or continue to direct the defense of an **Insured** physician scheduled below, after the applicable Limit of Liability stated in paragraph (1) above has been exhausted by the payment of **Loss**.

(4)      It is understood and agreed that the applicable Deductible stated in ITEM 4.A. of the Declarations shall apply to **Claims** made against the **Insured** physicians scheduled below.

(5)      In the event that the full amount of the applicable aggregate Deductible stated in ITEM 4 of the Declarations has been paid by the Underwriter and/or the **Insured,** a maintenance deductible in the amount of $500,000 shall apply to each **Claim** under INSURING AGREEMENT (A) of this Policy made after the date such aggregate Deductible has been paid in full against any **Insured** physician scheduled below.

(6)      The maintenance deductible stated in paragraph (5) above shall be eroded (or exhausted) by the payment of **Loss**. The **Insured** shall be responsible for payment in full of such deductible; provided, that the Underwriter has agreed to pay such deductible on behalf of the **Insured** and the **Insured** understands and agrees that he/she/it shall repay the

Underwriter any amounts so paid as soon as practicable upon demand of the Underwriter. Any amounts paid within such maintenance deductible will reduce, and may exhaust, the applicable Limits of Liability stated in paragraph (1) above.

(7)     Unless and until the "Aggregate for all Claims" Limit of Liability stated in ITEM 4.A. of the Declarations for any **Policy Year** is exhausted by the payment of **Loss** and/or **Defense Expenses**, any payment of **Loss** resulting from a **Claim** under INSURING AGREEMENT (A) of this Policy made against an **Insured** physician scheduled below will reduce, and may exhaust, such "Aggregate for all Claims" Limit of Liability.  In the event that the "Aggregate for all Claims" Limit of Liability stated in ITEM 4.A. of the Declarations for any **Policy Year** is exhausted by the payment of **Loss** and/or **Defense Expenses**, then any available applicable Limits of Liability stated in paragraph (1) above shall be paid in addition to such "Aggregate for all Claims" Limit of Liability.

(8)     No coverage will be available under this Policy for **Loss** or **Defenses Expenses** for any **Claim** based upon, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving any actual or alleged **Professional Services Wrongful Act** committed or allegedly committed by any **Insured** physician scheduled below prior to the Retroactive Date set forth opposite such **Insured** physician's name.

(9)     No coverage will be available under this Policy for **Loss** or **Defense Expenses** for any **Claim** based upon, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving any actual or alleged **Professional Services Wrongful Act** committed or allegedly committed by any **Insured** physician scheduled below after the Termination Date, if any, set forth opposite such **Insured** physician's name.  To the extent that an **Insured** physician scheduled below does not have a Termination Date, this paragraph shall not apply.

(10)    This Policy shall be deemed amended to extent necessary to effect the purpose and intent of this endorsement.

Schedule

| Name | Retroactive Date | Termination Date | Specialty |
|------|------------------|------------------|-----------|
| Edelstein, Joel | 08.01.1998 | | Psychiatry |
| Handler, Robert | 01.01.2005 | 01.02.2015 | Psychiatry |
| Musunuri, Sailaja | 05.14.2007 | | Psychiatry |
| Posner, Imran | 08.01.2010 | | Psychiatry |
| Reeder, Tilden | 01.01.2003 | | Psychiatry |
| Shresta, Ranjeeb | 07.16.2012 | | Psychiatry |
| Zavodnick, Jacquelyn | 02.10.2001 | | Psychiatry |

All other terms, conditions and limitations of this Policy shall remain unchanged.

ENDORSEMENT NO. 35
SEPARATE LIMITS OF LIABILITY FOR PENNSYLVANIA PHYSICIANS
ENDORSEMENT

This Endorsement, which is effective at 12:01 a.m. on January 19, 2015, forms part of:

| | |
|---|---|
| Policy No. | MPP-6333-14 |
| Issued to | Devereux Foundation |
| Issued by | Homeland Insurance Company of Delaware |

In consideration of the premium charged:

(1)    Solely with respect to each **Insured** physician scheduled below:

    (a)    the maximum amount payable by the **Insured** and/or the Underwriter under INSURING AGREEMENT (A) of this Policy for all **Loss** resulting from each covered **Claim** made against each such **Insured** physician shall be $500,000; and

    (b)    the maximum amount payable by the **Insured** and/or the Underwriter under INSURING AGREEMENT (A) of this Policy for all **Loss** resulting from all covered **Claims** made against each such **Insured** physician shall be $1,500,000.

(2)    The Limits of Liability stated in paragraph (1) above shall apply separately to each **Policy Year** (as such term is defined in Endorsement No. 27 to this Policy).

(3)    The Underwriter will have no obligation to pay **Loss** or **Defense Expenses** resulting from any **Claim** under INSURING AGREEMENT (A) of this Policy made against an **Insured** physician scheduled below, or continue to direct the defense of an **Insured** physician scheduled below, after the applicable Limit of Liability stated in paragraph (1) above has been exhausted by the payment of **Loss**.

(4)    It is understood and agreed that the applicable Deductible stated in ITEM 4.A. of the Declarations shall apply to **Claims** made against the **Insured** physicians scheduled below.

(5)    In the event that the full amount of the applicable aggregate Deductible stated in ITEM 4 of the Declarations has been paid by the Underwriter and/or the **Insured,** a maintenance deductible in the amount of $500,000 shall apply to each **Claim** under INSURING AGREEMENT (A) of this Policy made after the date such aggregate Deductible has been paid in full against any **Insured** physician scheduled below.

(6)    The maintenance deductible stated in paragraph (5) above shall be eroded (or exhausted) by the payment of **Loss**.  The **Insured** shall be responsible for payment in full of such deductible; provided, that the Underwriter has agreed to pay such deductible on behalf of the **Insured** and the **Insured** understands and agrees that he/she/it shall repay the

Underwriter any amounts so paid as soon as practicable upon demand of the Underwriter. Any amounts paid within such maintenance deductible will reduce, and may exhaust, the applicable Limits of Liability stated in paragraph (1) above.

(7)     Unless and until the "Aggregate for all Claims" Limit of Liability stated in ITEM 4.A. of the Declarations for any **Policy Year** is exhausted by the payment of **Loss** and/or **Defense Expenses**, any payment of **Loss** resulting from a **Claim** under INSURING AGREEMENT (A) of this Policy made against an **Insured** physician scheduled below will reduce, and may exhaust, such "Aggregate for all Claims" Limit of Liability.  In the event that the "Aggregate for all Claims" Limit of Liability stated in ITEM 4.A. of the Declarations for any **Policy Year** is exhausted by the payment of **Loss** and/or **Defense Expenses**, then any available applicable Limits of Liability stated in paragraph (1) above shall be paid in addition to such "Aggregate for all Claims" Limit of Liability.

(8)     No coverage will be available under this Policy for **Loss** or **Defenses Expenses** for any **Claim** based upon, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving any actual or alleged **Professional Services Wrongful Act** committed or allegedly committed by any **Insured** physician scheduled below prior to the Retroactive Date set forth opposite such **Insured** physician's name.

(9)     No coverage will be available under this Policy for **Loss** or **Defense Expenses** for any **Claim** based upon, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving any actual or alleged **Professional Services Wrongful Act** committed or allegedly committed by any **Insured** physician scheduled below after the Termination Date, if any, set forth opposite such **Insured** physician's name.  To the extent that an **Insured** physician scheduled below does not have a Termination Date, this paragraph shall not apply.

(10)    This Policy shall be deemed amended to extent necessary to effect the purpose and intent of this endorsement.

Schedule

| Name | Retroactive Date | Termination Date | Specialty |
| --- | --- | --- | --- |
| Edelstein, Joel | 08.01.1998 | | Psychiatry |
| Handler, Robert | 01.01.2005 | 01.02.2015 | Psychiatry |
| Klotz, Steven G | 01.19.2015 | | Psychiatry |
| Musunuri, Sailaja | 05.14.2007 | | Psychiatry |
| Posner, Imran | 08.01.2010 | | Psychiatry |
| Reeder, Tilden | 01.01.2003 | | Psychiatry |
| Shresta, Ranjeeb | 07.16.2012 | | Psychiatry |
| Zavodnick, Jacquelyn | 02.10.2001 | | Psychiatry |

All other terms, conditions and limitations of this Policy shall remain unchanged.

ENDORSEMENT NO.  36
NOTICE OF NONRENEWAL ENDORSEMENT

This Endorsement, which is effective at 12:01 a.m. on July 1, 2014, forms part of:

Policy No.   MPP-6333-14
Issued to    Devereux Foundation
Issued by    Homeland Insurance Company of Delaware

In consideration of the premium charged, Section IV GENERAL CONDITIONS (I)(3) of this Policy is amended to read in its entirety as follows:

(3)    The Underwriter will not be required to renew this Policy upon its expiration.  If the Underwriter elects not to renew this Policy, the Underwriter shall mail written notice of nonrenewal at least ninety (90) days prior to the Expiration Date of this Policy to the **First Named Insured** at the last known address shown on the Declarations.

All other terms, conditions and limitations of this Policy shall remain unchanged.

ENDORSEMENT NO.  37
DELETE ENDORSEMENT

This Endorsement, which is effective at 12:01 a.m. on April 3, 2015, forms part of:

      Policy No.     MPP-6333-14
      Issued to      Devereux Foundation
      Issued by     Homeland Insurance Company of Delaware

In consideration of the premium charged, Endorsement No. 35 to this Policy is deleted in its entirety and shall be of no force or effect from and after the effective date of this Endorsement.

All other terms, conditions and limitations of this Policy shall remain unchanged.

ENDORSEMENT NO. 38
SEPARATE LIMITS OF LIABILITY FOR PENNSYLVANIA PHYSICIANS
ENDORSEMENT

This Endorsement, which is effective at 12:01 a.m. on April 3, 2015, forms part of:

      Policy No.     MPP-6333-14
      Issued to      Devereux Foundation
      Issued by     Homeland Insurance Company of Delaware

In consideration of the premium charged:

(1)      Solely with respect to each **Insured** physician scheduled below:

      (a)     the maximum amount payable by the **Insured** and/or the Underwriter under INSURING AGREEMENT (A) of this Policy for all **Loss** resulting from each covered **Claim** made against each such **Insured** physician shall be $500,000; and

      (b)     the maximum amount payable by the **Insured** and/or the Underwriter under INSURING AGREEMENT (A) of this Policy for all **Loss** resulting from all covered **Claims** made against each such **Insured** physician shall be $1,500,000.

(2)      The Limits of Liability stated in paragraph (1) above shall apply separately to each **Policy Year** (as such term is defined in Endorsement No. 27 to this Policy).

(3)      The Underwriter will have no obligation to pay **Loss** or **Defense Expenses** resulting from any **Claim** under INSURING AGREEMENT (A) of this Policy made against an **Insured** physician scheduled below, or continue to direct the defense of an **Insured** physician scheduled below, after the applicable Limit of Liability stated in paragraph (1) above has been exhausted by the payment of **Loss**.

(4)      It is understood and agreed that the applicable Deductible stated in ITEM 4.A. of the Declarations shall apply to **Claims** made against the **Insured** physicians scheduled below.

(5)      In the event that the full amount of the applicable aggregate Deductible stated in ITEM 4 of the Declarations has been paid by the Underwriter and/or the **Insured,** a maintenance deductible in the amount of $500,000 shall apply to each **Claim** under INSURING AGREEMENT (A) of this Policy made after the date such aggregate Deductible has been paid in full against any **Insured** physician scheduled below.

(6)      The maintenance deductible stated in paragraph (5) above shall be eroded (or exhausted) by the payment of **Loss**.  The **Insured** shall be responsible for payment in full of such deductible; provided, that the Underwriter has agreed to pay such deductible on behalf of the **Insured** and the **Insured** understands and agrees that he/she/it shall repay the

Underwriter any amounts so paid as soon as practicable upon demand of the Underwriter. Any amounts paid within such maintenance deductible will reduce, and may exhaust, the applicable Limits of Liability stated in paragraph (1) above.

(7)     Unless and until the "Aggregate for all Claims" Limit of Liability stated in ITEM 4.A. of the Declarations for any **Policy Year** is exhausted by the payment of **Loss** and/or **Defense Expenses**, any payment of **Loss** resulting from a **Claim** under INSURING AGREEMENT (A) of this Policy made against an **Insured** physician scheduled below will reduce, and may exhaust, such "Aggregate for all Claims" Limit of Liability.  In the event that the "Aggregate for all Claims" Limit of Liability stated in ITEM 4.A. of the Declarations for any **Policy Year** is exhausted by the payment of **Loss** and/or **Defense Expenses**, then any available applicable Limits of Liability stated in paragraph (1) above shall be paid in addition to such "Aggregate for all Claims" Limit of Liability.

(8)     No coverage will be available under this Policy for **Loss** or **Defenses Expenses** for any **Claim** based upon, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving any actual or alleged **Professional Services Wrongful Act** committed or allegedly committed by any **Insured** physician scheduled below prior to the Retroactive Date set forth opposite such **Insured** physician's name.

(9)     No coverage will be available under this Policy for **Loss** or **Defense Expenses** for any **Claim** based upon, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving any actual or alleged **Professional Services Wrongful Act** committed or allegedly committed by any **Insured** physician scheduled below after the Termination Date, if any, set forth opposite such **Insured** physician's name.  To the extent that an **Insured** physician scheduled below does not have a Termination Date, this paragraph shall not apply.

(10)    This Policy shall be deemed amended to extent necessary to effect the purpose and intent of this endorsement.

<u>Schedule</u>

| Name | Retroactive Date | Termination Date | Specialty |
|---|---|---|---|
| Edelstein, Joel | 08.01.1998 | | Psychiatry |
| Handler, Robert | 01.01.2005 | 01.02.2015 | Psychiatry |
| Klotz, Steven G | 01.19.2015 | 04.03.2015 | Psychiatry |
| Musunuri, Sailaja | 05.14.2007 | | Psychiatry |
| Posner, Imran | 08.01.2010 | | Psychiatry |
| Reeder, Tilden | 01.01.2003 | | Psychiatry |
| Shresta, Ranjeeb | 07.16.2012 | | Psychiatry |
| Zavodnick, Jacquelyn | 02.10.2001 | | Psychiatry |

All other terms, conditions and limitations of this Policy shall remain unchanged.

ENDORSEMENT NO.  39
PHYSICAL ABUSE/SEXUAL MISCONDUCT PER CLAIM AND AGGREGATE
SUBLIMIT LOSS AND DEFENSE EXPENSES ENDORSEMENT (INSURING
AGREEMENT (A))

This Endorsement, which is effective at 12:01 a.m. on February 4, 2015, forms part of:

|         |                                     |
|---------|-------------------------------------|
| Policy No. | MPP-6333-14 |
| Issued to | Devereux Foundation |
| Issued by | Homeland Insurance Company of Delaware |

In consideration of the premium charged:

(1)     It is understood and agreed that:

    (a)     the Underwriter's maximum Limit of Liability for all **Loss** and all **Defense Expenses** resulting from each **Physical Abuse Claim** (as defined below) under INSURING AGREEMENT (A) of this Policy shall be $5,000,000;

    (b)     the Underwriter's maximum Limit of Liability for all **Loss** and all **Defense Expenses** resulting from each **Sexual Misconduct Claim** (as defined below) under INSURING AGREEMENT (A) of this Policy shall be $5,000,000; and

    (c)     the Underwriter's maximum aggregate Limit of Liability for all **Loss** and all **Defense Expenses** resulting from all **Physical Abuse Claims** and all **Sexual Misconduct Claims**, combined, under INSURING AGREEMENT (A) of this Policy shall be $9,000,000 (the "**Physical Abuse/Sexual Misconduct Sublimit**").

Such amounts shall be part of, and not in addition to, the Underwriter's Limits of Liability for INSURING AGREEMENT (A) of this Policy, as set forth in ITEM 4.A. of the Declarations.

In the event a **Claim** contains allegations of both **Physical Abuse** and **Sexual Misconduct**, then it is further understood and agreed that the Underwriter's maximum Limit of Liability for all **Loss** and all **Defense Expenses** in connection with any such **Claim** shall not exceed $5,000,000.

(2)     Notwithstanding anything to the contrary contained in this Policy, it is understood and agreed that, for the purposes of this endorsement, **Defense Expenses** are part of and not in addition to the applicable **Physical Abuse/Sexual Misconduct Sublimit,** and payment of **Defense Expenses** by the Underwriter will reduce, and may exhaust, such applicable **Physical Abuse/Sexual Misconduct Sublimit**.

(3)     For the purposes of this endorsement:

    (a)     "**Physical Abuse**" means:

      (i)      actual or threatened physical abuse of a **Patient**;

      (ii)     the failure of any **Insured**, or of any person for whom the **Insured** is legally responsible, to prevent or suppress the **Physical Abuse** described in subparagraph (i) above; or

      (iii)    the negligent employment, investigation, supervision, retention, or reporting to the proper authorities (or failing to so report), of any person whose conduct is described in subparagraph (i) above, but only when alleged as part of a **Claim** for any **Physical Abuse** described in subparagraph (i) above.

  (b)     "**Physical Abuse Claim**" means any **Claim** based upon, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving any actual or alleged **Physical Abuse**.

  (c)     "**Sexual Misconduct**" means:

      (i)      any welcome or unwelcome conduct, physical acts, gestures or spoken or written words of a sexual nature against a **Patient**, including without limitation sexual intimacy (even if consensual), sexual molestation, sexual assault, sexual battery, sexual abuse, sexual harassment, sexual exploitation or any sexual act;

      (ii)     the failure of any **Insured** or of any person for whom the **Insured** is legally responsible, to prevent or suppress the **Sexual Misconduct** described in subparagraph (i) above; or

      (iii)    the negligent employment, investigation, supervision, retention, or reporting to the proper authorities (or failing to so report), of any person whose conduct is described in subparagraph (i) above, but only when alleged as part of a **Claim** for any **Sexual Misconduct** described in paragraph (i) above.

  (d)     "**Sexual Misconduct Claim**" means any **Claim** based upon, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving any actual or alleged **Sexual Misconduct**.

(4)    The Underwriter will have no obligation to pay **Loss** or **Defense Expenses**, or to continue to direct the defense of any **Insured**, after the applicable **Physical Abuse/Sexual Misconduct Sublimit** has been exhausted by the payment of **Loss** and/or **Defense Expenses**.

All other terms, conditions and limitations of this Policy shall remain unchanged.

ENDORSEMENT NO.  40

ADDITIONAL INSURED SCHEDULED MORTGAGEE, LANDLORD OR LESSOR
ENDORSEMENT

This Endorsement, which is effective at 12:01 a.m. on August 24, 2015, forms part of:

      Policy No.    MPP-6333-14
      Issued to     Devereux Foundation
      Issued by    Homeland Insurance Company of Delaware

In consideration of the premium charged:

(1)    Solely for the purposes of the coverage afforded under INSURING AGREEMENT (B) of this Policy, the term "**Insured**," as defined in Section II DEFINITIONS of this Policy, shall be deemed to include any mortgagee, landlord or lessor of leased equipment, identified in the SCHEDULE below, that the **Named Insured** is required by written contract to name as an insured under this Policy (each an "Additional Insured"), but only with respect to liability of any such Additional Insured that is based on or arises out of the maintenance, operation or use by the **Named Insured** of the applicable premises and/or leased equipment.

(2)    Notwithstanding paragraph (1) above, no coverage will be available under this Policy for any:

    (a)    **Occurrence** which takes place after the **Named Insured** ceases to be a tenant in the applicable premises or a mortgagor under the applicable mortgage; or

    (b)    **Claim** based on or arising out of :

        (i)    any structural alterations, new construction or demolition operations performed by or on behalf of an Additional Insured; or

        (ii)    the terms, conditions or limitations of any such mortgage, or the failure by the **Named Insured** to pay all or any part, or to otherwise perform any obligations under the terms and conditions, of any mortgage loan.

(3)    It is understood and agreed that the amount, extent and scope of coverage available under this Policy to an Additional Insured will be no greater than the amount, extent and scope of indemnification available to such Additional Insured as agreed to by the **Named Insured** in the written contract between the **Named Insured** and such Additional Insured.

(4)     It is understood and agreed that the Additional Insured share in the applicable
         Limits of Liability set forth in ITEM 4.B. of the Declarations.


   <u>SCHEDULE</u>:
   Cummings Properties, LLC
   Woburn Services, LLC



All other terms, conditions and limitations of this Policy shall remain unchanged.

ENDORSEMENT NO. 41
AMEND PROFESSIONAL SERVICES ENDORSEMENT

This Endorsement, which is effective at 12:01 a.m. on June 14, 2016, forms part of:

Policy No.    MPP-6333-14
Issued to     Devereux Foundation
Issued by     Homeland Insurance Company of Delaware

In consideration of the premium charged, the term "**Professional Services**," as defined in Section II DEFINITIONS of this Policy, is amended to include the following service(s):

Therapist services relating to Orlando night club shooting which occurred on the evening of June 11/morning of June 12, 2016

All other terms, conditions and limitations of this Policy shall remain unchanged.

## CERTIFICATE OF SERVICE

I, Joseph A. Arnold, hereby certify that on August 17, 2017, I caused the foregoing

Amended Complaint to be served electronically via ECF upon all counsel of record.

_____

Joseph A. Arnold

# **<u>EXHIBIT 2</u>**

Writ of Summons in *Johnson* Litigation

(dated June 17, 2014)

C.P.97

# Commonwealth of Pennsylvania
## CITY AND COUNTY OF PHILADELPHIA

SUMMONS
*CITACION*

Eric Johnson
7149 Greenway Ave., Apt. A
Philadelphia, PA 19142

COURT OF COMMON PLEAS

MAY 2014 _____ Term, 20 14

No. 001360

*vs.*

Devereux Foundation
444 Devereux Dr. P.O. Box 638
Villanova, PA 19085

JURY FEE PAID

To [1]

Robert Kreider, President, Devereux
Foundation
444 Devereux Dr. P.O. Box 638
Villanova, PA 19085;

James Cole, Devereux CBHS
655 Sugartown Rd. Malvern, PA 19355;

David Woodward, Executive Director,
Devereux CBHS
655 Sugartown Rd. Malvern, PA 19355;

Gary Bilski
655 Sugartown Rd. Malvern, PA 19355;

Byron Lee, Supervisor
Devereux Rd. Glenmore, PA 19343;
Steven Rose, Employee
Devereux Rd. Glenmore, PA 19343;
Shykir Crew, Inmate, SCI Graterford
Pennsylvania 29, Perkiomen, PA 19426

You are notified that the Plaintiff [2]
*Usted esta avisado que el demandante* [2]

Eric Johnson
7149 Greenway Ave., Apt. A
Philadelphia, PA 19142

Has (have) commenced an action against you.
*Ha (han) iniciado una accion en contra suya.*



ATTEST

JUN 11 2014   JOSEPH H. EVERS
*Prothonotary*

REISSUE
JUDICIAL RECORDS

By *Deborah Savoy*

Date *May 14, 2014*

[1] Name(s) of Defendant(s)
[2] Name(s) of Plaintiff(s)

10-208 (Rev. 6/00)

C.P.97

# Commonwealth of Pennsylvania

SUMMONS
*CITACION*

## CITY AND COUNTY OF PHILADELPHIA

Eric Johnson
7149 Greenway Ave., Apt. A
Philadelphia, PA 19142

COURT OF COMMON PLEAS

MAY 2014 _____ Term, 20 14

No. 001360

*vs.*

Devereux Foundation
444 Devereux Dr. P.O. Box 638
Villanova, PA 19085

JURY FEE PAID

To[1]

Robert Kreider, President, Devereux
Foundation
444 Devereux Dr. P.O. Box 638
Villanova, PA 19085;

James Cole, Devereux CBHS
655 Sugartown Rd. Malvern, PA 19355;

David Woodward, Executive Director,
Devereux CBHS
655 Sugartown Rd. Malvern, PA 19355;

Gary Bilski
655 Sugartown Rd. Malvern, PA 19355;

Byron Lee, Supervisor
Devereux Rd. Glenmore, PA 19343;
Steven Rose, Employee
Devereux Rd. Glenmore, PA 19343;
Shykir Crew, Inmate, SCI Graterford
Pennsylvania 29, Perkiomen, PA 19426

You are notified that the Plaintiff[2]
*Usted esta avisado que el demandante*[2]

Eric Johnson
7149 Greenway Ave., Apt. A
Philadelphia, PA 19142

Has (have) commenced an action against you.
*Ha (han) iniciado una accion en contra suya.*

RECEIVED
SHERIFF'S OFFICE
CHESTER COUNTY, PA.
2014 JUN 17 AM 10: 40



ATTEST

JUN 1 1 2014   JOSEPH H. EVERS
*Prothonotary*

REISSUE
JUDICIAL RECORDS

By *Deborah Savoy*

Date *May 14, 2014*

[1] Name(s) of Defendant(s)
[2] Name(s) of Plaintiff(s)

10-208 (Rev. 6/00)

# **EXHIBIT 3**

Reservation of Rights Letter from
Homeland to Devereux

(dated January 14, 2015)



| 199 Scott Swamp Road | 860.321.2915 t | onebeaconpro.com |
| Farmington, CT 06032 | 877.256.5067 f | |

January 14, 2015

Kathy Lewis, Assistant Treasurer               Judy Starr, Esq.
Devereux Foundation                            Devereux Foundation
2012 Renaissance Boulevard                     2012 Renaissance Blvd.
King of Prussia, PA 19406                       King of Prussia, PA 19406
KLEWIS4@devereux.org                           JStarr@devereux.org


        Insured :       Devereux Foundation
        Claim No.:     0AB113522
        <u>Subject:       Eric Johnson                         </u>

Dear Ms. Lewis and Ms. Starr:

Please allow this letter to serve as a follow-up to our previous correspondence concerning the above-referenced matter.

OneBeacon Professional Insurance ("OBPI") is the claim manager for Homeland Insurance Company of Delaware ("Homeland"), a member of the OneBeacon Insurance Group for the captioned policies issued to the Devereux Foundation ("Devereux") effective July 1, 2014 to July 1, 2016.

We are in receipt of the Complaint related to Eric Johnson.  It appears Mr. Johnson seeks damages as a result of an alleged robbery and shooting committed by a client and resident of a Devereux facility.

Our coverage analysis is based on the language in the captioned policies, as well as the allegations in the attorney.  We realize you may dispute these allegations.  Please note that in referring to these allegations, Homeland does not mean to imply that any of them are true, however, we must refer to them in determining our coverage obligations.

This letter will outline the coverage provided by Homeland and the bases for our coverage determination.

## A.    <u>THE COMPLAINT</u>

The complaint, case id number 140501360 was filed in the Court of Common Please, Philadelphia County, PA by Eric Johnson against Devereux Foundation as the sole defendant.  The Complaint asserts causes of action sounding in negligence and assault and battery. Plaintiff seeks compensatory damages in excess of $50k

According to the Complaint, Devereux was negligent in the supervision of their clients, specifically Shykir Crew, a client residing in one of their facilities.  It is alleged that Mr. Crew fled the facility, travelled to Philadelphia and robbed and shot the plaintiff, Eric Johnson.  The Complaint further alleges that Devereux were deliberately indifferent to the supervision of the juveniles in their charge, while knowing at all times that the juveniles posed a threat to the community if they were to leave Devereux.

Devereux Foundation
Re: Eric Johnson
Page 2

## B.    COVERAGE

Homeland issued a Health Care Organizations and Providers Professional Liability, General Liability and Employee Benefit Liability Policy No. MPP-6333-14 (the "Policy") to the Devereux Foundation, for the policy period from July 1, 2014 to July 1, 2016.  The Limits under the Policy are $10,000,000 per **Claim**, with a $18,000,000 aggregate limit, subject to a $4,000,000 per **Claim** and $8,000,000 in the aggregate Deductible for Coverage A.  This is a Claims-Made and reported policy with a Retroactive Date of July 1, 1990.

## C.    COVERAGE ANALYSIS

The scope of liability protection afforded by the Policy and responding to this matter is set forth in the Insuring Agreement (A) of the Policy, which provides as follows:

## I.    INSURING AGREEMENTS

**(A)    Claims Made Professional Liability Insurance:**

The Underwriter will pay up to the applicable Limit of Liability on behalf of the **Insured** any **Loss,** including **Defense Expenses,** in excess of the applicable Deductible (as described in GENERAL CONDITION (B)), that the **Insured** is legally obligated to pay as a result of any covered **Claim** for a **Professional Services Wrongful Act** happening on or after the **Retroactive Date**; provided, that the **Claim** is first made against the **Insured** during the **Policy Period** or applicable **Extended Reporting Period**.

Sections II of the Policy contain definitions of certain terms under the Policy.  The following definitions may be applicable to this instance:

## II.    DEFINITIONS

The Policy defines the term "**Insured**" as follows:

**(S)    "Insured"** means any of the following:

(1)    the **Named Insured**;
(2)    any **Employee** or **Volunteer**; but only when such **Employee** or **Volunteer** is acting within the capacity and scope of his or her duties as such;

Devereux Foundation is the **First Named Insured** under the Policy.  To the extent that the entity named in the lawsuit is not the same entity as the **First Named Insured** under the Policy, Homeland reserves rights with respect to the impact that this definition may have on the coverage available under the Policy.

Devereux Foundation
Re: Eric Johnson
Page 3

(Y)      "**Loss**" means:

(1) for the purposes of INSUREING AGREEMENTS (A), (B) and (C), any damages, settlements, judgments or other amounts (including punitive or exemplary damages if insurable under the applicable law most favorable to the insurability thereof) in excess of the deductible or self-insured retention, if any stated in ITEM 4 of the Declarations which an **Insured** is legally obligated to pay as a result of a **Claim;**

**Loss** shall not include:

(1) **Defense Expenses**

(2) The multiplication portion of any multiplied damage award

(3) fines, penalties, sanctions, fees, government payments or taxes;

*       *       *       *

It is not clear what damages are being sought at this time.  In the event that any award or settlement amount does not constitute **Loss**, please be advised that said award or amount would not be covered by the Policy.

## III.  EXCLUSIONS

### (D) Exclusions Applicable to ALL INSURING AGREEMENTS:

Except as otherwise expressly provided in this Policy, this Policy does not apply to, and the Underwriter will not pay Loss or Defense Expenses, for any Claim based upon, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving any actual or alleged:

(4) dishonest, fraudulent, criminal or intentionally malicious act, error or omission by an **Insured**; any willful violation of law, statute rule or regulation by an **Insured**; or the gaining of any profit, remuneration or advantage by an **Insured** to which such **Insured** was not legally entitled, including, but not limited to, health care fraud; provided, however, that no such act of one **Insured** will be imputed to any other **Insured** who was not aware and did not participate in such act;

While we place no merit in the allegations of criminal, intentional and willful misconduct on the part of Devereux, Homeland must reserve its rights under the Policy with regard to any bearing the above exclusion may have to the claims made in the Complaint.

## III.  GENERAL CONDITIONS

The Policy features the following Limits of Liability applicable to the Insuring Agreement (A):

## IV. LIMIT OF LIABILITY

(A)      Limits of Liability

(1)      Insuring Agreement (A) – Professional Liability

(a) The "Each Claim" amount stated in ITEM 3.A. of the Declarations will be the Underwriter's maximum Limit of Liability for all **Loss**, including **Defense Expenses**,

Devereux Foundation
Re: Eric Johnson
Page 4

resulting from each **Claim** or **Related Claims** for which this Policy provides coverage under INSURING AGREEMENT (A).

It is unclear what damages are being sought.  In the event of a judgment, settlement and/or **Defense Expenses** in excess of the available policy limits of the Policy of $10,000,000 for each **Claim** and $18,000,000 in the aggregate, Devereux would be responsible for any amounts in excess of the limits.

**D.**      **SUMMARY**

Based on the foregoing, coverage is afforded to Devereux under Insuring Agreement (A) of the Policy subject to the $10,000,000 per **Claim** limit and a $18,000,000 aggregate limit, a $4,000,000 per **Claim** and $8,000,000 in the aggregate Deductible and a reservation of rights.   In the event the **Defense Expenses**, and/or any judgment or settlement exceeds the available policy limits of the Policy, Devereux would be responsible for any amounts in excess of the limits.

These are the bases on which Homeland has reserved its rights:

- Policy definition of **Insured** and **Loss;**
- Exclusion (D)(4)
- Excess of Limits Potential.

Homeland expressly reserves all of their rights under the Policy and/or available at law to limit or deny coverage on additional or alternative bases as other terms, conditions, exclusions, endorsements and provisions of the Policy, including representations, statements, declarations and omissions in connection with the **Application** incorporated therein, are found to be applicable.  Nothing in this letter should be construed to be a waiver of Homeland's rights under any of the provisions of the Policy, or any other defenses that Homeland may have.

Please note that Homeland's present coverage determination is based on the information that has been made available to date. If you have any other information that you believe may affect our coverage analysis or if you have any questions about the substance of this letter, please feel free to contact the undersigned.

Additionally, should you have any questions or concerns regarding this coverage position or anything stated herein, or if you have additional information which you believe may affect the carrier's position, please do not hesitate to contact the undersigned.

Very truly yours,

Nancy Morél
Assistant Vice President, Health Care Claims


cc:  Philip Glick - Conner Strong & Buckelew
      pglick@connerstrong.com

      Kevin McGovern – Conner Strong & Buckelew
      kmcgoverrn@connerstrong.com

# __EXHIBIT 4__

The Cohen Brief

(dated April 27, 1994)

Case 2:17-cv-02415-CDJ   Document 13   Filed 09/12/17   Page 249 of 262

COHEN & COMPANY, LTD. and William Brady, Appellants,..., 1994 WL 16166931...

1994 WL 16166931 (C.A.3) (Appellate Brief)
United States Court of Appeals,
Third Circuit.

COHEN & COMPANY, LTD. and William Brady, Appellants,
v.
NORTH RIVER INSURANCE COMPANY and Crum & Forster Managers Corporation, Appellees.

No. 94-1479.
1994.

APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF PENNSYLVANIA

**Brief of Appellants**

Cohen & Company, Ltd. and William Brady, Ralph J. Bellafatto, Esquire, Teel, Stettz, Shimer & Digiacomo, Ltd., Attorneys for Appellants/Plaintiffs, 400 S. Greenwood Avenue, Suite 300, Easton, Pennsylvania 18042, (610) 258-0866

**\*7 TABLE OF CONTENTS**

TABLE OF CITATIONS ................................................................ 1

I. JURISDICTIONAL STATEMENT ................................................ 1

A. SUBJECT MATTER - JURISDICTION ........................................ 1

B. APPELLATE JURISDICTION ................................................. 1

II. STATEMENT OF THE ISSUES .............................................. 2

III. STATEMENT OF THE CASE ............................................... 2

A. NATURE OF THE CASE .................................................... 2

B. COURSE OF PROCEEDINGS ................................................ 2

C. COURT DISPOSITION .................................................... 3

D. STATEMENT OF RELATED CASES AND PROCEEDINGS ................... 3

IV. STATEMENT OF THE FACTS ............................................. 4

SCOPE OF REVIEW ........................................................... 7(a)

V. ARGUMENT ................................................................ 8

A. MOTION FOR SUMMARY JUDGMENT ..................................... 8

B. NOTICE PREJUDICE RULE ............................................... 12

C. BAD FAITH - REFUSAL TO PROVIDE COVERAGE AND DEFENSE ........ 20

COHEN & COMPANY, LTD. and William Brady, Appellants,..., 1994 WL 16166931...

CERTIFICATE OF SERVICE .......................................................................................................... 22

APPENDIX ............................................................................................................................................... 23

## SCOPE OF REVIEW

V.A.1. THIS APPEAL IS A DE NOVO APPEAL TO THE THIRD CIRCUIT ALLEGING THAT, UNDER F.R.C.P. 52(a), THE DISTRICT COURT - PLAINLY ERRED IN DECIDING THE PARTIES' MOTIONS FOR SUMMARY JUDGMENT.

V.B.1. THIS APPEAL IS A DE NOVO APPEAL TO THE THIRD CIRCUIT ALLEGING THAT, UNDER F.R.C.P. 52(a), THE DISTRICT COURT ERRED BY FAILING TO APPLY THE LEGAL PRECEPT OF THE NOTICE PREJUDICE RULE TO CLAIMS-MADE POLICIES IN ALL CIRCUMSTANCES.

V.C.1. THIS APPEAL IS A DE NOVO APPEAL TO THE THIRD CIRCUIT ALLEGING THAT, UNDER F.R.C.P. 52(a), THE DISTRICT COURT ERRED BY FAILING TO DETERMINE WHETHER THE DEFENDANTS ACTED IN BAD FAITH BY REFUSING TO PROVIDE COVERAGE AND A DEFENSE FOR THE PLAINTIFFS' CLAIM

## *i *TABLE OF AUTHORITIES*

*Table of Cases*:

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-8, 106 S. Ct. 2505, 2510, 91 L. Ed. 2 202 (1986) ................................ 11

*Armon v. Aetna Cas. & Surety Co.*, 369 Pa. 465, 87 A.2d 302 (1952) ................................................................................ 11

*Brakeman v. Potomac Insurance Co.*, 371 A.2d 193, (Pa. Supreme Ct. (1977)) ........................................ 12-14, 16-17, 19

*Clemente v. Home Insurance Co.*, 791 F.Supp. 118 (E.D. Pa. 1992) .................................................. 15, 17, 18, 19, 21

*Employers Reinsurance Corporation v. Sarris*, 746 F. Supp. 560 (E.D. Pa., 1990) ..................................... 11, 15-19, 21

*Federal Insurance Co. v. General Machine Corp.*, 699 F. Supp. 490 (E.D. Pa. 1988) .......................................... 8

*National Security Corp. v. Midland Bank*, 551 F.2d 21, 28 (3d Cir. 1977) ............................................................. 8

*New Amsterdam Cas. Co. v. Kelly*, 57 F. Supp. 209 (D.C. Pa. 1944) .................................................................... 11

*New York Life Ins. Co., v. Baum*, 707 F. 2d 870 (5th Cir. 1983) .......................................................................... 8

*Poles v. State Mutual Beneficial Society*, 129 Pa. Super. 297, 195 A. 429 (1938) ............................................... 11

*Telectronics, Inc. v. United Nat. Ins. Co.*, 796 F. Supp. 1382 (D. Colo 1992) .....................................................     19, 20

*The City of Harrisburg v. International Surplus Lines Insurance Co.*, 596 F.Supp. 954 (M.D. Pa. 1989) ..........................     15, 18, 19, 21

*U.S.F.&G. v. Barron Industries, Inc.*, 809 F. Supp. 355, 359 (M.D. Pa., 1992) ..................................................     8-11, 14, 19

*Statutes*:

28 U.S.C.A. § 1332(a) .............................................     1

28 U.S.C.A. § 1291 ................................................     1

*Other Authorities Cited*:

Federal Rules of Appellate Procedure 3 and 4 ......................     2

Court of Appeals Third Circuit Rule 8 .............................     2

*Appendix*:

Memorandum and Order - Judge Daniel H. Huyett Notice of Appeal

April 27, 1994 U.S. District Court, Eastern District of Pennsylvania, Notice of Appeal filing letter U. S. District Court for the Eastern District of Pennsylvania - docket entries

## *1 I. JURISDICTIONAL STATEMENT:

### A. Subject Matter - Jurisdiction

Jurisdiction is founded on diversity of citizenship pursuant to 28 U.S.C.A. § 1332(a).

Plaintiff Cohen & Company, Ltd. is a corporation incorporated under the laws of the Commonwealth of Pennsylvania, having its principal place of business at Suite 200, Plaza Building, 14 North Sixth Street, Stroudsburg, Monroe County, Pennsylvania 18360. Plaintiff William Brady is a citizen of the Commonwealth of Pennsylvania. Defendant North River Insurance Company is a corporation incorporated under the laws of the State of New Jersey, with its principal place of business in a state other than the Commonwealth of Pennsylvania. Crum and Forster Managers Corporation is a corporation incorporated under the laws of the State of Illinois, having its principal place of business in a state other than the Commonwealth of Pennsylvania. The matter in controversy exceeds, exclusive of interest and costs, the sum of Fifty Thousand ($50,000.00) Dollars.

### B. APPELLATE JURISDICTION

This appeal is taken from a final order of the District Court for the Eastern District of Pennsylvania, pursuant to 28 U.S.C.A. § 1291. On July 22, 1993, Defendants filed a Motion for Summary Judgment. Plaintiffs filed their response and Cross Motion on or about August 20, 1993. After briefs were submitted, *2 the Honorable Daniel H. Huyett, III, denied Plaintiffs' Summary Judgment Motion on March 25, 1994 and granted Defendants' Motion for Summary Judgment. This appeal ensued. Pursuant to FRAP 3 and 4 and Court of Appeals Third Circuit, Rule 8, Plaintiffs filed their Notice of Appeal on April

22, 1994.


## II. STATEMENT OF THE ISSUES:


**A. WHETHER THE TRIAL COURT ERRED IN FINDING AS A MATTER OF LAW THAT THE PLAINTIFFS FAILED TO GIVE TIMELY NOTICE TO DEFENDANTS PURSUANT TO THE STRICT NOTICE REQUIREMENTS OF THE PROFESSIONAL LIABILITY INSURANCE POLICY.**


**B. WHETHER THE TRIAL COURT ERRED IN HOLDING THAT THE "NOTICE PREJUDICE" RULE IS INAPPLICABLE TO CLAIMS-MADE POLICIES UNDER ALL CIRCUMSTANCES.**


**C. WHETHER THE TRIAL COURT ERRED WHEN IT DETERMINED THAT THE DEFENDANTS DID - NOT ACT IN BAD FAITH BY REFUSING TO PROVIDE COVERAGE (AND A DEFENSE FOR A CLEARLY COVERED CLAIM UNDER THE CIRCUMSTANCES OF THIS CASE).**


### III. STATEMENT OF THE CASE:


#### A. NATURE OF THE CASE

This case involves -the denial of coverage for certified public accountants under an insurance policy for professional liability.


#### B. COURSE OF PROCEEDINGS

On May 15, 1991, James and Lucinda Brady and others (hereinafter referred to as "the Brady Plaintiffs" and the "Brady **\*3** case") filed a Writ of Summons against Cohen, et al., in the Court of Common Pleas of Northampton County, Civil Action No. 1991-C-04134. Plaintiffs were served with the Summons in late June, 1991.[1] On October 5, 1992, the Brady Plaintiffs filed a Complaint alleging professional negligence and breach of contract by Cohen & Company, et al.,

Although originally filed as a declaratory judgment action in state court, the Defendants removed this matter to Federal District Court on March 3, 1994. On April 27, 1993, the Defendants answered the Declaratory Judgment Complaint and asserted affirmative defenses. Thereafter, the parties conducted discovery, including written Interrogatories and depositions.

On July 22, 1993, the Defendants filed a Motion for Summary Judgment. Plaintiffs filed a response and cross Motion for Summary Judgment on or about August 20, 1993.


#### C. COURT DISPOSITION

The District Court for the Eastern District of Pennsylvania -denied Plaintiffs' Motion for Summary Judgment. This appeal ensued.


**D. STATEMENT OF RELATED CASES AND PROCEEDINGS This case has not previously been before this Court. Plaintiffs are not aware of any other case or proceeding that is \*4 in any way related, completed, pending, or about to be presented before this Court or any other court or agency, State or Federal.**

WESTLAW   © 2017 Thomson Reuters. No claim to original U.S. Government Works.

## IV. STATEMENT OF THE FACTS:

On May 15, 1991, a Writ of Summons was filed against the Plaintiffs in the Court of Common Pleas of Northampton County at Civil Action No. 1991-C-04134 by James and Lucinda Brady and others. Plaintiffs were served with the Summons in late June of 1991. The Summons with which Plaintiffs were served simply identifies the parties, and was filed to toll the statute of limitations. (Stettz deposition, pp. 26-29, Adamson deposition, p. 6.)

At the time that Plaintiffs were initially served with the Summons, no insured was aware of the facts or particulars of the claim contemplated by the Brady Plaintiffs. (Rossick deposition, p. 63, Capone deposition, pp. 15-20.) William Brady was the only partner who handled the accounting work for the Brady Plaintiffs but had terminated his partnership with Cohen & Company on June 13, 1990. This was one year before the filing of the Summons. (Brady deposition, p. 7, Rossick deposition, p. 33.) William Brady's separation from the accounting firm was on less than good terms and communications between William Brady and his former partners were strained. (Stettz, deposition, pp. 40-41, 43, 45.) Even William Brady had no idea of the particulars of the claim contemplated by the Brady Plaintiffs and believed the claim to be a possible professional malpractice action only because of the **\*5** past accountant/client, relationship between the parties. (Brady deposition, p. 47.) On July 5, 1991, William Brady sent a letter to William Schmidt of Cohen & Company requesting that the liability insurance carrier be notified. Consistent with William Brady's lack of knowledge of the particulars of the claim, the letter set forth no information concerning the subject matter of the claim.

Robert Rossick had assumed the administrative partner role from William Schmidt. He was also in the process of terminating his partnership with Cohen & Company in the summer of 1991. As Rossick was unsure as to what actions to take with regard to the Summons and the Brady letter of July 5, 1991, he notified Cohen & Company's corporate counsel, Stanley Stettz, for advice. Mr. Stettz advised Rossick to hold off on notifying the carrier until such time as the facts or particulars of the claim were known. (Stettz deposition, pp. 34-35.) After making inquiry among the remaining Cohen & Company partners, it was apparent that no one had any knowledge of the facts or particulars of the claim. (Stettz deposition, pp. 24-25.) Accordingly, Stettz contacted Richard Adamson, attorney for the Brady Plaintiffs, to inquire as to the contemplated action. At that time, Stettz was advised by Adamson that even Adamson did not know of the particulars of the claim or, for that matter, whether the claim would be pursued at all until such time as Adamson received the report of his expert. (Stettz deposition, pp. 25-26; Adamson deposition, p. 7.) Adamson told Stettz that he had filed a Summons simply to toll **\*6** the statute and that there was an ongoing investigation being performed by his partner and an expert. (Adamson deposition, pp. 12, 22, and 49.) Adamson indicated that he would not be in a position to file a Complaint until such time as his expert report was in hand and, in the event that the expert did not find a viable theory against the Brady Defendants (Plaintiffs herein), the claim would not be pursued. (Adamson deposition, p. 50, Stettz deposition, p. 26.) Thereafter, Stettz advised Rossick to delay notifying the carrier since they did not know the particulars of the claim, did not know whether the claim would be pursued at all, did not know whether the claim would exceed the $25,000.00 deductible under the policy of professional liability insurance[2], since the insureds had no information to convey to the insurance company other than the fact that a Summons had been filed by a former client.

Stettz entered his appearance of record on behalf of the Brady Defendants and awaited the filing of a Complaint.

Adamson requested various extensions of time and ultimately filed the Complaint on October 6, 1992, a few weeks after Adamson had received his expert's report. When the Complaint was filed, **\*7** Plaintiffs were aware for -the first time that the claim was, in fact, going to be pursued, that the claim was for in excess of the $25,000.00 deductible, and, for the first time, Plaintiffs herein were aware of the particulars of the claim. The Complaint includes at least one Count which is covered by the professional liability policies issued by Defendants, as well as other claims which are not covered. After securing an extension of time within which to answer Plaintiffs' Complaint, the Defendant insurance carriers were notified on or about November 10, 1992, of Civil Action No. 1991-C-04134 and were requested to indemnify and defend Plaintiffs herein in connection with the Brady claim.

On January 12, 1993, Defendants denied coverage on the basis that notice was not given within the December 1, 1990 through December 1, 1991 claim period (or within the 60-day grace period following December 1, 1991).[3]

## *8 V. ARGUMENT:

## A. MOTION FOR SUMMARY JUDGMENT

**WAS THE NOTICE PROVIDED TO DEFENDANTS TIMELY BECAUSE PLAINTIFFS WERE UNABLE TO PROVIDE NOTICE AS STRICTLY REQUIRED BY THE NOTICE PROVISION UNTIL THE COMPLAINT WAS FILED IN OCTOBER OF 1992?**

Suggested Answer: Yes.

When reviewing Motions for Summary Judgment, Federal Rule of Civil Procedure 56(c) in pertinent part requires a judgment as a matter of law for the moving party "if the pleadings, depositions, answers to interrogatories... together with affidavits... show there is no genuine issue as to any material fact. New York Life Ins. Co. v. Baum, 707 F. 2d 870 (5th Cir. 1983).

The Court's task is to determine how the Pennsylvania Supreme Court would decide the case before us. National Security Corp. v. Midland Bank, 551 F.2d 21, 28 (3d Cir. 1977). Pennsylvania law governs this Court's interpretation of the insurance policy's coverage. Pennsylvania's principles of law governing interpretation of insurance policies are well settled. The goal is to ascertain the intent of the parties as demonstrated by the language utilized in the insurance contract. U.S.F.&G. v. Barron Industries, Inc., 809 F. Supp. 355, 359 (M.D. Pa., 1992), citing Federal Insurance Co. v. General Machine Corp., 699 F. Supp. 490 (E.D. Pa. 1988). The notice provision at issue provides in pertinent part:

### *9 V. Insured's Duties In the Event of Claim or Suit

It is a condition precedent to this insurance that the insured shall:
(A) Upon notice of any claim or of an incident or circumstance likely to give rise to a claim hereunder, give immediate written notice thereof to Crum & Forster Managers Corporation (Illinois), 200 South Wacker Drive, Chicago, IL 60607;

(B) Give written notice containing particulars sufficient to identify the insured and the claimant and full information with respect to the time, place and circumstances of the act, error or omission complained of;

(C) In the event claim is made or suit is brought against the insured, immediately forward to the Company every demand, notice, summons or other process received by him or his representative;.... (emphasis supplied.)

Where the language of the policy is clear and unambiguous, a court is required, as with any contract, to reinforce that language. USF&G, supra, at 359. However, ambiguities are to be construed against the insurance company as the maker of the contract. USF&G, Ibid.

The notice provision requires that the insureds "give written notice containing particulars sufficient to identify the insured and the claimant and full information with respect to the time, place and circumstances of the act, error or omissions complained of;.... The uncontradicted material facts of record demonstrate that the insureds, their attorneys, and even the attorney for Plaintiff in the Brady case, were without such full information until the Complaint was filed in October of 1992. Before the Complaint was filed, the only information available to the insureds was that a former client had filed a **10 Summons in the Court of Common Pleas of Northampton County in order to toll the statute of limitations on a claim which may or may not sound in professional negligence, which may or may not exceed the $25,000.00 deductible, and which may or may not be brought, depending upon the evaluation by the Brady Plaintiffs' expert. The insureds were utterly incapable of providing information with respect to the time and place and circumstances of the act, error or omission complained of, as such information was not even available from Richard Adamson, the attorney for the Plaintiffs in the Brady case.

Defendants contend that the insureds were obligated to provide notice as soon as they received a Summons identifying a former client as a Plaintiff. Defendants' argument ignores the information available to the Plaintiffs at that time which, while suggesting the possibility of a professional negligence action, also suggested that it was just as likely that no claim which would be covered under the subject policy of insurance would be brought. The Brady Plaintiffs' intentions were not known with any certainty until the Complaint was filed in October of 1992. At that point, the insureds promptly gave notice to their

carrier along with a request for coverage. The request for coverage came at the inception of the active litigation of the claim, although technically instituted by Summons more than a year earlier.

If possible, a court should interpret policy so as to avoid ambiguities and give effect to all of its provisions. USF&G, supra, at 359.

**\*11** Plaintiffs are entitled to have the subject insurance policy construed in their favor and against the insurance company as the drafter of the contract. Employers Reinsurance Corporation v. Sarris, 746 F. Supp. 560 (E.D. Pa., 1990). In deciding whether the insureds have fulfilled their obligations under the notice provision, the Court should construe the provision so as not to defeat coverage where possible without doing violence to the plain meaning of the language. The forfeiture of insurance policies is not favored. New Amsterdam Cas. Co. v. Kelly, 57 F. Supp. 209 (D.C. Pa. 1944); Armon v. Aetna Cas. & Surety Co., 369 Pa. 465, 87 A.2d 302 (1952); Poles v. State Mutual Beneficial Society, 129 Pa. Super. 297, 195 A. 429 (1938).

Plaintiffs provided timely notification of the Brady claim as. soon as they were able to give the manner of notice required by the notice provision. Specific notice was given as soon as they were in possession of particulars sufficient to give full information with respect to the time, place and circumstances of the act, error or omission complained of. This did not occur until the filing of the Complaint in the Brady case.

"[The] standard of FRCP 5610 provides that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported Motion for Summary Judgment; the requirement is that there be no genuine issue of material fact." USF&G, supra, at 358, citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-8, 106 S. Ct. 2505, 2510, 91 L. Ed. 2 202 (1986) (emphasis in original). A fact is **\*12** material if proof of its existence or nonexistence would affect the outcome of the lawsuit (under the law applicable to the case). Ibid.

The alleged lack of notice when the Writ of Summons was received is not a material fact upon which summary judgment can properly be denied. The Writ of Summons provided no information regarding the existence or nonexistence of any fact that could effect a lawsuit. The Writ of Summons contained only one fact, namely, that an action was instituted. Plaintiffs' Motion for Summary Judgment should be granted by this Court.

## B. NOTICE PREJUDICE RULE

**ASSUMING FOR THE SAKE OF ARGUMENT THAT PLAINTIFFS DID NOT PROVIDE NOTICE IN A TIMELY FASHION AS REQUIRED BY THE NOTICE PROVISION, SHOULD THE LATE NOTICE BE EXCUSED SINCE THE BRADY CLAIM WAS INSTITUTED BY SUMMONS ONLY, SINCE THE INSUREDS HAD NO INFORMATION CONCERNING THE PARTICULARS OF THE CLAIM, SINCE THE INSUREDS WERE NOT CERTAIN THAT THE BRADY CLAIM WOULD STATE A CAUSE OF ACTION SOUNDING IN PROFESSIONAL MALPRACTICE, AND BECAUSE DEFENDANTS HAVE SUFFERED NO PREJUDICE WHATSOEVER AS A RESULT OF THE UNTIMELY NOTIFICATION?**

In the seminal case of Brakeman v. Potomac Insurance Co., 371 A.2d 193, (Pa. Supreme Ct. (1977)), the Pennsylvania Supreme Court held that an insurance carrier seeking to void coverage on the basis of a failure to give timely notice must also.demonstrate that the insurer has suffered prejudice as a result of the delayed notice. In the absence of such prejudice, the courts will excuse a condition of forfeiture, where to give effect of the condition would be purely arbitrary and without **\*13** reason. Such is the nature of the forfeiture sought by the Defendants in the instant case. The Brakeman Court reasoned that an insurance contract should be read to accord with the reasonable expectation of the purchaser so far as its language will permit. Since an insurance contract is not a negotiated agreement but rather its conditions are by and large dictated by the insurance company, the Court declined to adopt a strict contractual approach to the notice provision of the insurance policy. Rather, the Court viewed the notice requirements of an insurance policy to prevent an insurer from being prejudiced and not to arbitrarily provide a technical escape path by which the insured is denied the very thing for which the insured paid. Brakeman, pp. 196-197.

The purpose of a policy provision requiring notice of an accident or loss to be given within a certain time is to give the

Case 2:17-cv-02415-CDJ   Document 13   Filed 09/12/17   Page 256 of 262

COHEN & COMPANY, LTD. and William Brady, Appellants,..., 1994 WL 16166931...

insurer an opportunity to acquire, through an adequate investigation, full information about the circumstances of the case, on the basis of which, it can proceed to disposition, either through settlement or defense of the claim. (Cites omitted.)

Such a requirement protects the insurance company from fraudulent claims, as well as invalid claims made in good faith, by allowing the insurance cfompany to gain early control of the proceedings. Since the insurance company has the advantage of a trained legal and investigatory staff, which is unavailable to the average insured, the notice requirement normally operates to benefit the insured as well as the insurance company.

Thus, a reasonable notice clause is designed to protect the insurance company from being placed in a substantially less favorable position than it would have been if timely notice had been provided, e.g., being forced to  **\*14** pay a claim against which it has not had an opportunity to defend effectively. In short, the function of a notice requirement is to protect the insurance company's interests from being prejudiced. Where the insurance company's interests have not been harmed by a late notice; even in the absence of extenuating circumstances to excuse the tardiness, the reason behind the notice condition in the policy is lacking, and it follows neither logic nor fairness to relieve the insurance company of its obligations under the policy in such a situation.


USF&G, supra, at 362-363.

All of the above Brakeman rationale apply to the instant case with equal force. Defendants herein insured Plaintiffs both during the time that the Summons was filed and during the time that the Complaint was filed, albeit under different claim periods. The insurer sustained no prejudice by being notified of the claim following the filing of the Complaint rather than after the Summons was filed as the insureds were continually insured by Defendants throughout the entire period of time regardless. Moreover, the failure to provide notice of the claim following the institution of suit by Summons had no bearing whatsoever on the insureds' premium or on subsequent renewals as witnessed by the Defendants' decision to renew for at least two subsequent claim periods, even after Defendants were notified of the Brady claim. Crum & Forster was notified of the claim as soon as it was apparent to the insureds that a claim was in fact going to be pursued. In fact, even the Attorney for the Plaintiffs in the Brady case, Richard Adamson, was not certain that a claim would be pursued until he received his expert's report a few weeks **\*15** before filing the Complaint in October of 1992. Attorney Stettz's decision to delay notification to the insurance carrier until such time as it was determined that the claim would exceed the deductible under the insurance policy, that the claim would state a cause of action for professional negligence, and until such time as the Brady Plaintiffs indicated that they would pursue the cause of action which they instituted by Summons only is both reasonable, and was made with the best interests of the insured at heart. The carrier's decision to deny coverage is simply an opportunistic attempt to deny their insureds the very coverage for which they paid premiums, for not one but two claim periods. The denial of coverage is unjustifiable and arbitrary.

In reaching his holding that the notice prejudice rule was inapplicable to claims-made policies, Judge Huyett cited The City of Harrisburg v. International Surplus Lines Insurance Co., 596 F.Supp. 954 (M.D. Pa. 1989). Clemente v. Home Insurance Co., 791 F.Supp. 118 (E.D. Pa. 1992), and Sarris, supra, in support of the Court's position. Each case, Harrisburg, Clemente, and Sarris, is dramatically and obviously distinguishable from the fact pattern presented by the instant case, and their holdings should not be expanded to sustain the denial of coverage in the instant case. We will address each case in seriatim.

In the City of Harrisburg case, a state court complaint against Mayor Reed was filed on November 4, 1982, during a period of time that the City of Harrisburg and its "lawfully elected" **\*16** city officials were insured under a claims made policy with term running from March 25, 1981, through January 15, 1983. Thereafter, the City and Mayor pursued the defense of the case, through discovery and joinders of additional parties, and litigated the case to the eve of trial before notifying the Defendant insurance carrier on April 24, 1984, long after the particulars of the claim were known to the city of Harrisburg, and a year after the policy had expired and was not renewed. A jury returned a verdict on June 22, 1984, in favor of the City and Mayor Reed. However, Mayor Reed subsequently made claim to the insurance carrier for reimbursement of over $36,000.00 in attorneys' fees and costs in defending the lawsuit. Essentially, the Mayor, with full and complete knowledge of a claim against him, ignored the insurance company's interests in assessing, evaluating, potentially settling, and handling the defense of the claim, and only sought reimbursement under the policy of insurance for attorneys' fees and costs after denying the insurance company an opportunity to participate in any meaningful way throughout the litigation. In sustaining the carrier's denial of coverage, the Middle District held first and foremost that "a mayor-elect" was not a covered individual

under the subject policy of insurance. The Middle District, however, went on to hold that the insurer would not have to demonstrate prejudice under this claims made policy finding the rationale underlying the Brakeman holding not present in that case.

In the Sarris case, a complaint was filed on May 18, 1988, **\*17** removed to federal court, and defended vigorously until June 8, 1989. before Employer's Reinsurance Corporation was notified of the claim. At the time that the carrier was notified of the claim, the discovery deadline was about to expire, and trial was scheduled for the following month in July of 1989. Additionally, on February 28, 1989, Sarris canceled his professional liability insurance with Employer's Reinsurance Corporation. Judge Van Antwerpen found the Brakeman holding inapplicable "in the circumstances of the instant case" and found that the carrier need not demonstrate prejudice. Sarris, p. 563 (Emphasis added.)

Lastly, in the Clemente case, a complaint was filed against Mr. Clemente on August 1, 1988, at which point Mr. Clemente engaged counsel of his own to defend him. His counsel in the litigation was not designated by his insurance carrier, nor did he obtain the carrier's consent to his choice of counsel. Mr. Clemente defended the case through settlement on November 26, 1990. incurring legal fees and costs of over $318,000.00. The Eastern District Court, through Judge Broderick, sustained the carrier's denial of coverage first and foremost on the conclusion that "the company was prejudiced by Mr. Clemente's breach of the notice provision of the policy ..." Clemente, p. 121. Judge Broderick went on to also base his holding on an inapplicability of the Brakeman notice prejudice rule under the circumstances of that case as well.

Each of three cases relied upon by Defendants presents an extreme and unreasonable delay in reporting to the carrier. In **\*18** each, case, the carrier was not notified until either the eve of trial, or in some instances even after the trial was concluded and/or settled before being asked to indemnify. In two of the three cases, the Court affirmed the carrier's denial of coverage for reasons other than late notice. By presenting their claims for indemnification at such a late stage in the litigation, the Sarris, Harrisburg, and Cletmente plaintiffs adversely affected the insurance carrier's ability to fix its reserves for future liabilities and compute premiums with greater certainty, which rationale was instrumental in the holdings of all three cases.

By comparison, Crum & Forster was presented with no such difficulty in the instant case since they were notified of the Complaint promptly after it was filed, at a point in time when the carrier could select defense counsel of its choosing, set its reserves in whatever manner it deemed appropriate, and could consider the claim with regard to setting future premiums. Regardless of when the Brady Plaintiffs are deemed to have made a claim against Cohen & Company and William Brady, be it during the December 1, 1990, through December 1, 1991, claim period (when the Summons was filed), or during the December 1, 1991, through December 1, 1992, claim period (when the Complaint was filed), Plaintiffs were insured by Crum & Forster through both claim periods, and beyond, continually under substantially similar policies. Crum & Forster will experience no prejudice whatsoever by being ordered to provide the indemnity and the defense for which they were paid two claims period worth of premiums. The **\*19** Harrisburg, Sarris, and Clements line of cases draws a rational exception to the Brakeman holding when applied to the fact pattern presented by those cases of unreasonably long delay, and extensive litigation before notifying the carrier, and cancellation or expiration of coverage between the time that complaints were filed and the time that the carrier was notified. However, to extend the reasoning of that line of cases to the instant case would result only in a hypertechnical, arbitrary forfeiture, and would allow Crum & Forster to dodge the very obligations to indemnify and defend for which they bargained.

The application of this reasoning to the instant case dramatically expands the Harrisburg, Sarris and Clemente holdings. Brakeman, USF&G, supra, and Telectronics, supra, unequivocally applied the notice prejudice rule to Pennsylvania insurance contracts. These cases do not distinguish between claims-made policies and occurrence-based policies. They establish that, under Pennsylvania law, an insurance company is only released from the policy obligations if it can prove actual (emphasis supplied) prejudice. The Defendants have shown no such prejudice. Their claimed prejudice is illusory and unsupported. Judge Huyett's decision must, therefore, be overruled.

If arguendo, Plaintiffs' notice to Crum and Forster was untimely, the untimely notice should not preclude coverage because the Defendants suffered no prejudice from the untimely notification. Crum and Forster was notified of the Complaint promptly after it was filed. At that point in time, the carrier **\*20** could conduct its investigation, select defense counsel of its choosing, set its reserves in whatever manner it deemed appropriate, and could consider the claim with regard to setting future premiums. Regardless of when the Brady Plaintiffs are deemed to have made a claim against Cohen & Company and William brady, be it during the December 1, 1990 through December 1, 1991 claim period (when the Summons was filed) or

during the December 1, 1991 through December 1, 1992 claim period (when the Complaint was filed), Plaintiffs were insured by Cruin & Forster through both claim periods and beyond, continually under substantially similar policies.

Nothing in the record indicates any direct prejudice to the Defendants. See, Telectronics, Inc. v. United Nat. Ins. Co., 796 F. Supp. 1382 (D. Colo 1992).

Crum & Forster should therefore be ordered to provide the indemnity and the defense to which Plaintiffs are entitled.

### C. SHOULD DEFENDANTS BE HELD TO HAVE ACTED IN BAD FAITH BY REFUSING TO PROVIDE COVERAGE AND A DEFENSE FOR A CLEARLY COVERED CLAIM UNDER THE CIRCUMSTANCES OF THIS CASE?

The carrier's decision to decline coverage on a clearly covered claim constitutes, bad faith pursuant to 42 Pa.C.S.A. § 8371 entitling Plaintiffs to punitive damages, costs, and attorney's fees associated with this litigation.

Having received premiums for four consecutive claim periods, **\*21** and having been presented with a Complaint sounding in professional malpractice clearly within the scope of the insurance policy, and having been afforded an opportunity to participate in the defense of that covered claim from its inception, Crum & Forster instead sought to deny coverage by any means available. Seeking to capitalize on a quirk of Pennsylvania procedure and an unusually long but justifiable delay between the filing of a Summons and subsequent Complaint, the carrier is asking the Court to dramatically expand the Harrisburg, Sarris, and Clemente line of cases to this fact pattern rather than acknowledge their contractual responsibilities for which they received multiple premium payments. Plaintiffs request the Court to find Crum & Forster's actions in bad faith and impose statutory penalties for their bad faith denial as the Court deems appropriate.

WHEREFORE, Plaintiffs respectfully request that (1) their Motion for Summary Judgment be granted; and (2) the Defendants' Motion for Summary Judgment be denied and dismissed with prejudice.

**Appendix not available.**

Footnotes

1      Due to a failure to have the Summons served within thirty (30) days, the Brady Plaintiffs filed for reinstatement of the Summons on June 20, 1991.

2      Policy No. ALO-0728710-01 contained provision for a $25,000.00 deductible defined by the policy to include not only payments to third party claimants but also for the costs of defense including attorneys' fees. Stettz also recommended against notifying the carrier at the time the Summons was initially filed for the purpose of sparing his clients potentially unnecessary attorneys' fees which would be incurred if the carrier were notified and defense counsel appointed. This was especially evident since Adamson was uncertain as to whether the claim would be pursued at all. Stettz, Deposition, p. 33-35.

3      Defendants have also taken issue with the Plaintiffs' decision not to identify the Brady claim on their professional liability insurance renewal application in September of 1991. Rossick and Stettz both testified that the Brady claim was not identified on that renewal application because they were still unsure as to whether the claim would be pursued and whether it was a professional liability claim at all. (Stettz deposition, pp. 36-40; Rossick deposition, p. 42.) Moreover, the Brady claim was identified on subsequent renewal applications, in September, 1992 and September, 1993. The identification of the claim on the renewal applications has had no bearing on Defendants' decisions to renew Plaintiffs' insurance for an additional two claim periods, with no increase in premium attributable to the claim.

End of Document                                    © 2017 Thomson Reuters. No claim to original U.S. Government Works.

# **<u>EXHIBIT 5</u>**

Civil Coversheet from *Johnson* Litigation

(dated May 7, 2014)

Court of Common Pleas of Philadelphia County
Trial Division
# Civil Cover Sheet

| | For Prothonotary Use Only (Docket Number) |
|---|---|
| | **MAY 2014**   **001360** |

| PLAINTIFF'S NAME | DEFENDANT'S NAME |
|---|---|
| Eric Johnson | Devereux Foundation |

| PLAINTIFF'S ADDRESS | DEFENDANT'S ADDRESS |
|---|---|
| 7149 Greenway Ave., Apt. A<br>Philadelphia, PA 19142 | 444 Devereux Dr. P.O. Box 638<br>Villanova, PA 19085 |

| PLAINTIFF'S NAME | DEFENDANT'S NAME |
|---|---|
| | Robert Kreider, President |

| PLAINTIFF'S ADDRESS | DEFENDANT'S ADDRESS |
|---|---|
| | 444 Devereux Dr. P.O. Box 638<br>Villanova, PA 19085 |

| PLAINTIFF'S NAME | DEFENDANT'S NAME |
|---|---|
| | David Woodward, Executive Director |

| PLAINTIFF'S ADDRESS | DEFENDANT'S ADDRESS |
|---|---|
| | Devereux Children's Behavioral Health Services<br>655 Sugartown, Rd. Malvern, PA 19355 |

| TOTAL NUMBER OF PLAINTIFFS | TOTAL NO. OF DEFENDANTS | COMMENCEMENT OF ACTION |
|---|---|---|
| 1 | 8 | ☐ Complaint   ☐ Petition Action   ☐ Notice of Appeal<br>☒ Writ of Summons   ☐ Transfer From Other Jurisdictions |

| AMOUNT IN CONTROVERSY | COURT PROGRAMS | | | |
|---|---|---|---|---|
| ☐ $50,000.00 or less<br>☒ More than $50,000.00 | ☐ Arbitration<br>☒ Jury<br>☐ Non-Jury<br>☐ Other: | ☐ Mass Tort<br>☐ Savings Action<br>☐ Petition | ☐ Minor Court Appeal<br>☐ Statutory Appeals<br>☐ Commerce (Completion of Addendum Required) | ☐ Settlement<br>☐ Minors<br>☐ W/D/Survival |

CASE TYPE AND CODE (SEE INSTRUCTIONS)

Tort (2B), Negligence (2O)

2F

STATUTORY BASIS FOR CAUSE OF ACTION (SEE INSTRUCTIONS)

| RELATED PENDING CASES (LIST BY CASE CAPTION AND DOCKET NUMBER) | | IS CASE SUBJECT TO COORDINATION ORDER? |
|---|---|---|
| | Johnson Vs Devereux Foundation Etal-WRSUM | Yes   No |
| | 14050136000003 | ☐   ☐<br>☐   ☐<br>☐   ☐ |

---

### TO THE PROTHONOTARY:

Kindly enter my appearance on behalf of Plaintiff/Petitioner/Appellant:

Papers may be served at the address set forth below.

| NAME OF PLAINTIFF'S/PETITIONER'S/APPELLANT'S ATTORNEY | ADDRESS (SEE INSTRUCTIONS) |
|---|---|
| William M. Davis | McMonagle, Perri, McHugh and Mischak, P.C.<br>30 S. 15th St.<br>Suite 701<br>Philadelphia, PA 19102 |

| PHONE NUMBER | FAX NUMBER | |
|---|---|---|
| 215-981-0999 | 215-981-0977 | |

| SUPREME COURT IDENTIFICATION NO. | E-MAIL ADDRESS |
|---|---|
| 93102 | wdavis@mpmpc.com |

| SIGNATURE | DATE |
|---|---|
| *(signature)* | 5/7/2014 |

01-101 (Rev. 6/08)

Court of Common Pleas of Philadelphia County
Trial Division

# Civil Cover Sheet
*(Supplemental Parties)*

VALIDATION

For Prothonotary Use Only (Docket Number)          12:19
MAY 2014  TICKET 001360
CASE NO:  140501360
TOTAL AMT: $      656.42
REGISTER: Register B 282 CH
CASHIER: NV
CUSTOMER: Cash Walk-in customer

| PLAINTIFF'S NAME | DEFENDANT'S NAME |
|---|---|
| Eric Johnson | James Cole |
| PLAINTIFF'S ADDRESS | DEFENDANT'S ADDRESS |
| 7149 Greenway Ave., Apt. A Philadelphia, PA 19142 | Devereux CBHS 655 Sugartown Rd. Malvern, PA 19355 |
| PLAINTIFF'S NAME | DEFENDANT'S NAME |
|  | Gary Bilski |
| PLAINTIFF'S ADDRESS | DEFENDANT'S ADDRESS |
|  | Devereux CBHS 655 Sugartown Rd. Malvern, PA 19355 |
| PLAINTIFF'S NAME | DEFENDANT'S NAME |
|  | Byron Lee |
| PLAINTIFF'S ADDRESS | DEFENDANT'S ADDRESS |
|  | Devereux Brandywine Facility Devereux Rd. Glenmore, PA 19343 |
| PLAINTIFF'S NAME | DEFENDANT'S NAME |
|  | Steven Rose |
| PLAINTIFF'S ADDRESS | DEFENDANT'S ADDRESS |
|  | Devereux Brandywine Facility Devereux Rd. Glenmore, PA 19343 |
| PLAINTIFF'S NAME | DEFENDANT'S NAME |
|  | Shykir Crew |
| PLAINTIFF'S ADDRESS | DEFENDANT'S ADDRESS |
|  | SCI Graterford Pennsylvania 29, Perkiomen, PA 19426 |
| PLAINTIFF'S NAME | DEFENDANT'S NAME |
|  |  |
| PLAINTIFF'S ADDRESS | DEFENDANT'S ADDRESS |
|  |  |
| PLAINTIFF'S NAME | DEFENDANT'S NAME |
|  |  |
| PLAINTIFF'S ADDRESS | DEFENDANT'S ADDRESS |
|  |  |
| PLAINTIFF'S NAME | DEFENDANT'S NAME |
|  |  |
| PLAINTIFF'S ADDRESS | DEFENDANT'S ADDRESS |
|  |  |

01-102

## <u>CERTIFICATE OF SERVICE</u>

Pursuant to Federal Rule of Civil Procedure 5, Local Rule 5.1.2(8) and the General Order

on Electronic Case Filing, I certify that, on September 12, 2017, a copy of the foregoing was filed,

served and made available to all parties through counsel of record via the Court's ECF system:

<div align="center">

Joseph A. Arnold, Esquire
jarnold@gordonrees.com
Gordon & Rees Scully Mansukhani LLP
2005 Market Street, Suite 2900
Philadelphia, PA 19103

</div>

<div align="right">

*/s/ Jennifer M. Adams*
Jennifer M. Adams, Esquire

</div>